318

1   A.    He came back to my house about 10:25, 10:30, him

2   and his girlfriend.

3   Q.    And could you describe his demeanor and how he was

4   acting then?

5   A.    Jovial looking.

6   Q.    Was he approximately the same?

7   A.    Uh-huh.

8   Q.    And how long did he stay at your house that time?

9   A.    He stayed until about 11:30, because we watched

10  the news and stuff together.

11  Q.    And did he leave about 11:30 or so?

12  A.    Yes.

13  Q.    Did you see him again that evening after he left

14  that time?

15  A.    No.

16        MR. STOKES:  I don't have any further

17  questions of Ms. Hicks.

18  CROSS-EXAMINATION BY MR. EVERETT:

19  Q.    Ms. Hicks, did you see Mr. Sharpe on a daily

20  basis?

21  A.    Basically every day.

22  Q.    What day of the week was that?

23  A.    I believe it was on a Friday.  I believe it was.

24  Q.    Okay.  Did you see him on Thursday that week?

25  A.    I believe I did.

319

```
 1    Q.    You remember what time you saw him that night?

 2    A.    What night, sir?

 3    Q.    On Thursday.

 4    A.    Basically Thursday.  I believe I seen him several

 5    times Thursday.

 6    Q.    Do you know what time that night you saw him

 7    Thursday?

 8    A.    No, sir.

 9    Q.    How about Saturday night?  Did you see him

10    Saturday?

11    A.    I seen him Saturday.

12    Q.    You know what time you saw him Saturday night?

13    A.    Yeah.  I remember seeing him Saturday.  He took me

14    to the store.

15    Q.    What time did you see him Saturday night?

16    A.    He took me to the store Saturday around 4:30,

17    5:00.

18    Q.    What other time did you see him on Saturday?

19    A.    Off and on that day.

20    Q.    Had you seen him Sunday?

21    A.    Like I said, basically I see him every day.

22    Q.    You saw him every day?

23    A.    Basically.  I didn't say every day.

24    Q.    I'm not trying to trick you.  You saw him

25    basically every day for how long a period of time?
```

320

1    A.    Like I said, basically every day for several

2    different times.  Sometimes be half hour, two or three

3    hours.

4    Q.    What I'm saying is, over a period of a week, a

5    month a year, two years?

6    A.    I seen him basically every day for three years.

7    Q.    Three years.  And on February 11 you saw him, on

8    February 10 you saw him, on February 12 you saw him.

9    You remember seeing him.  You didn't see any ambulance

10   go by or anything, did you?

11   A.    Did I see an ambulance go by that night?

12   Q.    Uh-huh.

13   A.    Not from the end I was staying at.

14   Q.    Did you hear anything about this murder over on

15   6th Street?

16   A.    I heard it on the news.

17   Q.    And how long was it until you found out -- when

18   did you find out that Dantae had been arrested?

19   A.    I believe that was in April.  Around April, I

20   believe.

21   Q.  -  About two months later.  About two months?

22   A.    (Witness nodding head.)

23   Q.    Did you see him every day, basically every day

24   between February 11 and --

25   A.    Basically.

Sharpe 000321

J.A. 2237

321

```
 1   Q.    -- and when he was arrested?  Do you know what day

 2   he was arrested on?

 3   A.    No, sir.

 4   Q.    Somebody told you?

 5   A.    I seen it on the news.

 6   Q.    Okay.  You saw it on the news too.  Did you see

 7   him the day he was arrested?

 8   A.    I don't believe so.

 9   Q.    How about the day before?

10   A.    Probably so.

11   Q.    Were you watching some television show that night

12   too?

13   A.    I happened to be standing on my back porch because

14   I was upset.  I had a family problem.

15   Q.    It was February?

16   A.    I remember that night very clear because that was

17   the first time my son ever talked back to me and it sort

18   of bothered me.

19   Q.    How old is your son?

20   A.    He's 14 now.

21   Q.  - You're no relation to Mr. Sharpe?

22   A.    No.

23   Q.    You just happen to be friends with him?

24   A.    He's a very close friend with my daughter, and he

25   became -- I was like a mother to them also.  They come
```

322

1　over to my house, and we used to talked, you know.

2　Stuff like that.

3　Q.　Who is your daughter?

4　A.　Analoa.

5　Q.　At that time who was Mr. Sharp's girlfriend?

6　A.　Kizzy.

7　Q.　Kizzy Page?

8　A.　Uh-huh.

9　Q.　When he was arrested did you talk with Ms. Ward

10　about it?

11　A.　Did I talk to Ms. Ward?

12　Q.　Uh-huh.

13　A.　I believe so.  We all discussed it.

14　Q.　You told her --

15　A.　I had told her that I could not believe what I had

16　seen on the news.

17　Q.　And when did you go call the police?

18　A.　I went with Mrs. Ward, I believe, to the DA's

19　Office or something in April shortly after that, but he

20　wasn't interested in what we had to say.

21　Q.　.How many of y'all went to the DA's Office that

22　day?

23　A.　What do you mean, how many of us went?

24　Q.　How many went?  She went, he went.  Who else went?

25　A.　I believe it was his mother and aunt.

323

1  Q.   Okay.  And you're saying that on that day you came

2  in and said that you knew where Dantae Sharpe was?

3  A.   No.  I didn't say that to you.  I said on that day

4  we went to the office.  I did not speak with the man

5  myself, so I didn't tell you that.

6  Q.   And you're saying that you knew exactly where

7  Dantae Sharpe was on -- when this murder happened, and

8  you didn't speak to anyone about it?

9  A.   Exactly on the day of the murder that happened, at

10  the time that the man got killed, naturally we didn't

11  think Dantae was involved in it because he was at my

12  home.  So that was the farthest thought from my mind.

13  They arrested him.  And that was impossible.  He can't

14  be in two places at one time, I don't think.

15  Q.   You knew that?

16  A.   Yes, I did.

17  Q.   And you never contacted Mr. Best, did you?

18  A.   I told you we went to the DA's Office.

19  Q.   Did you ever talk to the police at the very

20  beginning?

21  A. - No, I did not.

22  Q.   To Ms. Melvin, did you go see her?

23  A.   No, I did not.

24  Q.   Did you ever talk to me?

25  A.   I have never seen you.

Sharpe 000324

**J.A. 2240**

324

1    Q.    Okay.  Who did you talk to, ma'am?

2    A.    I myself didn't talk to anyone, sir.

3    Q.    And all this time you knew that Mr. Sharpe hadn't

4    done this crime and he had been charged wrong?  You knew

5    that?

6    A.    Yes.

7    Q.    You're the president of the New Town Housing

8    Development.  You see people -- Mr. Tripp, don't you?

9    A.    I see Officer Tripp every day.

10   Q.    Every day?

11   A.    I don't see him every day, but I see him.

12   Q.    Didn't you say, "James, come here; you've got to

13   do something.  This is bad, my friend is in jail and he

14   didn't do anything."  Did you ever tell him that?

15   A.    No.  He wasn't involved in this crime.  I mean, he

16   was the officer in charge of this.  I did go to a blue

17   building.  I think it was a detective building at one

18   time.  And so I had went in reference to Kizzy Page and

19   I did talk to that lady sitting over there with that

20   blond hair.

21   Q.  . Why did you go in reference to Kizzy Page?

22             MR. STOKES:  Objection.

23   A.    Because he was being accused of something --

24             THE COURT:  Sustained.

25   BY MR. EVERETT:

Sharpe 000325

J.A. 2241

325

```
 1   Q.    You went in reference to something that Kizzy Page
 2   had done?
 3   A.    Yeah.
 4   Q.    But you didn't bother to tell this lady with the
 5   blonde hair while you were there that Dantae Sharpe was
 6   with you that night?
 7   A.    She didn't bother to ask me either, did she?
 8   Q.    Well, she didn't know it, did she, ma'am?
 9   A.    I have no idea.
10   Q.    You tell us you've never been convicted of any
11   crime?
12   A.    No.
13   Q.    You've never been convicted of writing a bad
14   check?
15               MR. STOKES:  Objection.
16               THE COURT:  Overruled.
17   BY MR. EVERETT:
18   Q.    Ma'am?
19   A.    I don't feel like I was convicted of writing a bad
20   check.  It was an honest mistake and I paid for that.
21   Q.    How many of those were there, ma'am?
22   A.    I believe there were only two.
23   Q.    You remember one at Piggly Wiggly?
24   A.    Yes, I do.
25   Q.    Belks?
```

Sharpe 000326

**J.A. 2242**

326

```
 1   A.   No, I do not.

 2   Q.   In '92?

 3   A.   I don't remember one.

 4   Q.   How about one at PTA Pizza?

 5   A.   Who?

 6   Q.   PTA Pizza?

 7   A.   I don't eat pizza.

 8   Q.   How about Highlights?

 9   A.   Who's Highlights?

10   Q.   Highlights. The store Highlights?

11   A.   I don't remember.

12   Q.   How about Overtones?

13   A.   No.

14   Q.   K-Mart?

15   A.   No.

16   Q.   Piggly Wiggly?

17   A.   I remember Piggly Wiggly.

18   Q.   Joan's Fashions?

19   A.   I remember Joan's Fashions.

20   Q.   You're saying that you sent somebody a letter

21   about this?

22   A.   Did I send somebody a letter about what?

23   Q.   I'm sorry.  Did you send anybody a letter about

24   what happened?

25   A.   No, I did not send anyone a letter.
```

J.A. 2243

327

```
 1   Q.    Thank you, ma'am.

 2              MR. STOKES:  You may come down, Ms. Hicks.

 3              THE COURT:  Call your next witness.

 4                    ********

 5   ANGELA SUTTON, being first duly sworn, was examined and

 6   testified as follows during DIRECT EXAMINATION by

 7   MR. STOKES:

 8   Q.    Could you state your name and address for the

 9   Court please?

10   A.    My name is Angela Sutton.  I live at Lot 213,

11   Shady Knoll Trailer Park.

12   Q.    How long have you resided at that address?

13   A.    A little over a year now.

14   Q.    And do you know the defendant Dantae Sharpe?

15   A.    I mean, his face is familiar, but I don't know him

16   personally.

17   Q.    Do you know the lady that testified yesterday,

18   Beatrice Stokes?

19   A.    Yes, sir, I do.

20   Q.    How long have you known her?

21   A.    I've known her for a lot of years, because I've

22   known her ever since I was a little girl.

23   Q.    And do you know her reputation in the community in

24   which she lives and frequents for truthfulness and

25   veracity?
```

328

```
 1   A.    Yes.

 2   Q.    Do you know her reputation for that?

 3              MR. EVERETT:  Objection.

 4   A.    Yes, I do.

 5              THE COURT:  Well, y'all approach the bench.

 6   (Side-bar conference.)

 7   BY MR. STOKES:

 8   Q.    Now, Ms. Sutton, you say that you've known

 9   Beatrice Stokes since you were a girl?

10   A.    Uh-huh.

11   Q.    Now, taking you back to the early months of 1994,

12   later months of 1993, did you know her at that time?

13   A.    Yes, sir, I did.

14   Q.    And how often would you see her at that time?

15   A.    I saw her frequently because I traveled the road,

16   you know, because my hairdresser was on the road at the

17   time, so I traveled, you know, in that area right often.

18   And I also would see her out towards the country area

19   where I stay.

20   Q.    And did you during that period of time in late

21   1993 and early 1994 have occasion to talk to her?

22   A.    I have spoke with her, just speaking.  Not just

23   holding long conversations.

24   Q.    And have you talked with people who did know her,

25   who did talk to her and who saw her as frequently as you
```

Sharpe 000329

J.A. 2245

329

```
 1   did?

 2   A.    Yeah.  Yes, sir.

 3   Q.    And did some or part of their discussions or

 4   conversations with you concern their knowledge, belief

 5   about Beatrice Stokes?

 6   A.    Yes.  I mean most of the conversations went like,

 7   "did you see" --

 8              MR. EVERETT:  Objection.

 9              THE COURT:  Sustained.

10   BY MR. STOKES:

11   Q.    Did -- in those conversations in 1993 and 1992 --

12   excuse me, 1993 and 1994, did those people that you

13   spoke to who -- did they know her very well?

14   A.    Yes.

15   Q.    Did they express their opinions about her

16   reputation to you?

17   A.    Yes.

18   Q.    And approximately how many people are you talking

19   about that you talked to concerning her reputation in

20   just general conversation?

21   A.    Maybe a few that me and her both knew?

22   Q.    Three, five?

23   A.    Probably about five or six.

24   Q.    And did you know that those people knew her well?

25   A.    Yes.
```

Sharpe 000330

J.A. 2246

330

```
 1    Q.    Have you still continued to see her?

 2    A.    Yes.

 3    Q.    Have you still continued to hear conversations

 4    dealing with her reputation in the community?

 5    A.    Yes, whenever I'm out.

 6    Q.    Has that lasted up until the present time?

 7    A.    Yes.

 8    Q.    How old are you, ma'am?

 9    A.    24.

10    Q.    If she's 27, you're approximately the same age?

11    A.    Yeah.  Somewhere along that same age.

12    Q.    Now, taking your knowledge from other people, what

13    they have said about her as to her reputation, do you

14    know her reputation for truthfulness and her veracity in

15    the community in which she lives and frequents?

16    A.    Yes.

17    Q.    And what is it?

18               MR. EVERETT:  Objection.

19               THE COURT:  Overruled.

20    A.    She is a crackhead.  I mean, everybody know that.

21               MR. EVERETT:  Objection.  Not responsive.

22               THE COURT:  Sustained.  Don't consider the

23    witness' last statement.

24    BY MR. STOKES:

25    Q.    You telling me that you know her reputation in the
```

J.A. 2247

331

1   community?

2   A.    Right.

3   Q.    For truthfulness and veracity?

4   A.    Yes.

5   Q.    What is that reputation in the community for being

6   truthful?

7   A.    Truthfully, I mean, she is not a bad person but

8   she's not a person that could be trusted or an honest

9   person.

10  Q.    Will you expand on it when you say she can't be

11  trusted and she's not honest?

12  A.    I mean, she's known for stealing.  She's known for

13  starting trouble.

14          MR. EVERETT:  Objection.

15          THE COURT:  Sustained.

16  A.    Lying.

17          MR. EVERETT:  Objection.

18          THE COURT:  Sustained.  Any other questions?

19          MR. STOKES:  No, sir.  Not at this time.

20          THE COURT:  Cross-examination.

21  CROSS-EXAMINATION BY MR. EVERETT:

22  Q.    Ma'am, have you ever been convicted of any offense

23  involving punishment of more than 60 days in the last

24  ten years?

25  A.    No, I haven't.

**J.A. 2248**

332

```
1   Q.   And you live where now?

2   A.   Lot 213 Shady Knoll.

3   Q.   You ever live in Kerney Park?

4   A.   Yes, I have.

5   Q.   Do you recall, ma'am, being convicted of assault?

6   A.   Yes.  That was when I was about 15.

7   Q.   Ma'am, you couldn't have been 15, ma'am.  Could

8   you, ma'am?  You would have been in juvenile court,

9   wouldn't you?

10  A.   What I'm saying is it was around the time I was 15

11  or 16.  I wasn't older; I was real young.

12  Q.   And you assaulted someone by the name of Linda

13  Purvis, did you not?

14  A.   Yes.

15  Q.   Who is Linda Purvis?

16  A.   It's a lady  -- that's when I was living in

17  Colonial.  She's a lady that I lived near in the

18  neighbor.

19  Q.   You didn't consider a conviction for assaulting

20  someone --

21            THE COURT:  Let me ask you, are you talking

22  about simple assault?

23            MR. EVERETT:  Yes, sir

24            MR. STOKES:  Objection.

25            THE COURT:  Sustained.
```

Sharpe 000333

J.A. 2249

333

```
 1   (Side-bar conference.)

 2   BY MR. EVERETT:

 3   Q.    Ma'am, you travel in the same circles that

 4   Beatrice Stokes does?

 5   A.    I'm saying I use the road where my hairdresser is,

 6   but I don't travel in the same circles.  No, I do not.

 7   Q.    You know all her friends?

 8   A.    Because we have hung out but that was before she

 9   was on drugs.  I've known her a long time.

10   Q.    You're saying drugs destroyed her life.  Is that

11   what you're saying?

12   A.    Yes, it did.

13   Q.    And before she was on drugs, you hung out with

14   her?

15   A.    Yes.  I've known her a long time.

16   Q.    You thought she was untruthful then too, huh?

17   A.    She was untruth.  I mean, she still wasn't trusted

18   to be a friend.  She was just somebody I got around

19   with.  And like I said, she lived right next door to my

20   grandfather when I was younger.  But as I got older, we

21   did hang around for a short time.

22   Q.    Did you hang around over on 6th Street?

23   A.    No, I did not.  I never hung in that area.

24   Q.    Where did you hang with Beatrice Stokes?

25   A.    Oh, in Colonial Trailer Park.  That's before I
```

334

```
 1    moved over in Greenville.
 2    Q.    When did you know to come to court?
 3    A.    Yesterday.
 4    Q.    How did you know to come to court?
 5    A.    I was subpoenaed to come to court.
 6    Q.    When was that, ma'am?
 7    A.    It was Tuesday.
 8    Q.    Tuesday.  And you're saying that friends of yours
 9    that were friends of hers have talked to you about her
10    and her drug problem and her unreliability?
11    A.    I didn't say friends.  I said people that we both
12    hung around with that we both -- that Beatrice and I
13    both knew.
14    Q.    Were these friends -- these people are the drug
15    users too?
16    A.    No.
17    Q.    And they still hung around with her also, right?
18    A.    Yes.  That was before she got on drugs though.
19    Q.    And then they've been saying it's too bad she's
20    been on drugs?
21    A.  -  Yes.
22    Q.    Thank you, ma'am.
23              MR. STOKES:  Call Tracy Highsmith, Your
24    Honor.
25                    ********
```

335

1  TRACY HIGHSMITH, being first duly sworn, was examined

2  and testified as follows during DIRECT EXAMINATION by

3  MR. STOKES:

4  Q.    Could you state your name for the Court, please,

5  ma'am?

6  A.    Tracy Highsmith.

7  Q.    And where do you live, Ms. Highsmith?

8  A.    At lot 59, Thomas Trailer Park.

9  Q.    Were you living there during February of 1994?

10  A.    No, sir.

11  Q.    Where were you living at that time?

12  A.    At 1915 North Norcott.

13  Q.    Now, Ms. Highsmith, have you been convicted of any

14  crimes which carries a punishment of more than 60 days

15  in the last ten years?

16  A.    Yes.

17  Q.    And what was that?

18  A.    For forgery.

19  Q.    Forgery?

20  A.    Uh-huh.

21  Q.    And when was that?

22  A.    In '92.

23  Q.    In 1992?

24  A.    Yes, sir.

25  Q.    Now, Ms. Highsmith, do you know Beatrice Stokes?

336

```
 1   A.   Yes, sir.

 2   Q.   How long have you known her?

 3   A.   I've been knowing her for a long time ever since I

 4   was young.

 5   Q.   I didn't hear.  Ever since what?

 6   A.   Ever since I was real young I've been knowing her.

 7   Q.   And during the latter part of 1993 and 1994, the

 8   early part of 1994, did you have occasion to see her

 9   during that period of time?

10   A.   Yes, sir.

11   Q.   And how often did you see her?

12   A.   Probably about two or three times a week.

13   Q.   And where would you see her during these periods

14   of town?

15   A.   Around 14th Street and Fifth Street.

16   Q.   And did you have occasion during that period of

17   time to see her and speak with her?

18   A.   I never spoke to her, but I seen her.

19   Q.   You knew who she was?

20   A.   Yes, sir.

21   Q.   - Did you know other people that knew her during

22   that period of time?

23   A.   Yes, sir.

24   Q.   And did you -- approximately how many people do

25   you know that knew her well to talk to her and to have
```

J.A. 2253

337

1  conversations with her?

2  A.    Numerous amount of people.

3  Q.    Can you give me an estimate?

4  A.    About 20 or 30 people at the most?

5  Q.    Were they people that hung down on the block?

6  A.    Yeah, mostly.

7  Q.    And in talking with those people in conversations

8  with them about Beatrice Stokes or when her name would

9  come up, did there come a time that you became

10  acquainted with her reputation out there in the

11  community?

12  A.    Yes, sir.

13  Q.    And taken those conversations into account and

14  what you learned from the 20 or 30 people that hung out

15  there with her, do you know her reputation for

16  truthfulness and veracity in the community that she

17  lives and frequents?

18  A.    Yes, sir.

19  Q.    And what is that opinion?

20  A.    She's not the type of person to be trusted.  You

21  can't believe her.  I mean, she just tells a lot of

22  lies.

23  Q.    Do you know Dantae Sharpe?

24  A.    Yes, I know him.

25  Q.    How long have you known him?

**J.A. 2254**

338

```
 1   A.   Probably about a year.

 2   Q.   Were you related to him?

 3   A.   No, sir.

 4   Q.   And you've known him about a year from right now

 5   back or a year from February of '94 back?

 6   A.   I met Dantae about '92 probably.

 7   Q.   About '92?

 8   A.   Yes, sir.

 9   Q.   You have not had any communications with him right

10   lately, have you?

11   A.   No, sir.

12   Q.   What do you do, ma'am?

13   A.   I just recently got employed at McDonald's.

14   Q.   And what did you do before that?  Have you even

15   started to working there yet?

16   A.   Huh-uh.

17   Q.   Where did you work before that?

18   A.   At E.C.U. Cafeteria, Mendenhall.

19   Q.   And what did you do at the cafeteria over at East

20   Carolina?

21   A.   I used to prepare stuff to go in the salad bar.

22   Q.   How old are you, ma'am?

23   A.   22.

24           Judge, may I approach the bench with the

25   District Attorney?
```

Sharpe 000339

**J.A. 2255**

339

1           THE COURT:  Yes, sir.

2   (Side-bar conference.)

3           THE COURT:  Now, members of the jury, I need

4   to take up a matter outside your presence.  I'm going

5   to ask that you step into your jury room for a few

6   minutes.  While you're in there, don't discuss the case

7   or form any kind of opinion.

8   (Jury out.)

9           THE COURT:  Let the record reflect the jury

10  is absent from the courtroom.

11          Mr. Stokes, just for record, if you'll state

12  what you want to elicit, the evidence you want to

13  elicit from this witness.

14          MR. STOKES:  Thank you, Your Honor.  Your

15  Honor, at this time I plan to ask Ms. Highsmith a

16  series of particular questions concerning a man named

17  Damien Smith, who at the time between February 11 of

18  '94 and March 9 of '94 expressed to her that he was

19  actually the guilty party in this case and that he

20  committed the murder of George Radcliffe.  And that's a

21  shorthand statement of what I hope that I can bring

22  out.

23          THE COURT:  And you're contending now that

24  Damien Smith is now deceased?

25          MR. STOKES:  Yes, sir.

340

```
 1              THE COURT:  All right.  We'll now conduct a
 2   voir dire hearing then.
 3              MR. STOKES:  Thank you very much, Your
 4   Honor.
 5   VOIR DIRE EXAMINATION BY MR. STOKES:
 6   Q.   Ms. Highsmith, did you know a man named Damien
 7   Smith on February 11, 1994?
 8   A.   Yes, sir.
 9   Q.   And how did you know him?
10   A.   He was my boyfriend at the time.
11   Q.   Did you see him in the late evening hours of
12   February 11, 1994, or the early morning hours of
13   February 12, 1994?
14   A.   Yes, sir.
15   Q.   And where was it that you saw him and
16   approximately what time did you see him?
17   A.   We had been home all day, and he left about a
18   little bit before nine.  And when he left, he didn't
19   have any money or nothing in his pockets.  And he got
20   home about 1:30 close to 2:00 --
21   Q.   And what was his condition when he left?  What was
22   he like as a person when he left?
23   A.   I mean, he just acted normal.  He just said, "I'm
24   going somewhere and I'll be back."
25   Q.   All right.  Now, what was his condition -- what
```

341

```
 1    time did you say you approximately saw him come home?
 2    What time was it?
 3    A.    About 1:30, 2:00.
 4    Q.    What was his mental state or condition at the time
 5    you saw him when he came home?
 6    A.    Well, he came home, he looked like he had been
 7    running or something.  And when he came back, he was
 8    real tired.  And I asked him where he had been.  He
 9    said, "I went across town."
10    Q.    And did he tell you what had occurred across town
11    on February 11 or 12?
12    A.    Yes, sir.
13    Q.    What did he say happened?
14    A.    He said when he got over there, he say he seen
15    this white man.  I was like, "A white man."  He said,
16    "Yeah.  I seen this white man."  And he said he was
17    sitting in a truck and he wanted to buy some.  When he
18    said it, he said that he just wanted to rob the man
19    because he knew he had a quantity of money since he was
20    a white man in a neighborhood like that, that time of
21    the night.  So he said he robbed the man and he shot
22    him, but he didn't know if he had killed him or not.
23    Q.    And did there come a time that Damien Smith found
24    out that the man was Mr. Radcliffe and that he had died?
25    A.    We didn't know the man's name, but we knew the man
```

342

1    had died.

2    Q.    How long after his coming home that night did he

3    find out that the man had died?

4    A.    The next day.

5    Q.    And did you speak with him the next day about the

6    fact that the man he had said he had robbed the night

7    before, shot the night before had died?

8    A.    Yeah, we talked about it.  When he saw that the

9    man had died, he just hung his head down.

10    Q.    What did he say about it at that time?

11    A.    He just said, "Lord, I'm going to jail for killing

12    somebody."  He kept saying he would kill himself before

13    he go to jail for killing a white man.

14    Q.    And did he say the next day and when you heard the

15    man was dead, did he say the next day that he wouldn't

16    go to jail and he would kill himself before he would go

17    to jail?

18    A.    Yes, sir.

19    Q.    Did Mr. Smith commit suicide?

20    A.    Yes, sir.

21    Q.    When did he commit suicide?

22    A.    About three weeks later, on March 9.

23    Q.    And during this three-week period did you hear

24    Mr. Smith tell you that before he would go to jail that

25    he would kill himself?

J.A. 2259

343

1  A.    Yes.  He told me that numerous amounts of times.

2  Q.    And could you state whether or not his demeanor,

3  the way he acted, the way he changed after February 11,

4  1994, was different than prior to February 11?

5  A.    Yeah.  He changed a lot.  Because he started

6  abusing cocaine.  Something that he had never done a day

7  in his life.  He used to the wake up at night hollering,

8  you know.  And then he used to wake up screaming and

9  sweating.  And I knew something was wrong.  And I knew

10  he had done it, because, you know, his conscience was

11  eating him up.  He wasn't that type of person.  He was a

12  good person.  And then all of a sudden after this, he

13  just started getting mean, abusive and everything.

14  Q.    And were you in the house when he committed

15  suicide?

16  A.    Yes, sir.

17  Q.    How did he commit suicide?

18  A.    He shot himself in the head with a .25 automatic.

19  Q.    Between February 11 or 12 and March 9, during that

20  26 or 27 day period, approximately how many times did he

21  tell you that he was going to kill himself?

22  A.    About five or six times.

23  Q.    Were you ever of the opinion that he was not

24  serious about it when he said that?

25  A.    Sometimes I didn't believe him.  But most of the

344

```
 1   time I did because he was a suicidal person.
 2   Q.    Was he a suicidal person prior to February 11?
 3   A.    Yeah, he was before.  But then all of a sudden he
 4   really got suicidal after that date.
 5   Q.    So he really changed after that date?
 6   A.    He really changed.
 7   Q.    Did you ever consider prior to February 11, 1994,
 8   that if he said he was going to kill himself that he
 9   meant it?
10   A.    Yes.
11   Q.    Prior to that day?
12   A.    Yes, sir.
13   Q.    Could you describe the differences in him, even
14   though he had said he was going to kill himself prior to
15   that date, after that date in relation to the suicide?
16   A.    He always said he'll kill himself.  And he used to
17   take the gun and put guns to his head.  And most of the
18   time I'd talk him out of it.  And then he used to take
19   pills, take overdose of pills to kill himself and stuff
20   like that.
21   Q.    And after February 11, there was a change in him?
22   A.    Yeah.  A real big change.
23   Q.    Even from the prior times of talking about
24   suicide?
25   A.    Yes, sir.
```

J.A. 2261

345

1  Q.   How many times did he tell you he was the man that

2  actually shot the white man down on 6th Street?

3  A.   About two or three times.  And I really believed

4  him.

5          MR. STOKES:  I don't have any further

6  questions of her, Your Honor.

7          THE COURT:  Questions by the State?

8          MR. EVERETT:  Yes, Your Honor.

9  VOIR DIRE EXAMINATION BY MR. EVERETT:

10  Q.   Ms. Highsmith, in fact, on several occasions prior

11  to February 11, he threatened suicide to the extent that

12  police officers talked to him, did they not?

13  A.   I don't know anything about him threatening police

14  officers.

15  Q.   Didn't he talk to Officer Bass at length about him

16  committing suicide one time?

17  A.   Not that I know of.

18  Q.   And you knew about he had a .25 automatic, right?

19  A.   Yes, sir.

20  Q.   How long had he had that gun?

21  A.   He had it for a long time.

22  Q.   How many other guns did he have?

23  A.   He had a numerous amount of guns.  I never messed

24  with his stuff, so I don't know.

25  Q.   And, of course, when Damien Smith shot himself you

**J.A. 2262**

346

```
 1   were interviewed by the police or they tried to
 2   interview you, didn't they?
 3   A.    Yes.
 4   Q.    You hid the gun from them, didn't you?
 5   A.    Yes.
 6   Q.    You wouldn't give them the gun.  You didn't tell
 7   them anything, did you?
 8   A.    No, sir.
 9   Q.    In fact, at that time you knew all this stuff, .
10   right?
11   A.    Yes.
12   Q.    And then later you knew that Dantae Sharpe was in
13   jail?
14   A.    I didn't know it was the same man.
15   Q.    What do you mean, you didn't know it was the same
16   man?
17   A.    All these people getting shot around here, I was
18   -- didn't know it was the same man.  I was going through
19   tragedy.  I didn't think nothing else of it.
20   Q.    You didn't think it was important to tell Officer
21   Melvin here that Damien shot himself because he thought
22   he had killed somebody?
23   A.    No.  She asked me -- she told me that she was
24   about to get him for a number one suspect for shooting
25   this man.
```

347

```
 1    Q.    And you didn't tell her anything about it?

 2    A.    No, sir.

 3    Q.    And knowing this, you let Dantae Sharpe sit in

 4    jail for a year knowing someone else committed this

 5    crime?

 6    A.    Well, I didn't know it was the same man.  Just

 7    like I said one time before.

 8    Q.    How did you know to come up here today?

 9    A.    Because I just came.

10    Q.    How did you know to come?  Who told you to come?

11    A.    Nobody told me to come.

12    Q.    How did you know the trial was going on?

13    A.    Because I seen it on the news.

14    Q.    So you just came in today on your own because you

15    realized today that this was the man that Damien Smith

16    shot?

17    A.    Well, I heard it on the news.  They said it was a

18    white man across town.  When I put bits and pieces

19    together and I started to just think and I just thought

20    it was important.

21    Q.    Of course, it's been on the news for over a year,

22    hasn't it?

23    A.    I don't look at the news.

24    Q.    And it's been down on the block for over a year,

25    hadn't it?
```

Sharpe 000348

348

```
1    A.    I don't hang over in there.

2    Q.    It just so happened that you happened to see it

3    last night and showed up today?

4    A.    No.  I seen it Monday night on TV.

5    Q.    And is it my understanding that your boyfriend

6    said, "I'm getting ready to die now.  I want to tell you

7    before I die that I shot --"

8    A.    No, he didn't say it like that.

9               MR. EVERETT:  No further questions.

10              MR. STOKES:  I don't have any redirect, Your

11   Honor.  I'd just like to be heard.

12              THE COURT:  All right.  I'll be glad to hear

13   from you.

14              MR. STOKES:  Your Honor, I have several

15   cases that I would like to hand up.  But first, I would

16   just very briefly like to sort of go through my

17   contentions as to this testimony, if I might.

18              THE COURT:  All right.

19              MR. STOKES:  Your Honor, under the case of

20   State v. Lynch, 1990 case, the Court said in speaking

21   about exceptions to the hearsay rule, they came up

22   looking at the exception of state of mind.  It says

23   that, quote, "the following are not excluded by the

24   hearsay rule even though the declarant is available as

25   a witness."  And then it goes -- jumps to number three.
```

349

```
 1      "Then existing mental, emotional or physical condition
 2      a statement of the declarant's then existing state of
 3      mind, emotion, sensation or physical condition, such as
 4      intent, plan, motive, design, mental feeling, pain and
 5      bodily health."
 6              So, I would first argue to Your Honor that
 7      these statements that he made could also come in under
 8      a second exception to the rule, that being state of
 9      mind.  But at least at a minimum, what was this man's
10      state of mind after February 11.  The witness testified
11      that even though he had talked about committing suicide
12      prior to February 11, but after February 11 he was much
13      more serious about it, she believed him more seriously
14      and he did in fact with -- well, within less than 30
15      days commit suicide.  He carried out the plan, design
16      and whatever he had on his mind on the late hours of
17      February 11, early morning hours of February 12 or
18      during the day of February 12.  Then I go from arguing
19      the state of mind of the declarant to the cases dealing
20      with a dying declaration.
21              Now, the first case I would cite to Your
22      Honor, and then hand up, would be 1981 case of State of
23      Carolina v. Hamlette --
24              THE COURT:  Let me interrupt you just a
25      minute.  I didn't inquire if the State had any evidence
```

J.A. 2266

350

```
 1   they want to offer.
 2            MR. STOKES:  Excuse me, Judge.  I'm sorry.
 3            MR. EVERETT:  Judge, I guess at this point,
 4   Your Honor, I just feel like they haven't gone far
 5   enough for me to have to do that, carried the burden
 6   for me to have to do that.
 7            THE COURT:  I just want to give you an
 8   opportunity if you wanted to.
 9            MR. EVERETT:  Yes.  I would like to reserve
10   the right to, Judge, if you feel like they've carried
11   their burden.  It's obvious they have not.
12            THE COURT:  Go ahead.
13            MR. STOKES:  The burden that Mr. Everett
14   speaks was set out in Hamlette, dying declarations by a
15   person whose death is at issue have long been
16   admissible.  Four things are present.  These are the
17   four prerequisites that I must carry the burden on:
18            One, at the time they were made, the
19   declarant was in actual danger of death.  Two, he had
20   full apprehension of the danger.  Three, death did in
21   fact ensue.  And four, the defendant, if living, would
22   be a  competent witness to testify to the matter.
23            Now, I believe that three, death actually
24   did ensue, that one has been met very clearly.  Four,
25   the defendant, if living, would be a competent witness.
```

351

1   I don't believe there's any evidence to the contrary

2   that he would have been a competent witness to testify.

3   So my problem lies with one and two.

4          Now, dealing with those two burdens that I

5   must cross, I look to those two.  And I find this in

6   State v. Stevens, Byron James Stevens, 1978.  The Court

7   said, in citing several other cases, "It is not

8   necessary that the declarant should be in the very act

9   of dying; it is enough if he be under the apprehension

10  of impending dissolution."  Cited State v. Daughtry.

11         Stated in simple terms, the Court went on to

12  say, it is enough if he believed he is going to die".

13  Citing State v. Tate, State v. Bright and others.  And

14  then the Court said again, "Obviously, if no one

15  believes" -- excuse me.  "Obviously, if one believes he

16  is going to die, he believes there is 'no hope of

17  recovery,'" alluding to other cases in which the

18  question was, well, did the deceased have no hope of

19  recovery.

20         Then the Court above said that, "We have now

21  concluded that the statutory prerequisites that the

22  deceased must have been 'conscious of approaching death

23  and believed that there was no hope of recovery,' do

24  not change our case-law requirements that in order to

25  be admissible the declarations of a decedent must have

J.A. 2268

352

1   been 'in present anticipation of death.'"

2           So beginning in 1978, the North Carolina

3   Courts started expanding what a person's state of mind

4   would be toward impending or approaching death.  And

5   they reached the conclusion, well, if this person truly

6   believed that his life was about to end or going to

7   end, that that would be enough.

8           Now, then I go to State -- again State v.

9   Hamlette, and find that the party seeking admission of

10  the out-of-court statement need not show that the

11  declarant stated he had given up all hope of living or

12  considered himself to be in the throes of death.  All

13  that must be shown is that the declarant believes he's

14  going to die.

15          And then finally I go to the case of State

16  of North Carolina v. Michael Allen Lester where the

17  defendant was contending that some statements by the

18  State were inadmissible.  And the Courts spoke to that

19  and said that "admissibility seems no longer to be

20  confined to situations in which the declarant's death

21  is in issue, but rather extends to any situation in

22  which the cause or circumstances of the declarant's

23  death may be relevant to any issue in litigation.  The

24  rationale of the statute clearly rests upon a belief in

25  the general trustworthiness of dying declarations

**J.A. 2269**

353

1   rather than upon the necessity for bringing to justice

2   the perpetrators of secret homicides,".

3         The Court further said in that particular

4   case, "It is usually said that the declaration must be

5   a statement of fact and not opinion, but this seems to

6   mean only that the declarant must have had personal

7   knowledge of the declared facts, and not that the

8   opinion rule in all its severity is applicable.

9         And, Judge, with those cases, I go back --

10   I'll hand those cases up in just a second to number one

11   and two.  At the time the statements were made, they

12   were made -- the declarant was in actual danger of

13   death.  They have said it is sufficient if the

14   declarant believes he's going to die, as a state of

15   mind he's going to die.  I go back to my first

16   argument, Your Honor, showing statement of mind.  The

17   hearsay exception on that allows it if it becomes part

18   of a plan or a design.

19         I would argue to Your Honor that from

20   February 11 when he changed and really became serious

21   about killing himself until the day of the suicide,

22   this became a plan in his mind that evolved.  "If I get

23   in trouble for this, I'll go to jail, I'm going to kill

24   myself rather than go through it."  And it appears that

25   he was already somewhat an unstable person and this

J.A. 2270

354

1    event precipitated the plan or design on February 11,

2    which culminated 26 days later in the decedent's death.

3    I would argue to Your Honor that that burden has been

4    met by the defendant.

5              Under the second one, he had full

6    apprehension of the danger.  Judge, I believe a person

7    who commits suicide fully apprehends what the result of

8    putting a gun to your head, beside your head and

9    pulling the trigger is going to do to you.  And if Your

10   Honor looks at it like I've perceived it, the state of

11   mind starts first.  His plan or design then is put into

12   action, and it comes greater and greater and greater,

13   more of a burden, more of a burden.

14             He continues during this 30-day period to

15   say this several times: "I'm going to kill myself over

16   this" in some form of fashion.  I'm not using the exact

17   words that she used, I know.  But I'm -- and then he

18   had full apprehension of the danger because he took the

19   pistol and put it to his head and he pulled the

20   trigger.  And I believe that the fact that he himself

21   took his own life satisfies number two.

22             This is an extremely unusual situation in

23   this particular exception to the hearsay rule and the

24   statutes and case law under that simply, because in

25   almost every case that I could find the person had

355

```
 1   already sustained the injury.  But when you couple --
 2   and this is the point that there is no law like that.
 3   This is where we're at the edge of in the case law, in
 4   my opinion.  When you couple state of mind and plan
 5   along with what actually occurred, then you satisfy the
 6   first two requirements, three and four obviously being
 7   satisfied, I believe that I have met the burden as to
 8   all four points.  And with that, Your Honor, if I
 9   might, I would like to hand up these cases to Your
10   Honor.
11           THE COURT:  All right.  Any further
12   argument?
13           MR. STOKES:  No, sir.
14           THE COURT:  I'll be glad to hear from the
15   State.
16           MR. EVERETT:  I'll address you on state of
17   mind.  State of mind has nothing to do with what a
18   person's state of mind is after they supposedly do
19   something.  State of mind is what they intend to do,
20   what they plan to do, what they're doing.  If before --
21   let's take some credible -- and believe him, and say if
22   he had shot this man.  And before he shot him, he had
23   gone to this lady and said, "I need some money, I'm
24   going down town to rob somebody.  Maybe I can find me a
25   rich white man," that is intent and plan or state of
```

Sharpe 000356

J.A. 2272

356

1    mind.  The courts say that comes in.  The logic there

2    is -- the reason for the rule is you don't say things

3    like that for no reason.

4            Now, once you get passed it, and you're

5    saying, "I killed that man down on 14th or 6th Street,"

6    that's no longer an intent or plan or state of mind.

7    That's just a statement he makes after the fact.  Now,

8    if you were trying to introduce the statement, "I'm

9    going to kill myself," that will probably come in, if

10   it was relevant because that is an intent and it's a

11   state of mind and it's intent to do something.  But to

12   say, "I killed a man last week," that's not a state of

13   mind.  That's just a blanket confession.  Basically

14   what it is.

15           As far as the dying declaration, I've never

16   heard of a dying declaration on a suicide, Judge,

17   because he is the one who has control over whether he

18   kills himself.  He's not going to die unless he shoots

19   himself.  The reason you have dying declaration is

20   because people who know they're dying, knowing it is

21   hopeless, that they're going and they're going to face

22   their maker are cleansing their soles.  They have

23   nothing to lose.  They want to set the record straight.

24           This guy for a long time has been

25   threatening suicide.  He is not -- there is no

357

1    intending death.  He is posed a hill where he believes

2    death is intended.  He controls it all together.  And

3    I've never seen a case where a person who threatens

4    suicide that that was counted as -- I may be wrong.  It

5    came up this morning.  I haven't had a chance to look

6    at all of the cases.  I've never heard of one where

7    dying declaration was counted as a suicide case.

8              I would go on to say, Your Honor, that for

9    the sake of argument, if these things are -- do fit,

10   which I say they do not, but I would go on to say and

11   argue that they have not met their burden in the fact

12   that this lady's credibility is not such to meet their

13   burden.  In fact, she admits at the time of this man's

14   death she didn't say this.  She wouldn't even cooperate

15   with anybody, wouldn't even tell anybody.  And now 12

16   months later she happens to see it on TV and comes to

17   court.  I would just say that they haven't met the

18   burden, and I would object to any admission.

19             THE COURT:  The Court finds the defendant

20   has failed to carry its burden of proof regarding the

21   admissibility of the statement of one Damien Smith

22   under either the state of mind exception of the hearsay

23   rule or the dying declaration exception to the hearsay

24   rule and the Court rules such testimony be inadmissible

25   and sustains the objection of the State.

358

1        MR. STOKES:  If I may approach the bench?

2        THE COURT:  Yes, sir.

3  (Side-bar conference.)

4        THE COURT:  All right.  Let's bring the jury

5  back in.

6  (Jury in.)

7        THE COURT:  Mr. Stokes, do you have any

8  further questions of this witness?

9        MR. STOKES:  No, sir, I don't, Your Honor.

10       THE COURT:  Any cross-examination,

11  Mr. Everett?

12       MR. EVERETT:  Yes, sir.

13  CROSS-EXAMINATION BY MR. EVERETT:

14  Q.   Good morning, Ms. Highsmith.  Ms. Highsmith, as I

15  understand, you knew 20 or 30 people who knew Beatrice

16  Stokes?

17  A.   Yes, sir.

18  Q.   And where do these people hang at?

19  A.   Around 14th Street area, 5th Street.

20  Q.   14th, 6th?

21  A.   14th and 5th.

22  Q.   5th.  And are these people who use drugs?

23  A.   No.

24  Q.   None of the 20 or 30 use drugs?

25  A.   Not that I know of.

359

```
 1   Q.    So these are the 20 or 30 people who also know

 2   Beatrice Stokes?

 3   A.    Yes.

 4   Q.    And do you know anybody that uses drugs down

 5   there?

 6   A.    I don't be in peoples' business like that.

 7   Q.    So you don't know anybody on the block, on 14th,

 8   5th that uses drugs?

 9   A.    Not that I know of?

10   Q.    Except Beatrice Stokes?

11   A.    Mostly.

12   Q.    She's the only one on 14th and 5th that uses

13   drugs?

14   A.    I don't hang out there, I wouldn't know.

15   Q.    But the only one that you know of?

16   A.    The only one that I know of, yeah.

17   Q.    So out of the 20 or 30 people you know of, she's

18   the only one?

19   A.    That's all I know of is her.

20   Q.    And these are people that hang out there; is that

21   right?

22   A.    There's a lot of people that hang out down there.

23   Q.    And how long -- you said you've known Mr. -- the

24   defendant for how long?

25   A.    For about a year.  I met him in about '92.
```

360

```
 1   Something like that.
 2   Q.    And where did you see him?
 3   A.    Across town where everybody hang out at.
 4   Q.    Across town.  Where is this, ma'am?
 5   A.    On 14th Street.
 6   Q.    And what does he do over there?
 7   A.    Everybody just hang out over there.
 8   Q.    He just hangs out?
 9   A.    Yeah.  Everybody hang out over there.
10   Q.    Does he sell drugs over there?
11   A.    Not that I know of.  I don't know what he do.
12   Q.    You've been seeing him for two years?
13   A.    Yeah.
14   Q.    You don't know what he does?
15   A.    Naw, I don't know what he does.
16   Q.    Does he have a job somewhere?
17   A.    I don't know what he do.
18   Q.    And you said you've been convicted of forgery?
19   A.    Yes.
20   Q.    You signed someone's name to a check that wasn't
21   yours; is that right?
22   A.    Yes.
23   Q.    Basically told some story -- you didn't tell the
24   truth, did you?
25   A.    Tell the truth about what?
```

J.A. 2277

361

1　Q.　That check.

2　A.　Evidently I didn't.

3　Q.　You went to a store and gave them a check that

4　won't yours and --

5　A.　I didn't go to no store.

6　Q.　Where did you go?

7　A.　I just ordered food and paid for it with the

8　check.

9　Q.　Ordered food from where?

10　A.　Everywhere you get food from.

11　Q.　So when -- pizza place?

12　A.　Yeah.

13　Q.　And it was a check that was somebody's else's

14　check.　It wasn't yours?

15　A.　Yeah.

16　Q.　And you told -- you paid the pizza man with that

17　check?

18　A.　Yep.

19　Q.　Of course, he didn't know it was somebody's else's

20　check, did he?

21　　　　　　THE COURT:　Well, sustained.

22　BY MR. EVERETT:

23　Q.　You weren't truthful then, were you, ma'am?

24　A.　Nope.

25　Q.　How did you know to come here?

Sharpe 000362

J.A. 2278

362

```
1    A.    I just came.

2    Q.    How did you know?

3    A.    I seen it on the news.  And I said that I want to

4    go up there and testify.  So that's why I'm up here.

5    Q.    Do you know any of the names of the people that

6    you talked to in forming your opinion about Beatrice

7    Stokes' reputation?

8    A.    I mean, everybody know it.  I just talk to people.

9    Q.    I mean, any name at all?

10   A.    No, I don't know no name.

11   Q.    No name out of 20 or 30 people?

12   A.    Huh-uh.

13   Q.    Do you know this lady right here?

14   A.    Yes.

15   Q.    You know the victim's mother-in-law?

16   A.    Yes.

17   Q.    You know her?

18   A.    Yes.

19   Q.    She fired you, didn't she, ma'am?

20              MR. STOKES:  Objection.

21              THE COURT:  Overruled.

22   BY MR. EVERETT:

23   Q.    And you're mad about it, aren't you?

24   A.    No, I'm not mad about it.

25   Q.    That's why you're here, isn't it?
```

Sharpe 000363

363

```
 1   A.     No.

 2   Q.     She fired you; isn't that right?

 3   A.     Yes.

 4          MR. EVERETT:  No further questions.

 5          THE COURT:  Any further questions of this

 6   witness?

 7          MR. STOKES:  No, sir.  You can step down.

 8          THE COURT:  Now, members of the jury, we're

 9   going to -- you may have taken a recess when you were

10   in your jury room; we didn't get to take one out here.

11   So we're going to take  our morning recess at this

12   time.  Remember my prior admonitions to you.  We'll be

13   in recess for 15 minutes.

14          THE COURT:  Mr. Stokes, you may call your

15   next witness.

16          MR. STOKES:  Before I forget it, I would

17   make a motion to admit the defendant's exhibits, I

18   believe 1 through 3 into evidence.

19          THE COURT:  Any objection?

20          MR. EVERETT:  Can I see what they are?

21          -      (Side-bar conference.)

22          THE COURT:  Now, members of the jury, we've

23   got another matter I've got to take up outside your

24   presence.  I apologize, but I'm going to have to ask

25   you to step into your jury room again.  Remember my
```

Sharpe 000364

**J.A. 2280**

364

1    prior admonitions to you.

2    (Jury out.)

3            THE COURT: Mr. Everett, it's my

4    understanding that the State is objecting to the

5    introduction of Defendant's Exhibits 1 and 2, and you

6    have no objection to the introduction of Defendant's

7    Exhibit 3; is that correct?

8            MR. EVERETT: That's correct, Judge.

9            THE COURT: I'll be glad to hear you on your

10   -- on the basis of your objections.

11           MR. EVERETT: Judge, both -- first of all,

12   number one is an accident report that was filled out by

13   an officer who has already testified. It is a drawing

14   that he made. There's a narration in there of him

15   talking to an unknown person who has not testified.

16   And the whole accident report basically is information

17   he received from that person.

18           If you read the heading of the report and

19   you look at his drawing, it's all information he

20   received from that person. He couldn't tell you what

21   the person told him in court. It's clearly hearsay.

22   He couldn't tell you. So he can't get it in just

23   because it's written down.

24           This is not part of the business records. I

25   think accident reports, Your Honor, are exempt as are

365

```
 1    police reports.  Just like the narrative.  He can't get

 2    into evidence through the officer what this unknown

 3    person said.  So he just can't offer the report into

 4    evidence.  Just because it's written down doesn't make

 5    it anymore admissible.  We'd object to both 1 and 2,

 6    Your Honor.

 7              THE COURT:  What is 2?

 8              MR. EVERETT:  Two is the narrative.  If he

 9    wants to excise that one little section in there out of

10    number 2, I don't have any objection.  That can be

11    done.

12              THE COURT:  What section are you talking

13    about?  Do you want to be heard as to the portion of

14    the investigating report as far as Defendant's Exhibit

15    Number 2 which deals with a statement of one Tony

16    Johnson?

17              MR. STOKES:  Judge, in understanding the

18    law, I agree with the District Attorney in his

19    objection.  I would ask that that particular paragraph

20    be stricken but the rest of that particular report be

21    admitted into evidence.

22              THE COURT:  The State has no objection to

23    that, I take it?

24              MR. EVERETT:  As long as everything

25    involving Tony Johnson is excised, I don't have any
```

366

```
 1    problem.

 2              MR. STOKES:  And, however, the State would

 3    like to have that done.

 4              THE COURT:  I take it you're talking about

 5    one paragraph on page three of the report which begins

 6    "R.O. briefly interviewed Tony Johnson"?

 7              MR. EVERETT:  Yes, sir.

 8              THE COURT:  If you can get somebody from

 9    your office to put a piece of paper over this section

10    of this report and then copy the report over again

11    which would make that paragraph -- basically strike

12    that paragraph from the report, and then we can have

13    that admitted.  You got somebody to do that?

14              MR. PERRY:  Yes, sir.  May I approach?

15              THE COURT:  Yes, sir.

16              MR. STOKES:  May I be heard as to the

17    accident report?

18              THE COURT:  Yes, sir.

19              MR. STOKES:  Now, Your Honor, as to the

20    accident, as I recall Officer Jones' direct testimony

21    and cross-examination -- now, I realize that in that

22    accident report is also a narrative by the

23    investigating officer again dealing with this person --

24    the unknown person is Johnson.  I realize that the

25    State would not want that paragraph in.  And again I
```

367

1   understand the State's objection as to that paragraph.

2   However, as to the diagram, I believe that Officer

3   Jones testified either on direct or cross that his

4   investigation of the accident revealed that the truck

5   had come as illustrated on the diagram. On either

6   direct or cross or recross or redirect, he testified

7   that the physical, and this is as I recall it, that the

8   physical evidence began at the corner of Sheppard and

9   6th when the truck hit the curb. That was the first ·

10   place the physical evidence was.

11         I also believe that Officer Jones testified

12   that he had made numerous measurements with a road tape

13   and had put all of those measurements and points from A

14   to B on his accident report. Thus, I believe that the

15   diagram that the officer drew correctly illustrates his

16   testimony and I believe that it also illustrates his

17   testimony as to the accident investigation.

18         Judge, I believe that the courts -- and I

19   don't have any case laws to support this. But I

20   believe that in -- the courts time and time again --

21   when you start dealing with an accident investigation

22   especially when it relates to something like a driving

23   while impaired, the courts have given great latitude to

24   the investigating officer to determine what, if you

25   can, what the facts are of the accident prior to some

J.A. 2284

368

1    arrest.

2                In this case the officer was trying to

3    determine the facts of the accident to find out what

4    occurred in an accident at that point.  The truck hit

5    the curb, hit the house.  I realize that it turned into

6    a homocide investigation immediately, but the officer

7    did a separate accident report, which -- I don't know

8    whether it's usual or not.  I suppose it would be.  But

9    that's a separate report dealing with the path of the

10   truck as an experienced officer with a lot of

11   experience investigating accidents.  I believe I asked

12   him about that.  That was his opinion as to what

13   occurred based on, not only what Johnson told him, but

14   his experience as a uniformed officer.  So I believe

15   that if nothing more would be introduced than the

16   diagram, the diagram should be introduced for several

17   reasons:  One, it illustrates his testimony; two, I

18   believe he testified to everything on the diagram;

19   three, it was an accident investigation.  And that in

20   particular report it was perceived as a, quote,

21   "accident investigation."  And that the officer's

22   opinion as to how it occurred was based on his

23   experience, his knowledge, and it was based on more

24   than Mr. Johnson, whoever he may have been, telling the

25   officer what he saw.  And so I believe that at least if

J.A. 2285

369

1    you strike that paragraph again dealing with -- and the

2    reporting officer was very careful -- if Your Honor

3    would note in that paragraph where he did not even

4    identify the person that told him.

5            So, really, I would argue to Your Honor for

6    the record, that all of it ought to come in.  But if

7    Your Honor rules that, well, that paragraph obviously

8    should not be in, then I would take the position, Your

9    Honor, without having to argue twice, that at least the

10    rest of the accident report -- I don't think there's

11    anything on the reverse side that the State would

12    object to on the front page of the accident report.

13    But on the rear page that Your Honor is looking at, I

14    would argue that at least the rest of the accident

15    report, including the diagram itself, should come into

16    evidence as supporting, illustrating the officer's

17    testimony which was elicited not only by

18    cross-examination but by direct examination.

19            MR. EVERETT:  Be heard briefly, Judge.

20    Judge, there is nothing -- as you recall, there's --

21    except for the corner, the damage, there is no other

22    evidence anywhere in the this street, anywhere except

23    where the car goes over the curb right here.  That

24    indicates the car would have been right here, right

25    here or anywhere else before it went up there.  That's

370

1    a jury question.

2         Now, he is basing his drawings -- his whole

3    narrative is a narrative of what this guy supposedly

4    told him or tells him. He's basing his placement of

5    that vehicle on what this guy tells him. But if he

6    can't look at the damage there and say that that car

7    was there at any time, he can't look there and back

8    that car up and say it was right here any time. That

9    is pure speculation on his part, except he's got

10   someone saying that.

11        Now, you take that out, you got to, because

12   the guy is not here. It is pure hearsay. That drawing

13   is hearsay, that is, the drawing of that vehicle down

14   on 6th Street. That would be no different than if we

15   put -- if we didn't put Charlene Johnson up there and

16   Beatrice Stokes and put Ricky Best up there and draw a

17   picture and to say based on my investigation I believe

18   Dantae Sharpe was here and my investigation revealed

19   that so and so was here, and he shot him like this. He

20   can't do that. Officer Jones can't do that. And that

21   whole accident report is permeated by this one person.

22   Everything in there is based on this one person except

23   for where the vehicle ended up.

24        Now, everything from this point on is fine

25   because he saw it with his own eyes. But there's

371

1    nobody who can say, absent any more evidence than we

2    have, that that vehicle was at this point right here

3    any time. And I just think that's certainly very

4    prejudicial to the State and should not be admitted.

5         MR. STOKES: Your Honor, may I briefly say

6    one other thing?

7         THE COURT: Yes, sir.

8         MR. STOKES: What Mr. Everett says is

9    completely true that the accident report correctly

10   reflects all of the physical evidence that the officer

11   discovered from this curb here only. That all of those

12   facts on that accident are actually shown by physical

13   -- other physical evidence which has been introduced.

14   However, I believe it is the law in this state that the

15   experienced officers dealing with this kind of thing

16   use a number of things to determine what their opinion

17   is. And I believe that his opinion, because as I

18   recall it, and I'm not sure, I'm having to recall from

19   memory, as I recall it, the officer testified in front

20   of the jury that in his opinion the truck came down 6th

21   Street, veered off, hit the stop sign and went over

22   there. And I believe that that particular fact is in

23   front of the jury. And I believe that the accident

24   report should come in to illustrate that also, because

25   I believe that's in front of the jury.

Sharpe 000372

J.A. 2288

372

```
 1           THE COURT:  With regard to Defendant's
 2   Exhibit Number 1, which is an accident report of
 3   Patrolman K. L. Jones of the Greenville Police
 4   Department, the Court finds that Officer Jones'
 5   depiction of the accident is a sketch drawn upon the
 6   report based upon a statement made by a witness whose
 7   name was not included in the report for the witness's
 8   protection, according to officer Jones; that there was
 9   no physical evidence to warrant Officer Jones'
10   depiction of the accident as contained in the accident
11   report with exception of the portion of the accident
12   report dealing with the vehicle after it struck a curb,
13   hit a stop sign and ended up in a garden or vacant lot.
14   The Court finds that the statement contained in the
15   portion of the accident report entitled "Describe What
16   Happened" is inadmissible as it constitutes hearsay and
17   that the sketch or depiction of the accident is based
18   upon that hearsay statement and is therefore also
19   inadmissible.  The Court hereby sustains the State's
20   observation to the introduction of Defendant's Exhibit
21   Number 1.
22           (Defendant's Exhibit Number 1 not admitted.)
23           THE COURT:  With regard to the introduction
24   of Defendant's Exhibit 1 -- strike that -- 2 and 3, the
25   Court will receive those items into evidence as
```

J.A. 2289

373

```
 1    modified or excised to exclude the paragraph relating

 2    to the witness' statement -- related to the statement

 3    made by the witness whose name was revealed as Tony

 4    Johnson who has not testified in this case.

 5              (Defendant's Exhibits 2 and 3 admitted into

 6    evidence.)

 7              MR. STOKES:  I don't know that it can be

 8    done.  I would like for what was marked as Defendant's

 9    Exhibit 2 that does contain the paragraph to be the

10    thing -- so that if it goes up on appeal that paragraph

11    would be present and not deleted.

12              THE COURT:  You can offer that on voir dire.

13    In addition to Defendant's Exhibit 1, you can mark

14    those as voir dire exhibits and offer that into

15    evidence.

16

17              MR. STOKES:  Yes, sir.  I would like to do

18    it as a voir dire exhibit, if I might.

19              Your Honor, I would not object or would

20    move, whichever is proper, that a copy, total

21    photostatic copy of Defendant's Exhibit Number 2 be

22    made, excluding this paragraph, which Mr. Perry has

23    done, and just have that photostatic copy introduced in

24    lieu of the actual exhibit which is numbered, if you

25    understand what I'm saying.  Make a copy of the whole
```

374

```
 1    thing Mr. Everett suggested.

 2              MR. EVERETT:  What you could do, Judge, this

 3    would be 2 and then have the one that's amended 2A and

 4    have that one published to the jury.

 5              THE COURT:  Okay.  Make that also number --

 6    mark that as voir dire exhibit.  And in addition to

 7    this one, Defendant's Exhibit Number 1, needs to be

 8    marked as next voir dire exhibit, whatever the next

 9    voir dire exhibit number is.  I think we've already

10    used one of them.

11              MR. STOKES:  Yes, sir.

12              (Defendant's Voir Dire Exhibits 2A marked

13    for identification.)

14              MR. EVERETT:  I'll get these pages run off,

15    Judge.

16              THE COURT:  Are you going to publish that to

17    the jury?

18              MR. STOKES:  Yes, sir, I am.

19              THE COURT:  All right.  We're going to need

20    13 copies of that then.

21              MR. STOKES:  Your Honor, at this time I

22    would ask that they be published to the jury.

23              MR. EVERETT:  Judge, that would be the

24    defendant's exhibits, I believe.

25              THE COURT:  Did I say State's?  I meant
```

375

1    defendant's.

2              MR. STOKES:  Judge, the defendant rests.  At

3    this time I ask the Court to instruct that's a

4    permanent record of it.

5              THE COURT:  The Clerk says she will get

6    somebody to photocopy it.

7              MR. STOKES:  That's fine.

8              MR. EVERETT:  That is going to be done

9    regardless.

10             MR. STOKES:  I just wanted it on the record.

11             THE COURT:  You have any other witnesses

12   you're going to call?

13             MR. STOKES:  I would like for the jury to

14   view those exhibits, if I might.

15             THE COURT:  All right.  You got 13 copies of

16   those two exhibits?

17             MR. EVERETT:  Yes, sir, Judge.

18             THE COURT:  Let's bring the jury back in,

19   Sheriff.

20   (Jury in.)

21             THE COURT:  Let State's (sic) Exhibits 2 and

22   3 be received into evidence.

23             (Defendant's Exhibits 2 and 3 admitted into

24   evidence.)

25             MR. STOKES:  Your Honor, at this time I ask

J.A. 2292

376

```
 1    that these be passed among the jury.

 2              THE COURT:  All right.  Mr. Buck, would you

 3    hand the jurors these exhibits.

 4              (Exhibits published to the jury.)

 5              MR. EVERETT:  That would be the defendant's

 6    exhibits, I believe.

 7              THE COURT:  Did I say "State"?  I meant

 8    defendant's.

 9              MR. STOKES:  I believe it is a copy for each

10    juror.

11              THE COURT:  Be any further evidence for the

12    defendant?

13              MR. STOKES:  Judge, the defendant rests.

14              THE COURT:  Any rebuttal evidence for the

15    State?

16              MR. EVERETT:  One moment, Judge.  Nothing

17    further.

18              THE COURT:  Now, members of the jury, all

19    the evidence has been presented.  Prior to the final

20    arguments of the attorneys and the instructions, I'll

21    give you the law on this case.  I'm required to confer

22    with the attorneys about that law.  And while I do

23    that, I'll have to ask that you again step back into

24    your jury room.  While you're in there remember not to

25    discuss this case among yourselves or form any kind of
```

377

1  opinion about it.

2  (Jury out.)

3              THE COURT:  Let the record reflect we've

4  convened for the purpose of conducting the charge

5  conference.  Are there any requested instructions from

6  the State?

7              MR. EVERETT:  Let me think one minute,

8  Judge.  I don't have any special instructions.

9              THE COURT:  Any requested instructions from

10  the defendant?

11              MR. STOKES:  Judge, if I might just run

12  through the ones that -- and I know some of the

13  standard instructions.  One being function of the jury,

14  101.05.  The second instruction dealing with

15  credibility of witnesses.  I'm not sure about the

16  number.

17              THE COURT:  That's 101.15.

18              MR. STOKES:  I'm sorry, Your Honor.  I would

19  ask that that one come in.  Of course, 101.10, burden

20  of proof, reasonable doubt.  I'm just going to run

21  through them, if I might, Your Honor.

22              THE COURT:  Yes, sir.  Go ahead.

23              MR. STOKES:  101.36, highest aim charge,

24  104.20, interested witness charge, paragraph on that;

25  104.50A as opposed to 104.50 dealing with photographs.

Sharpe-000378

J.A. 2294

378

```
 1              THE COURT:  That's photograph as substantive

 2    evidence.  I don't think the photographs were admitted

 3    into evidence as substantive evidence. I'll be glad to

 4    give 104.50, illustrative evidence.

 5              MR. STOKES:  Yes, sir.

 6              THE COURT:  All right.

 7              MR. STOKES:  105.30, character of a witness.

 8              THE COURT:  All right.

 9              MR. STOKES:  301.10, alibi.

10              THE COURT:  All right.

11              MR. STOKES:  And, Judge, I'm assuming that

12    you're going to give 101.35, the concluding

13    instructions.

14              THE COURT:  Yes.

15              MR. STOKES:  Judge, may I inquire of the

16    Court?  Does Your Honor plan to charge on the charge of

17    first-degree murder and exclude any other lesser

18    included offenses or does Your Honor plan to include

19    some of those --

20              THE COURT:  I had intended to charge on

21    first and second-degree murder.  I will be glad to hear

22    from you on any others.

23              MR. STOKES:  Judge, I would argue the charge

24    of voluntary manslaughter.  If I might be heard very,

25    very briefly on that.
```

Sharpe 000379

J.A. 2295

379

1        Your Honor, I think the facts show that the

2   deceased was shot first in the arm and was shot not at

3   some great distance, but a fairly -- just a few feet or

4   less.  I believe the evidence shows that.  I believe

5   that it goes to the malice and actual premeditation to

6   kill.  Because when you're close to someone and you

7   pull a gun and you point it at them and fire, fire the

8   gun, if you intend to shoot them in the arm and you

9   have an opportunity to shoot them in the head, but you

10  choose the arm, I would argue to Your Honor that that's

11  where the voluntary manslaughter comes in that you

12  intend to do a criminal act, which is to shoot someone.

13  And if that bullet -- let's say the bullet had not

14  penetrated the man's chest and killed him, then the

15  defendant would be guilty of nothing more than assault

16  with a deadly weapon inflicting serious injury.

17        So, I would argue to Your Honor that I

18  believe the evidence shows, and it could be argued,

19  that the defendant or whoever shot this man intended to

20  shoot him in the arm and not to kill him in a

21  premeditated way with malice.  I believe the evidence

22  tends to substantiate first and second.  But I also

23  believe it can be really inferred that when someone

24  pulls a gun and shoots at somebody, where they shoot

25  them at is indicative of their intent and what they

Sharpe 000380

J.A. 2296

380

```
 1   intend to do with that person.  And I believe that when
 2   you intend to shoot somebody in the arm and the head is
 3   right there available to them, whoever shot the gun had
 4   a choice.
 5           If they chose to shoot them in the arm, I
 6   believe it's arguable they did not intend to kill them.
 7   Because if they had intended to kill them, I believe
 8   they could have just as easily aimed at the head at
 9   close range and shot him in the head.  And that would
10   be the basis of my argument for the charge of voluntary
11   manslaughter, Your Honor.  Thank you.
12           THE COURT:  Does the State want to be heard
13   on that?
14           MR. EVERETT:  Judge, can I inquire of
15   Mr. Stokes if you are requesting that that be sent on
16   imperfect self-defense, voluntary manslaughter -- are
17   you requesting that it be sent on voluntary
18   manslaughter under imperfect self-defense theory?
19           MR. STOKES:  No.  Not on the self-defense
20   theory.
21           MR. EVERETT:  Judge, I guess, I don't think
22   that the law of voluntary manslaughter applies in that
23   sense.  I think if you inflict an injury to a person
24   with a deadly weapon, you're guilty of second-degree
25   murder because malice is inferred.  And I guess my only
```

381

1    question, Judge, and I'm going to rely on Your Honor, I

2    don't know the answer to this question.  But based on

3    the evidence that we have, does that rise to the level

4    of imperfect self-defense, that is, the defendant and

5    the victim --

6                 THE COURT:  The defendant's claiming alibi.

7                 MR. EVERETT:  Okay.  I won't bring that to

8    the Court's attention.  If he's not asking for it,

9    that's fine.  If that's the case, Judge, I don't think

10   voluntary manslaughter should go.

11                THE COURT:  I take it you don't disagree

12   with second-degree murder?

13                MR. EVERETT:  Oh, no, Your Honor.

14                THE COURT:  The verdict sheet will read:

15   guilty of first-degree murder or guilty of

16   second-degree murder or not guilty.

17                Does the State want opening and closing?

18                MR. EVERETT:  Just closing, Your Honor.

19                THE COURT:  I take it -- are you ready to

20   proceed in your closing argument or had you rather take

21   a lunch recess.

22                MR. STOKES:  Judge, I'd rather take a lunch

23   recess.  I believe if we don't, my argument, to cover

24   all of the testimony that's come in, would be rather

25   lengthy.

382

```
 1              THE COURT:  I don't believe I want to split

 2    the arguments either.  So I think what we will do is

 3    take our lunch recess and come back and let the

 4    defendant argue, followed by the State, and then I'll

 5    give the charge.

 6              Anything further before we bring the jury

 7    back in?

 8              MR. STOKES:  No, sir.

 9              THE COURT:  Anything from the State?

10              MR. EVERETT:  No, Your Honor.

11              THE COURT:  All right.  Let's bring the jury

12    back in.

13    (Jury in.)

14              THE COURT:  All right.  Members of the jury,

15    prior to the argument of the attorneys, which I

16    anticipate will take some period of time, we're going

17    to go ahead and take our lunch recess before that.

18              Remember during this lunch recess especially

19    now that you've heard all the evidence in the case,

20    that you should not form any kind of opinion about it;

21    that you should not discuss it among yourselves or

22    allow anyone to discuss it with you.  Try to be back at

23    1:30.  I'm going to let y'all leave now and ask that

24    you be back in your seats at 1:30.  Everybody else

25    remain seated while the jury leaves.
```

Sharpe 000383

```
1    (Jury out.)

2              THE COURT:  One other thing, Mr. Stokes.

3    You did not request, but I want to ask, do you want me

4    to give the instruction of the effect of the

5    defendant's decision not to testify?

6              MR. STOKES:  Yes, sir.  Excuse me.  I'm

7    sorry, Judge.

8              THE COURT:  I will give that as well.

9              MR. STOKES:  Thank you very much.

10             THE COURT:  The charge will be basically the

11   charge as contained in the Pattern Jury Instruction

12   206.13 related to first and second-degree murder.

13             MR. STOKES:  Yes, sir.  And for the record,

14   I have no other types of charges that I would have

15   typed up and submit to the Court other than the pattern

16   jury instructions.

17             THE COURT:  All right.  Thank you.

18             All right, now, Sheriff, take a recess until

19   1:30.

20   (Lunch recess.)

21             THE COURT:  All right.  Ladies and

22   gentlemen, all the evidence has been presented.  It is

23   now time for the final arguments of the lawyers.  At

24   the conclusion of these arguments, I'll instruct you on

25   the law on this case and then you will be taken to the
```

1    jury to begin your deliberations.

2            Final arguments of the lawyers are not

3    evidence and are given to assist you in evaluating the

4    evidence.  The lawyers are permitted in their final

5    statement to argue, to characterize the evidence and to

6    attempt to persuade you to a particular verdict.  It is

7    improper for a lawyer in final argument to become

8    abusive, to inject personal experiences, to express a

9    personal belief as to the guilt or innocence of the

10   defendant, or to make arguments on the basis of matters

11   outside the record, except for those matters concerning

12   which the Court will take judicial notice.

13           A lawyer may, however, on the basis of the

14   lawyer's analysis of the evidence, argue any position

15   or conclusion with respect to a matter in issue.  If,

16   in the course of making a final argument, a lawyer

17   attempts to restate a portion of the evidence and your

18   recollection of the evidence differs from that of the

19   lawyer, you are, in recalling and remembering the

20   evidence, be guided exclusively by your own

21   recollection of the evidence.

22           All right, Mr. Stokes, the jury is with the

23   defendant.

24           MR. STOKES:  Thank you, very much, Your

25   Honor.

1    (Closing argument by Mr. Stokes, followed by

2    Mr. Everett.)

3    THE COURT: Members of the jury, we're going

4    to take about a ten minute recess at this point in

5    time. Remember my prior admonitions to you and do not

6    discuss this case among yourselves or form any kind of

7    opinion about it. We will be in recess for

8    ten-minutes.

9    (Recess.)

10    THE COURT: Members of the jury, all the

11    evidence has been presented. It is now your duty to

12    decide from this evidence what the facts are. You must

13    then apply the law which I'm about to give you to those

14    facts. It is absolutely necessary that you understand

15    and apply the law as I give it to you, and not as you

16    think it is, or as you might like it to be. This is

17    important because justice requires that everyone tried

18    for the same crime be treated in the same way and have

19    the same law applied to him.

20    The defendant has entered a plea of "not

21    guilty." The fact that he has been indicted is no

22    evidence of guilt  Under our system of justice, when a

23    defendant pleads not guilty, he is not required to

24    prove his innocence; he is presumed to be innocent.

25    The State must prove to you that the defendant is

1    guilty beyond a reasonable doubt.

2            A reasonable doubt is a doubt based on

3    reason and common sense, arising out of some or all of

4    the evidence that has been presented, or lack or

5    insufficiency of the evidence, as the case may be.

6    Proof beyond a reasonable doubt is proof that fully

7    satisfies or entirely convinces you of the defendant's

8    guilt.

9            You're the sole judges of the credibility of

10   each witness.  You must decide for yourselves whether

11   to believe the testimony of any witness.  You may

12   believe all, or any part, or none of what a witness has

13   said on the stand.

14           In determining whether to believe any

15   witness you should apply the same tests of truthfulness

16   which you apply in your everyday affairs.  As applied

17   to this trial, these tests may include the opportunity

18   of witness to see, hear, know, or remember the facts or

19   occurrences about with he testified; the manner and

20   appearance of the witness; any interest, bias or

21   prejudice the witness may have; the apparent

22   understanding and fairness of the witness; whether his

23   testimony is reasonable, and whether his testimony is

24   consistent with the other believable evidence in the

25   case.

1    You're the sole judges of the weight to be

2  given any evidence.  By this I mean, if you decide that

3  certain evidence is believable you must then determine

4  the importance of that evidence in light of all other

5  believable evidence in the case.

6    The defendant in this case has not

7  testified.  The law of North Carolina gives him this

8  privilege.  The same law also assures him that his

9  decision not to testify creates no presumption against

10  him.  Therefore, his silence is not to influence your

11  decision in any way.

12    Photographs and a diagram were introduced

13  into evidence in this case for the purpose of

14  illustrating and explaining the testimony of a witness.

15  These photographs and diagram may not be considered by

16  you for any other person.

17    In this case you've heard evidence from

18  witnesses who have testified as expert witnesses.  An

19  expert witness is permitted to testify in the form of

20  an opinion in the field where he or she purports to

21  have specialized skill or knowledge.

22    As I've instructed you, you are the sole

23  judges of the credibility of each witness and the

24  weight to be given to the testimony of any witness.  In

25  making this determination as to the testimony of an

Sharpe 000388

J.A. 2304

388

1   expert witness, you should consider in addition to the

2   other tests of credibility and weight, the witness'

3   training, qualifications and experience, or lack

4   thereof; the reasons, if any, given for the opinion;

5   whether the opinion is supported by facts that you find

6   from the evidence; whether the opinion is reason, and

7   whether it is consistent with other believable evidence

8   in the case.  You should consider the opinion of an

9   expert witness, but you're not bound by it.  In other

10  words, you're not required to accept an expert witness'

11  opinion to the exclusion of the facts and circumstances

12  disclosed by other testimony.

13          When evidence has been received with regard

14  to the character of the witness for truthfulness, you

15  may consider this evidence for one purpose only.  If

16  you believe all, or any part of this evidence and find

17  that it bears upon the witness' truthfulness, you may

18  consider it, together with all other facts and

19  circumstances bearing upon the witness' truthfulness in

20  deciding whether you will believe or disbelieve his or

21  her testimony at this trial.  Except as it may bear on

22  this decision, this evidence may not be considered by

23  you in your determination of any fact in this case.

24          You may find that a witness is interested in

25  outcome of this trial.  In deciding whether or not to

389

1    believe such a witness you may take his interest into

2    ask.  If, after doing so, you believe his or her

3    testimony in whole or in part, you should treat what

4    you believe the same as any other believable evidence.

5         The defendant contends that he was at some

6    other place at the time the offense is alleged to have

7    taken place.  This is known as an alibi.  The word

8    "alibi" simply means somewhere else.

9         The burden of proving an alibi does not

10   rests upon the defendant.  To establish the defendant's

11   guilt, the State must prove beyond a reasonable doubt

12   that the defendant was present at and participated in

13   the crime charged.  The defendant's contention that he

14   was not present and did not participate is simply

15   denial of facts essential to the State's case.

16        Therefore, I charge that if, upon

17   considering all the evidence in the case including the

18   evidence with respect to alibi, you have a reasonable

19   doubt as to defendant's presence at or participation in

20   the crime charged, you must find him not guilty.

21        The highest aim of every legal contest is

22   the ascertainment of the truth.  Somewhere within the

23   facts of every case, the truth abides, and where

24   truthful is, justice steps in garbed in it robes and

25   tips the scales.  In this case you have no friend to

Sharpe 000390

**J.A. 2306**

1  reward, you have no enemy to punish; you have no anger

2  to appease or sorrow to assuage.  Yours is the solemn

3  duty to let your verdict speak the everlasting truth.

4          The defendant has been accused of

5  first-degree murder.  Under the law and the evidence in

6  this case, it is your duty to return one of following

7  verdicts:  guilty of firs-degree murder, or guilty of

8  second-degree murder, or not guilty.

9          First-degree murder is the unlawful killing

10  of a human being with malice and with premeditation and

11  deliberation.

12          Second-degree murder is the unlawful killing

13  of a human being with malice, but without premeditation

14  and deliberation.

15          Now I charge for you to find the defendant

16  guilty of first-degree murder, the State must prove

17  five things beyond a reasonable doubt:

18          First, the defendant intentionally and with

19  malice killed the victim with a deadly weapon.

20          Malice means not only hatred, ill-will, or

21  spite, as it is ordinarily understood to be sure that

22  is malice, but it also means that condition of mind

23  which prompts a person to take the life of another

24  intentionally or to intentionally inflict serious

25  bodily harm which proximately results in death without

1   just cause, excuse or justification.  If the State

2   proves beyond a reasonable doubt that the defendant

3   intentionally killed the victim with a deadly weapon or

4   intentionally inflicted a wound upon the victim with a

5   deadly weapon that proximately caused the victim's

6   death, you may infer first, that the killing was

7   unlawful, and second, that it was done with malice,

8   which you are not compelled to do so.  You may consider

9   this along with all other facts and circumstances in.

10   determining whether the killing was unlawful and

11   whether it was done with malice.

12          Second, the State must prove that the

13   defendant's act was the proximate cause of the victim's

14   death.  A proximate cause is a real cause, a cause

15   without which the victim's death would not have

16   occurred.

17          Third, that the defendant intended to kill

18   the victim.  Intent is the mental attitude seldom

19   provable by direct evidence.  It must ordinarily be

20   proved by circumstances from which it may be inferred.

21   An intent to kill may be inferred from the nature of

22   the assault, the manner in which it was made, the

23   conduct of the parties and other relevant

24   circumstances.

25          Fourth, the defendant acted with

392

1    premeditation, that is, that he formed the intent to

2    kill the victim over some period of time, however

3    short, before he acted.

4          And fifth, the defendant acted with

5    deliberation, which means that he acted while he was in

6    a cool statement or mind. This does not mean that

7    there had to be a total absence of passion or emotion.

8    If the intent to killed was formed with a fixed

9    purpose, not under the influence of some suddenly

10   aroused violent passion, it is immaterial that the

11   defendant was in a state of passion or excited when the

12   intent was carried into effect.

13         Neither premeditation nor deliberation are

14   usually susceptible of direct proof. They may be

15   proved by circumstances from which they may be

16   inferred, such as the lack of provocation by the

17   victim, the conduct of the defendant before, during and

18   after the killing, or manner in which or the means by

19   which the killing was done.

20         Second-degree murder differs from

21   first-degree murder in that neither specific intent to

22   kill, premeditation nor deliberation are necessary

23   elements. In order for you to find the defendant

24   guilty of second-degree murder, the State must prove

25   beyond a reasonable doubt that the defendant

393

1  unlawfully, intentionally and with malice killed

2  victim.

3          So I charge that if you find from the

4  evidence beyond a reasonable doubt that on or about the

5  alleged date the defendant intentionally killed the

6  victim with a deadly weapon thereby proximately causing

7  the defendant's death, and that the defendant acted

8  with malice, with premeditation and with deliberation,

9  it would be your duty to return a verdict of guilty of

10  first-degree murder.  However, if you do not so find or

11  have a reasonable doubt as to one or more of these

12  things, you will not return a verdict of guilty of

13  first-degree murder.

14          If you do not find the defendant guilty of

15  first-degree murder, you must determine whether he's

16  guilty of second-degree murder.

17          If you find from the evidence beyond a

18  reasonable doubt that on or about the alleged date the

19  defendant intentionally and with malice killed the

20  victim with a deadly weapon, thereby proximately

21  causing the victim's death, it would be your duty to

22  return a verdict of guilty of second-degree murder.

23  However, if you do no so find or have a reasonable

24  doubt as to one or more of these things, it would be

25  your duty to return a verdict of not guilty.

**J.A. 2310**

```
 1              I don't know whether I instructed you or

 2    not, but, members of the jury, a firearm is a deadly

 3    weapon.

 4              Now, members of jury, you've heard the

 5    evidence and the argument of counsel for the State and

 6    for the Defendant.  The Court has not summarized the

 7    evidence in this case.  It your duty to remember the

 8    evidence whether it has been called to your attention

 9    or not.  If your recollection of the evidence differs

10    from that of the State's attorney or of the defense

11    attorney, you are to rely solely upon your recollection

12    of the evidence in your deliberations.  I have not

13    reviewed any contentions of the State or of the

14    defendant, but it is your duty not only to consider all

15    the evidence, but also to consider all the arguments,

16    contentions and positions urged by the State's

17    attorneys and the defendant's attorney in their

18    speeches to you, and any other contention that arises

19    from the evidence, and to weigh them in the light of

20    your common sense, and as best you can, to determine

21    the truth of this matter.

22              The law, as indeed it should, requires the

23    presiding judge to be impartial.  You're not to draw

24    any inference from any ruling that I have made, or any

25    inflection in my voice or expression on my face, or any
```

1    question I've asked a witness or anything else that I

2    may have said or done during this trial, that I have an

3    opinion or have intimated an opinion, as to whether any

4    part of the evidence should be believed or disbelieved,

5    as to whether any fact has or has not been proved, or

6    as to what your findings ought to be.  It is your

7    exclusive province to find the true facts of the case

8    and to render a verdict reflecting the truth as you

9    find it.

10            I instruct you that a verdict is not a

11   verdict until all twelve jurors agree unanimously as to

12   what your decision shall be.  You may not render a

13   verdict by majority vote.

14            When you've reached a unanimous verdict,

15   have your foreperson mark the appropriate place on the

16   verdict form, which I'll send to you in a few moments

17   after you enter the jury room.

18            At this time, Mr. Koonce, I'll ask that you

19   have a seat out in the courtroom, sir.

20            As you retire to the jury room, you should

21   first select one of your members to serve as your

22   foreperson to lead you in your deliberations.  Do not

23   begin your deliberations on your verdict until you

24   receive the written verdict form from the bailiff,

25   proceed immediately with the selection of your

1   foreperson, and then after receiving the written

2   verdict form, proceed with your verdict deliberations.

3   When you have reached a unanimous verdict and are ready

4   to pronounce it, and your foreperson has marked the

5   verdict on the form, have your foreperson sign and date

6   the verdict form, notify the bailiff by knocking on the

7   door to the jury room and you will be returned to the

8   courtroom to pronounce your verdict.  You may now

9   retire and select your foreperson.

10  (Jury out at 3:55 p.m.)

11              THE COURT:  Before sending the verdict form

12  to the jury, are there any specific requests for

13  corrections or additions to the charge from the State?

14              MR. EVERETT:  No, Your Honor.

15              THE COURT:  From the defendant?

16              MR. STOKES:  No, sir, Your Honor.

17              THE COURT:  All right.  Mr. Buck, if you'll

18  hand the verdict sheet to the jury.

19              Do we have any other matters we can take up

20  while we're waiting on the jury?

21              MR. EVERETT:  I think we released everybody,

22  Judge.

23              THE COURT:  All right.  We'll be in recess

24  until we get a verdict.

25  (Recess.)

J.A. 2313

397

```
 1              THE COURT:  All right.  Gentlemen, I have
 2    received a question from the jury, from the foreman,
 3    which says that "We have a juror that knows one of the
 4    witnesses.  And the question is, how does this affect
 5    the juror's status during the deliberation?  The juror
 6    has stated that the past knowledge of the witness is
 7    affecting the perception of credibility."
 8              That is exactly what I predicted would
 9    happen in this case when you would not give me the list
10    of the witnesses.  So, now, we got -- we'll probably
11    have to declare a mistrial.  But I'll bring the juror
12    out and question that juror.
13              If you'll bring all the jurors out, first of
14    all, Sheriff, I will find out what they want me to do.
15    (Jury in at 4:45.)
16              THE COURT:  Now, Mr. Nowell, I have received
17    your written question.  And it reads, "We have a juror
18    that knows one of the witnesses.  And the question is,
19    how does this affect the juror's status during the
20    deliberations?"  It further goes on to say "The juror
21    has stated the past knowledge of the witness is
22    affecting the perception of credibility."  I need to
23    know which juror it is that knows the witness.
24              THE COURT:  All right.  You're Sarah Blount.
25    is that correct?
```

398

```
 1              JUROR:  Yes.
 2              THE COURT:  Ms. Blount, I'm going to ask
 3     that you remain in the courtroom for a few minutes
 4     while I ask you a few questions.  The other jurors, I'm
 5     going to ask that you go back into your jury room.
 6     While you're in your jury room right now, do not
 7     further deliberate on this case.  Do not discuss it.
 8     Do not talk about it.  Do not deliberate until you hear
 9     from me.  I'll ask that you go back into your jury room
10     at this time.
11              All right.  Let the record reflect the other
12     eleven jurors are absent from the courtroom and Juror
13     Number 2, Sarah Blount, remains in the courtroom for
14     questioning by the Presiding Judge.
15     BY THE COURT:
16     Q.   Ms. Blount, which witness is it that you know or
17     witnesses or witness that you know.
18     A.   Charlene Johnson.
19     Q.   Who?
20     A.   Charlene.
21     Q.   Charlene Johnson?
22     A.   Uh-huh.
23     Q.   How do you know Ms. Johnson?
24     A.   When she was small going to church with her
25     grandmother, she and I used to go to the same church
```

J.A. 2315

399

1    together.

2    Q.    So how long have you known her, would you say?

3    A.    Ever since she was a little girl.

4    Q.    Did you grow up in her same community?

5    A.    Well, she stayed in the country out by Bells Fork

6    way.  I was staying in Winterville.  Between Winterville

7    and the Farmville area.

8    Q.    Do you know the members of her family, her mother

9    and other people?

10   A.    I know her grandmother.  I probably know her

11   mother if I would see her.  But as far as just knowing

12   her mama, I don't know her mama.  She was mostly raised

13   by her grandmother.

14   Q.    You have apparently indicated to the foreperson of

15   the jury that this is causing you some problems.  What

16   kind of problems is it causing?

17   A.    Well, I know Charlene before she left, I mean,

18   from around Winterville.  Charlene was wild.

19   Q.    Was what?

20   A.    Was wild.

21   Q.    Was wild?

22   A.    Uh-huh.  And I think that was one reason her

23   grandma sent her to her mama.  She couldn't do with her.

24   And at one point, I don't know whether she called

25   herself -- but I know she would call my house late at

**J.A. 2316**

400

```
 1   night to talk to my youngest son.  I guess she called

 2   herself trying to date him or something.

 3   Q.    Charlene was doing that?

 4   A.    Yes.

 5   Q.    How often did this happen?

 6   A.    That was late at night.  Sometimes two or three

 7   times a week.

 8   Q.    Two or three times a week she'd call late at

 9   night?

10   A.    Uh-huh.

11   Q.    And you knew it was Charlene calling?

12   A.    Yes.  Because my son would tell me, say, "I wish

13   that girl would stop calling me.  I don't want that

14   girl."  That was when he was singing in junior choir at

15   the church.

16   Q.    What hours of the day or night would she call?

17   A.    Any time after 11:00 at night.

18   Q.    After 11:00?

19   A.    Yes.

20   Q.    The fact that you know Charlene Johnson in this

21   manner that you've just described, Ms. Blount, will that

22   cause you to give her testimony more or less weight than

23   you would any other competent witness that you didn't

24   know?

25   A.    Right now I don't think I would want to -- want to
```

**J.A. 2317**

401

```
 1   testify -- I mean, you know, it would be less weight on
 2   Charlene's side.
 3   Q.    You would give less weight because of your
 4   knowledge of her?
 5   A.    Yes.
 6   Q.    Would that cause you to be -- would that prevent
 7   you from being fair and impartial in this case to both
 8   the State and defendant, or either the State or the
 9   defendant?
10   A.    Yes.
11   Q.    It would prevent you from being fair to the State.
12   A.    Yes.
13   Q.    And so, therefore, you do not feel you would be a
14   competent juror to sit on this case because of your
15   knowledge of Charlene and your prior experiences with
16   her?
17   A.    (Witness nodding head.)
18   Q.    And the fact you would not give her testimony as
19   much weight as you would some other person that you
20   didn't know that you also found to be competent.  Is
21   that right?
22   A.    Yes, sir.
23            THE COURT:  Does the State have any
24   questions of this juror?
25            MR. EVERETT:  No, sir.
```

J.A. 2318

402

```
 1              THE COURT:  Any questions, Mr. Clark (sic)?
 2              MR. EVERETT:  No, sir.
 3              THE COURT:  Does the defendant have any
 4     questions?
 5              MR. STOKES:  Yes, sir.  I believe I will, if
 6     I might.
 7              THE COURT:  All right.  Go ahead.
 8     BY MR. STOKES:
 9     Q.   Do you think because of your knowledge of Charlene
10     -- you say that you don't feel that you could be fair to
11     the State?
12     A.   (Witness nodding head.)
13     Q.   Do you feel like that you could not put that
14     knowledge aside and decide this case, trying to be fair
15     to the State and the defendant, and put that knowledge
16     to the side and try to base your decision on the facts
17     that have come out in this courtroom and not your
18     knowledge of Charlene?  Do you think you could do that?
19     A.   Yes, sir.
20              MR. STOKES:  Judge, that's the only question
21     I would like to ask her.
22              THE COURT:  All right.  Either side have any
23     argument as to whether or not this juror should be
24     excused?
25              MR. EVERETT:  No, sir.
```

**J.A. 2319**

403

1              MR. STOKES:  Yes, sir.

2              THE COURT:  All right.  I'll be glad to hear

3       from you.

4              MR. STOKES:  Your Honor, this juror has now

5       stated that she feels like that she can put that

6       feeling aside.  And through putting that feeling aside

7       she could be fair to both sides.  And I believe with

8       her answering that question that way and the answer

9       that she gave, that she feels like she can do that.  I

10      think that that places her in position of any other

11      juror who may know a party to a case or a witness in a

12      case.  Yes, I know them.  But can you put that

13      knowledge aside and decide the case?  Yes, I can.

14             So, I would argue to Your Honor that because

15      she feels like she can put that knowledge aside, and

16      she's stated in open court that she can decide this

17      case based on the facts that came out in this

18      courtroom, that she should be allowed to sit on this

19      case and render whatever verdict the jury comes back

20      with.

21             THE COURT:  All right.

22      BY THE COURT:

23      Q.   You've given some kind of answers now that are

24      somewhat conflicting, Ms. Johnson.  Strike that.

25      Ms. Blount.  You told me just a little while ago that

404

1    you didn't think you could be fair to the State because

2    of your prior acquaintance and knowledge of Charlene

3    Johnson.  Do you still feel that way?

4    A.    Yes.

5    Q.    And you just told the attorney for the defendant

6    that you feel like you can put your feelings aside.

7    A.    Yes.

8    Q.    You still feel like you can put your feelings

9    aside and render a verdict that's fair and impartial?

10   A.    Yes, sir.  I can put them aside.

11   Q.    Well, why did you express your concerns to the

12   foreman of the jury then?

13   A.    Well, we were sitting there talking and in general

14   that came up, that I just told him that I knew Charlene.

15   Q.    You must much have told him more than that?

16   A.    I told him that I knew of Charlene.

17   Q.    Well, he's written that --- he said that you had

18   past knowledge of a witness that was affecting your

19   perception of credibility?

20   A.    Well, Mr. Stokes asked me did I think I could put

21   it -- that, you know, being that I know Charlene, aside

22   and give a verdict.  And yes, I can put it aside.  I

23   mean, being that I know her, I can request put it aside.

24   Q.    You feel like you could be fair to the State even

25   though your opinion of Charlene might be whatever it is?

405

```
 1    A.    Yes.

 2    Q.    So you're telling me then that you feel like you

 3    can be a competent juror in this case and you would be

 4    fair to both sides?

 5    A.    Yes, sir.

 6    Q.    And that you would not let your opinion of

 7    Charlene influence -- your prior opinion of Charlene

 8    influence your decision in this particular case?

 9    A.    No, sir.

10    Q.    All right.

11              THE COURT:  I'm going to leave the juror on.

12              MR. EVERETT:  Judge, can I ask her one --

13              THE COURT:  I gave you a chance.

14              MR. EVERETT:  I know, but that was --

15              THE COURT:  All right.  Go ahead.

16    BY MR. EVERETT:

17    Q.    Ms. Blount, I don't mean to bother you anymore.

18    You understand that whatever you decide is to be based

19    on the evidence that is brought out in court?

20    A.    Yes.

21    Q.    What comes from the witness stand?

22    A.    Yes, sir.

23    Q.    And can you tell me, as the prosecutor for the

24    State, that you would examine all the evidence and

25    examine Ms. Johnson's testimony like you would anybody
```

406

```
 1   else's?  Would you do that?

 2   A.    Yes.

 3   Q.    Would you base your verdict on the evidence as

 4   brought out in the courtroom?

 5   A.    Yes, sir.

 6   Q.    You have an opinion now that Charlene Johnson is

 7   not reliable?

 8   A.    No.  I'm not saying she's not reliable.

 9   Q.    You have an opinion she's not truthful?

10   A.    I'm not saying she's not truthful.  I know that --

11   Q.    That she in the past has bothered you?

12   A.    No.

13   Q.    Not you but, say, called your house and stuff?

14   A.    Calling my house.

15   Q.    And you didn't like that?

16   A.    Not that time of the night.  I mean, I feel like

17   that time of the night she should have been where my son

18   was.

19   Q.    Right.  But you can tell me, and promise the

20   State, that you'll base your verdict on the evidence

21   that came in from the witness stand?

22   A.    Yes.

23   Q.    And not rely on something you might have known,

24   some experience you might have had with her before?

25   A.    Yes.
```

J.A. 2323

407

1          THE COURT:  Any argument either way?  All

2     right.  I'm going to let this juror remain on the jury

3     panel.  Bring in the others.

4     (Jury in.)

5          THE COURT:  Now, members of the jury, I've

6     questioned Ms. Blount concerning her knowledge of one

7     of the witnesses who testified in this case, and I have

8     determined upon questioning her that she can still be

9     fair and impartial in this particular case despite her

10    previous knowledge of one of the witnesses.  So,

11    therefore, I'm going to let you return to your jury

12    room and resume your deliberations.

13    (Jury out at 4:59 p.m.)

14         THE COURT:  Mr. Everett, let me say that I'm

15    putting the State on notice right now that in any

16    future trial, in which I preside in Pitt County, I will

17    require the State and the defendant to present a

18    written list of potential witnesses prior to jury

19    selection with no exceptions.  Had we done that in this

20    case, we wouldn't have this problem right now.  And I

21    realize that.  And I should have required it then, but

22    I'm sorry I didn't.

23         We'll be in recess until the jury reaches a

24    verdict.

25    (Recess.)

408

```
 1              THE COURT:  All right.  Let's bring the jury
 2      back in.
 3      (Jury in.)
 4              Mr. Nowell, I have received your
 5      correspondence, and you have indicated that the jury
 6      needs to see the criteria between first-degree murder
 7      and second-degree, and that you have been in discussion
 8      for the last ten minutes on the differences there.  I'm
 9      going to reinstruct you or recharge you on that
10      subject.
11              The defendant has been accused of
12      first-degree murder.  Under the law and the evidence in
13      this case, it is your duty to return one of the
14      following verdicts:  guilty of first-degree murder, or
15      guilty of second-degree murder, or not guilty.
16              First-degree murder is the unlawful killing
17      of a human being with malice and with premeditation and
18      deliberation.
19              Second-degree murder is the under lawful
20      killing of a human being with malice, but without
21      premeditation and deliberation.
22              Now I charge that for you to find the
23      defendant guilty of first-degree murder, the State must
24      prove five things beyond a reasonable doubt:
25              First, that the defendant intentionally and
```

Sharpe 000409

J.A. 2325

409

1    with malice killed the victim with a deadly weapon.

2              Malice means not only hatred, ill-will, or

3    spite, as it is ordinarily understood to be sure that

4    is malice, but it also means that condition of mind

5    which prompts a person to take the life of another

6    intentionally or to intentionally inflict serious

7    bodily harm which proximately results in his death

8    without just cause, excuse or justification.  If the

9    State proves beyond a reasonable doubt that the

10   defendant intentionally killed the victim with a deadly

11   weapon or intentionally inflicted a wound upon the

12   victim with a deadly weapon that proximately caused the

13   victim's death, you may infer first, that the killing

14   was unlawful, and second, that it was done with malice,

15   but you're not compelled to do so.  You may consider

16   this along with all other facts and circumstances in

17   determining whether the killing was unlawful and

18   whether it was done with malice.  A firearm is a deadly

19   weapon.

20             Second, the State must prove that the

21   defendant's act was the proximate cause of the victim's

22   death.  A proximate cause is a real cause, a cause

23   without which the victim's death would not have

24   occurred.

25             Third, that the defendant intended to kill

Sharpe 000410

J.A. 2326

410

```
 1    the victim.  Intent is a mental attitude seldom

 2    provable by direct evidence.  It must ordinarily be

 3    proved by circumstances from which it may be inferred.

 4    An intent to kill may be inferred from the nature of

 5    the assault, the manner in which it was made, the

 6    conduct of the parties and other relevant

 7    circumstances.

 8              Fourth, that the defendant acted with

 9    premeditation, that is, that he formed the intent to

10    kill the victim over some period of time, however

11    short, before he acted.

12              And fifth, that the defendant acted with

13    deliberation, which means that he acted while he was in

14    a cool state of mind.  This means -- this does not mean

15    that there had to be a total absence of passion or

16    emotion.  If the intent to kill was formed with the

17    fixed purpose, not under the influence of some suddenly

18    aroused violent passion, it is immaterial that the

19    defendant was in a state of the passion or excited when

20    the intent was carried into effect.

21              Neither premeditation nor deliberation are

22    usually susceptible of direct proof.  They may be

23    proved by circumstances from which they may be

24    inferred, such as the lack of provocation by the

25    victim, conduct of the defendant before, during and
```

Sharpe 000411

J.A. 2327

411

1    after the killing or manner in which or the means by

2    which the killing was done.

3         Second-degree murder differs from

4    first-degree murder in that neither specific intent to

5    kill, premeditation nor deliberation are necessary

6    elements.  In order for you to find the defendant

7    guilty of second-degree murder, the State must prove

8    beyond a reasonable doubt that the defendant

9    unlawfully, intentionally and with malice killed the

10   victim.

11        So I charge that if you find from the

12   evidence beyond a reasonable doubt that on or about the

13   alleged date, the defendant intentionally killed victim

14   with a deadly weapon thereby proximately causing the

15   victim's death, and that the defendant acted with

16   malice, with premeditation and with deliberation, it

17   would be your duty to return a verdict of guilty of

18   first-degree murder.  However, if you do not so find or

19   have a reasonable doubt as to one or more of these

20   things, you will not return a verdict of guilty of

21   first-degree murder.

22        If you do not find the defendant guilty of

23   first-degree murder, you must determine whether he is

24   guilty of second-degree murder.

25        If you find from the evidence beyond a

Sharpe 000412

**J.A. 2328**

412

1   reasonable doubt that on or about the alleged date the

2   defendant intentionally and with malice killed the

3   victim with a deadly weapon, thereby proximately

4   causing the victim's death, it would be your duty to

5   return a verdict of guilty of second-degree murder.

6   However, if you do not so find or have a reasonable

7   doubt as to one or more of these things, it would be

8   your duty to return a verdict of not guilty.

9           All right.  Does that answer your question

10  Mr. Nowell?

11          JUROR:  Thank you, Your Honor.

12          THE COURT:  Let me ask you this now:  It's

13  about 6:30.  Y'all have been deliberating for about two

14  and a half hours.  Do you want to continue your

15  deliberations tonight or do you want to come back

16  tomorrow morning and continue your deliberations?

17  That's something that y'all can decide and let me know.

18          JUROR:  Can we have a few minutes, Your

19  Honor?

20          THE COURT:  Yes, sir.  You want to go in

21  your jury room and do that, and send me out a message

22  if you want to.

23          JUROR:  Yes, sir.

24  (Jury out at 6:32 p.m.)

25          THE COURT:  The foreman has sent me another

413

1  note.  The jury would like to continue deliberations.

2  We will be in recess again until they reach a verdict.

3  (Recess.)

4  THE COURT:  All right.  Let's bring the jury

5  in.

6  (Jury in at 8:12.)

7  THE COURT:  Can you answer this question

8  "yes" or "no"?  Has the jury agreed upon a unanimous

9  verdict?

10  JUROR:  Yes, Your Honor.

11  THE COURT:  Do you have the verdict sheet?

12  JUROR:  Yes, Your Honor.

13  THE COURT:  Would you hand that to the

14  bailiff, please.

15  (Foreman complied.)

16  THE COURT:  All right.  Madam Clerk, would

17  you take the verdict.

18  CLERK:  The jury will stand.  Members of the

19  jury, your foreman has returned a verdict of guilty of

20  first-degree murder.  Is this your verdict so say you

21  all?

22  (No negative response.)

23  THE COURT:  Is there anything further of

24  this jury from the State?

25  MR. EVERETT:  No, Your Honor.

Sharpe 000414

J.A. 2330

4-14

```
 1              THE COURT:  From the defendant?

 2              MR. STOKES:  Yes, sir.  I would ask that the

 3    jury be polled.

 4              THE COURT:  Madam Clerk, would you poll the

 5    jury.  Y'all can have a seat.

 6              THE CLERK:  As I call your name, would you

 7    please stand.

 8              Mr. Nowell.  You have returned a verdict of

 9    guilty of first-degree murder.  Is this your verdict?·

10              JUROR:  Yes, it is.

11              CLERK:  Is this still your verdict?

12              JUROR:  Yes, it is.

13              CLERK:  Thank you.  You may be seated.

14              Mr. Dixon.  Your foreman has returned a

15    verdict of guilty of first-degree murder.  Is this your

16    verdict?

17              JUROR:  Yes.

18              COURT:  Is this still your verdict?

19              JUROR:  Yes.

20              CLERK:  Thank you.

21              Ms. Blount.  Your foreman has returned a

22    verdict of guilty of first-degree murder.  Is this your

23    verdict?

24              JUROR: Yes.

25              CLERK:  Is this still your verdict?
```

Sharpe 000415

J.A. 2331

415

```
 1                    JUROR:  Yes.

 2                    CLERK:  Ms. Corbett.  Your foreman has

 3    returned a verdict of guilty of first-degree murder.

 4    Is this your verdict?

 5                    JUROR:  Yes.

 6                    CLERK:  Is this still your verdict?

 7                    JUROR:  Yes, sir.

 8                    CLERK:  Mr. Forbes.  Your foreman has

 9    returned a verdict of guilty of first-degree murder.

10    Is this your verdict?

11                    JUROR:  Yes.

12                    CLERK:  Is this still your verdict?

13                    JUROR:  Yes.

14                    CLERK:  Mr. Wiggins.  Your foreman has

15    returned a verdict of guilty of first-degree murder.

16    Is this your verdict?

17                    JUROR:  Yes.

18                    CLERK:  Is this still your verdict?

19                    JUROR:  Yes.

20                    CLERK:  Mr. Jackson.  Your foreman has

21    returned a verdict of guilty of first-degree murder.

22    Is this your verdict?

23                    JUROR:  Yes.

24                    CLERK:  Is this still your verdict?

25                    JUROR:  Yes.
```

Sharpe 000416

J.A. 2332

416

```
 1              CLERK:  Ms. Harrington.  Your foreman has
 2    returned a verdict of guilty of first-degree murder.
 3    Is this your verdict?
 4              JUROR:  Yes, ma'am.
 5              CLERK:  Is this still your verdict?
 6              JUROR:  Yes, ma'am.
 7              CLERK:  Mr. Mozengo.  Your foreman has
 8    returned a verdict of guilty of first-degree murder.
 9    Is this your verdict?
10              JUROR:  Yes.
11              CLERK:  Is this still your verdict?
12              JUROR:  Yes.
13              CLERK:  Ms. Best.  Your foreman has returned
14    a verdict of guilty of first-degree murder.  Is this
15    your verdict?
16              JUROR:  Yes.
17              CLERK:  Is this still your verdict?
18              JUROR:  Yes.
19              CLERK:  Mr. Cannon.  Your foreman has
20    returned a verdict of guilty of first-degree murder.
21    Is this your verdict?
22              JUROR:  Yes.
23              CLERK:  Is this still your verdict?
24              JUROR:  Yes.
25              CLERK:  Ms. Wright.  Your foreman has
```

417

```
 1     returned a verdict of guilty of first-degree murder.
 2     Is this your verdict?
 3              JUROR:  Yes.
 4              CLERK:  Is this still your verdict?
 5              JUROR:  Yes.
 6              THE COURT:  Is there anything further with
 7     this jury from the defendant?
 8              MR. STOKES:  No, sir.
 9              THE COURT:  State want to be heard as to
10     sentencing?
11              MR. EVERETT:  No, Your Honor.
12              THE COURT:  Defendant care to be heard?
13              MR. STOKES:  I've examined the mitigating
14     factors on the form and I find --
15              THE COURT:  Well, it's a mandatory sentence
16     on this case.
17              MR. STOKES:  Yes, sir.
18              THE COURT:  Let the defendant stand then.
19     It is the judgment of the Court that the defendant be
20     committed to the custody of the North Carolina
21     Department of Corrections for a term of life.  The
22     defendant to be given credit for any time served while
23     awaiting trial.
24              MR. STOKES:  Your Honor, to that, we would
25     give notice of appeal.
```

J.A. 2334

418

```
1              THE COURT:  You can have a seat.  Take this
2    -- make this appeal entry then, Madam Court Reporter:
3              The defendant has given notice of appeal to
4    the North Carolina Court of Appeals.  Defendant's trial
5    counsel was given an opportunity to object to the jury
6    charge out of the hearing and presence of the jury and
7    did not do so.
8              Defendant shall serve a proposed record on
9    appeal on the State within 35 days after the Court
10   Reporter delivers copies of the transcript to
11   defendant's appellate counsel giving notice -- or after
12   giving or filing notice of appeal if no transcript is
13   ordered.  The State shall serve its amendments,
14   objections or proposed alternative record on appeal on
15   the defendant within 21 days after service upon the
16   defendant's proposed record on appeal.
17             Release of the defendant pursuant to G.S.
18   15A-536 is denied.
19             The clerk should mail copies of these
20   entries to all counsel, including the District
21   Attorney, the court reporter, and to the defendant.
22             All right.  Is there anything further?
23             MR. STOKES:  Yes, sir, Your Honor.  I'm
24   appointed in this case, and I do not have appellate
25   practice, and I would hope that Your Honor would
```

Sharpe 000419

J.A. 2335

419

```
 1    appoint the Appellate Public Defender's Office to

 2    handle this practice, as my client is indigent.

 3               THE COURT:  All right.  Make this finding:

 4               The defendant is indigent and has requested

 5    a transcript and the appointment of counsel.  It is

 6    ordered that the defendant is allowed to appeal as an

 7    indigent, and the Administrative Office of the Courts

 8    shall pay the costs of producing a transcript and

 9    reproducing the record and the defendant's brief.  The

10    Appellate Defender is appointed to perfect the

11    defendant's appeal.  In the event that the appellate

12    defender declines this appointment pursuant to G.S.

13    7A-486.3(1.), the defendant's alternative for appellate

14    counsel named is appointed to perfect the defendant's

15    appeal.

16               I'm going to name you as the alternative

17    appellate counsel, Mr. Stokes, in case the Appellate

18    Defender declines to take the appeal.

19               MR. STOKES:  Your Honor, with all due

20    respect to that, I would say to the Court that I have

21    never filed an appeal.  At one time I told this Court

22    in this room, and now I say to Your Honor, that I do

23    not feel myself competent to handle an appeal in this

24    matter.

25               THE COURT:  Does anybody know the name of
```

J.A. 2336

420

1    the attorney in Wilmington that does appellate work on

2    an indigent basis?

3            MR. EVERETT: We have several lawyers here

4    that do it, Judge.

5            THE COURT: All right. Somebody give me a

6    name.

7            MR. EVERETT: Steven Fisher.

8            THE COURT: I didn't know y'all had --

9    Steven Fisher. I'll appoint him as alternative

10   appellate counsel in the event the Appellate Defender's

11   Office refuses to accept this case.

12           The defendant's appellate counsel named

13   above is appointed to perfect the defendant's appeal.

14   The Clerk shall furnish to the defendant's appellate

15   counsel a copy of all documents on file in this case.

16   Unless the parties stipulate that parts of the

17   proceeding shall not be transcribed, the Clerk shall

18   order from the court reporter a transcript of all parts

19   of the proceedings, and that the Court Reporter is to

20   prepare and deliver to the parties a transcript of all

21   portions of the proceedings in the above-captioned

22   case.

23           All right. I think that takes care of it.

24           Members of the jury, without comment on your

25   verdict, I want to thank you for your services in this

421

```
 1   case.  I appreciate your willingness to stay late
 2   tonight and finish this matter up rather than having to
 3   come back tomorrow.  We will not have any other matters
 4   to be tried this week by a jury, so I'm going to
 5   discharge you.
 6              If any of you have moved or changed your
 7   address since you received your original summons, if
 8   you would contact the Clerk -- if you will come up and
 9   give your name to the Clerk and your new address so we
10   will know where to send your check.
11              Do any of you have any questions about
12   anything before you leave?  I'll be glad to try to
13   answer it.  Seeing none then, I thank you again for
14   your services and I discharge you for the week.
15   (Jurors left the courtroom.)
16              THE COURT:  Anything further before we
17   adjourn?
18              MR. EVERETT:  No, Your Honor.
19              MR. STOKES:  No, Your Honor.
20              THE COURT:  All right.  Sheriff, adjourn
21   court.
22   _____
23                    END OF HEARING.
24
25
```

# APPENDIX M

DECEMBER 5, 1995

TO:      SERGEANT J.W.CORBETT

FROM:    DETECTIVE/CORPORAL CAROLYN J. MELVIN

SUBJECT: LETTER OF RESIGNATION

As you are aware, my attempts to take a Medical Leave were denied
by Chief C.Hinman despite the recommendation by Dr. Lane.

Due to the deterioration of my heath, Chief Hinman left me with no
other recourse.  Documentation will support the on going problems
I have suffered with my unstable Hyperthyroidism.

I feel that the decision to deny this leave, was another act of
Retaliation, placing my heath at risk and totally disregarding
the welfare of my two young children by Chief Hinman.

For the above reasons I feel I have been forced to leave a Career
I have Love and given my all. I feel I have been just as Loyal to
this Organization as any other Law Enforcement Officer. I only began
having problems when I stood up and refused to be a victim of Sexual
Harassment and Retaliation, which followed up to this date.
The retaliation I suffered had no limits, to include Sabotaging of
my assigned Major Cases.

I am submitting this letter of Resignation to you to be effective
Thursday December 28, 1995 at 1800hrs.

*Rec. 12-6-95*

Melvin HR File City 061

# APPENDIX N

*Exhibit A*

NORTH CAROLINA                IN THE GENERAL COURT OF JUSTICE
PITT COUNTY                   DISTRICT COURT DIVISION
                              FILE NO

STATE OF NORTH CAROLINA      )
                             )    AFFIDAVIT OF CHARLENE JOHNSON
            v                )
                             )
MONTOYAE DONTAE SHARPE,      )
            Defendant        )


     NOW COMES Charlene Johnson, being first duly sworn, deposes
and says

     1    That prior to the trial of Montoyae Dontae Sharpe, I
was approached by the Greenville Police Department and Detective
Ricky Best concerning testifying against Montoyae Dontae Sharpe

     2    That Detective Best and the District Attorney told me
that I should testify against Montoyae Dontae Sharpe because they
wanted to get a murderer off the streets

     3    That before this trial I told them that I did not want
to go through with this trial, and they told me that I should   I
thought about running away from the courtroom because I was going
to tell a lie, but I was told by the district attorney that they
would put me in jail if I did that because I was State's witness
I told them that I did not want to do this, that I did not want
to testify, and they told me that I had to go through with the
trial and should testify

     4    Everything that I testified to, that Montoyae Dontae
Sharpe killed that man that night, was untrue   I was not there
that night at all   I felt that I had to testify or that I would
go to jail

Co. 0203

J.A. 2342

5    That at the time of this trial I was *14* years old

6    That I came into the Law Offices of Steven M  Fisher and requested that I be able to make some sort of written statement or affidavit in order to show that my testimony against Montoyae Dontae Sharpe was entirely false

7    That I told Mr  Fisher's employee, Tina D  Lyda, that I had not told the truth when I testified

8    That the attached transcript is the conversation that I had with Mr  Fisher's employee, Tina D  Lyda, and I request that the transcript be a part this affidavit

This the *10th* day of *September*, 1996

*Charlene Johnson*
CHARLENE JOHNSON

NORTH CAROLINA
PITT COUNTY
    I, *Tina D Lyda*, a Notary Public for said County and State do hereby certify that Charlene Johnson personally appeared before me this day and acknowledged the due execution of the foregoing instrument
    Witness my hand and official seal, this the *10th* day of *September*, 19*96*

(OFFICIAL SEAL)

*Tina D Lyda*
NOTARY PUBLIC

My commission expires
*9-13*, 19*98*



STATEMENT MADE BY CHARLENE JOHNSON AND TAKEN BY TINA LYDA

Q  (Tina)      What is your name?

A  (Charlene)  Charlene Johnson

Q  (Tina)      Do you know you are being recorded?

A  (Charlene)  Yes

Q  (Tina)      Do you have any opposition to being recorded?

A  (Charlene)  No

Q  (Tina)      Okay, tell me what you have in your hand

A  (Charlene)  It is a piece of paper telling, like what they
               used to do for me

Q  (Tina)      Tell me who "they" are

A  (Charlene)  Detective Best

Q  (Tina)      Okay, tell me what they used to do for you

A  (Charlene)  Detective Best used to buy me outfits, give me
               money, take me out to eat, take me places and
               stuff like that

Q  (Tina)      Go ahead and tell me what else he did

A  (Charlene)  That's it  He took me to Wilmington, North
               Carolina

Q  (Tina)      What for?

A  (Charlene)  When I got beat up

Q  (Tina)      Okay  You wanted to tell me what happened with
               Dantae

A  (Charlene)  Yes

Q  (Tina)      Alright, tell me what happened with Dante

A  (Charlene)  It was   Everything that I said on the stand was a
               lie

Q  (Tina)      Okay, tell me what happened

A  (Charlene)  They told me that I should do it because they
               wanted to get a mur   Detective Best told me I
               should do it because they wanted to get a murderer

Co. 0207

**J.A. 2346**

off the street

Q (Tina)        Okay, do you want to tell me exactly what
happened

A (Charlene)    When?

Q (Tina)        What happened? What was a lie?

A (Charlene)    Everything that I said, that he killed that Mr
Bradcliffe

Q (Tina)        Okay  How do you know that he didn't?

A (Charlene)    Because I wasn't out there that night

Q (Tina)        You were not there at all?

A (Charlene)    No

Q (Tina)        Okay, what else is written on your piece of paper?

A (Charlene)    When I told them that I didn't want to do this,
want to Go through with this trial, they told me
that I should

Q (Tina)        Okay, and who is "they"? Detective Best?

A (Charlene)    Uh huh   And I was thinking about running away
from the  court room, when I was going to do it,
they told me that if I did that, they would put me
in jail, because I was a state witness

Q (Tina)        Detective Best told you he would put you in
jail

A (Charlene)    No, they said that I would go to jail

Q (Tina)        And who is "they"?

A (Charlene)    The D A

Q (Tina)        The D A  told you that you would go to jail if you
ran away because you were state's witness?  Is
that right?

A (Charlene)    Uh huh

Q (Tina)        Anything else you want to tell me?

A (Charlene)    No

Q (Tina)        Tell me your name again

Co. 0209

J.A. 2348

A  (Charlene)    Charlene Johnson

Q  (Tina)       Do you know what today's date is?

A  (Charlene)    The 18th

Q  (Tina)       Okay, of what?

A  (Charlene)    April

Q  (Tina)       What year is this?

A  (Charlene)    1996

Q  (Tina)       How old are you?

A  (Charlene)    Sixteen

Q  (Tina)       When is your birthday?

A  (Charlene)    ███████████

Q  (Tina)       Do you know your social security number?

A  (Charlene)    No

Q  (Tina)       Okay

A  (Charlene)    Yeah, yeah I do   ████████

Q  (Tina)       That is your Social Security number?

A  (Charlene)    Yes

Q  (Tina)       Okay  Uh, anything else you want to say?

A  (Charlene)    No

Q  (Tina)       Okay

END OF STATEMENT

Co. 0211

**J.A. 2350**

STATE OF NORTH CAROLINA          IN THE GENERAL COURT OF JUSTICE
PITT COUNTY                      SUPERIOR COURT DIVISION
                                 94 CRS 7660


STATE OF NORTH CAROLINA          )
                                 )
                                 )
            v                    )     ORDER GRANTING EVIDENTIARY
                                 )     HEARING ON DEFENDANT'S MOTION
                                 )     FOR APPROPRIATE RELIEF
                                 )
                                 )
MONTOYAE DONTAE SHARPE           )


THIS CAUSE coming on before the Honorable W Russell Duke, Jr , on defendant's
Motion for Appropriate Relief, and it appearing from the verified motion and attached affidavits
that an evidentiary hearing is necessary for a determination of the issues presented in the
defendant's motion, it is therefore ORDERED pursuant to G S  15A-1411 *et seq* , that an
evidentiary hearing be held in this matter

THIS the *16th* day of _____Judy_____, 1997


                                 _____
                                 Honorable W Russell Duke, Jr
                                 Senior Resident Superior Court Judge

Pitt Co. 0213

J.A. 2352

# Appendix O

PROFESSIONAL SERVICES UNLIMITED INVESTIGATIVE AGENCY
P.O. BOX 755
AYDEN, NC 28513
(252)412-0316
(252)916-2840

Investigator Carolyn J. Melvin-Fordham
Owner/Operator    NC Lic#1937

Mrs. Sara Sharpe Staton;

    I would like to take this opportunity to thank you for hiring Professional Services Unlimited Investigative Agency to work this case for you.

    It is always a joy to work for Clients who exhibits ethincs, and integrity. Again thank you for your services. If you have any questions, please feel free to contact me.

Respectfully,
Investigator Carolyn J. Melvin-Fordham
      NC Lic# 1937

Sharpe 005377

# Duke Number 3 of 28

### PRIVATE INVESTIGATOR'S SUMMARY

Investigator Carolyn J. Melvin-Fordham
case no: 00/0008
June 28, 2000

This investigator has never had the opportunity to work a case in which P.I. was the Primary Investigator while P.I. worked as Detective/Corporal at the Greenville Police Dept.

P.I. was first notified by the North Carolina Prison System in November 1999 in reference to this case. P.I. was asked to make attempts to look for Beatrice Stokes within two weeks. Due to the fact P.I. had just moved back to Greenville the day prior and that P.I. had only met Stokes once prior to the trial. Nevertheless P.I. was unable to locate Stokes at that time.

P.I. was approached a second time in March 2000 by Sara Staton reference this case. Staton, mother of Donta Sharpe, hired P.I. to investigate new discovered evidence in her son's case. Staton advised P.I. of the details of witness #1 recantation two years prior. Staton advised P.I. that she was told that the second witness was paid to testify against Donta Sharpe.

As the Preliminary Investigator in this case, P.I. was assisted by Detective David Ricky Best of the Greenville Police Dept.

P.I. first reviewed the original murder file of the case to refresh P.I.'s memory of the case. Staton provided P.I. with a copy of the trial transcript, which assisted greatly. Staton provided P.I. with a copy of witness #1, Charlene Johnson's Affidavit. These materials along with a thorough investigation assisted in P.I. not only reopening the case, but substantiating the fact that Donta Sharpe is incident of the murder charges he was convicted of in 1995.

P.I. began looking for motive in this case. What motive would the two witnesses have to frame Sharpe in this murder case. What motive would Detective Best, Greenville Police Dept or the District Attorney Office, specifically Clark Everette would have to keep a man in prison for a crime they have evidence he did not commit.

P.I. began with witness #1's mother Bandy, who satisfied P.I. with the fact that her daughter, who at that time was very young, impressionable, immature and rebellious. Bandy felt because of Johnson's life style she had chosen, Johnson lied on Sharpe. Bandy stated young girls who try to hang on the streets they tend to bond with the guys on the streets. Bandy stated if the affection is not return, the young girls can and will retaliate against the guys with total disreguard to the consequences of thier actions. Bandy stated after Johnson realized what she had done she did everything she could to rectify the situation. It did not help that Detective Best bonded with this young girl who was looking for a father figure, to the exent that Johnson was allowed to call Best "daddy Best", given gifts, and money daily. P.I. witnessed the relationship between Best and Johnson during this time. P.I. was even asked to buy Johnson a dress for the trial because she wanted a new dress. P.I. flatly refused by stating it would not be appropriate for a Investigator to buy gifts for a witness prior to trial.

P.I. was introduced to witness #2 later by Detective Best. P.I. was advised that Beatrice Stokes was someone he had dealt with in past cases and was a witness in this case. P.I. met Stokes once prior to the trial. One the day of the trial P.I. was suspended one day without pay for a incident while occured four months prior. P.I. was listed as lead Investigator in this case however, like with the witnesses, which was the only evidence used in this case to convict Sharpe. P.I. did not collect, submit or receive any evidence

Sharpe 005378

**IN THE UNITED STATES DISTRICT COURT**
**THE EASTERN DISTRICT OF NORTH CAROLINA**
**EASTERN DIVISION**
**Lead Case No. 4:21-cv-185-BO**
*Consolidated with 4:22-cv-88-BO*

| | |
|---|---|
| MONTOYAE DONTAE SHARPE,<br><br>                     Plaintiff,<br><br>vs.<br><br>DAVID RICKY BEST, JEFFREY D.<br>SHROCK, CAROLYN MELVIN, and<br>the CITY OF GREENVILLE, NORTH<br>CAROLINA,<br><br>                     Defendants. | **DEFENDANT MELVIN'S**<br>**MEMORANDUM OF LAW IN SUPPORT**<br>**OF REVISED MOTION FOR SUMMARY**<br>**JUDGMENT** |

Defendant Carolyn Melvin ("Melvin"), by and through her undersigned counsel, and pursuant to Local Civil Rules 7.1 and 7.2 and Rule 56 of the Federal Rules of Civil Procedure, submits the following Memorandum of Law in support of her Revised Motion for Summary Judgment filed contemporaneously herewith. Pursuant to the Court's Order dated November 6, 2024 (D.E. 242), Melvin incorporates by reference her Statement of Material Facts (D.E. 185), Appendix to Statement of Material Facts (D.E. 201, 203) and exhibits (D.E. 212-1, 212-2, 212-3), and Memorandum of Law in Opposition to Plaintiff's Revised Motion for Summary Judgment (D.E. 250) previously filed in this matter. For ease of reference, the undersigned refers to the Docket Entry number, instead of the appendix letter for her Appendix to Statement of Material Facts.

## NATURE OF THE CASE

In February 1994, George Radcliffe ("Radcliffe") was murdered in Greenville, North Carolina when he was attempting to purchase cocaine. (D.E. 203-1). at In April 1994, an

1

eyewitness, Charlene Johnson ("Charlene"), gave information about this homicide, which led to Plaintiff Montoyae Dontae Sharpe ("Sharpe" or "Plaintiff") being arrested and charged for the homicide of Radcliffe. (D.E. 243, ¶¶ 58, 61-62, 87). Melvin was the Greenville Police Department ("GPD") on-call detective assigned to investigate Radcliffe's murder but due to her suffering from Graves' disease, Detective Ricky Best ("Detective Best") began assisting in the investigation on February 15, 1994. (D.E. 201-3, Part II 8:22 – 8:25, 27:2 – 27:12, 48:5 – 48:8). In July 1995, a Pitt County jury convicted Sharpe for murdering Radcliffe. Sharpe ultimately had his conviction overturned in 2019, was released from prison, and the then Pitt County District Attorney dismissed the charges. (D.E. 243, ¶ 1).

Following his release, Plaintiff filed this lawsuit on December 20, 2021, asserting claims against the City of Greenville, Greenville patrol officer Jeffrey Shrock ("Shrock"), and Greenville detective Ricky Best for allegedly violating 42 U.S.C. § 1983 ("§ 1983") and various state torts and state constitutional claims in connection with his arrest and incarceration. Near the expiration of the statute of limitations, Plaintiff then sued Melvin by filing a complaint on July 29, 2022 (22-CV-088-BO; EDNC) (the Melvin suit was combined with the initial action filed against the City of Greenville, Shrock and Best). Plaintiff filed an Amended Complaint against all defendants on November 7, 2024. (D.E. 243). Sharpe claims the defendants intentionally violated his rights under the United States Constitution and North Carolina Constitution by engaging in police misconduct, withholding evidence from the prosecutor, fabricating evidence and providing false testimony and causing his wrongful imprisonment, which led to his conviction. Melvin denies violating his rights in any manner and moves for summary judgment as to all claims made against her.

Despite Plaintiff's conclusory claims to the contrary, Melvin conducted a fair and careful investigation. Plaintiff has produced no evidence, beyond mere speculation and conjecture, that Melvin fabricated evidence, failed to intervene in the use of Charlene's alleged fabricated handwritten statement, coerced or induced any witness to testify falsely, or intentionally withheld any exculpatory evidence from the prosecutor. Melvin likewise had probable cause to arrest Plaintiff, as Fourth Circuit dictates that probable cause be determined objectively, and not subjectively thirty years later. Nor has he demonstrated that any alleged wrongful activity of Melvin was the proximate or but-for cause of Plaintiff's arrest or conviction. Plaintiff has no constitutional right to an "error-free" investigation or for detectives to exhaustively investigate every alternative lead. Accordingly, summary judgment should be granted in favor of Melvin.

## STATEMENT OF THE FACTS

Defendant Melvin incorporates her previously filed Statement of Undisputed Facts (D.E. 185, 201, 203-1, 203-2, 203-3).

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). It is "the affirmative obligation of the trial judge to prevent 'factually unsupported claims and defenses' from proceeding to trial.'" *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993) (quoting *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987)). Critically, "the question of qualified immunity should be decided at the summary judgment stage[.]" *Morgan v. Spivey*, No. 5:16-CV-365-FL, 2019 WL 81480, at *11 (E.D.N.C. Jan. 2, 2019) (internal quotation marks omitted) (quoting *Willingham v. Crooke*, 412 F.3d 553, 558–59 (4th Cir. 2005)).

## LEGAL ARGUMENT

**I.      Plaintiff's Second Cause of Action Against Melvin for Knowingly Using False Evidence Should Be Dismissed.**

Plaintiff asserts that Melvin violated his rights under the Fourteenth Amendment by using the alleged fabricated handwritten statement of Charlene to obtain an arrest warrant for his arrest. (D.E. 243, ¶¶ 251-264). For reasons set forth below, this claim should be dismissed.

**A.          Plaintiff's claims that Melvin fabricated false evidence lack factual support.**

Plaintiff claims Melvin violated his rights by allowing Detective Best to "take investigative steps without her supervision and/or approval, or in violation of her supervision and approval," and allowing the alleged fabricated statement of Charlene to be used to charge him for murder. (D.E. 243, ¶¶ 254-257). However, Melvin was assigned to be the lead detective for only a couple of days before Detective Best was assigned as the lead detective and Melvin remained the lead detective on paper only. (D.E. 243, ¶ 19) (D.E. 201-3, Part II, 7:14 – 8:24) (Q: "When he [Best] was assigned, what was he expected to do?" A: "To be the lead investigator, to complete all of the necessary documents, 96 Hour Reports. To be present at the autopsy, and to handle the evidence and as a lead investigator. . . I was reassigned to another building, so I never saw a whole lot of work. I was taking sick leave, Graves disease, so I was in and out.") (D.E. 201-3, Part II, 81:12 – 81:16) ("It was common knowledge I weren't working the case, it just weren't on paper.") Further, Plaintiff has failed to forecast evidence from which a jury could reasonably conclude that Melvin knowingly used fabricated evidence or that Plaintiff's arrest or conviction was the "but-for" or proximate result of any alleged wrongful conduct or omission of Melvin.

Under the Fourteenth Amendment, a criminal defendant has the right "not to be deprived of liberty as a result of the fabrication of evidence by a government officer acting

in an investigating capacity." *Massey v. Ojaniit*, 759 F.3d 343, 354 (4th Cir. 2014) (citation

omitted). To prevail on a fabrication of evidence claim, the plaintiff must prove the fabricated

evidence caused his conviction and subsequent incarceration. *See Massey,* 759 F.3d at 356–57.

Stated differently, the plaintiff must prove "that his conviction was a reasonably foreseeable

result of the fabrication." *See Black v. W. Virginia State Police*, 696 F. Supp. 3d 236, 247

(S.D.W. Va. 2023) (citations omitted). Constitutional torts require a showing of both but-for and

proximate causation. *See Evans v. Chambers*, 703 F.3d 636, 647 (4th Cir. 2012); *Massey*, 759

F.3d at 354. "But-for" causation exists when the harm at issue would not have occurred without

the relevant conduct. *Evans*, *supra.* But-for causation may be lacking when an intervening

decision-maker would have brought about the seizure or deprivation of liberty even with no

alleged misconduct. *Id.*

Here, Plaintiff claims Melvin knowingly used Charlene's "false" witness statement to

obtain a warrant for Plaintiff's arrest. (D.E. 243, ¶ 256). However, Plaintiff has cited no evidence

that Melvin <u>knew</u> Charlene's statement was false on April 7, 1994 when she obtained a warrant

for his arrest, which is fatal to his fabrication claim. Rather, the first time Melvin learned that

Charlene did not see Sharpe kill Radcliffe was when she "had left the PD and that's when Sarah

said she recanted it [in March 2000]. I never known anything different." (D.E. 201-3, Part II,

74:15 – 74:21; Appendix O). Critically, Melvin testified that "[w]hen [she] was in the room with

Ricky and Charlene [for Charlene's interview], there was nothing abnormal." (D.E. 201-3, Part II

56:11- 56:12). Melvin unequivocally denies she allowed Detective Best to "feed" Charlene any

information and admits she would have written Detective Best up if he engaged in such conduct.

(D.E. 201-3, Part II 128:23 – 129:21). Instead, Plaintiff seeks to rely upon Melvin's deposition

testimony from April 2024 – over 30 years later – that she "wasn't buying the Charlene issue."

(D.E. 201-3, Part I, 34:16 -34:17). But Melvin has <u>never</u> testified that she thought Charlene's statement was false on April 7, 1994 when she obtained the warrant for Sharpe's arrest. (D.E. 201-3). Notably, Melvin testified in the case *sub judice* that Charlene <u>always</u> maintained that Sharpe was the shooter, and she did not have information of anything different in 1994 and 1995. (D.E. 201-3, Part II, 51:6 – 51:20).

Melvin, similarly, denies any person in her presence instructing Charlene how to testify at trial in 1995. (D.E. 201-3, Part II 129:14 – 130:6) ("Did he [Detective Best] advise Ms. Johnson about the time, place, and manner of the George Radcliffe homicide?" "Not in my presence."). Detective Best, likewise, denies: (1) that he provided the details of Radcliffe's murder to Charlene or (2) that he or Melvin told Charlene what to write in her handwritten statement. (D.E. 201-5, 264:11 – 265:3). Charlene, likewise, testified that Detective Best put her in a room, gave her a blank piece of paper, and "told [her] to write down what [she] knew." (D.E. 201-6, 38:12 – 38:17). Charlene never testified at trial in 1995 or in this case that Melvin stood by and watched as Detective Best purportedly told her what to write, and therefore, Melvin lacked any knowledge that Charlene's statement was false on April 7, 1994. (D.E. 201-6, 38:12 – 41:8) (D.E. 201-3, Part II, 129:9 – 129:16) (Q: "And up until the time that Ms. Johnson testified in the criminal trial of Dontae Sharpe in July of 1995, did you give her any written material or anything of that nature to tell her to base her testimony on?" A: "No, sir." Q: "Did you tell her how she should testify at the trial that day in July of 95?" A: "No, sir.")

As such, Plaintiff's conclusory allegations that Melvin knowingly used false evidence are entirely devoid of factual development. *See Wai Man Tom v. Hosp. Ventures LLC*, 980 F.3d 1027, 1037 (4th Cir. 2020) ("[C]onclusory allegations or denials, without more, are insufficient to preclude granting the summary judgment motion.") Discovery has closed and there is no

evidence establishing that Melvin knew Charlene's written statement was false on April 7, 1994, when she typed the warrant for Plaintiff's arrest. As for the causation prong, the record is entirely devoid of any evidence that Melvin participated in the alleged fabrication of Charlene's statement. Plaintiff's conviction was not a reasonably foreseeable result of Melvin's purported act of fabrication – being in the room while Charlene wrote her statement and using the statement, which identified Plaintiff as the shooter, to establish probable cause.  As such, Plaintiff's arrest or conviction was not the "but-for" or proximate result of Melvin's conduct. Accordingly, summary judgment should be entered in Melvin's favor on the fabrication of evidence claim.

> ### B.        Melvin is entitled to qualified immunity on Plaintiff's knowing use of false evidence claim.

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments," and it "protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2085 (2011) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). The doctrine protects officers from suit in cases involving "gray areas" of constitutional rights or the violation of such asserted rights. *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 2012). The qualified "immunity shield is necessarily more protective than is the defense on the merits." *Torchinsky v. Siwinski*, 942 F.2d 257, 261 (4th Cir. 1991). Qualified immunity shields officials from money damages unless (1) the official violated a statutory or constitutional right, and (2) "every reasonable official would have understood" the right was "clearly established" at the time

7

of the alleged violation. *See Harlow*, 457 U.S. at 818; *Ashcroft v. al-Kidd*, 563 U.S. at 741 (2011) (emphasis added) (internal quotations omitted). The Court may determine these elements in either order. *See Pearson*, 555 U.S. at 232, 236.

To establish qualified immunity, the detective must demonstrate the plaintiff "has not shown facts "mak[ing] out a violation of a constitutional right" or the right was not 'clearly established' at the time of its violation." *Black v. W. Virginia State Police*, 696 F. Supp. 3d 236, 244 (S.D.W. Va. 2023) (quoting *Owens v. Baltimore City State's Attorneys' Office*, 767 F.3d 379, 395 (4th Cir. 2014) (quoting *Pearson*, 555 U.S. at 232))). In the Fourth Circuit, the plaintiff bears the burden of proving a constitutional violation and the officer bears the burden on the clearly established prong. *See Jones v. Solomon*, 90 F.4th 198, 207 (4th Cir. 2024).

Here, for all of the reasons described in part I, *supra*, Melvin did not violate any constitutional right, which ends the Court's qualified immunity analysis. *See Abney v. Coe*, 493 F.3d 412, 415 (4th Cir. 2007) (finding that "[i]f [an official] did not violate any right, he is hardly in need of any immunity and the analysis ends right then and there"); *Parker v. Burris*, 2015 WL 1474909, at *8 (M.D.N.C. Mar. 31, 2015) (finding that "the absence of evidence supporting a finding that a constitutional violation occurred satisfies the first prong of the qualified immunity analysis"), *aff'd*, 623 F. App'x 82 (4th Cir. 2015). While the *knowing use of false evidence* is a clearly established constitutional right, Plaintiff cannot forecast sufficient evidence that Melvin violated such a right. *See Goodman v. Moose*, No. 1:23-CV-00023-MR, 2024 WL 4761389, at *4 (W.D.N.C. Nov. 12, 2024) ("[B]ecause the Plaintiff has not presented a forecast of evidence that any Defendant violated his constitutional rights, the Defendants are entitled to qualified immunity.") Instead, Plaintiff has forecast <u>no</u> evidence that Melvin, on April 7, 1994, when she

applied for Sharpe's arrest warrant: (1) had knowledge that Detective Best fabricated Charlene's statement or (2) knew Charlene's statement was false.

At best, Plaintiff may have been deprived of liberty as a result of negligently collected evidence, which does not amount to an established constitutional violation. To the contrary, there is no "established constitutional right not to be deprived of liberty as a result of *false evidence negligently* gathered by a government officer." *Robertson v. Elliott*, 315 F. App'x 473, 477 (4th Cir. 2009) (emphasis added) ("There is no constitutional right that protects against the deprivation of liberty as a result of negligently gathered evidence.") *See also Zahrey v. Coffey,* 221 F.3d 342, 348 (2d Cir.2000) ("The manufacture of false evidence, in and of itself . . .does not impair anyone's liberty, and therefore does not impair anyone's constitutional right.") (internal quotation marks omitted). As the Supreme Court espoused in *Daniels v. Williams*, "the Due Process Clause is simply not implicated by a negligent act of an official causing unintended loss of or injury to life, liberty or property," which is precisely the issue before this Court. 474 U.S. 327, 328 (1986) (emphasis added). *See Jean v. Collins*, 221 F.3d 656, 660 (4th Cir. 2000) (en banc). For the reasons set forth above, Melvin did not knowingly use false evidence, as she did not know that Charlene's statement was false on April 7, 1994, and did not violate any clearly established constitutional right and is entitled to qualified immunity on this claim. (D.E. 201-3, Part II, 74:15 – 74:21) (Q: "And at all times that you had conversations with Charlene, Charlene always maintained that, yes, she saw Dontae Sharpe kill George Radcliffe, correct?" "A. Yes. The first time I ever heard a difference, I had left the PD and that's when Sarah said she recanted it. I never known anything different.")

9

## II.  Plaintiff's Third Cause of Action Against Melvin for Failing to Intervene Should Be Dismissed.

Plaintiff claims that Melvin violated his constitutional rights under the Fourteenth Amendment by failing to intervene with "her supervisors of the Chief of Police to prevent the arrest of Dontae Sharpe for the murder of George Radcliffe" and failing to inform the District Attorney "that she believed the statement obtained from Charlene Johnson was false[.]" (D.E. 243, ¶¶ 268, 272).

### A.  Plaintiff's claims that Melvin failed to intervene lack factual support.

"The concept of bystander liability is premised on a law officer's duty to uphold the law and protect the public from illegal acts, regardless of who commits them." *Randall v. Prince George's Cnty., Md.*, 302 F.3d 188, 203 (4th Cir. 2002). As such, under § 1983, an officer may only be held liable under a failure to intervene theory – also known as bystander liability – "where the officer <u>knows</u> that a fellow officer is violating an individual's rights, has a reasonable opportunity to prevent the violation, and chooses not to intervene." *Quinn v. Zerkle*, 111 F.4th 281, 295–96 (4th Cir. 2024) (emphasis added). Under the first prong, "a bystander must have '<u>specific knowledge</u>' of the relevant conduct." *Kifer v. Crow*, No. 3:21-CV-039-DCK, 2023 WL 5192113, at *8 (W.D.N.C. Aug. 11, 2023) (quoting *Randall*, 302 F.3d at 204) (emphasis added).

Here, Plaintiff fails to satisfy the first prong – specific knowledge. As set forth above, there is no evidence that Melvin had specific knowledge that Charlene's statement was false on April 7, 1994 or prior to Sharpe's criminal trial in July 1995. Instead, in 1994 and 1995, Melvin lacked any knowledge that Detective Best "obtained a fabricated statement by Charlene Johnson that falsely implicated Dontae Sharpe in the murder of George Radcliffe[.]" (D.E. 243, ¶ 237). (D.E. 201-3, Part II 128:13 –130:6). Indeed, Plaintiff cannot forecast any evidence that Melvin had actual or constructive knowledge of Detective Best causing Charlene to provide a fabricated

10

statement in 1994 or 1995. No such evidence exists. Instead, when asked whether Detective Best gave Charlene a paper with details and told her to copy it in her own handwriting, Melvin unequivocally responded, "No, I would have wrote him up." (D.E. 201-3, Part II 129:2 - 129:5). Melvin, likewise, testified Detective Best never provided the time, place, and details of Radcliffe's homicide to Charlene in her presence. (D.E. 201-3 Part II 129:6 – 129:8). Moreover, Melvin properly documented the interview with Charlene on April 7, 1994, and stated, "Johnson wrote a statement as to the fact that she saw them the night of the murder." (D.E. 203-1, at 22).

Importantly, Melvin testified that Charlene, in accordance with her handwritten statement, always maintained she saw Plaintiff kill George Radcliffe and "[t]he first time [she] ever heard a difference, [she] had left the PD[1] and that's when Sarah [Plaintiff's mother] said she recanted it. I never known anything different." (D.E. 201-3, Part II 74:15 – 74:21). Therefore, there is no evidence that Melvin had knowledge in 1994 and 1995 that Charlene's statement was false, and Plaintiff has cited none, which is fatal to Plaintiff's claim. Charlene did not recant until after Sharpe's July 1995 trial (PSF ¶¶ 159-163) and Melvin did not learn of Charlene's recantation until after March 2000 when Plaintiff's mother retained her as a private investigator, so Melvin could not intervene prior to Sharpe's trial, as Plaintiff contends. (Appendix O, Sharpe 005378) (D.E. 201-3, Part II, 40:10 – 40:13, 59:1 – 59:5) ("She [Sharpe's mother] says since you have gone, the witnesses have recanted their statements. I didn't even know they had. I said, really? And she told me what, she says, but we need to find Beatrice Stokes.") (Q: "Do you feel that you personally have done a lot since the year 2000 to help get Dontae Sharpe released from jail?" A: "Yes.")

---

[1] Melvin resigned from the GPD on December 28, 1995. (D.E. 201-13.) *See* D.E. 201-3, Part II, 37:13 – 37:16) (Q: "When you started working for the Sharpe family, you had been, you had already resigned from the City of Greenville, correct?" A: "Right.")

As such, there is not any evidence to create a genuine dispute of material fact that Melvin had the requisite "specific knowledge" in 1994 and 1995 that Charlene's statement was false to hold her liable on this failure to intervene claim.  She did not have any such knowledge and Plaintiff has not produced any such evidence, just allegations. The evidence is insufficient to show that Melvin: (1) knew Detective Best provided details of Radcliffe's murder to Charlene to write in her own handwriting; (2) knew Detective Best caused Charlene to fabricate a statement; or (3) knew that Charlene's statement was false in 1994 and 1995, and without such knowledge, there is, similarly, insufficient evidence to show Melvin had a realistic opportunity to intervene with her supervisors or the Chief of Police to prevent Plaintiff's arrest and subsequent conviction. Plaintiff cannot forecast sufficient evidence, besides mere speculation, that Melvin knew Charlene's statement was false on April 7, 1994 when she applied for the arrest warrant, which destroys his claim. *See Shipley v. Disney*, No. CV SAG-21-3173, 2022 WL 2789076, at *7 (D. Md. July 15, 2022) (dismissing failure to intervene claim where the allegations did not put detectives "in a position where they could have observed the alleged violations of Plaintiff's constitutional rights, or "stood by" while they occurred.") (D.E. 201-3 Part II 129:6 – 129:8).

Given that no sufficient evidence exists to show Melvin knew Charlene provided a false statement, she had no such duty to intervene, as she lacked any knowledge Charlene's statement was false until 2000 when Sharpe's mother informed her of the same. *See Quinn v. Zerkle*, 111 F.4th 281, 295 (4th Cir. 2024) (holding state trooper was entitled to qualified immunity where he lacked actual knowledge that the sheriff deputies' entry into the residence was unconstitutional and did not have a reasonable opportunity to prevent the deputies from entering the home); *Burley v. Baltimore Police Department*, 422 F. Supp. 3d 986, 1030 (D.Md. 2019).

Further, a § 1983 failure to intervene claim is, by nature, derivative of a plaintiff's other § 1983 claims. *See Hinkle v. City of Clarksburg*, 81 F.3d 416, 420 (4th Cir. 1996) (observing that bystander liability claim was "derivative" of excessive force claim and holding that claim failed "[i]n the absence of any underlying use of excessive force"). Here, Plaintiff's failure to intervene claim is derivative of his §1983 claims for fabrication of evidence and institution of criminal charges without probable cause against Melvin. Because the fabrication of evidence and lack of probable cause claims fail for the reasons set forth hereinabove and below, the failure to intervene claim against Melvin must fail as well. *See Shipley v. Disney, Jr.,* No. CV SAG-21-03173, 2024 WL 4635459, at *13 (D. Md. Oct. 31, 2024) ("This claim is thus derivative of Plaintiff's fabrication of evidence and Brady claims. Where those claims have failed, so too must any claims that other officers failed to intervene.") (internal citations and quotation marks omitted).

Accordingly, summary judgment should be entered in Melvin's favor on the failure to intervene claim.

### B. Melvin is entitled to qualified immunity on Plaintiff's failure to intervene claim.

Here, for all of the reasons described in part II, *supra*, Melvin did not violate any constitutional right and is entitled to qualified immunity on Plaintiff's failure to intervene claim. *See Abney,* 493 F.3d at 415; *Parker,* 2015 WL 1474909, at *8.

Even if this Court were to find a constitutional violation, which is denied, then Melvin is nonetheless entitled to qualified immunity under the second prong, as the right was not clearly established in 1994 and 1995. The Supreme Court has acknowledged "it is sometimes difficult for an officer to determine how the relevant legal doctrine . . . will apply to the factual situation the officer confronts." *Saucier v. Katz,* 533 U.S. 194, 205 (2001), *rev'd on other grounds*, 555

U.S. 223 (2009). Through its second prong, qualified immunity protects officers who must operate along the "hazy border[s]" that divide acceptable from unreasonable conduct. *Id.* at 206. Where there are cases that factually put the officer's conduct within constitutional limits as there are here, the plaintiff must show either (1) that the officer's conduct was materially different from those cases or (2) that there is either "controlling authority" or a "robust 'consensus of cases of persuasive authority'" leading to a different result. *Plumhoff v. Rickard*, 572 U.S. 765 (2014) (citing *al-Kidd*, 563 U.S. at 741).

Melvin is entitled to qualified immunity because there is no clearly established law preventing her from sitting in an interview room with an eyewitness to a homicide and allowing the witness to provide a handwritten statement about the homicide she witnessed, which is precisely what she did here. As Supreme Court precedent makes clear, "clearly established" means that, at the time of the [official's] conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful." *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (quotation omitted); *see, e.g., City of Escondido v. Emmons*, 139 S. Ct. 500, 503-04 (2019). An officer "cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Plumhoff,* 572 U.S. at 778–779. Here, as set forth hereinabove, Melvin did not participate in the alleged fabrication of Charlene's statement and did not know Charlene's statement was false in 1994 or 1995. Further, as set forth hereinbelow, Melvin had probable cause to believe that Sharpe murdered Radcliffe on the basis of Charlene's statement, which she did not learn was false until 2000. *See McPherson v. Baltimore Police Dep't*, No. CV SAG-20-0795, 2023 WL 5433011, at *26 (D. Md. Aug. 3, 2023), *appeal dismissed sub nom. McPherson v. Patton*, No. 23-1938, 2024 WL

14

**J.A. 2369**

4490631 (4th Cir. Oct. 15, 2024) ("[C]ourts have found that an officer nonetheless has probable cause even when a witness's statement contains inconsistencies.")

Further, there is no clearly established constitutional obligation for a detective to intervene in a purported fabricated statement when she does not observe the purported fabrication or know her co-detective violated someone's constitutional rights. The Amended Complaint, notably, contains no allegation that <u>Melvin knew</u> Detective Best violated Sharpe's constitutional rights by fabrication. *See McIntyre v. Unified Gov't of Wyandotte Cnty. & Kansas City, Kansas*, No. CV 18-2545-KHV, 2020 WL 1028303, at *23 (D. Kan. Mar. 3, 2020) ("Glaringly absent from that explanation is any assertion – or most importantly any direction to allegations in the second amended complaint – that [detectives] actually knew or had reason to know of constitutional violations by other officials.") The only allegation Plaintiff can point to certainly does not allege Melvin knew Best violated Plaintiff's constitutional rights through fabrication. (D.E. 243, ¶ 266) ("Melvin knew or reasonably should have known that using fabricated and false evidence violated Dontae Sharpe's constitutional rights.") The undersigned is, likewise, not aware of Fourth Circuit, United States Supreme Court, or North Carolina Supreme Court precedent that makes it sufficiently clear that reasonable officers in 1994 and 1995 would have understood that failing to intervene during a "normal" witness interview violated the plaintiff's constitutional rights. (D.E. 201-3, Part II 56:11- 56:12). *See Doe ex rel. Johnson v. S.C. Dep't of Soc. Servs.*, 597 F.3d 163, 176 (4th Cir. 2010) ("In the Fourth Circuit, existing precedent includes precedent of the United States Supreme Court, the Fourth Circuit, and the highest court of the state in which the action arose.") *See*, *e.g.*, *Thorpe v. City of Philadelphia,* Civ. A. No. 19-5094, 2020 WL 5217396, at *11 (E.D. Pa. Sept. 1, 2020) (holding officers were entitled to qualified immunity on failure to intervene in coerced confession claim).

15

There is, likewise, no evidence to conclude that a reasonable officer in Melvin's shoes clearly knew at the time of Charlene's interview on April 7, 1994, that her failure to stop Charlene from writing a handwritten statement based on what she witnessed would have violated Plaintiff's constitutional rights. If the Court so held, it would impose a general duty on detectives to intervene and stop any witness interview where they may have reservations about the witness' credibility, which would entirely eviscerate the criminal investigative process.

As stated hereinabove, qualified immunity "protects all but the plainly incompetent or those who knowingly violate the law" and protects Melvin here, who did not knowingly violate the law. Importantly, Melvin lacked knowledge that Detective Best allegedly violated Sharpe's constitutional rights, and therefore, had no duty to intervene to prevent a fabrication that she did not know about in 1994 or 1995. *See Kisela v. Hughes*, 584 U.S. 100, 104 (2018) (citation omitted). Plaintiff, critically, has not alleged or demonstrated that her and Detective Best shared information with one another as it was gathered, as Melvin never met the second eyewitness, Beatrice Stokes, until trial in July 1995. *See Chestnut v. Kincaid*, No. CV RDB-20-2342, 2021 WL 1662469, at *12 (D. Md. Apr. 28, 2021) (holding failure to intervene claim survived motion to dismiss where the plaintiff alleged the detectives were all "members of the investigative team and shared information with one another as it was gathered.") (D.E. 201, Part I, 16:3) ("I think with Beatrice, I met her on the day of trial, so I didn't know her.") Accordingly, the doctrine of qualified immunity protects Melvin from liability for any such alleged errors in Charlene's witness interview and subsequent use by prosecutors of the statement at trial in 1995.

16

### III.    Plaintiff's Fourth Cause of Action for Malicious Prosecution Against Melvin Should be Dismissed.

Plaintiff claims that Melvin knowingly used the "false and fabricated statement of Charlene Johnson to charge Dontae Sharpe with the murder of George Radcliffe" and instituted charges without probable cause. (D.E. 243, ¶ 286).

To succeed on a § 1983 malicious prosecution claim, Plaintiff must show that Melvin: (1) caused (2) a seizure of Sharpe pursuant to legal process unsupported by probable cause, and (3) the criminal proceedings terminated in Sharpe's favor. *See Hupp v. Cook*, 931 F.3d 307, 324 (4th Cir. 2019) (quoting *Evans*, 703 F.3d at 647). Here, as stated hereinabove, Melvin did not fabricate Charlene's witness statement and lacked any knowledge that Charlene recanted until March 2000, and probable cause existed for Sharpe's April 7, 1994 arrest. (Appendix O.)

"Probable cause is determined by a 'totality-of-the-circumstances' approach." *Smith v. Munday*, 848 F.3d 248, 253 (4th Cir. 2017) (citing *Illinois v. Gates*, 462 U.S. 213, 230 (1983)). While probable cause requires "more than bare suspicion[,]" it "requires less than that evidence necessary to convict." *United States v. Gray*, 137 F.3d 765, 769 (4th Cir. 1998) (internal quotations omitted). Probable cause "is not a high bar." *Kaley v. United States*, 571 U.S. 320, 338 (2014). The inquiry "turns on two factors: 'the suspect's conduct as known to the officer, and the contours of the offense thought to be committed by that conduct.' " *Id.* (quoting *Graham v. Gagnon*, 831 F.3d 176, 184 (4th Cir. 2016)). The Fourth Circuit applies an *objective* test to determine whether a reasonably prudent officer with the information available to the officer *at the time* would have thought that probable cause existed for the arrest. *See Hupp*, 931 F.3d at 318 (emphasis added) (citing *Graham*, 831 F.3d at 185)).

A court does "'not examine the subjective beliefs of the arresting officers to determine whether they thought that the facts constituted probable cause.'" *Gilliam*, 932 F.3d at 234

(quoting *Smith v. Munday*, 848 F.3d 248, 253 (4th Cir. 2019)). Rather, "an officer [] has probable cause even when a witness's statement contradicts other known facts in the record[.]" *See McPherson*, 2023 WL 5433011, at *26; *Torchinsky*, 942 F.2d at 262  (reasoning that "[i]t is surely reasonable for a police officer to base his belief in probable cause on a victim's reliable identification of his attacker," as "it is difficult to imagine how a police officer could obtain better evidence of probable cause than an identification by name of assailants provided by a victim, unless, perchance, the officer were to witness the crime himself.") Moreover, reasonable officers need not "resolve every doubt about a suspect's guilt before probable cause is established." *Torchinsky*, 942 F.2d at 264.

### A.    Plaintiff's claim that Melvin lacked probable cause to apply for an arrest warrant fails as a matter of law.

As to the first prong, the Court analyzes Sharpe's conduct *known to Melvin at the time she applied for the arrest warrant on April 7, 1994* – not her subjective beliefs thirty years later. *Spivey v. Norris*, 731 F. App'x 171, 176 (4th Cir. 2018) (citations omitted) ("[W]e do not examine the subjective beliefs of the arresting officers to determine whether they thought the facts constituted probable cause.") Here, based on Charlene's handwritten statement, which contained her eyewitness account of the homicide identifying Sharpe as the shooter, Melvin reasonably believed Sharpe murdered Radcliffe and had no reason to doubt the accuracy of Charlene's identification. *See, e.g.*, *English v. Clarke*, 90 F.4th 636, 650 (2024) ("And when officers reasonably believe that a victim's identification is accurate, they cannot be held liable for a violation of the Constitution merely because it later turns out that it was not.") (internal citations and quotation omitted); *United States v. Beckham*, 325 F.Supp.2d 678, 687 (E.D. Va. 2004) ("Because of this sensible principle, an eyewitness identification will constitute sufficient probable cause unless, at the time of the arrest, there is an apparent reason for the officer to

18

believe that the eyewitness was lying, did not accurately describe what he had seen, or was in some fashion mistaken regarding his recollection of the confrontation.") (citation omitted)).  As stated hereinabove, Melvin had no reason to believe Charlene was lying or did not accurately describe what she witnessed on February 11, 1994. *See McPherson*, 2023 WL 5433011, at *26 ("Plaintiffs fail to present evidence that no reasonable officer would have credited Bailey's eyewitness account. At best, Plaintiffs present evidence of poor police work, but an incompetent or negligent investigation is insufficient to establish a constitutional violation.") (internal quotation marks and citation omitted). Charlene's statement provided the correct location of the murder; correctly identified Sharpe as a crack dealer active in the crime scene vicinity; and correctly identified a drug deal in the area, of which Radcliffe participated. (D.E. 201-7). Melvin knew the area where the homicide occurred was "Sharpe family" territory; knew Sharpe sold cocaine in said area; and knew Sharpe would solicit buyers from cars driving through said area. (D.E. 201-12, at 275:12 – 276:11, 276:24 – 278:6). *See United States v. Colzie*, 1987 WL 37231, at *2 (4th Cir. 1987) (unpublished) (citing Ringle, 2 *Searches & Seizures*, Arrest and Confessions, § 23.3(a) (1986) ("presence combined with other factors may provide probable cause").

Further, Charlene's statement corroborated information previously provided by the witnesses below and was known to Melvin at the time of Sharpe's arrest:

- <u>Martha Ann Stewart</u> (interviewed by Melvin on February 14, 1994) saw two African American males, age 17-20, whistle at the Radcliffe's truck; Radcliffe pulled his vehicle over; saw two African American males approach his vehicle; heard a shot; and one male was taller than the other and had a "muscular" build, which is consistent with Sharpe's 6'4" height and above-average build;

- <u>Alonzo Vines</u> (interviewed on February 16, 1994) saw two people standing near Radcliffe's truck, which is consistent with Charlene's statement identifying Sharpe and Mark Joyner as the suspects; and

19

- <u>Wilbur Mercer</u> (interviewed by Melvin on February 14, 1994) told detectives that Radcliffe was looking to purchase cocaine in the area where the homicide occurred prior to homicide.

(D.E. 203-1, at 8-14). Moreover, "there is no evidence that [Melvin] was even aware of, much less that [s]he ignored, exculpatory evidence." *McKinney v. Richland Cnty. Sheriff's Dep't*, 431 F.3d 415, 419 (4th Cir. 2005). At most, Melvin's failure to interview Sharpe or his alibi witnesses "before his arrest amounted to a failure to pursue potentially exculpatory leads, and such does not negate probable cause." *See id.* (citing *Wadkins v. Arnold*, 214 F.3d 535, 541 (4th Cir. 2000) ("Although an officer may not disregard readily available exculpatory evidence of which he is aware, the failure to pursue a potentially exculpatory lead is not sufficient to negate probable cause.") Likewise, even though Charlene's handwritten statement contained inconsistencies with the physical evidence at the scene, Melvin still had probable cause for his arrest. *See McPherson*, 2023 WL 5433011, at *26 ("[C]ourts have found that an officer nonetheless has probable cause even when a witness's statement contains inconsistencies.")

Accordingly, Charlene's statement provided Melvin with probable cause to obtain a warrant for Sharpe's arrest. Critically, a neutral and detached magistrate also determined probable cause existed, which deserves deference by this Court, as Charlene did not recant until 1996 (D.E. 203-3) – well after Melvin resigned from the GPD in December 1995. (D.E. 203-2). *See United States v. Orozco*, 41 F 4th 403, 407 (4th Cir. 2022) ("We afford initial probable cause determinations 'great deference' when, as here, a 'neutral and detached magistrate' finds probable cause to support a warrant.") (quoting *Illinois*, 462 U.S. at 236)). Further, Plaintiff is "unable to establish a constitutional violation because, although the underlying criminal proceedings were terminated in his favor, the prosecution was plainly supported by probable cause, as conclusively established by [his] indictment[]." (D.E. 201-10). *See Durham v. Horner*,

690 F.3d 183, 188–89 (4th Cir. 2012). Stated differently, Sharpe's indictment, which is "fair upon its face," was properly returned by a grand jury and "conclusively determines the existence of probable cause." *Munday*, 848 F.3d at 255.

Importantly, Plaintiff has cited no evidence that Melvin "deliberately supplied misleading information that influenced the [grand jury's] decision," as Melvin lacked any knowledge that Charlene's statement was false until March 2000 when informed by Plaintiff's mother. (D.E. 201-3, Part II, 74:15 – 74:21; Appendix O). *See Durham*, 690 F.3d at 189 (citations omitted). Moreover, like in *Durham*, Sharpe was indicted by a Pitt County jury "before which Melvin did not even testify. [Detective Best] was the only law enforcement officer to testify before the grand jury and, in that circumstance, [Melvin] could hardly have been the instrument of its misapprehension." (D.E. 201-10). *See id.* at 189. Plaintiff has cited no evidence to conclude that Melvin tainted the grand jury process, as the record "does not disclose the evidence that the grand jury heard and considered. Nor has [Plaintiff] put forward any evidence to show that [Melvin] acted maliciously or conspired with [Detective Best] to mislead the grand jury." *See id.* at 189. Therefore, the grand jury's probable cause determinations and its indictment were "the proximate cause of [Sharpe]'s arrest and detention, which by operation of law constituted a reasonable seizure." *See id.*

Lastly, the fact that Charlene later recanted and provided a different version of events "is of no moment in the probable cause determination, which is based on what [] [Melvin] reasonably believed and knew at the time—not later developments." *Wardrett v. City of Rocky Mount*, No. 5:14-CV-854-BO, 2016 WL 1408091, at *4 (E.D.N.C. Apr. 7, 2016). A reasonable detective could have believed that arresting Sharpe on charges of murder was lawful, in light of clearly established law and the information the detectives possessed in 1994. *See Rogers v.*

21

*Pendleton*, 249 F.3d 279, 290 (4th Cir. 2001). Melvin acted pursuant to a valid arrest warrant (D.E. 203-2) and reasonably believed there was probable cause to support the application, and a neutral and detached magistrate agreed with Melvin's probable cause assessment, and therefore, Plaintiff's malicious prosecution claim fails as a matter of law.

**B.    Melvin is entitled to qualified immunity on Plaintiff's malicious prosecution claim.**

As the Supreme Court held in *Malley v. Briggs*, "[o]nly where the warrant application is so lacking in indicia of probable cause as to render official belief in its existence unreasonable, will the shield of [qualified] immunity be lost." 475 U.S. 335, 344–45 (1986). "The qualified immunity standard 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.' " *Hunter v. Bryant*, 502 U.S. 224, 229 (1991). "Under settled law, [Melvin is] entitled to immunity if a reasonable officer could have believed that probable cause existed to arrest [Sharpe]." *Hunter*, 502 U.S. at 228. Even if Melvin erred in concluding probable cause existed to arrest Sharpe, she is still entitled to qualified immunity if her "decision was reasonable, even if mistaken." *See id.*

For purposes of qualified immunity, the Court must determine whether Melvin's actions were reasonable under the circumstances. Here, as set forth above, Melvin's actions were reasonable in applying for a warrant for Sharpe's arrest and presenting it to a neutral and detached magistrate, as the magistrate ultimately decided to charge Sharpe for Radcliffe's murder. *See Wadkins*, 214 F.3d at 543 ("[T]here is simply no basis for a rule that would require law enforcement officers to take issue with or second-guess the considered judgments of . . . magistrates."); *Roberts v. Cumberland Cnty.*, No. 5:21-CV-356, 2024 WL 4350315, at *9 (E.D.N.C. Sept. 30, 2024) (quoting *Messerschmidt v. Millender*, 565 U.S. 535, 546, 132 (2012)) ("Where the alleged Fourth Amendment violation involves a search or seizure pursuant to a

22

warrant, the fact that a neutral magistrate has issued a warrant is the clearest indication that the officers acted in an objectively reasonable manner[.]") Notably, Melvin sought the approval of a detached district court magistrate who agreed with her determination of probable cause, which the Fourth Circuit has found significant in finding qualified immunity. *See Gomez v. Atkins*, 296 F.3d 253, 264–65 (4th Cir. 2002) ("In our assessment of objective reasonableness, it is also significant that Atkins arrested Isidro only after first seeking and procuring the approval of a detached district court magistrate. This was the proper course of action on his part.") Again, prior to Melvin seeking the warrant for Plaintiff's arrest on April 7, 1994, she conducted an "individualized [and thorough] investigation," including being present for Charlene's interview where she identified Sharpe as the shooter, and in her application, she did not lie or make misleading statements that resulted in criminal charges against Plaintiff. *See Wyatt v. Holmes*, No. 3:23CV875, 2024 WL 4445962, at *5 (E.D. Va. Oct. 8, 2024). Lastly, Plaintiff has not produced any evidence that the "warrant application is so lacking in indicia of probable cause as to render official belief in its existence unreasonable" and therefore, Melvin is entitled to qualified immunity on this malicious prosecution claim. *See Malley*, 475 U.S. at 344–45.

## IV. Plaintiff's Fifth Cause of Action Against Melvin for Failure to Investigate Should Be Dismissed.

Plaintiff claims that Melvin violated his constitutional rights under the Fourteenth Amendment by failing to investigate the following: (1) "[f]ailing to conduct an investigation of Charlene Johnson's statement in light of the known evidence that was inconsistent with that statement"; (2) "[f]ailing to confront Charlene Johnson about the fact that her description of the events was inconsistent with the physical evidence from the crime scene and the autopsy report of Dr. Page Hudson"; (3) failing to investigate the alibis of Plaintiff and Mark Joyner; (4) "[f]ailing to conduct any follow-up investigation of Wilbur Mercer, whose coat was found in

Radcliffe's truck, who admitted being with Radcliffe earlier on the evening of his murder, and whose statements to Officer K.L Jones on the night of the murder and to Melvin three days later, were vastly inconsistent"; (5) "[f]ailing to investigate if there was a connection between the Radcliffe murder and the assault of Scott Ray and Michael Lewis[.]" (D.E. 243, ¶ 295).

However, Plaintiff does not have a constitutional right to an "error-free investigation" of criminal charges, *Baker v. McCollan*, 443 U.S. 137, 146 (1979), or to have police officers investigate an alternate suspect. *Gilliam v. Sealey*, 932 F.3d 216, 240 (4th Cir. 2019). Critically, "[o]fficers are not required to pursue and exhaust all potentially exculpatory leads and avenues of investigation before applying for a warrant." *Warren v. Braswell*, No. 7:24-CV-233-FL, 2024 WL 3678360, at *5 (E.D.N.C. Aug. 2, 2024) (citing *Wadkins,* 214 F.3d at 541). Stated differently, detectives have "no constitutional duty to investigate independently every claim of innocence." *Howard v. City of Durham*, 487 F. Supp. 3d 377, 426 (M.D.N.C. 2020), *aff'd in part, rev'd in part and remanded*, 68 F.4th 934 (4th Cir. 2023) (internal quotation marks and citation omitted).

Under Fourth Circuit precedent, evidence that an officer allegedly failed to investigate a lead is relevant to a § 1983 claim only when presented to support a claim for fabrication or concealment of material evidence by showing that the defendant's failure to investigate was part of a bad faith effort to hide the fabrication or concealment. *See Gilliam*, 932 F.3d at 240-41 (jury allowed to consider evidence that defendants intentionally failed to seek fingerprint tests that would have pointed to an alternate suspect only because the failure was part of a bad faith effort to hide the fact that defendants had secured fabricated confessions from minors through egregiously coercive and deceptive interrogation tactics).

Here, as demonstrated above, Plaintiff failed to present evidence from which a jury could conclude that Melvin violated his rights through fabrication. Absent such evidence, Plaintiff cannot sustain an independent § 1983 claim merely by second guessing Melvin's investigative choices, which is precisely what he seeks to do here. Melvin was not required to "pursue and exhaust all potentially exculpatory leads and avenues of investigation before applying for [the] warrant." *See Warren*, 2024 WL 3678360, at *5. Moreover, Plaintiff has failed to present a forecast of evidence demonstrating that any such additional investigation would have identified an alternative suspect or created an alternative result. Plaintiff, likewise, alleges Melvin should have investigated his alibi and reached out to the individuals he identified in his interview with Detective Best on April 7, 1994; however, Plaintiff did not call any of those alibi individuals that purportedly went with him to Grimesland, North Carolina to eat lasagna or who he met up with upon his return to Greenville that night – Karsten Robinson, Mark Joyner, Kizzy Paige, and Wanda Carmen – at his trial in 1995. (D.E. 178, at 20; D.E. 201-12, at 4; D.E. 203-1, at 23-24).

Finally, assuming *arguendo* this Court determines Melvin owed Plaintiff a constitutional duty to follow alternative leads even in the absence of a bad faith effort to hide information that she fabricated, or conceal material evidence, the law establishing that duty was not clearly established in 1994 when Plaintiff was arrested and in 1995 when he was convicted of murder. *See*, *e.g.*, *Clipper v. Takoma Park, Md.*, 876 F.2d 17, 20 (4th Cir. 1989) (holding that officer's failure to investigate leads provided by arrestee was not, in itself, sufficient to negate probable cause); *Washington v. Buraker*, 322 F. Supp. 2d 692, 702 (W.D. Va. 2004) (holding the "Court is not aware of any caselaw establishing such a constitutional violation . . . where a police officer fails to investigate some leads in a criminal case."); *Favors v. Hoover*, No. 13-CV-428, 2016 WL 675708, at *12 (D. Minn. Jan. 29, 2016), *aff'd*, 670 F. App'x

25

434 (8th Cir. 2016) ("A mere failure to investigate leads or explore inconsistencies in evidence is not sufficient to allege recklessness that would shock the conscience.") As such, the doctrine of qualified immunity protects Melvin from liability for any such alleged errors in his investigation. *See Harlow*, 457 U.S. at 818 (qualified immunity protects government officials from liability for violations of constitutional rights so long as they could reasonably believe that their conduct did not violate clearly established law at the time); *Malley*, 475 U.S. at 341 (qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law").

**V.    Plaintiff's State Law Claims Against Melvin Should Be Dismissed Because They Are Barred By Public Official Immunity.**

In addition to the federal claims, Plaintiff asserts derivative state law tort claims against Melvin in her *individual capacity* for wrongful imprisonment and civil conspiracy (Count XI) and gross and reckless negligence (Count XII). (D.E. 243, at 69, 71). As set forth above, Melvin is entitled to qualified immunity on the § 1983 claims, and therefore, is entitled to public official immunity on the state law tort claims. *See Caraway v. City of Pineville*, 639 F. Supp. 3d 560, 585 (W.D.N.C. 2022), *aff'd*, 111 F.4th 369 (4th Cir. 2024) ("Generally, where an officer defendant is entitled to qualified immunity for a Section 1983 claim, the officer is likewise entitled to public official immunity on derivative state law claims.") (citing *Cooper v. Sheehan*, 735 F.3d 153, 160 (4th Cir. 2013) ("[T]he analysis of a public officer's immunity is functionally identical to our discussion of the Officer's entitlement to qualified immunity with respect to § 1983 claims."))

"Public official immunity shields individuals, while serving as public officials, from individual liability for negligence, as long as a public officer lawfully exercises the judgment and discretion with which he is invested by virtue of his office, keeps within the scope of his official authority, and acts without malice or corruption." *Petrillo v. Barnes-Jones*, 291 N.C. App. 62, 67, 894 S.E.2d 772, 777 (2023) (internal brackets and quotation marks omitted). Importantly

26

here, "[a] police officer is a public official." *Jones v. Kearns*, 120 N.C. App. 301, 305, 462

S.E.2d 245, 247 (1995) (citation omitted). Discretionary acts require "personal deliberation,

decision and judgment." *See id.* North Carolina law "presumes that public officials will

discharge their duties in good faith and exercise their powers in accord with the spirit and

purpose of the law." *Knibbs v. Momphard*, 30 F.4th 200, 227 (4th Cir. 2022) (quoting *Doe v.

City of Charlotte*, 273 N.C. App. 10, 24, 848 S.E.2d 1, 12 (2020)). To rebut the presumption, a

plaintiff must show that the officer's act was (1) corrupt or malicious, or (2) outside the scope of

his official duties.  *See Caraway*, 639 F. Supp. 3d at 585.

 Here, Melvin, a sworn law enforcement officer in 1994 and 1995, is a public official

entitled to immunity because she was sued in her individual, and not official capacity. *See

Caraway v. City of Pineville*, 111 F.4th 369, 385 (4th Cir. 2024) (holding two police officers,

sued in their individual capacities[2], were entitled to public official immunity for North Carolina

state law claims). Except for conclusory allegations that he cannot rely upon at the summary

judgment stage, Plaintiff has not produced any evidence that Melvin acted with malice or

corruption or outside the scope of her official duties in conducting a fair investigation to

overcome the presumption that she discharged her duties in good faith. *See Evans v. Techs.

Applications & Serv. Co.*, 80 F.3d 954, 960 (4th Cir. 1996) (explaining "unsubstantiated

allegations and bald assertions" cannot defeat a motion for summary judgment); *Doe*, 273 N.C.

App. at 24, 848 S.E.at 12 ("A defendant acts with malice when he wantonly does that which a

man of reasonable intelligence would know to be contrary to his duty and which he intends to be

prejudicial or injurious to another.") (citation omitted). Further, Melvin, as set forth above, did

not violate any of Plaintiff's clearly established rights and therefore, is entitled to public official

---

[2] See D.E. 1-1, ¶¶ 11-12 in Case No. 3:21-cv-00454-FDW-DSC (WDNC), which shows that Officer Roberts and
Griffin were sued in their respective individual capacities.

27

immunity. *See Caraway*, 111 F.4th at 386 ("Public official immunity is unavailable to officers who violate clearly established rights[.]")

Accordingly, Melvin is entitled to public official immunity on Plaintiff's state law claims against her and summary judgment should be granted as to the state law claims.

### VI.    Plaintiff's State Constitutional Claims Against Melvin Should Be Dismissed Because Plaintiff Has An Adequate Remedy Under State Law.

In the alternative, Plaintiff alleges claims for violations of his due process rights under Article I, Sections 19 and 20 of the North Carolina Constitution. (D.E. 243, ¶ 405-410).

A plaintiff only has a direct claim under the North Carolina Constitution in "the absence of an adequate state remedy[.]" *Blackmon v. Holder*, No. 5:20-CV-524-FL, 2021 WL 2877902, at *9 (E.D.N.C. July 8, 2021) (quoting *Corum v. Univ. of N. Carolina Through Bd. of Governors*, 330 N.C. 761, 782 (1992)). "An adequate state law remedy exists where there is a cause of action, at common law or created by statute, that provides plaintiff with the **possibility** of relief for the same injury alleged in the direct constitutional claim." *See id.* (internal quotation marks and citation omitted) (emphasis added).

Here, "Plaintiff may not maintain h[is] state constitutional claims on the basis of the mere possibility that public official immunity may ultimately preclude relief against defendant [Melvin] on plaintiff's state common law claims," which is precisely the situation before the Court at present. *See Beard v. Town of Topsail Beach*, No. 7:19-CV-97-FL, 2020 WL 1539924, at *5 (E.D.N.C. Mar. 31, 2020). Accordingly, Counts XIII, XV, XVI, and XVII of the Amended Complaint should be dismissed. *See Davis v. Town of Southern Pines*, 116 N.C. App. 663, 675, 449 S.E.2d 240, 248 (1994) (holding the common law false imprisonment claim adequately protects "constitutional right not to be unlawfully imprisoned" and deprived of liberty).

## VII.    Plaintiff Is Not Entitled To Recover Punitive Damages From Melvin.

To the extent Plaintiff seeks punitive damages from Melvin in her official capacity, he is not entitled to punitive damages. *See Iglesias v. Wolford*, 539 F. Supp. 2d 831, 841 (E.D.N.C. 2008) ("[M]unicipal officials are not liable for punitive damages in their official capacities under either 42 U.S.C. § 1983 or North Carolina law.") He is, likewise, not entitled to punitive damages against her in her individual capacity.

For individual capacity § 1983 actions, punitive damages are available against an individual defendant "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade,* 461 U.S. 30, 56 (1983). Similarly, under North Carolina law, punitive damages may be awarded only if the plaintiff proves: (1) the defendant is liable for compensatory damages and (2) fraud, malice, or willful or wanton conduct by clear and convincing evidence. *See* N.C. Gen. Stat. § 1D–15.

Here, for the reasons set forth herein, Plaintiff has not forecast evidence that Melvin's conduct was motivated by evil motive or evil intent or recklessly indifferent to Plaintiff's constitutional rights. Plaintiff, likewise, cannot prove by clear and convincing evidence that Melvin acted with fraud, malice or engaged in willful or wanton conduct, or that Plaintiff is entitled to compensatory damages, as his claims against Melvin fail as a matter of law. Accordingly, Plaintiff's demand for punitive damages should be dismissed with prejudice. (D.E. 243, ¶¶ 411-413).

## <u>CONCLUSION</u>

For the foregoing reasons, Melvin respectfully requests the Court grant her Revised Motion for Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.

Respectfully submitted this the 27th day of November, 2024.

**POYNER SPRUILL LLP**

By:  /s/ Sydney P. Davis
J. Nicholas Ellis
N.C. State Bar No. 13484
jnellis@poynerspruill.com
Sydney P. Davis
N.C. State Bar No. 58038
sdavis@poynerspruill.com
P.O. Box 353
Rocky Mount, NC  27802-0353
Telephone: 252.972.7115

*Attorneys for Defendant Carolyn Melvin*

30

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies, pursuant to Rule 5 of the Federal Rules of Civil Procedure, the foregoing was electronically filed with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following:

David S. Rudolf
Sonya Pfeiffer
Phillip Lewis
Rudolf Widenouse
225 East Worthington Avenue
Charlotte, NC 28203
*Attorneys for Plaintiff*

Elizabeth A. Martineu
Martineau King, PLLC
P.O. Box 241268
Charlotte, NC 28224
*Attorneys for Defendants City of Greenville,*
*Ricky Best, and Jeffrey Shrock*

Peter Clements, Jr.
Wilson Elser Moskowitz Edelman & Dicker, LLP
227 West Trade Street, 3rd Floor
Charlotte, NC 28202
*Attorneys for Defendants City of Greenville,*
*Ricky Best, and Jeffrey Shrock*

This the 27th day of November, 2024.

/s/ Sydney P. Davis
Sydney P. Davis

31

## CERTIFICATE OF COMPLIANCE WITH PAGE LIMITS

The undersigned certifies the foregoing brief complies with Local Rule 7.2(f)(2). The brief contains 29 pages (in 12-point Times New Roman font), which includes the body of the brief, headings and footnotes. The caption, signature lines, certificate of service, and any cover page or index are not included in the above page count.

This the 27th day of November, 2024.

/s/ Sydney P. Davis
Sydney P. Davis

32

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NORTH CAROLINA**
**EASTERN DIVISION**
**Lead Case No. 4:21-CV-00185-BO**
*Consolidated with 4:22-CV-00088-BO*

| | |
|---|---|
| MONTOYAE DONTAE SHARPE, | |
| Plaintiff, | |
| vs. | **DEFENDANT DAVID RICKY BEST'S MOTION FOR SUMMARY JUDGMENT** |
| DAVID RICKY BEST, JEFFREY D. SHROCK, CAROLYN MELVIN, and the CITY OF GREENVILLE, NORTH CAROLINA, | |
| Defendants. | |

NOW COMES Defendant David Ricky Best ("Best" or "Defendant"), pursuant to Federal Rule of Civil Procedure 56, and respectfully requests that this Court enter judgment in his favor on all of Plaintiff's claims against him.

In support hereof, the Defendant states that there is no genuine issue of material fact and that Defendant is entitled to judgment as a matter of law on all claims against him. The reasons supporting the Defendant's motion are set out in more detail in its supporting memorandum filed contemporaneously.

WHEREFORE, Defendant David Ricky Best requests the Court as follows:

1. That the Court grant the Defendant's Motion for Summary Judgment, dismiss Plaintiff's action, and deny all claims for relief asserted against him;

2. That the Defendant recover from Plaintiff the costs of this action and attorneys' fees as allowed by law; and

3. That the Defendant have and recover such other and further relief as the Court deems

J.A. 2388

just and proper.

Respectfully submitted, this the 27 day of November 2024.


/s/ Peter Clements
Peter Clements
N.C. State Bar No. 57853
Peter.clementsjr@wilsonelser.com
22 West Trade Street # 300
Charlotte, NC 28217
Telephone: (401)688-0306
*Attorneys for Defendants Shrock, Best, and the City*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies, pursuant to Rule 5 of the Federal Rules of Civil Procedure, the foregoing was electronically filed with the Clerk of Court using the CM/ECF system which will send notification of such filing to all parties.

This the 27 day of November 2024.

/s/ Peter Clements
Peter Clements

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NORTH CAROLINA**
**EASTERN DIVISION**
**Lead Case No. 4:21-CV-00185-BO**
*Consolidated with 4:22-CV-00088-BO*

|  |  |
|---|---|
| MONTOYAE DONTAE SHARPE,<br><br>                        Plaintiff,<br><br>vs.<br><br>DAVID RICKY BEST, JEFFREY D.<br>SHROCK, CAROLYN MELVIN, and<br>the CITY OF GREENVILLE, NORTH<br>CAROLINA,<br><br>                        Defendants. | **MEMORANDUM IN SUPPORT OF<br>DEFENDANT DAVD RICKY BEST'S<br>MOTION FOR SUMMARY JUDMENT** |

NOW COMES Defendant David Ricky Best ("Best"), by and through his undersigned counsel, and pursuant to Federal Rule of Civil Procedure 56.1 and Local Rule 7.2, and submits the following memorandum of law it support of his Motion for Summary Judgment.

<u>**SUMMARY OF THE NATURE OF THE CASE**</u>

Plaintiff Montoyae Dontae Sharpe's ("Plaintiff" or "Sharpe") Complaint brings a § 1983 knowing and/or reckless use of false evidence claim against Best under the Fourteenth Amendment in connection with Sharpe's arrest and subsequent conviction for the murder of George Radcliffe ("Radcliffe"). ("Complaint") at ¶ 236-250 (D.E. 243). The Complaint alleges Best provided the details of the time, place, and manner of Radcliffe's murder to Charlene Johnson ("Charlene"). *Id.* at ¶ 237. The Complaint alleges Charlene fabricated a false statement implicating Sharpe in George Radcliffe's murder and Best recklessly used that fabricated statement. *Id.* The Complaint alleges Best caused Beatrice Stokes ("Stokes") to fabricate false statements implicating Sharpe in

Radcliffe's murder. *Id.* at ¶ 242. The Complaint alleges both statements "…directly and proximately caused Dontae Sharpe's wrongful arrest, conviction, and deprivation of liberty without due process of law[.]" *Id.* at ¶ 250.

Plaintiff also brings a § 1983 arrest without probable cause claim against Best. *Id.* ("Count IV") at ¶ 281-291. Plaintiff also brings a § 1983 failure to investigate claim against Best as well. *Id.* ("Count V") at ¶ 292-299.

Plaintiff also brings a § 1983 concealment of exculpatory and impeachment evidence claim against Best. *Id.* ("Count VI") at ¶ 300-307. The Complaint alleges Best failed to document and disclose Charlene's mental health history to the Pitt County District Attorney's Office and Sharpe's attorney. *Id.* at ¶ 302-303. Plaintiff also brings a § 1983 knowing and/or reckless use of false evidence claim against Best in connection with the February 1997 Motion for Appropriate Relief ("MAR") hearing. *Id.* ("Count VII") at ¶ 308-329. The Complaint alleges Best made false statements to the Pitt County District Attorney's Office prior to Sharpe's MAR hearing but after his criminal conviction. *Id.* at ¶ 312-317.

Plaintiff also brings a § 1983 deprivation of due process and effective access to the courts claim against Defendant Best under the First and Fourteenth Amendment. ("Count VIII") at ¶ 330-340. The Complaint alleges Best withheld exculpatory evidence, coerced witnesses, made false reports, destroyed physical exculpatory evidence, and made false representations about evidence in his possession in December 2000, March 2001, November 2004, and April 2012. *Id.* at ¶ 333-337. Plaintiff also brings a § 1983 bad-faith destruction of evidence claim against Defendant Best under the Fourteenth Amendment. ("Count IX") at ¶ 341-344.

Plaintiff also brings state common law wrongful imprisonment and civil conspiracy claims against Best *Id.* ("Count XI") ¶ 377-389. The Complaint alleges Best conspired to cause Sharpe's

unlawful arrest, conviction, and imprisonment. *Id*. at ¶ 380-381. Plaintiff also brings common law gross and reckless negligence claims against Best. *Id*. ("Count XII") at ¶ 390-404. The Complaint alleges Best violated his duty of care to Sharpe by "…failing to conduct a constitutionally adequate investigation of the murder of George Radcliffe, by failing to adequately direct and/or supervise Best's investigation of the murder of George Radcliffe, and by failing to intervene to prevent the fabrication of a statement by Charlene Johnson that falsely claimed Dontae Sharpe murdered George Radcliffe." *Id*. at ¶ 394. The Complaint further alleged that following Sharpe's conviction, Best violated his duty of care to Sharpe by failing to secure exculpatory evidence in his possession, withholding exculpatory evidence in connection with Sharpe's post-conviction proceedings, coercing witnesses, making false reports, destroying physical exculpatory evidence, and making false representations about evidence in his possession or control. *Id*. at ¶ 395.

Plaintiff also brings various due process claims against Best under Article I, Sections 19 and 20 of the North Carolina Constitution, specifically failing to perform a constitutionally adequate investigation ("Count XV"), using false evidence to arrest and indict Sharpe ("Count XVI"), instituting criminal charges against Sharpe without probable cause ("Count XVIII"), failing to document and disclose exculpatory information ("Count XIX ), and providing knowingly false and deceptive information to the District Attorney's office in the manner described above ("Count XX")

## <u>SUMMARY OF ARGUMENT</u>

(1) Regarding Count I and Count VII, Charlene admitted that the first part of her statement, the part identifying Sharpe as the person who shot and killed Radcliffe, was based on her own knowledge. Stokes also admitted that her statements were based on her own knowledge. Plaintiff adduced no evidence to substantiate a claim that Best did not believe either Best or Stokes.

Regardless, the first part of Charlene's statement deprives Plaintiff of the but-for and proximate causation he needs to prevail on any knowing use/reckless use/fabrication of evidence claims as officers had probable cause as a matter of law.  Best is protected by absolute immunity in connection with his 1997 testimony.  (2) Regarding Count IV, the first part of Charlene's statement also causes Plaintiff's arrest without probable cause claim to fail.  (3) Regarding Count V, Plaintiff failed to produce any evidence of a bad faith investigation and any assertions of a "sloppy" investigation are insufficient to sustain liability against Best.  Best also had probable cause to seek an arrest warrant for Plaintiff based on the first part of Charlene's statement.  (4) Regarding Count VI, Plaintiff failed to produce any evidence that any exculpatory or impeachment evidence was suppressed. In fact, discovery showed that Plaintiff, Plaintiff's attorney, and the District Attorney were already aware of any material exculpatory or impeachment information and that said information was disclosed at trial.   (5) Regarding Count XI, Plaintiff failed to produce any evidence that Best engaged in wrongful acts and omissions in concert with Melvin and Schrock that resulted in Plaintiff's arrest, conviction, and wrongful imprisonment; in fact, Best had probable cause to arrest Plaintiff. Plaintiff also failed to produce any evidence that Best was grossly and recklessly negligent (Count XII). (6) Plaintiff also failed to produce any evidence to strip Best of qualified immunity for the alleged First, Fourth, and Fourteenth Amendment violations (Counts I, IV, V, VI, VII, VIII & IX) or public official immunity for the alleged North Carolina state law violations (Counts XI, XII & XIII).  Regarding Counts XV, XVI, XIX & XX, Plaintiff's claims for due process violations under Article I, Sections 19 and 20 of the North Carolina Constitution are prohibited because he has an alternate remedy.  Finally, qualified immunity prohibits all Plaintiff's § 1983 claims as to Best and Plaintiff has not shown the alleged rights were clearly established. In sum, there is no genuine issue of material fact regarding any of Plaintiff's claims

against Best, and they should be dismissed.

## FACTUAL BACKGROUND

Defendant Best incorporates his separate Statement of Undisputed Facts, which is filed contemporaneously with this motion.

## STANDARD OF REVIEW

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." See *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986); There is a genuine dispute as to material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *CTB, Inc. v. Hog Slat, Inc.*, 954 F.3d 647, 658 (2020).

## ARGUMENT

At the outset, it should be noted that Plaintiff's Amended Complaint contained a significant number of allegations, including two new Counts. No discovery occurred in connection with these new allegations, Plaintiff has not adduced any evidence to support them. As "a party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Balt. Ravens Football Club. Inc.*, 346 F.3d 514, 522 (4th Cir. 2003). "Fanciful inferences and bald speculation of the sort no trier of fact would draw or engage in at trial need not be drawn or engaged at summary judgment." *Local Union 7107 v. Clinchfield Coal Co.*, 124 F. 3d 639, 640 (4th Cir. 1997). Therefore, the new claims contained in Plaintiff's Amended Complaint fail and summary judgement is appropriate.

I.    **There is no evidence Best knowingly/recklessly used false evidence to deny Plaintiff a fair criminal proceeding in violation of the Due Process Clause of the Fourteenth**

**Amendment and the right of effective access to the courts in violation of the First Amendment (Counts I & VII).**

Plaintiff alleges Best knowingly/recklessly used false evidence, specifically Charlene's April 7, 1994, Stokes' statement, Stokes' trial testimony, and a polygraph examination, that ultimately deprived him of his constitutional rights. It stands to reason that in order to knowingly/recklessly use false evidence, Best must first have created false evidence. Plaintiff does not appear to allege this, however.

Police officers violate a defendant's due process when they fabricate or falsify evidence that is used to secure a defendant's conviction. *Burguess v. Balt. Police Dep't*, 300 F. Supp. 3d 696 (D.Md. 2018). To prevail on a fabrication of evidence claim a plaintiff must prove that "(1) the defendants fabricated evidence, and (2) the fabrication resulted in the deprivation of [the plaintiff's] liberty." *Washington v. Wilmore*, 407 F.3d 274, 282 (4th Cir. 2005). "a plaintiff must [show] adequate facts to establish that the loss of liberty–i.e., his conviction and subsequent incarceration—*resulted from the fabrication. Massey v. Ojaniit*, 759 F.3d 343, 354 (4th Cir. 2014) (emphasis added). The causation element requires that the wrongful incarceration was reasonably the foreseeable result of the defendant's initial act of fabrication and fabrication claims require plaintiff demonstrate both but-for and proximate cause. *Id.* at 357. The false evidence must have been fabricated "deliberately or with reckless disregard for the truth" *Miller v. Prince George's City.*, 759 F.3d at 621, 627 (4th Cir. 2007).

Plaintiff alleges Charlene's April 7, 1994, statement constitutes fabricated evidence because Best exposed details of the time, place, and manner of Radcliffe's murder to Charlene on April 7, 1994, in order to induce Charlene to falsely implicate Sharpe in Radcliffe's murder. First, it is important to note that Charlene's April 7, 1994, statement consists of two separate statements. Appx. O, pp. 1. Plaintiff's Complaint acknowledges this. See Complaint at ¶ 62. The first

statement (without corrections to spelling and punctuation) reads:

> On February 11, 1994 I was walking down 14th, on my way too Lucky Spot, I stop at the stop sign And I so Donta and a white male and Mark Joy. Donta was about to sale that white male a rock but he only had $18.00. Donta said I can't do it you have to have the money straight up and the white male said Fuck you man. Donta push him and then he pulled out a gun a shot him.

*Id*. at ¶ 62.  The second statement, written four minutes after the first statement, (without corrections to spelling and punctuation) reads:

> Also Donta move the truck a ran it in the field. And Mark and Donta pick the white male up [interlineated on the line above – "from where he got shot"] put him in the truck and Donta throw the keys and the gun somewhere And Mark and Donta split up and meet each other and got into a red escort.

*Id*. at ¶ 62

In her September 12, 2023, deposition, Charlene testified Best only provided her details for the second statement.  Her second statement exclusively relates to Plaintiff's attempts to "cover up" Radcliffe's murder, not the murder itself. Appx. O, pp. 1.  Charlene testified her first statement, the statement that implicated Plaintiff in Radcliffe's murder, came from her own knowledge. Appx. QQ, "Deposition of Charlene Johnson" p. 40:1-17. Although Charlene eventually recanted her first statement, officers are not liable for a witness's independent recantation. *Gilliam v. Allen*, 62 F. 4th 829, 839 (4th Cir. 2023) ("If the plaintiffs' convictions were attributable to mistake, or to evidence later recanted or proved false, or simply an innocent failure of the system, the [defendant] could not be held liable."). It is undisputed that Charlene independently provided a handwritten statement claiming Plaintiff shot Radcliffe over a drug related dispute which she later recanted.

Plaintiff also alleges Best induced Stokes to falsely corroborate Charlene's statement. However, Plaintiff has failed to adduce any evidence to support this claim.  Best maintains Stokes approached him and claimed she witnessed Plaintiff murder Radcliffe.  Best relayed Stokes' claims directly to District Attorney Everett. Appx. GG ("Best Deposition") p. 74:13-14.   Plaintiff's

support for his contention that Best induced Stokes to falsely corroborate Charlene's statement mostly involves Stokes' post-trial recantation of her testimony. However, Stokes has confirmed the accuracy of the account when deposed in this matter. Fatally, Plaintiff himself has claimed in court filings that Stokes prior statements and testimony regarding Plaintiff's involvement in the murder are *irrelevant* to this matter. D.E. 157 at p. 4. Fairness demands that Plaintiff cannot ask the Court to exclude Stokes testimony as irrelevant while simultaneously maintaining a claim based on the very same materials.

Also, Plaintiff alleges Best fabricated evidence when he told the district attorney that a polygraph examination was administered to Charlene before she provided her statement to Best. However, Plaintiff has adduced no evidence of any such conversation. Further, Best was unequivocal that the polygraph was administered after Sharpe's arrest when testifying at the 1997 MAR. Appx. M, "1997 MAR" pp. 126:15-18. Specifically, Best stated "[h]er polygraph was after Dontae's arrest." *Id*. The evidence adduced clearly shows Best provided accurate testimony regarding Charlene's polygraph at the 1997 MAR hearing.

Additionally, Best is protected by absolute immunity regarding the polygraph examination since the allegations concern hearing testimony. "[W]itnesses are exempt from civil liability for testimony given in a prior trial." *Brice v. Nkaru*, 220 F. 3d. 233, 239 (4th Cir. 2000); See also *Rehberg v. Paulk*, 5666 U.S. 356, 367 (2012) ("the immunity of a trial witness sued under § 1983 . . . [is]. . . absolute . . . with respect to any claim based on the witness' testimony").

Plaintiff failed to provide any evidence that Charlene's first statement, the statement that concerned the murder, was based on anything other than what she independently knew about the murder. Appx. QQ, "Deposition of Charlene Johnson" p. 40:1-17. Consequently, that part of the statement, the part implicating Plaintiff in Radcliffe's murder, cannot be considered to be

fabricated.  Charlene's indisputably independent first statement deprives Plaintiff of the but-for and proximate causation he needs to prevail on a use of fabricated evidence claim and he has produced no evidence Best was on notice of the fabricated statement. *Id.*  As there are no genuine issues of material fact when it comes to whether Best is liable to Plaintiff for knowing use/reckless use/fabrication of false evidence based on the foregoing, Best is entitled to judgment as a matter of law on these claims.

## II.     <u>Best had probable cause to arrest Plaintiff as a matter of law and did not violate his rights under the Fourth and Fourteenth Amendments (Count IV).</u>

Plaintiff alleged Best, arrested and instituted criminal charges against him despite knowing it was based on fabricated evidence, and thus not supported by probable cause, thereby, violating his rights under the Fourth and Fourteenth Amendment.  He calls these claims "malicious prosecution" and "seizure," which is interchangeable with "false arrest."

To prove a malicious prosecution claim under § 1983, a plaintiff must plausibly allege that the defendant "'(1) caused (2) a seizure of the plaintiff pursuant to legal process unsupported by probable cause, and (3) criminal proceedings terminated in the plaintiff's favor.'"  *Humbert*, 866 F.3d at 555 (quoting *Evans*, 703 F.3d at 647).  The lack of probable cause is a central component of the claims.  Probable cause for an arrest "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *Illinois v. Gates*, 462 U.S. at 243-44, n.13 (1983) *see also Kaley v. United States*, 571 U.S. 320, 338 (2014) ("Probable cause . . . is not a high bar.").  An officer has probable cause when there are "'facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed . . . an offense.'" *Cahaly v. Larosa*, 796 F.3d 399, 407 (4th Cir. 2015) (alterations in *Cahaly*) (quoting *Michigan v. DeFillippo*, 443 U.S. 31, 37, 99 S. Ct. 2627, 61 L. Ed. 2d 343 (1979)).  Moreover, probable cause

is an objective standard, viewed from the perspective of "an objectively reasonable police officer[.]'" *Wesby*, 138 S. Ct. at 586 (citation omitted).  A court does "'not examine the subjective beliefs of the arresting officers to determine whether they thought that the facts constituted probable cause.'" *Gilliam*, 932 F.3d at 234 (quoting *Smith v. Munday*, 848 F.3d 248, 253 (4th Cir. 2019)).

Any criminal proceeding based on Charlene's indisputably independent statement describing who she saw murder Radcliffe was supported by probable cause, and Best cannot be held liable for malicious prosecution under § 1983 (outlined above). A recent Fourth Circuit decision in *Kewon English v. Clarke* is helpful to the analysis. 90 F.4th 636 (2024).  In *Clarke*, Kewon English ("English") alleged Senior Investigator Joseph Clarke fabricated his confession. Eight months after their arrest DNA test results became available from the evidence collected that excluded English.  English was granted bond and released in June 2016.  Thereafter, English filed a § 1983 action alleging, among other things, a Fourth Amendment clam for false arrest and a Fourth Amendment claim for malicious prosecution.

The Court did not permit English's malicious prosecution claim to go forward.  English claimed Clarke should be held liable for malicious prosecution because Clarke caused him to be unlawfully detained pursuant to a warrant (and later an indictment) that was secured using deliberately misleading information—namely, the two fabricated confessions "To begin with, information, even if 'misleading,' must also be material." *Id*. at 274; See also *Massey*, 759 F.3d at 357.  To determine whether an alleged misrepresentation was material, we excise the misrepresentation and consider whether there would have been probable cause based on the "corrected" evidence. See *Massey*, 759 F.3d at 357; see also *Miller v. Prince George's County*, 475 F.3d 621, 629 (4th Cir. 2007). The Court did not permit English's false arrest claim to go

forward either because Clarke "was amply justified in believing that English had committed burglary and sexual assault that morning based on the victim's repeated identification of English as one of her assailants." *Id*. at 650.  "And when officers reasonably believe that a victim's identification is accurate, they 'cannot be held liable for a violation of the Constitution merely because it later turns out that' it was not. *Id*. (citing *McKinney v. George*, 726 F.2d 1183, 1187 (7th Cir. 1984).

Here, based on the first part of Charlene's statement alone, Best was amply justified to believe Plaintiff murdered Radcliffe. Charlene's statement provided the correct location of the murder and correctly identified Plaintiff as a crack dealer active in the area. Appx. O, pp. 1. Critically, Charlene's statement aligns with the prior information provided by witnesses Martha Stewart, Alonzo Vines, and Wilber Mercer. The statement correctly identified that *two* men were involved in the murder and it confirmed Radcliffe was seeking drugs. See App. F, SHARPE 003686-003689; Appx. G, SHARPE 005028-005029; App. I, SHARPE 003690-003691. Based on the foregoing, Best cannot be held liable for false arrest under § 1983 as probable cause existed to arrest Plaintiff as a matter of law.

Also of note, in *Torchinsky v. Siwinski*, 942 F. 2d 257 (4th Cir. 1991), the Fourth Circuit determined that the court "need not formally resolve" the constitutional question of "whether the [plaintiffs] were arrested without probable cause" to address a § 1983 claim; the court stated that it "need only determine whether [the defendant]—a deputy sheriff performing within the normal course of his employment—acted with objective reasonableness necessary to entitle him to qualified immunity" *Id*. at 260.  The Court held that "[the officers] actions in seeking the arrest warrants and the magistrate's determination of probable cause provide[d] additional support for his claim that he acted with objective reasonableness" and entitled him to protection from suit

under 42 U.S.C. § 1983. *Id*. The Court continued: "[i]n determining whether Siwinski is entitled to qualified immunity, the guiding principle is that '[o]nly where the warrant application is so lacking in indicia of probable cause as to render official belief in its existence unreasonable will the shield of immunity be lost.'" *Id*. at 261 (citing *Malley*, 475 U.S. at 344-45, 106 S.Ct. at 1098).

A magistrate issued the warrant that led to Plaintiff's arrest based on Charlene's statement. Courts must afford initial probable cause determinations "great deference" when, as here, a "neutral and detached magistrate" finds probable cause to support a warrant. *United States v. Orozco*, 41 F 4th 403, 407 (4th Cir. 2022). "The task of a reviewing court is not to conduct a de novo determination of probable cause, but only to determine whether there is substantial evidence in the record supporting the magistrate's decision to issue the warrant." *Id*. As stated above, there is no evidence to support a finding that the first part of Charlene's statement was based on anything but her own knowledge. Appx. O, pp. 1. Further, that statement was corroborated by the accounts of multiple other independent witnesses and the facts known to officers. Plaintiff cannot produce any evidence that the warrant application was so lacking in indicia of probable cause as to render official belief in its existence unreasonable, thereby stripping Best of his qualified immunity and exposing him to suit under 42 U.S.C. § 1983.

There are no genuine issues of material fact when it comes to whether Best is liable to Plaintiff for false arrest/malicious prosecution; Best had probable cause to arrest Plaintiff based on the first part of Charlene's statement. Best is entitled to judgment as a matter of law on those claims.

### III. There is no evidence Best's investigation denied Plaintiff to fair criminal process in violation of the Due Process Clause of the Fourteenth Amendments (Counts V).

Plaintiff alleged Best deliberately, intentionally, and/or recklessly failed to follow basic investigative practices and take basic investigative steps, and this failure deprived Plaintiff of his

right to due process of law and a fair criminal proceeding in violation of the Fourteenth Amendment.

There is a dearth of case law in the Fourth Circuit regarding § 1983 failure to investigate claims under the Fourteenth Amendment. In fact, other circuits do not even recognize such claims. *Grega v. Pettengill*, 123 F. Supp. 3d. 517, 536 (D. Vt. 2015). At least some district courts sitting in the Fourth Circuit have held that "[p]olice officers may be liable under § 1983 for deliberate or reckless failures to investigate 'readily available exculpatory evidence.'" *Hines v. Johnson*, 2020 U.S. Dist. LEXIS 54796, at *13 (2020). However, these same courts have made clear that negligent police failures to investigate do not violate the Fourteenth Amendment. *Humbert v. O'Malley*, 2014 U.S. Dist. LEXIS 40321, at *50 (2014) (holding that police defendants were entitled to qualified immunity as there was no evidence showing that any of the alleged failures to investigate were "deliberate or reckless" and granting police defendants summary judgment on plaintiff's failure to investigate claim).

Plaintiff's Complaints list additional investigatory steps that Plaintiff contends Best should have conducted. See Complaint. at ¶ 295. However, it is well established that "[a] subject of a criminal investigation does not have a constitutional right to have a criminal investigation performed in a desired manner," *Mathis v. Town of Waynesville*, 2009 U.S. Dist. LEXIS 126103, at *10 (2009). Furthermore, to prove a § 1983 substantive due process claim, Plaintiff needs to show that Best's conduct/investigation was "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Dean v. McKinney*, 976 F.3d 407, 413 (2020).

Plaintiff relies exclusively on allegations that Best conducted a sloppy investigation to prove his claims. However, evidence of a sloppy investigation is insufficient to survive a motion for summary judgment in § 1983 claims. *Johnson v. Balt. Police Dep't*, No ELH-19-0698, 2022

U.S. Dist. LEXIS 189576, at *134 (2022). Here, there is no evidence Best coerced Charlene into implicating Plaintiff in Radcliffe's murder. In fact, as outlined above, Charlene testified to the contrary at her deposition. Additionally, despite Plaintiff's self-serving allegations, the evidence supports that Melvin and Best interviewed multiple witnesses and investigated every lead.

Plaintiff's failure to investigate claim also fails because there is no genuine dispute as to Best's efforts in establishing probable cause before Melvin sought an arrest warrant for Plaintiff.

According to the Fourth Circuit, failure to investigate claims test an officer's effort to establish probable cause *before* seeking an arrest warrant. *Safar v. Tingle*, 859 F.3d 241, 246 (2017) (citing *Wadkins v. Arnold*, 214 F. 3d 535, 541 (4th Cir. 2000)). Other courts have also provided valuable commentary regarding the factor of probable cause in § 1983 failure to investigate claims under the Fourteenth Amendment. *See Ahlers v. Schebil,* 188 F.3d 365, 371 (6th Cir. 1999) ("Once probable cause is established, an officer is under no duty to investigate further or to look for additional evidence which may exculpate the accused").

The evidence developed in the present case regarding Best's investigation clearly falls well short of the applicable "deliberate or reckless" standard and does not amount to "conscience-shocking" behavior. Rather, it shows Best acted in a rational and reasonable manner based on the circumstances.

Best and Melvin performed a thorough investigation as laid out in the statement of undisputed facts submitted contemporaneously. Best and Melvin gathered physical evidence, witness testimony, critically analyzed witness statements, and submitted physical evidence for testing. Unfortunately, we do not know all the steps Best and Melvin took as the original files have been lost in flooding. Appx. AA, "Baxter Affidavit". Charlene's first statement also provided Best/Melvin probable cause to obtain an arrest warrant for Sharpe. As Plaintiff is unable to

forecast any evidence that any failure to investigate by Best was deliberate/reckless or any evidence to overcome Charlene's testimony regarding the genuineness of her first statement, which provided Best probable cause to obtain an arrest warrant for Sharpe, Best is entitled to summary judgment on Sharpe's failure to investigate claim.

**IV.** **There is no evidence Best concealed exculpatory and/or impeachment evidence thereby depriving Plaintiff of liberty and denial of fair criminal process in violation of the Due Process Clause of the Fourteenth Amendments (Counts VI).**

Plaintiff alleged Best failed to disclose impeachment evidence, specifically, evidence regarding Charlene's mental health history, to the Pitt County District Attorney's Office or Plaintiff's attorney, and such failure resulted in deprivation of liberty and denial of fair criminal process in violation of the Fourteenth Amendment.

To make out a claim that a police officer has violated a criminal defendant's constitutional right by suppressing exculpatory evidence, the defendant must allege, and ultimately prove, that: (1) the evidence at issue was favorable to him; (2) the officer suppressed the evidence in bad faith; and (3) prejudice ensued. *Owens v. Baltimore City State's Attorneys Office*, 767 F.3d 479 (2014). In *Jean v. Collins*, 221 F.3d 656 (2000), the Plaintiff alleged that police officers violated his Fourteenth Amendment due process rights by failing to turn over exculpatory evidence to the prosecutor. The Court held that "…it would be impermissible to hold the police liable for due process violations under § 1983 where they have acted in good faith." The Court further noted that "…police officer negligence or inadvertence in failing to turn over evidence cannot be actionable under § 1983." A police officer generally conceals or "suppresses" evidence by not disclosing the evidence to the prosecutor. *Id*. at 396-397. However, suppression does not occur when the criminal defendant is already aware of the exculpatory information or when the evidence is "available to the defense from other sources" or through a "diligent investigation by the

defense." *Burgess v. Balt. Police Dep't.*, 2017 U.S. Dist. LEXIS 180657 at 29.

"[S]uppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution. *Brady v. Maryland*, 373 U.S. 83, 87, 10 L.Ed.2d 215, 218 (1963). Evidence is material if there is "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *U.S. v. Bagley*, 473 U.S. 667, 682, 87 L.Ed.2d 481, 494 (1985).

First, Best maintain he was never informed of Charlene's history of mental illness, he had no reason to inquire into such matters, and it would be inappropriate and damaging to law enforcements relationship with the community to rigorously inquire into the medical background of witnesses. Regardless of whether Best knew about Charlene's history of mental illness, District Attorney Clark Everett ("Everett") testified that he already had materials related to Charlene's hospitalization for mental illness because it was an issue in his prosecution of the women who assaulted Charlene after she identified Plaintiff as Radcliffe's murderer. Appx. BB, "Everett Deposition" pp. 89:21-25-90:1-7. This prosecution occurred before Plaintiff's prosecution. Although Everett does confirm he disclosed the records to multiple criminal attorneys he cannot confirm Plaintiff's attorney received the records. Appx. BB, "Everett Deposition" pp. 42:10-22.

There is also ample evidence that Plaintiff's attorney either knew or should have known about Charlene's hospitalization and mental history on May 24, 1994, at the latest. Everett subpoenaed Charlene's medical records while prosecuting Charlene's assailants. Those records indicate Charlene had been recently released from a "psych unit" prior to Plaintiff's arrest. Appx. EE, p. 3. Notes indicate those records were "put in all attorney boxes," on May 24, 1994. *Id.* at p.

1. These attorney boxes would have included Cherry Stokes' box because Cherry Stokes represented Evans, one of Charlene's assailants, in connection with Charlene's assault. Appx. U, p. 6.

Another reason the evidence could not have been suppressed is because the Court ordered it not be disclosed prior to trial. On May 31, 1995, before Plaintiff's criminal trial, the presiding judge denied Plaintiff's motions to "Compel Disclosure of All Evidence by Investigative Officers to the District Attorney" and "Motion for List of Witnesses." Appx. DD SHARPE 014233 and BATES Sharpe 14238-14239. The Court likely ordered this witness information to be suppressed due to the prior assault on Charlene at the hands of Plaintiff's girlfriend and friends, although this is not specified in the orders. Best cannot be liable for failing to disclose evidence a court ordered should not be provided to Plaintiff. Therefore, even if Best had the allegedly exculpatory materials that Cherry Stokes did not, those materials were withheld by the judge, not Best.

There can be no dispute that Charlene's mental health records were available to the defense from other sources or through a diligent investigation by the defense. All Cherry Stokes had to do was look in his "attorney box" at the Courthouse. Plaintiff produced no evidence that Cherry Stokes was not aware of Charlene's medical history or psychiatric treatment. In sum, Plaintiff cannot produce any evidence that his attorney, Cherry Stokes, did not have the allegedly suppressed information and improperly relies on speculation to support his allegations. "Mere speculation as to the materiality of the evidence is insufficient." *United States v. Caro*, 597 F.3d 608, 619 (2010). Not only did Best not suppress evidence of Charlene's mental health history in bad faith, but it is also clear the district attorney, as well as Plaintiff's attorney, possessed the evidence in question.

Plaintiff also alleged Best failed to disclose that Charlene failed the polygraph examination

she took after providing her statement.  There is no evidence to support Plaintiff's allegations. Best denies making these statements, Everett does not recall the statements, and Plaintiff's Complaint states "upon information and belief," indicating he has no firsthand knowledge of the alleged events.  Of note, this claim appears to stem from Everett's assertion that Charlene was polygraphed prior to Plaintiff's arrest during the MAR hearing.  Best corrected Everett on the record when Everett misspoke. Appx. M, "1997 MAR" pp. 126:15-18.  Importantly, Best is protected by absolute immunity since the allegations concern his hearing testimony. "[W]itnesses are exempt from civil liability for testimony given in a prior trial." *Brice v. Nkaru*, 220 F. 3d. 233, 239 (2000).

Based on the foregoing, there are no genuine issues of material fact when it comes to Plaintiff's suppression of evidence/concealment of impeachment evidence claims, and Best is entitled to judgment on these claims a matter of law.

**V.      Plaintiff did not adduce any evidence that Best withheld exculpatory evidence, coerced witnesses, made false reports, destroyed physical exculpatory evidence, or made false representations about evidence in his possession in violation of the First and Fourteenth Amendments (Counts VIII or IX).**

Plaintiff alleged Best "intentionally, recklessly, or with deliberate indifference withheld exculpatory evidence, coerced witnesses, made false reports, destroyed physical exculpatory evidence, and made false representations about evidence in his possession" following the denial of his MAR.  Plaintiff alleges Best, through an unnamed Greenville Police Department officer, coerced Stokes into repudiating her recantation in 2000, obstructed the North Carolina Statute Bureau of Investigation's investigation into Stokes recantation in March 2001, and otherwise made false representations/concealed evidence in November 2004 and April 2012.  Plaintiff also alleged Best destroyed evidentiary items from the Radcliffe murder investigation without a "court order, and . . . had no reason or justification for their sudden destruction ten years after [Plaintiff's] trial

and conviction."

Plaintiff did not make these allegations prior to filing his Amended Complaint on July 26, 2024, no discovery occurred in connection with these new allegations, and Plaintiff has no evidence to support them. Best denies the allegations. The Supervisor of the Property and Evidence Division within the Greenville Police Department, Molly Muise, also testified that Best was not involved in the destruction of the evidence in question; rather, Larry Hopkins and John Teel destroyed the evidence. Appx. TT ¶¶ 1-10. Best and Ms. Muise also point out that the handwritten entries on the Property Reports say "DEST," short for "destroy," not "BEST." *Id.* at ¶ 6. The Property Reports also indicate Best signed his name "Det. DR Best," to the Property Report Forms, not "DEST" or "BEST." *Id.* (see "Officer's Signature" box on Property Reports). Best was retired from the GPD in 2004 and was not aware of the destruction of evidence or Plaintiff's post-conviction efforts. Appx. RR, ¶ 10-12. Also, Best was not interviewed by the any of Plaintiff's representatives in 2012. *Id.* at ¶ 14. Finally, Plaintiff has not shown that any actions of Best, or any Defendant, taken after 1997 impacted his incarceration and conviction.

As Plaintiff has not adduced any evidence concerning these new allegations that Best withheld exculpatory evidence, coerced witnesses, made false reports, destroyed physical exculpatory evidence, or made false representations about evidence in his possession in violation of the First and Fourteenth Amendments, Best is entitled to judgment as a matter of law on these new claims.

**V.     Qualified Immunity shields Best from liability for any claims brought against him under the First, Fourth, or Fourteenth Amendment (Counts I, IV, V, VI & VII).**

Best is also entitled to judgment as a matter of law on Plaintiff's federal law claims based on qualified immunity.[1] The privilege of qualified immunity protects government officials from

---

[1] Also discussed in connection with Best's response to Sharpe's allegations of arrest and institution of criminal charges

liability so long as they could reasonably believe that their conduct does not violate clearly established law. *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727 (1982). Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341, 106 S. Ct. 1092 (1986).

The analyses consist of a two-step process that "asks first whether a constitutional violation occurred and second whether the right violated was clearly established." *Melgar v. Greene*, 593 F.3d 348, 353 (2010). Plaintiff's bear the burden to show that the constitutional violation occurred, while defendants bear the burden to show that that right was not clearly established. *Henry v Purnell*, 501 F.3d at 377-378. If the facts could establish a constitutional violation, the court must analyze whether the constitutional right alleged to have been violated was "clearly established" at the time of the officer's actions. *Saucier v. Katz*, 533 U.S. 194, 201, 121 S. Ct. 2151, 2156 (2001). In considering this second prong, the key issue is whether the law "gave the officials 'fair warning' that their conduct was unconstitutional." *Ridpath v. Board of Governors Marshall Univ.*, 447 F.3d 292, 313 (2006).

In order for an officer to lose the protection of qualified immunity, existing precedent at the time of the occurrence must show that it was "beyond debate" that the officer's specific actions violated the Constitution. *Mullenix v. Luna*, 577 U.S. 7, 11-12, 136 S.Ct. 305, 308-9 and 312 (2015). Thus, the inquiry into whether the right was clearly established must "be undertaken in light of the specific context of the case" and "not as a broad general proposition . . . ." *Saucier v. Katz*, 533 U.S. 194, 201, 121 S Ct. 2151, 2156 (2001). An inquiry under the qualified immunity analysis must be particularized and fact-specific. *Anderson v. Creighton*, 483 U.S. 635, 640-41, 107 S.Ct. 3034, 3039-40 (1987). Ordinarily, when analyzing whether it was "clearly established"

---

without probable cause (Section II above).

that the officer's actions violated the Constitution in the specific factual scenario he faced, the Fourth Circuit does not "look beyond the decisions of the Supreme Court, this court of appeals, and the highest court of the state in which the case arose." *Hill v. Crum*, 727 F.3d 312, 322 (2013). "The relevant dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202, 121 S Ct. 2151, 2156 (2001). If the right was not "clearly established" in the "specific context of the case," that is, if it was not "clear to a reasonable officer' that the conduct in which he allegedly engaged "was unlawful in the situation he confronted," then the law affords immunity from suit. *Saucier*, 533 U.S. 194, 201-02, 121 S Ct. 2151, 2156 (2001).

In this litigation, Plaintiff has discussed "clearly established law" generally. That is not enough. "The right [Best] is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant sense." *Anderson v. Creighton*, 486 U.S. 635, 640. As Plaintiff has not shown the rights Best allegedly violated were clearly established at the time Best acted, Best is entitled to judgment as a matter of law on Plaintiff's federal law claims based on qualified immunity.

Assuming arguendo that Plaintiff made this showing, Plaintiff cannot point to any existing precedent at the time of the occurrence showing that it was "beyond debate" that Best's specific actions violated the Constitution because Best had probable cause to arrest, prosecute, and convict Plaintiff based on the first part of Charlene's statement. Other than self-serving, unsubstantiated claims to the contrary, Plaintiff has not adduced any evidence that Best did not believe Charlene, or that Best acted in bad faith, or that Best's conduct was otherwise unlawful. In fact, there was ample other evidence to support Best's belief that Plaintiff murdered Radcliffe, including the

witness tampering Plaintiff's associates engaged in after Charlene provided her statement. Based on the foregoing, Best is also entitled to judgment as a matter of law on Plaintiff's federal law claims based on qualified immunity.

Finally, Best contends that the allegations and circumstances pertaining to him are distinct from those involving the other Officer Defendants. Accordingly, he respectfully requests that the Court evaluate his claim of qualified immunity separately.

## VI.  There is no evidence Best and Shrock conspired to wrongfully imprison Plaintiff in violation of North Carolina common law (Count XI).

Plaintiff alleged Best, acting in concert with Melvin and Schrock, engaged in wrongful acts and omissions that resulted in Plaintiff's wrongful imprisonment in violation of state law.  As outlined above, Plaintiff's restraint was not illegal because it was supported by probable cause. Plaintiff has not forecast any evidence that there was any agreement between the parties that injured Plaintiff.  As there are no genuine issues of material fact when it comes to Sharpe's wrongful imprisonment and civil conspiracy claims, Best is entitled to judgment as a matter of law on those claims.

## VI.  There is no evidence Best engaged in grossly and recklessly negligent acts or omissions that resulted in Plaintiff's arrest, conviction, and imprisonment in violation of North Carolina common law (Counts XII).

Plaintiff claims Best breached his duty of care to Plaintiff when he caused Charlene and Stokes to fabricate statements, concealed Charlene's psychiatric hospitalizations, and made false statements to prosecutors and gave false testimony to the court in the 1995 trial and 1997 MAR hearing.  Again, Plaintiff's arrest and conviction were based on the first part of Charlene's statement.  Charlene testified that her first statement was based on her own eyewitness accounts, and Plaintiff has not forecast any evidence proving otherwise.  Plaintiff also knew or should have known about Charlene's psychiatric hospitalizations, and there is no evidence to support Plaintiff's

allegation that Best gave fast statements to prosecutors or false testimony to the court at any time. As discussed in detail above, Plaintiff cannot prove Best breached any duty owed to Plaintiff as a police officer or that any duty Best allegedly breached caused Plaintiff's arrest and incarceration; therefore, Best is entitled to judgment as a matter of law in connection with Plaintiff's negligence allegation.

## VII.    Public Official Immunity shields Best from liability for any claims brought against him under state law.

Under North Carolina law, a plaintiff may hold a public official who is engaged in the exercise of his discretionary, governmental duties personally liable for tort claims only by establishing "corrupt or malicious" actions or actions beyond the scope of their duties. *Smith v. Hefner*, 235 N.C. 1, 6, 68 S.E.2d 783, 787 (1952).  Police officers are public officials. *Jones v. Kearns*, 120 N.C. App. 301, 303, 462 S.E.2d 245, 246, disc. review denied, 342 N.C. 414, 465 S.E. 2d 541 (1995).  A public official does not waive immunity unless it is alleged and proved the officer's actions were corrupt or malicious or beyond the scope of the official's duties. *Shaw v. Stroud*, 13 F.3d 791, 804 (4th Cir. 1994).

Public official immunity is a complete bar to Plaintiff's state law claims against Best individual capacity.  There is no dispute that Best was acting as a GPD police officer/detective during the times giving rise to Plaintiff's suit.  Moreover, the decisions made by Best during this time were discretionary decisions made during the course of performing his official duties as a public officer.  "Discretionary acts are those requiring personal deliberation, decision, and judgment." *Jones*, 120 N.C. at 306, 462 S.E.2d at 248. Therefore, to survive this motion for summary judgment, Plaintiff must have alleged and forecast evidence demonstrating that Best acted corruptly or with malice.

Here, Plaintiff has not produced any evidence that Best acted with malice or corruption.

Plaintiff may also not rest on the conclusory allegations in his Complaint. "It is well settled that absent evidence to the contrary, it will always be presumed that 'public officials will discharge their duties in good faith and exercise their powers in accord with the spirit and purpose of the law.' This presumption places a heavy burden on the party challenging the validity of public officials' actions to overcome this presumption by competent and substantial evidence." *Leete v. County of Warren*, 341 N.C. 116, 119, 462 S.E. 2d 476, 478 (1995) (quoting *Huntley v. Potter*, 255 N.C. 619, 628, 122 S.E.2d 681, 687 (1961)). Because Plaintiff failed to come forward with evidence to overcome Best's public official immunity, Best is entitled to summary judgment on Plaintiff's state law claims.

## VIII. State law provides an adequate remedy for Plaintiff's alleged North Carolina Constitution due process violations (Counts XIII through XIX).

Plaintiff alleges, in the alternative, claims for violation of his due process rights pursuant to Articles 19 and 20 of the North Carolina Constitution. As a threshold matter, a Plaintiff may not proceed under a claim directly under the NC Constitution when an adequate remedy is available. *Corum v. University of North Carolina*, 330 N.C. 761 (1992). In North Carolina, it is well established that a plaintiff's constitutional right not to be unlawfully deprived of his liberty are adequately protected by a common law claim for false imprisonment, which protects a plaintiff from unlawful arrest. See *Davis v. Town of Southern Pines*, 116 N.C. App. 663 (1994); see also Alt v. Parker, 112 N.C. App. 307 (1993). Plaintiff's state law negligence/gross negligence/reckless negligence, wrongful imprisonment, and civil conspiracy claims provide him with an adequate state law remedy. *Blackmon v. Holder*, No. 5:20-CV-524-FL, 2021 U.S. Dist. LEXIS 127158, 2021 WL 2877902, at *10 (2021). Therefore, Plaintiff's direct claims under the North Carolina Constitution should be dismissed as his rights are adequately protected by his other state law claims.

Best incorporates by reference any and all valid assertions, contentions, and arguments contained in the anticipated motions for summary judgment and supporting materials of other Defendants to this action equally applicable to him.

## **CONCLUSION**

Wherefore, for the reasons stated above, Defendant David Ricky Best states that there is no genuine issue of material fact remaining and that he is entitled to judgment as a matter of law on all Plaintiff's claims against him and all claims against him should be dismissed.


Respectfully submitted, this the 27 day of November, 2024.


/s/ Peter Clements
Peter Clements
N.C. State Bar No. 57853
Peter.clementsjr@wilsonelser.com
22 West Trade Street # 300
Charlotte, NC 28217
Telephone: (401)688-0306
*Attorneys for Defendants Shrock,*
*Best, and the City of Greenville*

## **CERTIFICATE OF COMPLIANCE WITH WORD COUNT LIMIT**

The undersigned certifies the foregoing brief complies with Local Rule 7.2(f)(3). The brief contains 7662 words, which includes the body of the brief, headings and footnotes. The caption, signature lines, certificate of service, and any cover page or index are not included in the above word count.

This the 27 day of November, 2024.

/s/ Peter Clements
Peter Clements

**J.A. 2416**

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies, pursuant to Rule 5 of the Federal Rules of Civil Procedure, the foregoing was electronically filed with the Clerk of Court using the CM/ECF system which will send notification of such filing to all counsel.

This the 27 day of November, 2024.

/s/ Peter Clements
Peter Clements

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION
Lead Case No. 4:21-CV-00185-BO**
*Consolidated with 4:22-CV-00088-BO*

| | |
|---|---|
| MONTOYAE DONTAE SHARPE, | |
| Plaintiff, | |
| vs. | **DEFENDANT JEFFREY D. SHROCK'S** |
| DAVID RICKY BEST, JEFFREY D. SHROCK, CAROLYN MELVIN, and the CITY OF GREENVILLE, NORTH CAROLINA, | **MOTION FOR SUMMARY JUDMENT** |
| Defendants. | |

NOW COMES Defendant Jeffrey D. Shrock ("Shrock" or "Defendant"), pursuant to Federal Rule of Civil Procedure 56, and respectfully requests that this Court enter judgment in his favor on all of Plaintiff's claims against him.

In support hereof, the Defendant states that there is no genuine issue of material fact and that Defendant is entitled to judgment as a matter of law on all claims against him. The reasons supporting the Defendant's motion are set out in more detail in his supporting memorandum filed contemporaneously.

WHEREFORE, Defendant Jeffrey D. Shrock requests the Court as follows:

1. That the Court grant the Defendant's Motion for Summary Judgment, dismiss Plaintiff's action, and deny all claims for relief asserted against him;

2. That the Defendant recover from Plaintiff the costs of this action and attorneys' fees as allowed by law; and

3. That the Defendant have and recover such other and further relief as the Court deems

just and proper.

Respectfully submitted, this the 27 day of November 2024.

/s/ Peter Clements
Peter Clements
N.C. State Bar No. 57853
Peter.clementsjr@wilsonelser.com
22 West Trade Street # 300
Charlotte, NC 28217
Telephone: (401)688-0306
*Attorneys for Defendant Shrock*

2

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies, pursuant to Rule 5 of the Federal Rules of Civil Procedure, the foregoing was electronically filed with the Clerk of Court using the CM/ECF system which will send notification of such filing all parties.

This the 27 day of November 2024.

/s/ Peter Clements
Peter Clements

3

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION
Lead Case No. 4:21-CV-00185-BO
*Consolidated with 4:22-CV-00088-BO***

| | |
|---|---|
| MONTOYAE DONTAE SHARPE, | |
| Plaintiff, | |
| vs. | **MEMORANDUM IN SUPPORT OF DEFENDANT JEFFREY D. SHROCK'S MOTION FOR SUMMARY JUDGMENT** |
| DAVID RICKY BEST, JEFFREY D. SHROCK, CAROLYN MELVIN, and the CITY OF GREENVILLE, NORTH CAROLINA, | |
| Defendants. | |

NOW COMES Defendant Jeffrey D. Shrock (herein after referred to as "Shrock"), by and through his undersigned attorneys, and pursuant to Federal Rule of Civil Procedure 56.1 and Local Rule 7.2, submits the following memorandum of law in support of his Motion for Summary Judgment.

## I.     SUMMARY OF THE NATURE OF THE CASE

Plaintiff, Dontae Montoyae Sharpe, has brought this action against David "Ricky" Best ("Best"), Shrock, and the City of Greenville (the "City" or "GPD") (collectively referred to as the "Defendants")[1] pursuant to 42 U.S.C § 1983 and North Carolina State Law. Plaintiff asserts two § 1983 liability claims against Shrock for concealment of evidence, Count VI ("Concealment Claim" or "Brady Claim"), and fabrication of evidence, Count VII ("Fabrication Claim"). (D.E. 53 at ¶ 219-227; 228-249). Plaintiff also alleges state law claims against Shrock for wrongful imprisonment and negligence in Counts XI. (*Id*. 268-280; 295-306). Alternatively, Plaintiff has

---

[1] Defendants Melvin is not included in the definition of Defendants for the purposes of this Motion.

brought claims against Shrock for due process violations under Article 1, Sections 19 and 20 of the North Carolina Constitution, Counts XII-XIX ("State Constitution Claims"). (*Id*. at ¶ 307-312).

Shrock hereby moves, pursuant to Fed. R. Civ. P. 56, to dismiss Counts VI, VII, XI, and XII-XIX of Plaintiff's Complaint as no genuine issue of material fact exists, and he is entitled to judgment as a matter of law as to Plaintiff's § 1983 claims, state common law claims, and North Carolina Constitutional Claims.

## II.     <u>SUMMARY OF ARGUMENT</u>

Shrock is entitled to qualified immunity for Plaintiff's § 1983 claims as he did not violate Plaintiff's First or Fourteenth Amendment rights, there is no evidence any exculpatory or impeachment evidence was suppressed or received by Shrock, discovery has shown that Plaintiff Sharpe, his Counsel, and the District Attorney were already made aware of the allegedly exculpatory information and said information was disclosed at trial, Plaintiff is unable to show that the subject Constitutional Rights were "Clearly Established," testimonial immunity bars Plaintiff's fabrication claim, and Shrock is entitled to public official immunity for Plaintiff's state law claims. Therefore, the Court should grant Shrock's Motion for Summary Judgment and dismiss all Plaintiff's claims against him.

## III.     <u>FACTUAL BACKGROUND</u>

Defendant Shrock incorporates his separate Statement of Undisputed Facts, which is filed contemporaneously with this motion.

## IV.     <u>STANDARD OF LAW</u>

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317,

322-24, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986); *Cybernet, LLC v. David*, 954 F.3d 162, 168 (4th Cir. 2020); *Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018); *Iraq Middle Mkt. Dev. Found v. Harmoosh*, 848 F3d 235, 238 (4th Cir. 2017). To avoid summary judgment, the nonmoving party must demonstrate that there is a genuine dispute of material fact so as to preclude the award of summary judgment as a matter of law. *Ricci v. DeSefano*, 557 U.S. 585-86, 129 S. Ct. 2658, 174 L. Ed. 2d 490 (2009); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986); *Gordon v. CIGNA Corp.*, 890 F. 3d 463, 470 (4th Cir. 2018).

The Supreme Court has clarified that not every factual dispute will defeat a summary judgment motion. "By its very terms, this standard provides that mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Answers on v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id*. at 248.

There is a genuine dispute as to material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*.; *see CTB, Inc. v. Hog Slat, Inc.*, 954 F.3d 647, 658 (4th Cir. 2020); *Variety Stores, Inc.*, 888 F. 3d at 659; *Sharif v. United Airlines, Inc.*, 841, F.3d at 199, 204 (4th Cir. 2016). But, "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*. 477 U.S. at 252.

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Balt. Ravens Football Club. Inc.*, 346 F.3d 514,

522 (4th Cir. 2003). "Unsupported speculation is not sufficient to defeat a summary judgment motion." *Felty v. Graves-Humphrys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987); *see also Reddy v. Buttar*, 38 F. 4th 393, 403-04 (4th Cir. 2022); *Harris v. Home Sales Co.*, 499 F. App'x 285, 294 (4th Cir. 2012). "Fanciful inferences and bald speculation of the sort no trier of fact would draw or engage in at trial need not be drawn or engaged at summary judgment." *Local Union 7107 v. Clinchfield Coal Co.*, 124 F. 3d 639, 640 (4th Cir. 1997).

## V.    ARGUMENT

### A.  Shrock is entitled to qualified immunity for Plaintiff's § 1983 Claims.

"The doctrine of qualified immunity protects government officials from 'liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  The doctrine of qualified immunity "gives government officials breathing room to make reasonable but mistaken judgments and protects all but the plainly incompetent or those who knowingly violate the law." *Smith v. Ray*, 781 F.3d 95, 100 (4th Cir. 2015) (internal quotation marks omitted).  It serves to protect officers from suit for money damages in cases involving "gray areas" of constitutional rights or the violation of such asserted rights. *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 2012). The qualified "immunity shield is necessarily more protective than is the defense on the merits." *Torchinsky v. Siwinski*, 942 F.2d 257, 261 (4th Cir. 1991).

"Qualified immunity shields federal and state officials from monetary damages" unless a plaintiff can show both the violation of a constitutional right *and* "that the right was clearly established at the time of the challenged conduct." *Gentry v. Robinson*, 2020 U.S. App. LEXIS 38075, at *18 (4th Cir. Dec. 7, 2020) (citation omitted).  "To be clearly established, a right must

be sufficiently clear that <u>every</u> reasonable official would [have understood] that what he is doing violates that right." *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (emphasis added) (alteration in original) (citation and internal quotation marks omitted). Put another way "that a constitutional right is 'clearly established' means more than that it is well-known or easily articulated." *Cloaninger v. McDevitt*, 555 F. 3d 324, 331 (2009).

> Rather, . . . the right the official is alleged to have violated must have been "clearly established" in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a **reasonable official would understand that what he is doing violates that right**. The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.

*Saucier v. Katz*, 533 U.S. 194, 202, 150 L. Ed. 2d 272 (2001). "Ordinarily, no factual findings are necessary to the analysis of a qualified immunity claim because the 'issue is a purely legal one: whether the facts alleged (by the plaintiff, or, in some cases, the defendant) support a claim of violation of clearly established law." *Cloaninger*, 555 F.3d at 331.

Consequently, "Ruling on a defense of qualified immunity therefore requires (1) identification of the specific right allegedly violated; (2) determining whether at the time of the alleged violation the right was clearly established; and (3) if so, then determining whether a reasonable person in the officer's position would have known that doing what he did would violate the right." *Porterfield v. Lott*, 156 F.3d at 563, 567 (4th Cir. 1998). (holding that "if no right is transgressed, our inquiry ends, because government officials cannot have known of a right that does not exist.)

Here, Shrock is entitled to qualified immunity under § 1983 unless "(1) [he] violated a federal statutory or constitutional right, and (2) the unlawfulness of [his] conduct was 'clearly established at the time.'" *Sharpe v. Winterville Police Dep't*, 2020 U.S. Dist. LEXIS 151012, at

*8, 13 (E.D.N.C. Aug. 20, 2020) (citations omitted) (holding that qualified immunity barred plaintiff's claim against North Carolina law enforcement officer).

No constitutional rights were violated by Defendant Shrock during his interaction with Charlene Johnson ("Charlene") and his subsequent testimony at the 1997 MAR. As discussed at length herein, the District Attorney had the allegedly exculpatory information and disclosed it to Plaintiff's defense attorney Cherry Stokes. The Fourth Circuit has stated a party cannot complain of a Brady violation if they or their counsel fails to use the information available to them or that they had access to it from other sources. *United States v. Wilson*, 901 F. 2d 378 (4th Cir. 1990). It has not been alleged that Plaintiff and his counsel were not made aware Shrock drove Charlene to the hospital as she testified to that information at trial. A diligent attorney defending the murder charge and beating would have followed up on possible impeachment information regarding Charlene, or on the filings of other attorneys seeking that information.

Further, assuming arguendo, that Plaintiff's constitutional rights were violated, which is denied, qualified immunity still applies as a reasonable officer could have still believed that Shrock's conduct was lawful in 1994 and 1997. No contemporary precedent establishes that Shrock's actions were unlawful. This is highly significant, because qualified immunity ensures that officers will be liable "only for 'transgressing bright lines.'" *Doe v. Broderick*, 225 F.3d 440, 453 (4th Cir. 2000). A reasonable officer in 1994 would not have understood that transporting a juvenile witness to the emergency room could constitute withholding exculpatory evidence or violating a defendant's constitutional rights. In short, a reasonable officer possessing the same information could have believed that Shrock's conduct was lawful.

Additionally, Plaintiff has not shown a "clearly established" right to Shrock not disclosing exculpatory or impeachment evidence absent a showing of bad faith in 1994. Especially instructive

6

J.A. 2426

to this issue is the Fourth Circuit's decision in *Owens v. Balt. City Stat's Atyys. Office*, 767 F.3d 379 (4th Cir. 2014). In *Owens*, the plaintiff alleged that the defendants, including Baltimore City police officers, violated his constitutional rights by intentionally withholding exculpatory evidence during his 1988 trial on rape and murder charges. *Id*. at 385.

In addressing the question of whether the plaintiff's constitutional rights were "clearly established" in 1988 (when the officers acted), the Court performed a review of applicable precedent. *Id*. at 398-401. After reviewing applicable precedent, the Court held that "…our precedent unmistakably provides that, by 1988, a police officer violates clearly established constitutional law when he suppresses material exculpatory evidence <u>in bad faith</u>." *Id*. at *401.

In short, the applicable precedent shows that Plaintiff can, at best, show that he had a "clearly established" right to Shrock not concealing or suppressing material exculpatory evidence <u>in bad faith</u>. However, for all of the reasons described herein, Plaintiff is unable to forecast any evidence showing that the concealment of exculpatory/impeachment evidence by Shrock, <u>if any</u>, was in bad faith. Plaintiff simply cannot show a "clearly established" right to Shrock not disclosing exculpatory or impeachment evidence <u>absent a showing of bad faith</u>. As such, Plaintiff cannot satisfy the "clearly established" prong of the qualified immunity analysis, and Shrock is therefore entitled to summary judgment on Plaintiff's § 1983 concealment of exculpatory and impeachment evidence claim.

Importantly, witness Charlene freely provided a corroborated statement implicating Plaintiff in the underlying murder which established probable cause for his arrest as confirmed by a magistrate, grand jury, and the eventual trial. Shrock did not arrest Plaintiff and there is no evidence he was involved in the decision to arrest Plaintiff. Shrock's interaction with Charlene did not impact her statement or Plaintiff's arrest. Perhaps most importantly a magistrate found

probable cause and issued an arrest warrant for Plaintiff not these Defendants. *McKinny v. Richland County Sheriff's Dept.*, 431 F.3d 415, 419 (4th Cir. 2005) (officer entitled to qualified immunity, in part because a magistrate and prosecutor concluded that probable cause existed; *see also Kaley v. United States*, 571 U.S. 320, 338 (2014) ("Probable cause . . . is not a high bar."). Therefore, Shrock's actions did not violate any clearly established constitutional right and, as probable cause existed for Plaintiff's arrest as a matter of law, he is entitled to qualified immunity.

Similarly, Plaintiff has not shown a clearly established right against Shrock providing inaccurate information while testifying at the 1997 MAR because absolute immunity prohibits such a claim as explained below. A reasonable officer would not have understood that Shrock's testimony in 1997 violated a defendant's constitutional rights.

In sum, Shrock is entitled to qualified immunity as to all of Plaintiff's claims, because it was not clearly established or "beyond debate" that his specific actions, in the specific factual scenarios he faced, violated the Constitution. Finally, Shrock contends that the allegations and circumstances pertaining to him are distinct from those involving the other Officer Defendants. Accordingly, he respectfully requests that the Court evaluate his claim of qualified immunity separately.

### B. There is no evidence exculpatory/impeachment evidence was suppressed or received by Shrock.

A Brady, or concealment of evidence, violation occurs when a defendant can show the evidence at issue (1) was favorable to the defendant, (2) was material to the defense, and (3) the prosecution had the evidence but failed to disclose it. *Moore v. Illimois*, 408 U.S. 786, 794-95, 92 S. Ct. 2562, 33L. Ed. 2d 706 (1972); *United States v. Sarihifard*, 155 F.3d 301, 309 (4th Cir. 1998). The Supreme Court has held that the materiality of the evidence must be evaluated cumulatively, rather than in isolation. *Wearrt v. Cain*, 577 U.S. 385, 136 S. Ct. 1002, 194 L. Ed. 2d 78 (2016);

*Kyles v. Whitley*, 514 U.S. 419, 115 S. Ct. 1555, 131 L. 2d 490 (1995).

Under *Gigilo v. United States*, 405 U.S. 150, 154-55, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1972), it is improper for a prosecution to withhold evidence to impeach government witnesses. *See United States v. Bagley*, 473 U.S. 667, 676 105 S. Ct. 763, 31 L. Ed. 2d 104 (1972), This is because evidence "favorable to the defendant includes not only exculpatory evidence but also evidence that the defendant can use to impeach a government witness." *Blankenship*, 19 F 4th at 692 (italics omitted).

Notably, "the constitutional duty [to disclose under Brady] is triggered by the potential impact of favorable but undisclosed evidence." *Long v. Hooks*, 972 F.2d 442, 462 (4th Cir. 2020) (internal quotation marks omitted). But, the "constitution is not violated every time the government fails or choses not to disclose evidence that might prove helpful to the defense." *Blankenship*, 19 F 4th at 692.

Of importance here, "the suppressed evidence must be *materially* favorable to the accused . . ." *Id*. at 692 (emphasis added). Evidence is material when there is a reasonable probability that, had the evidence been disclosed, the result of the proceedings would have been different. *United States v. Bagley*, 473 U.S. 667, 682, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985); *United States v. Parker*, 790 F. 3d 550, 558 (4th Cir. 2015); *United States v. Bartko*, 728 F.3d 327, 340 *4th Cir. 2013). The reasonable probability standard is satisfied when the suppression casts "serious doubts on the proceedings" *Owens, supra*, 67 F.3d at 398. "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles*, 514 U.S. at 434.

Critically, "exculpatory information is not suppressed when a criminal defendant is already

aware of it." *Burgess*, 997 F.3d at 550. There is no Brady violation when the alleged exculpatory information is available to the accused from "a source where a reasonable defendant would have looked." *United States v. Wilson*, 901 F.2d 378, 380-81 (4ᵗʰ Cir. 1990); *see United States v. Higgs*, 663 F. 3d 726, 735 (4ᵗʰ Cir 2011). (stating there is also no Brady violation "if the evidence is available to the defense from other sources or the defense already possesses the evidence").

### i. Plaintiff's Brady claim fails because all the material information was disclosed at trial.

As a threshold matter, Plaintiff's claim against Shrock for concealment of exculpatory evidence should be dismissed as all the material information was disclosed at trial. Plaintiff's Complaint alleges that Shrock concealed evidence of Charlene's time at Pitt County Memorial Hospital and his suspicion she was potentially on drugs. Complaint at ¶ 221. Both allegations erroneously conclude that Shrock must have known the details of Charlene's medical history because he drove her to the hospital in February of 1994.

However, at the 1995 trial, the jury heard Charlene tell the story about police bringing her to Greenville hospital. Appx. *B, p.* 49:15-21. Charlene stated, "Well, I was cut up one night, and I went to hospital, Greenville hospital, and the police brought me there and they started talking to me." *Id* [sic]. This trial testimony aligns with Shrock's recollection of the interaction and was known to the jury. Further, although Charlene did not testify that she used drugs, she testified that she sold crack with Plaintiff Sharpe. *Id.* at page 39:1-6. Surely, Charlene's testimony regarding her involvement in selling crack put the jury on notice of her involvement with drugs.

Shrock anticipates Plaintiff will argue that any details, however small, are exculpatory and were improperly withheld from the jury. However, that line of argument ignores the materiality requirement inherent to all Brady claims. The jury heard everything relevant and material to Shrock's interaction with Charlene, *i.e.* that she was taken to the hospital by police and involved

in drugs, in 1995. As all material information was presented to the jury at trial, it was not suppressed, and Plaintiff's claim fails.

### ii. Plaintiff's Brady claim fails because he cannot show that his attorney Cherry Stokes did not have the disputed materials.

Further, Plaintiff's claim of concealment against Shrock fails as he has no evidence his attorney, Cherry Stokes, did not have the information or that the information was suppressed. Plaintiff has produced no evidence that his attorney Cherry Stokes was not aware of Charlene's medical history or psychiatric treatment. Cherry Stokes has not denied possessing the alleged Brady information and has never contended the information was material. "Mere speculation as to the materiality of the evidence is insufficient." *United States v. Caro*, 597 F.3d 608, 619 (4th Cir. 2010). Further confusing this matter, about a month prior to the trial, Cherry Stokes file was "strewn" after a break in at his office. See Appx. DD, Sharpe 003402-003403. Since Plaintiff cannot confirm what materials were in Cherry Stokes possession prior to the trial, his Brady claim is based purely on speculation.  In sum, Plaintiff cannot adduce any evidence his attorney Cherry Stokes did not have the allegedly suppressed information and improperly relies on speculation.

### iii. Plaintiff's Brady claim fails because the Court ordered the information related to witnesses suppressed.

Most importantly, the evidence could not have been suppressed because the Court ordered it not be disclosed prior to trial. On May 31, 1995, before the criminal trial, the presiding judge denied Plaintiff's motions to "Compel Disclosure of All Evidence by Investigative Officers to the District Attorney" and "Motion for List of Witnesses." See Appx. DD, Sharpe 014233 and Sharpe 14238-14239. The Court likely ordered this witness information be suppressed due to the prior assault on Charlene at the hands of Plaintiff's girlfriend and friends, although this is not specified in the orders. Of course, Shrock cannot be liable for failing to disclose evidence a court ordered

11

**J.A. 2431**

should not be provided to the Plaintiff. Therefore, even if Shrock had the allegedly exculpatory materials that Cherry Stokes did not, the evidence would have been withheld pursuant to a court order not Shrock.[2]

### iv. There is no evidence Shrock received or was aware of exculpatory/impeachment evidence or acted in bad faith.

Finally, there is simply no evidence Shrock had information regarding the details of Charlene's mental health treatment as evidence shows he merely drove her to the emergency room. Assuming, arguendo, that Charlene's mental health treatment was proper Brady information, there is no evidence Shrock was aware of these details. Also, because Plaintiff has not adduced any evidence that Shrock possessed the information in the first place, he has no evidence it was suppressed in bad faith as required to sustain a Brady claim. "Unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." *Arizona v. Youngblood*, 488, U.S. 51, 58 (1988).

The evidence indicates that Shrock merely drove Charlene to Pitt County Memorial Hospital. Plaintiff has adduced no evidence that Shrock was involved in bringing her to the adolescent psychiatric unit or familiar with her medical treatment. Further, the record is totally devoid of any evidence Shrock withheld any information in bad faith. In fact, the evidence indicates Shrock told Best that he drove Charlene to the hospital as the prosecution adduced the information at trial. Appx. GG, 118:3-12. In short, there is simply no evidence Shrock ever possessed the information in question or acted in bad faith.

### C. Discovery has shown that Plaintiff Sharpe, his attorney Cherry Stokes, and the District Attorney's Office were already made aware of the allegedly exculpatory information.

### i. The evidence indicates that the District Attorney had Charlene's medical

---

[2] Shrock incorporates by reference any arguments or law contained in the motions for summary judgment and supporting memorandum filed by other Defendants equally applicable to him as if stated herein verbatim.

**records.**

There is a mountain of evidence that medical records related to Charlene's psychiatric stay were received by the District Attorney's Office and disclosed to defense counsel. The evidence on the records shows that Plaintiff's attorney, Cherry Stokes, and the District Attorney's Office had records related to Charlene's psychiatric commitment prior to the 1995 trial. The Officer Defendants, including Shrock, appear to be the only individuals to the underlying criminal case who did not have possession of medical records regarding Charlene's psychiatric commitment. In Greenville, District Attorneys, not the police, provided information to the defense. *See* Appx. BB, "Everett Deposition" p 59:2-4.

There is no dispute that District Attorney Everett had Charlene's medical records before the 1995 trial.

> Q. And then, going back to the Richie Motion quickly and the medical documents that – were turned over to Don Hicks, if, for some reason, Ricky Best, Shrock – Officer Shrock or anyone had information regarding Charlene Johnson's medical history and psychiatric stay and told you about it, that would've been information the DA's office already had prior to the 1995 trial, correct?"
>
> A. We had the medical records.
>
> Q. And those medical records where you has referenced her psychiatric stay?
>
> A. Yes, sir.

See Appx. BB, "Everett Deposition" pp. 89:21-25-90:1-6.

**ii.     There is no evidence Cherry Stokes was excluded from disclosure of Charlene's medical records.**

As for Plaintiff's criminal defense team, the evidence indicates that his attorney, Cherry

Stokes, had the records related to Charlene's mental health treatment. As noted above, suppression does not occur when the criminal defendant is already aware of the exculpatory information or when the evidence is "available to the defense from other sources" or through a "diligent investigation by the defense." *Canton*, 769 F.3d at 871.

On May 24, 1994, Charlene's medical records, which indicated she was recently released from an "adolescent psych unit 3-94" were "put in all atty's boxes" *See* Appx. EE, SHARPE 0141155. The note is signed by public defender Don Hicks, who was known to Cherry Stokes. See Appx. CC, p. 56:11-15. The next day, another defense attorney named Greg Duke filed a "Ritchie Motion" seeking to review Charlene's medical records relevant to her trustworthiness. Appx. FF.[3] Even if Cherry Stokes did not receive the records in his capacity as counsel for Plaintiff, he likely received the materials pursuant to his representation of Lisa Evans, as indicated in her letter. See Appx. U. Sharpe 003833-003838. However, Plaintiff's attorney, Cherry Stokes, could not recall if he was appointed as Lisa Evans attorney or not. *See* Appx. CC, p. 59:15-17. There is no reason to believe Cherry Stokes was excluded from this disclosure.

Also, the fact that criminal defense attorney Greg Duke publicly filed a motion to review Charlene's medical records shows that the materials were available to Cherry Stokes, and thus, Plaintiff's defense. Charlene's importance as a witness was well known to Plaintiff and his attorneys prior to his 1995 trial. In fact, the defense investigator, Johnny Rose, made diligent efforts to locate Charlene. *See* Appx. PP, p. 1 ¶ 5 Pitt DA Copies 000631-000632. Further, Plaintiff's aunt accused Charlene of providing police information implicating Plaintiff in the murder of George Radcliffe mere minutes after she was assaulted. *See* Appx. S, p. 97:14-25.

---

[3] Clearly, if other defense attorneys filed motions to acquire additional materials related to Charlene's mental health treatment the information was public record and available to District Attorneys and Plaintiff's defense team through a diligent investigation.

Plaintiff's mother later informed Plaintiff that Charlene had admitted lying to police. Appx. S, pp. 69:25-70:1-2. Therefore, Cherry Stokes had possession of Charlene's medical treatment records, or was at least aware of them, but declined to use the information in trial.

In sum, the disputed information at the heart of Plaintiff's Brady claim was at issue in the criminal case, well known to the attorneys involved, and readily accessible.

### iii.  The disputed materials and information were not favorable to Plaintiff.

Fatally, the alleged Brady materials were not favorable to Plaintiff or exculpatory. Cherry Stokes likely chose not to pursue Charlene's medical treatment records to avoid the risk of introducing evidence that she was retaliated against by the Plaintiff's girlfriend and associates; this could have severely harmed the case. Pursuing those records could have inadvertently supported the claims against Plaintiff rather than weakening them. At the 1997 MAR, Plaintiff's counsel did not present evidence of Charlene's mental health treatment. Appx. M. This omission occurs even though Charlene testified on Plaintiff's behalf. Therefore, when assessed in their full context, Charlene's medical treatment records were likely not favorable to Plaintiff's case or exculpatory. For this reason alone, Plaintiff's Brady claim against Shrock should be dismissed as he cannot forecast evidence to show the alleged Brady materials were exculpatory or favorable.

### D.  Testimonial immunity bars all Plaintiff's claims.

Plaintiff alleges Shrock fabricated evidence while testifying at the 1997 MAR and bases his concealment of exculpatory evidence claim exclusively on statements Shrock made while testifying at that hearing.  The immunity of a testifying witness bars both those claims. *See Rehberg v. Paulk*, 566 U.S. 356, 367 (2012) ("the immunity of a trial witness sued under § 1983 . . . [is] absolute . . . with respect to *any* claim based on the witness' testimony"); *see also Williams v. Hepting*, 844 F.2d 138, 141-43 (3d Cir. 1988) (citing cases) (holding that preliminary hearing

testimony is within the scope of witness absolute immunity). It is well established that witnesses are entitled to absolute immunity from civil liability under § 1983 for their testimony in a judicial proceeding. *See*, *e.g. Briscoe v. LaHue*, 460 U.S. 325, 341-43, 103 S. Ct. 1108, 75 L. Ed. 2d 96 (1983); *Brice v. Nkaru*, 220 F.3d 233, 239 n.6 (4th Cir. 2000); 60A Am. Jur. 2d Perjury § 132 (1988) (false testimony in a criminal action does not furnish a basis for a civil suit by the criminal defendant). This Court has previously granted officer defendants summary judgment under similar circumstances. *Tarlton v. Sealey*, No. 5:15-cv-451, 2018 U.S. Dist. LEXIS 33393, at *20 (E.D.N.C. Mar. 1, 2018). Therefore, Plaintiff's claim for fabrication should be dismissed as it relates to the statements Shrock made while testifying.

Plaintiff attempts to circumvent this obvious impediment to his claim by alleging that Shrock made false statements to DA Clark Everett prior to the 1997 MAR. However, there is no evidence any such conversation took place. At his deposition, DA Everett unequivocally stated that he does not recall such a meeting ever taking place. *See* Appx. BB, 70:15-17. Even if the alleged conversation had taken place absolute immunity would still prohibit Plaintiff's claim. In *Rehberg*, the Court stated:

> In the vast majority of cases involving a claim against a [] witness, the witness and the prosecution conducting an investigation engage in proprietary activity, such as a preliminary discussion in which the witness relates the substance of his intended testimony. We decline to endorse a rule of absolute immunity that is so easily frustrated.

*Id*. at 370.[4] Therefore, Plaintiff's fabrication claim is prohibited and should be dismissed.

Similarly, Plaintiff attempts to sidestep testimonial immunity by basing his concealment of exculpatory evidence claim exclusively on the testimony of Shrock at the 1997 MAR. However,

---

[4] Shrock notes that absolute immunity is equally applicable to the claims against Best related to the 1997 MAR and, therefore, those claims should also be dismissed.

16

the Supreme Court has already ruled that absolute testimonial immunity "may not be circumvented by claiming that a [witness] conspired to present false testimony or to support any other § 1983 claim concerning the initiation or maintenance of a prosecution." *Rehberg*, 566 U.S. at 369.

In sum, Count VII of Plaintiff's claim should be dismissed because it is clearly prohibited by absolute immunity. Similarly, Count VI should be dismissed as it relates to Shrock because Plaintiff is improperly attempting to circumvent absolute immunity by exclusively using testimony to support his other § 1983 claim against Shrock.

### E.  There is no evidence Shrock deliberately fabricated evidence.

Shrock provided minor inaccurate details in his 1997 MAR testimony, but Plaintiff has not adduced any evidence he did so purposefully. To prevail on a fabrication of evidence claim a plaintiff must prove that "(1) the defendants fabricated evidence, and (2) the fabrication resulted in the deprivation of [the plaintiff's] liberty." *Washington v. Wilmore*, 407 F.3d 274, 282 (4th Cir. 2005). "a plaintiff must [show] adequate facts to establish that the loss of liberty –i.e., his conviction and subsequent incarceration—resulted from the fabrication. *Massey v. Ojaniit*, 759 F.3d 343, 354 (4th Cir. 2014). The causation element requires that the wrongful incarceration was reasonably the foreseeable result of the defendant's initial act of fabrication and fabrication claims require plaintiff demonstrate both but-for and proximate cause. *Id*. at 357. The false evidence must have been fabricated "deliberately or with *reckless* disregard for the truth" *Miller v. Prince George's City*., 759 F.3d at 621, 627 (4th Cir. 2007)

In the present case Plaintiff has not adduced evidence to support any of the required elements as to Shrock. First, Plaintiff cannot show that Shrock deliberately or recklessly made inaccurate statements on the stand. The evidence indicates that Shrock's memory was imperfect (he mistakenly testified the interaction took place in 1995 for example), but largely consistent with

the testimony of Charlene in that he drove her to the hospital. Appx. M "1997 MAR" p. 105. Further, Shrock was not even a police officer at the time of the 1997 MAR and had no reason to fabricate evidence and could not access materials to refresh his recollection prior to testifying. *Id*.

Plaintiff also cannot forecast evidence that Shrock's inaccurate statements at the 1997 MAR caused Plaintiff's incarceration or that his incarceration was foreseeable. For starters, Plaintiff was already incarcerated at the time of the 1997 MAR as a result of his 1995 conviction. More importantly, Plaintiff can forecast no evidence Shrock's testimony impacted the proceedings or the eventual ruling denying the MAR. Shrock had a minor role in the investigation into the murder of George Radcliffe, and his 1997 MAR testimony was brief and inconsequential. Therefore, Plaintiff cannot show Shrock deliberately fabricated evidence, or that such a fabrication foreseeably caused Plaintiff's incarceration. There is simply no evidence to the contrary.

**F. Shrock is entitled to public official immunity for Plaintiff's state law claims.**

Public official immunity is a complete bar to Plaintiff's negligence/gross negligence/recklessness and malicious prosecution state law claims against Shrock in his individual capacity, and Shrock is entitled to summary judgement on said claim.

Under North Carolina law, a plaintiff may hold a public official who is engaged in the exercise of his discretionary, governmental duties personally liable for tort claims only by establishing "corrupt or malicious" actions or actions beyond the scope of their duties. *Smith v. Hefner*, 235 N.C. 1, 6, 68 S.E.2d 783, 787 (1952); *see also Bailey v. Kennedy*, 349 F.3d 731, 742 (4th Cir. 2003). Police officers are public officials. *Jones v. Kearns*, 120 N.C. App. 301, 303, 462 S.E.2d 245, 246, *disc. review denied*, 342 N.C. 414, 465 S.E. 2d 541 (1995). A public official does not waive immunity unless it is alleged and proved the officer's actions were corrupt or malicious or beyond the scope of the official's duties. *Shaw v. Stroud*, 13 F.3d 791, 804 (4th Cir.

1994).

Undisputedly, Shrock was acting as a GPD police officer during the times giving rise to Plaintiff's suit. Moreover, the decisions made by Shrock in driving Charlene to the hospital were discretionary decisions made during the course of performing his official duties as a public officer. "Discretionary acts are those requiring personal deliberation, decision, and judgment." *Jones*, 120 N.C. at 306, 462 S.E.2d at 248. Therefore, to survive this motion for summary judgment, Plaintiff must have alleged and forecast evidence demonstrating that Shrock acted corruptly or with malice.

Here, Plaintiff has not produced any evidence that Shrock acted with <u>malice or corruption</u>. Plaintiff may also not rest on the conclusory allegations in his Complaint. "It is well settled that absent evidence to the contrary, it will always be presumed that 'public officials will discharge their duties in good faith and exercise their powers in accord with the spirit and purpose of the law.' This presumption places a heavy burden on the party challenging the validity of public officials' actions to overcome this presumption by competent and substantial evidence." *Leete v. County of Warren*, 341 N.C. 116, 119, 462 S.E. 2d 476, 478 (1995) (quoting *Huntley v. Potter*, 255 N.C. 619, 628, 122 S.E.2d 681, 687 (1961)). Because Plaintiff failed to come forward with evidence to overcome Shrock's public official immunity, Shrock is entitled to summary judgment on Plaintiff's state law claims and said claims should be dismissed.

Further, Counts XIII – XIX of Plaintiffs Complaint are brought directly under the North Carolina State Constitution. As a threshold matter, a Plaintiff may not proceed under a claim directly under the NC Constitution when an adequate remedy is available. *Corum v. University of North Carolina*, 330 N.C. 761 (1992). In North Carolina, it is well established that a plaintiff's constitutional right not to be unlawfully deprived of his liberty are adequately protected by a common law claim for false imprisonment, which protects a plaintiff from unlawful arrest. *See*

*Davis v. Town of Southern Pines*, 116 N.C. App. 663 (1994); *see also Alt v. Parker*, 112 N.C. App. 307 (1993). Therefore, Plaintiff's direct claims under the North Carolina Constitution should be dismissed as his rights are adequately protected by his other state law claims.

Shrock incorporates by reference any and all valid assertions, contentions, and arguments contained in the forthcoming motions for summary judgment and supporting materials of other Defendants to this action equally applicable to him.

## VI.    <u>CONCLUSION</u>

For the reasons stated above, summary judgement is proper as to Defendant Jeffrey D. Shrock because (1) Shrock is entitled to qualified immunity for Plaintiff's § 1983 claims as he did not violate Plaintiff's First or Fourteenth Amendment rights, (2) there is no evidence any exculpatory or impeachment evidence was suppressed or received by Shrock, discovery has shown that Plaintiff Sharpe, his Counsel, and the District Attorney were already made aware of the allegedly exculpatory information and said information was disclosed at trial, (3) Plaintiff is unable to show that the subject Constitutional Rights were "Clearly Established," (4) testimonial immunity bars Plaintiffs fabrication claim, (5) Shrock is entitled to public official immunity for Plaintiff's state law claims and (6) an alternative adequate remedy exists as to Plaintiff's claims brought directly under the North Carolina Constitution.  Therefore, Counts VI, VII, XI, and XIII – XIX of Plaintiff's Complaint **should be dismissed,** and Defendant Shrock **should be dismissed** from this action.

Respectfully submitted, this the 27 day of November, 2024.

/s/ Peter Clements
Peter Clements
N.C. State Bar No. 57853
Peter.clementsjr@wilsonelser.com
22 West Trade Street # 300
Charlotte, NC 28217

Telephone: (401)688-0306
*Attorneys for Defendant Shrock, Best, and City of Greenville*

## <u>CERTIFICATE OF COMPLIANCE WITH WORD COUNT LIMIT</u>

The undersigned certifies the foregoing brief complies with Local Rule 7.2(f)(3). The brief contains 5733 words, which includes the body of the brief, headings and footnotes. The caption, signature lines, certificate of service, and any cover page or index are not included in the above word count.

This the 27 day of November, 2024.

/s/ Peter Clements
Peter Clements

**<u>CERTIFICATE OF SERVICE</u>**

The undersigned hereby certifies, pursuant to Rule 5 of the Federal Rules of Civil Procedure, the foregoing was electronically filed with the Clerk of Court using the CM/ECF system which will send notification of such filing to all parties.

This the 27 day of November, 2024.

<u>/s/ Peter Clements</u>
Peter Clements

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION
Lead Case No. 4:21-CV-00185-BO
*Consolidated with 4:22-CV-00088-BO*

| | |
|---|---|
| MONTOYAE DONTAE SHARPE,<br><br>                              Plaintiff,<br><br>vs.<br><br>DAVID RICKY BEST, JEFFREY D. SHROCK, CAROLYN MELVIN, and the CITY OF GREENVILLE, NORTH CAROLINA,<br><br>                              Defendants. | **DEFENDANT CITY OF GREENVILLE'S MOTION FOR SUMMARY JUDMENT** |

NOW COMES Defendant the City of Greenville ("City" or "Defendant"), pursuant to Federal Rule of Civil Procedure 56, and respectfully requests that this Court enter judgment in its favor on all Plaintiff's claims against it.

In support hereof, the Defendant states that there is no genuine issue of material fact remaining and that Defendant is entitled to judgment as a matter of law on all claims. The reasons supporting the Defendant's motion are set out in more detail in its supporting memorandum filed contemporaneously.

WHEREFORE, Defendant City of Greenville requests the Court as follows:

1. That the Court grant the Defendant's Motion for Summary Judgment, dismiss Plaintiff's claims against it, and deny all claims for relief asserted against it;

2. That the Defendant recover from Plaintiff the costs of this action and attorneys' fees as allowed by law; and

3. That the Defendant have and recover such other and further relief as the Court deems

J.A. 2444

just and proper.

Respectfully submitted, this the 27 day of November, 2024.

<u>/s/ Peter Clements</u>
Peter Clements
N.C. State Bar No. 57853
Peter.clementsjr@wilsonelser.com
22 West Trade Street # 300
Charlotte, NC 28217
Telephone: (401)688-0306

### <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies, pursuant to Rule 5 of the Federal Rules of Civil Procedure, the foregoing was electronically filed with the Clerk of Court using the CM/ECF system which will send notification of such filing to all counsel.

This the 27 day of November, 2024.

/s/ Peter Clements
Peter Clements

**J.A. 2446**

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION
Lead Case No. 4:21-CV-00185-BO
*Consolidated with 4:22-CV-00088-BO***

| | |
|---|---|
| **MONTOYAE DONTAE SHARPE,**<br><br>                                      **Plaintiff,**<br><br>**V.**<br><br>**DAVID RICKY BEST, JEFFREY D. SHROCK, CAROLYN MELVIN, and the CITY OF GREENVILLE, NORTH CAROLINA,**<br><br><br><br>                              **Defendants.** | **DEFENDANT'S DAVID RICKY BEST, JEFFREY D. SHROCK AND THE CITY OF GREENVILLE, NORTH CAROLINA'S LOCAL RULE 56.1(a)(2) STATEMENT OF UNDISPUTED – JOINT APPENDIX** |

1.  Appendix A – Officer Jones Report

2.  Appendix B – 1995 Trial Transcript

3.  Appendix C – Physical Evidence submitted by GPD Detective Carolyn Melvin

4.  Appendix D – CPL Baker Report

5.  Appendix E – Autopsy Report

6.  Appendix F – Mercer Report

7.  Appendix G – Stewart Report

8.  Appendix H – Mendenhall Report

9.  Appendix I – Vines Report

10. Appendix J – Interview of Victims Wife Trisia Clarice Radcliffe

11. Appendix K – Farmer Report

12. Appendix L – SBI Evidence Submission

13. Appendix M – 1997 MAR

14. Appendix N – Charlene Report

15. Appendix O – Charlene Statement

16. Appendix P – Crime Stoppers Request

17. Appendix Q – Notes Interview of Sharpe

18. Appendix R – Pitt DA Copies

19. Appendix S – Staton Deposition

20. Appendix T – Elks Report

21. Appendix U – Lisa Evans Letter

22. Appendix V – Grand Jury Indictment of Plaintiff

23. Appendix W – Charlene Polygraph

24. Appendix Y – Pistol Comparison

25. Appendix Z – Sharpe Polygraph

26. Appendix AA – Baxter Affidavit

27. Appendix BB - DA Everett Deposition

28. Appendix CC – Stokes Deposition

29. Appendix DD – Pretrial Motions

30. Appendix EE – Charlene's Medical Records

31. Appendix FF – Richie Motion

32. Appendix GG – Best Deposition

33. Appendix HH – Melvin Deposition

34. Appendix II – Shrock Deposition

35. Appendix JJ – Blum Report

36. Appendix KK – Best BLET Certificate

37. Appendix LL – Hinman Deposition

**J.A. 2448**

38. Appendix MM – Affidavits of Hardy, Bass and Forrest

39. Appendix NN – Deposition of Robert Pusins

40. Appendix OO – Warrant for Arrest

41. Appendix PP – Stokes Motion to Strike

42. Appendix QQ – Deposition of Charlene Johnson

43. Appendix RR – Best Certificates

44. Appendix SS – Affidavit of Ricky Best

45. Appendix TT – Affidavit of Molly Muise

This the 27th day of November, 2024.

> **WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP**
>
> /s/Peter Clements
> **Peter Clements** NC Bar # 57853
> 227 West Trade Street, Suite 300
> Charlotte, NC 28202
> T: 704-302-1330 // F: 704-302-1331
> E: peter.clementsjr@wilsonelser.com
> *Attorney for Defendants DAVID RICKY BEST, JEFFREY D. SHROCK, and the CITY OF GREENVILLE, NORTH CAROLINA*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I electronically filed the foregoing **<u>DEFENDANT'S DAVID RICKY BEST, JEFFREY D. SHROCK AND THE CITY OF GREENVILLE, NORTH CAROLINA'S LOCAL RULE 56.1(A)(2) STATEMENT OF UNDISPUTED FACTS – JOINT APPENDIX</u>** using the CM/ECF system.  Notice of filing will be sent to all parties by operation of the Court's electronic filing system and/or via first class mail.

This the 27th day of November, 2024.

/s/ Peter Clements
Peter Clements

**INCIDENT/INVESTIGATION REPORT**

| INCIDENT DATA | | |
|---|---|---|
| Agency Name: Greenville Police | | OCA: 94-1108 |
| NC 0740300 | | Date / Time Reported: S M T W T ☒ S  Month 02  Day 11  Yr. 94  Time 2115 Hrs. |

**#1 Crime / Incident(s):** Murder
- ☐ Attempt  ☒ Complete
- At Found: S M T W T ☒ S  Month 02  Day 11  Yr 94  Time 2115 Hrs.
- Last Known Secure: S M T W T ☒ S  Month 02  Day 11  Yr 94  Time 2114 Hrs.

**#2 Crime Incident:**
- ☐ Attempt  ☐ Complete
- Location of Incident: West 6th Street
- Offense Tract: 28

**#3 Crime Incident:**
- ☐ Attempt  ☐ Complete
- Premise Type: Public Street
- Victim Residence Type: ☐ Single Family  ☐ Multi Family

**MO**

How Attacked or Committed: Suspect(s) shot victim w/ a firearm.

- Forcible: ☒ Yes  ☐ No  ☐ N/A
- Weapon / Tools: Firearm

# of Victims: 1

Type: ☒ Person  ☐ Business  ☐ Society  ☐ Government  ☐ Financial Institute  ☐ Religious  ☐ L.E. Officer Line of Duty  ☐ Other/Unk

Injury: ☒ None  ☐ Minor  ☐ Loss of Teeth  ☐ Broken Bones  ☐ Severe Lacerations  ☐ Internal  ☐ Unconscious  ☒ Other Major

Drug/Alcohol Use: ☒ Yes  ☐ Unknown  ☐ No  ☐ N/A

**VICTIM**

**V1** Victim/Business Name (Last, First, Middle): Radcliffe, George Edward
- Victim of Crime #: 1
- DOB / Age: -6- / 33
- Race: W
- Sex: M
- Relationship To Offender: Unk.
- Resident Status: ☒ Resident  ☐ Non-Resident  ☐ Unknown

Home Address: 1415 Rondo Drive  Greenville  NC
Home Phone: Unknown

Employer Name/Address: Fountain Powerboats  Washington  NC
Business Phone:

| VYR | Make | Model | Style | Color | Lic/Lis | Vin |
|---|---|---|---|---|---|---|
| 89 | Mazda | B2200 | Pickup | Gray | 7NF-1251 | JM2U71135K0736493 |

CODES: V = Victim (Denote V2, V3)    O = Owner (if other than victim)    R = Reporting Person (if other than victim)

**OTHERS INVOLVED**

Type: ☐ Person  ☐ Business  ☐ Society  ☐ Government  ☐ Financial Institute  ☐ Religious  ☐ L.E. Officer Line of Duty  ☐ Other/Unknown

| Code | Name (Last, First, Middle) | Victim of Crime # | DOB / Age | Race | Sex |
|---|---|---|---|---|---|
| | | | | | |

Home Address:  Home Phone:
Employer Name/Address:  Business Phone:

Type: ☐ Person  ☐ Business  ☐ Society  ☐ Government  ☐ Financial Institute  ☐ Religious  ☐ L.E. Officer Line of Duty  ☐ Other/Unknown

| Code | Name (Last, First, Middle) | Victim of Crime # | DOB / Age | Race | Sex |
|---|---|---|---|---|---|
| | | | | | |

Home Address:  Home Phone:
Employer Name/Address:  Business Phone:

**Status Codes**  L = Lost    S = Stolen    R = Recovered    D = Damaged    Z = Seized    B = Burned    C = Counterfeit / Forged    F = Found
(Check "OJ" column if recovered for other jurisdiction)

**PROPERTY**

| Victim # | DCI | Status | Value | OJ | QTY | Property Description | Make/Model | Serial Number |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |

Sharpe 003707

Number of Vehicles Stolen: 0    Number Vehicles Recovered: 0

**ID**
Officer Name: Jones K.L.    ID#: 92
Officer Signature: Jones, K.L.
Supervisor Signature: [signature] 37

**STATUS**
Complainant Signature:

Case Status:
- ☐ Further Investigation
- ☐ Closed/Cleared
- ☐ Closed/Leads Exhausted

Case Disposition:
- ☐ Unfounded
- ☐ Cleared by Arrest
- ☐ Cleared by Arrest by Another Agency
- ☐ Death of Offender
- ☐ Juvenile/No Custody
- ☐ Refuse to Prosecute
- ☐ Extradition Declined
- ☐ Prosecution Declined

OCI-600F    Page 1 of 4    Rev. 3/92

**CONTINUATION PAGE**

| | 2. ORI | 3. CONTINUATION TO: | 4. OCA FILE NO. |
|---|---|---|---|
| AGENCY<br>Greenville Police | NC 0740300 | ☒ INVESTIGATION ☐ ARREST<br>☐ SUPPLEMENTARY INV. | 94-1108 |

the fence line & knocked the fence over. R/o observed the a portion of the fence lying on the ground, w/ barbed wire hung underneath the truck & extending back to the fence. Both vehicle doors were open. Upon approach to the vehicle, R/o observed a w/M lying on the seat on his back, w/ blood on his left side. The w/M dead was lying on the seat in a fashion that his head & shoulders were in the passenger area, w/ his body extending so that legs were on the driver's side, underneath the steering wheel. R/o spoke w/ EMS personnel White & Ken Denton. They advised that upon arrival the doors of the vehicle were shut, & the w/M was lying across the seat w/ his legs under the steering wheel, his head & shoulders were in the floorboard of the passenger side).

The driver's side window of the vehicle was rolled down between half way & 3/4 way. R/o observed a man's wallet, a woman's wallet, & a checkbook in the driver's floorboard. A green camoflouge army jacket w/ the name "Nobles" across the left front pocket was in the middle of the seat near the gearshift. Blood was on the jacket. Various miscellaneous papers were scattered about the vehicle.

I.D. Officer R.G. Mendenhall, Detective C.J. Melvin, & Detective W.E. Reid responded to the scene. Mendenhall took photographs of the scene, & collected the wallets & checkbook from the vehicle.

R/o briefly interviewed Tony Johnson, B/M, of Tarboro NC. Johnson stated that he had no permanent address, but was staying w/ his grandmother in some apartments near the K-Mart shopping center (Greenville Square). Johnson stated that he was walking on Sheppard Street near 5th Street when he heard two gunshots. Johnson advised that shortly thereafter, he observed a pickup truck w/ no headlights on speed thru the intersection of 6th & Sheppard. Johnson is approximately 5'7" to 5'9". DCI shows 2 B/M at that height w/ a variation of that name from Tarboro — Anthony Bernard Johnson of 1003 Panola Street, Tarboro, DOB 10-15-61; & Juan Antonia Johnson of 907 King Ave., Tarboro, DOB 04-22-71. Johnson advised R/o that he was 34 y.o.a.

Sharpe 003708

Wilber Mercer, aka "Marshonna" approached R/o at the scene & asked if he could look inside the truck in ref. to a green army jacket. R/o & "Marshonna" then made contact w/ Reid & Melvin. "Marshonna" stated that the jacket should have the name Nobles on it & that the jacket

| Officer Signature | | Date / Time Submitted | Page 3 |
|---|---|---|---|
| Jones K.L. | | | of 4 |

REV. 3/92

**J.A. 2452**

## CONTINUATION PAGE

| 1. AGENCY | 2. ORI | 3. CONTINUATION TO: | 4. OCA FILE NO. |
|---|---|---|---|
| Greenville Police | NC 0740300 | ☒ INVESTIGATION  ☐ ARREST  ☐ SUPPLEMENTARY INV. | 94-1108 |

belonged to him ("Marchanna"). "Marchanno" stated that he had been w/ the victim approximately 2 hours earlier in an attempt to help the victim locate some powder cocaine. "Marchanno" advised that he had dealt w/ the subject on 1 or 2 prior occasions. "Marchanno" stated that the victim dropped him off at the intersection of 6th & Hudson so "Marchanna" could speak to someone about the cocaine. "Marshanna" advised that a marked patrol car passed through the area, causing the victim to leave. "Marshanna" advised that he yelled for the guy to stop because his coat was still in the vehicle, but the victim turned left (North) onto Ford street & "Marshanna" didn't see him again.

Leith Silver Star Nissan responded & towed the vehicle. R/o secured the vehicle & followed the tow truck & observed the vehicle secured by the driver in the garage area on Bismark street. R/o then presented the keys to Mendenhall.

R/o responded to the E.O. to observe the body of the victim. It appeared that the round entered the victim's outside upper left arm, exited the inside upper left arm, re-entered the victim in the upper left side, exited the upper right side, re-entered the victim in the inside upper right arm, possibly lodged in the right arm.

An accident report, case # T-94-0380, has also been submitted in reference to this incident.

Officer J. G. Jenkins located 3 spent .45 casings. 1 was located on W. 6th Street near McKinley. Same was in the roadway & had been apparently run over by a vehicle. 2 were located on 6th street near Roosevelt Ave. near the curb.

Sharpe 003709

| Officer Name / ID | Officer Signature | Date / Time Submitted | Page |
|---|---|---|---|
| Jones K. L. #72 | Jones K. L. | 02-12-94    0300 | 4 of 4 |

J.A. 2453

DCI-602 F                                                                                                    REV. 3/92

STATE OF NORTH CAROLINA    IN THE GENERAL COURT OF JUSTICE
COUNTY OF PITT                SUPERIOR COURT DIVISION
                              FILE NO. 94-CRS-7660

STATE OF NORTH CAROLINA  )    T-R-A-N-S-C-R-I-P-T
                         )
          VS.            )        Volume I
                         )      (Pages 1-214)
MONTOYAE DANTAE SHARPE,  )

          The transcript of the jury trial proceedings
taken in the General Court of Justice, Superior Court
Division, Pitt County, North Carolina, at the July 24,
1995, Criminal Session before the Honorable J. Richard
Parker, Jr., Judge Presiding.


APPEARANCES:

Mr. Clark Everett
Assistant District Attorney
Greenville, North Carolina
On behalf of the State.

Mr. R. Cherry Stokes
Attorney at Law
Greenville, North Carolina
On behalf of the Defendant.



Tina McNair
Official Court Reporter
Judicial District 3A
Pitt County Courthouse
Greenville, North Carolina  28735

**GREENVILLE POLICE PROPERTY REPORT**

(4061-0800)

PAGE 1 OF

| CASE NUMBER 94-1108 | DATE AND TIME REPORTED 2-11-94 2130 | PROPERTY NUMBER E-94-314 |

ADDRESS FROM WHICH PROPERTY WAS OBTAINED 6th & Shepard st

| NAME LAST/FIRST/M Ratcliff, George | PERSON TYPE 3 | SSN | IS THIS PERSON A JUVENILE? | YES | NO (circled) |

ADDRESS

| DRIVER LICENSE NUMBER | | STATE | HOME PHONE # |
| BUSINESS | | | DOB | POB |
| | | | BUSINESS PHONE # |

| NAME LAST/FIRST/M | PERSON TYPE | SSN | IS THIS PERSON A JUVENILE? | YES | NO |

ADDRESS

| DRIVER LICENSE NUMBER | | STATE | HOME PHONE # |
| BUSINESS | | | DOB | POB |
| | | | BUSINESS PHONE # |

| BIN NUMBER CUSTODIAN USE ONLY | PROPERTY CONTROL NUMBER | PACKAGE NUMBER | PROPERTY TYPE SEE BACK | * DESCRIPTION OF ARTICLES * INCLUDE MODEL, SERIAL NUMBER, IDENTIFYING MARKS, CONDITION, QUANTITY OR WEIGHT, COLOR, ETC. | CASH VALUE | DATE PROPERTY RELEASED |
|---|---|---|---|---|---|---|
| CM 3-2-94 16:53 HRS + Billy (Long) HBH (Long) NLI + POC 2-16-94 SEIZING | 1 | 1 one 1/6/11 (994) | 12 | one (1) 45 Acp casing REMINGTON | ∅ | |
| HBH (Long) 2-16-94 W.I.P.O.C. SEIZING | 2 | 1 one 1/6/11 (994) | 12 | one (1) .45 acp casing REMINGTON | ∅ | |
| HBH (Long) 2-16-94 W.I.P.O.C. SEIZING | 3 | 1 one 1/6/11 (994) | 12 | one (1) .45 acp casing REMINGTON | ∅ | |
| NLI POC 1/H (Long) | 4 | | | wallet belongs to George Ratcliff wallet belongs to Trish Ratcliff one check book | ∅ | Dest 11/24/04 |

RECEIVED
GREENVILLE POLICE DEPARTMENT
GREENVILLE, N.C. 27835
FEB 27 1994
EVIDENCE TECHNICIAN
J.R. MACDONALD
TIME: 1200/HRS

NARRATIVE Items #1 thru #5 were collected by ID specialist Mandenhall, Item #6 was collected by Cpl. J. Baker after autopsy. Item #7 was collected from Hospital by Mandenhall

| DATE AND TIME SUBMITTED 2-14-94 1300 HR | OFFICER'S NAME AND NUMBER D/L Melvin #75 | OFFICER'S SIGNATURE | SUPERVISOR'S NAME AND NUMBER |

POSTED 4061/914

Sharpe 004929

J.A. 2455

GREENVILLE POLICE DEPARTMENT
P.O. BOX 0156
GREENVILLE, N.C. 27835-0156

**PROPERTY REPORT**
**ADDITIONAL PROPERTY**

(4061-0007)

PAGE 2 OF 2

DATE AND TIME OF REPORT: 2-14-94 - 2130     PROPERTY NUMBER: E-94-314

| BIN NUMBER CUSTODIAN USE ONLY | PROPERTY CONTROL NUMBER | PACKAGE NUMBER | PROPERTY TYPE SEE BACK | *DESCRIPTION OF ARTICLES* INCLUDE MODEL, SERIAL NUMBER, IDENTIFYING MARKS, CONDITION, QUANTITY OR WEIGHT, COLOR, ETC. | CASH VALUE | DATE PROPERTY RELEASED |
|---|---|---|---|---|---|---|
| SJM 3-2-94 17/01 HRS AT 10/10N (1995) HET 24 (1994) | 5 | 1 | 10 | car keys | ∅ | Def ley 104 |
| HET 11 (1994) N.I.B.O.B (1995) | 6 | 1 AJC 16/11 (1994) | 12 | 45 cal projectile FMJ | ∅ | |
| NSPUC 114 | 7 | 2 | 10 | victim's clothing | ∅ | Def 11 |
| SJM 4-22-94 11:30 HRS NSPUC HET 11 (1994) N.I.B.O.B | 8 | 1 | 10 | Gunshot Residue kit SBI LAB | ∅ | 24 |
| USPUC 111 | 9 | 1 | 10 | 2 blood vials | ∅ | 04 |
| SJM 4-22-94 11:57 HRS 121/11 (1994) N.I.B.O.B (1994) | 10 | 1 | 10 | 2 paper bags that was on victim hands | | |
| SJM 4-18-94 14:25 HRS 12 2/A/6/1 (1994) | 12 | 1 | 10 | 1 ENVELOPE EARRINGS & BRACELET | | |

EVIDENCE TECHNICIAN J.R. MACDONALD TIME: 2100 HRS

RECEIVED GREENVILLE POLICE DEPARTMENT GREENVILLE, N.C. 27835 FEB 27 1994

POSSED 4061 SM

| DATE AND TIME SUBMITTED | OFFICER'S NAME AND NUMBER | OFFICER'S SIGNATURE | SUPERVISOR'S NAME AND NUMBER |
|---|---|---|---|
| 2-14-94 1300 24 HR | Det Melvin #25 | C J Mel | |

GREENVILLE POLICE DEPARTMENT
P.O. BOX 0156
GREENVILLE, N.C. 27835-0156

**PROPERTY REPORT**
**ADDITIONAL PROPERTY**

4096-CM

PAGE 1 OF 1

314

| BIN NUMBER CUSTODIAN USE ONLY | PROPERTY CONTROL NUMBER | PACKAGE NUMBER | PROPERTY TYPE SEE BACK | *DESCRIPTION OF ARTICLES* INCLUDE MODEL, SERIAL NUMBER, IDENTIFYING MARKS, CONDITION, QUANTITY OR WEIGHT, COLOR, ETC. | CASH VALUE | DATE PROPERTY RELEASED |
|---|---|---|---|---|---|---|
| EMC 4-6-94 15:15 hr. 8/4/11 (1994) | 11 | 3 | 40 | AT&T phone card wachovia check card | 6 | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | RECEIVED GREENVILLE POLICE DEPARTMENT GREENVILLE, N.C. 27835 APR 8 1994 EVIDENCE TECHNICIAN J.R. MACDONALD TIME 1515 hrs. | | | |
| | | | | | | |
| | | | | POSTED | | |
| | | | | | | |

CASE NUMBER 94-1108    DATE AND TIME OF REPORT 2-11-94 2130    PROPERTY NUMBER E-94-3

| DATE AND TIME SUBMITTED | OFFICER'S NAME AND NUMBER | OFFICER'S SIGNATURE | SUPERVISOR'S NAME AND NUMBER |
|---|---|---|---|
| 4-6-94    24 HR | K Mendenhall (Det Melvin) case | | |

Sharpe 004931

**GREENVILLE POLICE DEPARTMENT**
P.O. BOX 0156
GREENVILLE, N.C. 27835-0156

**PROPERTY REPORT**
**ADDITIONAL PROPERTY**

*(4/12-JRM)*

PAGE 1 OF 1

| BIN NUMBER CUSTODIAN USE ONLY | PROPERTY CONTROL NUMBER | PACKAGE NUMBER | PROPERTY TYPE SEE BACK | *DESCRIPTION OF ARTICLES* INCLUDE MODEL, SERIAL NUMBER, IDENTIFYING MARKS, CONDITION, QUANTITY OR WEIGHT, COLOR, ETC. | CASH VALUE | DATE PROPERTY RELEASED |
|---|---|---|---|---|---|---|
| CASE NUMBER 94-1108 | | | DATE AND TIME OF REPORT 2-19-94 | | PROPERTY NUMBER E-94-314 | |
| JRM 4-22-94 16-49 HRS JLH(Grees) 3/8/ (1994) | 13 | 3 | 10 | Miscellanious papers, beer cans, etc. from back & front seat | 0 | Dest 11/29 /04 |
| DMB 6-17-94 11 HTS Aem 6-14-94 1635 HRS Hash (1994) | 14 | "IN SBI BOX BACK FROM LAB" | 10 | Haskell 45 Auto Ser# 013499 model # JS-45 | | |

RECEIVED
GREENVILLE POLICE DEPARTMENT
GREENVILLE, N.C. 27835

APR 2 2 1994

EVIDENCE TECHNICIAN
J.R. MACDONALD
TIME: 16:45 HRS.

POSTED 4/12JRM

| DATE AND TIME SUBMITTED 4-13-94 0902 HR | OFFICER'S NAME AND NUMBER D.R. Best | OFFICER'S SIGNATURE D.R.Best | SUPERVISOR'S NAME AND NUMBER |
|---|---|---|---|

Sharpe 004932

J.A. 2458

IDENTIFICATION / CRIME SCENE
SUPPLEMENTARY REPORT

Greenville Police Department

| Call Number | Case Number |
|---|---|

| 1. Location of Crime | | 2. Time & Date of Call | 3. Case number & Code No. |
|---|---|---|---|
| PCMH Morgue | | 0830  2-13-94 | 94 - 1108 |

4. Complainant
George Edward Radcliffe

5. Address

| 6. Type of Crime | 7. Crime Scene | 9. Latent Finger | 10. Foot Prints | 11. Tire Tracks | 12. Other Physical Evidence |
|---|---|---|---|---|---|
| ( ) B & E | (X) Photographs | ( ) Found | ( ) Found | ( ) Found | (X) Found |
| ( ) Robbery | (X) B & W  ( ) Color | (X) Not Found | (X) Not Found | (X) Not Found | ( ) Not Found |
| (X) Murder | (X) Taken | ( ) Photographed | ( ) Cast Made | ( ) Cast Made | |
| ( ) Deceased | ( ) Not Taken | ( ) Lifted | ( ) Photographed | ( ) Photograph | 15. Disposition of Evidence |
| ( ) Larceny | | ( ) Filed | | | ( ) Sent to F.B.I. Lab |
| ( ) Photo Invest. | 8. No. Lab 3 | ( ) Ridge Detail | 14. Items Processed | | (X) Ident. & Lab. Section |
| ( ) Other | | ( ) In Lab | ( ) Items Processed in Field | | ( ) Left at Scene |
| 13. Time Spent on Call | | ___ No. Found | ___ No. Processed | | ( ) Photographed |
| 2 hours | | | ___ Persons Printed Field | | Other |
| | | | | | ( ) Fingerprints checked |

NARRATIVE

Homocide /

Made 3 photos of George Radcliffes wounds
at the morgue. Received evidence from
Doctor Paig Hudson (Bullet, blood, Gun shot residue
kit, and bloody paper ). Inked finger print
impressions were turned over to John Baker.

| OFFENSE STATUS | POLICE DISPOSITIONS | EXCEPTIONALLY CLEARED TYPE |
|---|---|---|
| 1 Further Investigation | 4 Unfounded | 1 By Death of the Offender |
| 2 Inactive | 5 Cleared By Arrest | 2 Prosecution Declined |
| 3 Closed | 10 Exceptionally Cleared - Adult | 3 Extradition Declined |
| | 11 Exceptionally Cleared - Juvenile | 4 Victim Refused To Cooperate |
| | | 5 Juvenile, No Custody |

| Officer J D Baker | Officer # 69 | Supervisor | Supervisor # | Date 2-13-94 | Time 1130 |
|---|---|---|---|---|---|
| Further Investigation? (X) Yes ( ) No | Investigating Officer Melvin | | Follow-up Due | | Page 1 of 1 |

OFFICE OF THE MEDICAL EXAMINER
EAST CAROLINA UNIVERSITY SCHOOL OF MEDICINE
DEPARTMENT OF PATHOLOGY AND LABORATORY MEDICINE
GREENVILLE, NORTH CAROLINA 27858-4354
1-800-682-8188 OR 919-816-4655

## REPORT OF AUTOPSY

DECEDENT: George E. RADCLIFFE

AUTOPSY: EC-94-0050
DATE OF AUTOPSY: 02/13/94
TIME OF AUTOPSY: 0810 hours
AUTOPSY AUTHORIZED BY:
  Page Hudson, M.D.
  Pitt County Medical Examiner

RIGOR:  3+
LIVOR:  Posterior
BODY HEAT:  Cold
BODY IDENTIFIED BY:  Hospital I.D. tag
PERSONS PRESENT AT AUTOPSY: David Patrick Bundy
AGE: 33    RACE: White    SEX: Male    LENGTH: 70 inches    WEIGHT: 224 pounds
EYES: Hazel        PUPILS: R5, L5            HAIR: Brown
BEARD: No            MOUSTACHE: Yes          CIRCUMCISED:  Yes

EXTERNAL DESCRIPTION:    No clothing, property or jewelry.  Manifestations of medical treatment are a loosely sutured thoracotomy type incision across the chest.   A surgical type drain wound is present in the right lateral chest. Intravascular sites are present in the antecubital spaces.  Cutdown incisions were present on the inner aspect of both ankles.  A urinary catheter was in place.  The teeth were in fair condition.  The only head wound noted was a very superficial, approximately 1/4 inch scrape on the left forehead.

## PATHOLOGIC DIAGNOSES

Gunshot wound of arms and chest:
    Perforation of left arm, left-to-right;
    Perforation of chest and heart, left-to-right;
    Penetration of right arm, left-to-right;
    Bullet removed from right arm;
    Surgical attack;
    Contusion of right lung;
    Blood in chest cavity.

Laennec's alcoholic cirrhosis with marked fatty change.

TOXICOLOGY:

Blood alcohol:  100 mg/dL ("0.10%")
Other toxicology:  Pending (as of 02/25/94)

CAUSE OF DEATH:   Gunshot wound of arms, chest and heart

The facts stated herein are correct to the best of my knowledge and belief.

_Page Hudson, M.D., Regional Pathologist_

EC-94-0050
Page 2

**WOUND DESCRIPTION:** A series of gunshot wounds were present across the left arm, chest and right arm. These are interpreted as beginning with an entrance wound in the lateral aspect of the upper portion of the left arm. The approximate 1/4 inch hole with a slight abrasion ring is 18 inches down from the top of the head. At the same level there is on the medial aspect of the left arm a 1/4 inch round hole, again with a slightly abraded collar. Immediately adjacent to the wound on the medial aspect of the left arm is a wound in the left lateral chest. The surgical wound created in the Emergency Room neatly bisects the typical gunshot entrance wound into two halves. There is a slight abrasion collar on this round wound but like the others, no wipe-off is seen. The entrance into the left pleural space is through the 6th rib. The track continues through the pericardial sac, into the apex of the left ventricle through the left ventricular wall, through a large and ragged defect in the intraventricular septum and exit the heart through a large ragged defect in the lateral superior portion of the right ventricle. A contusion approximately 4 cm in diameter is present in the anterior right lung but no bullet wound is seen in that tissue. The exit wound from the right chest wall is between ribs 3 and 4. There is a relatively round but slightly ragged exit type gunshot wound 17 inches down from the top of the head in the right lateral chest. Adjacent to this is a relatively round gunshot entrance wound with slightly abraded margin on the inner aspect of the right upper arm. Opposite this on the arm is a firm subcutaneous mass. Incision at this point reveals a large, probably .45 caliber, jacketed intact bullet. This is bagged and labelled and given to Officer John Baker of the Greenville Police Department in exchange for a written receipt.

**INTERNAL EXAMINATION:** The abdominal cavity is smooth and glistening and shows no unusual adhesions. There is slight blood contamination on the left side of the chest and a small amount of free blood in the left pleural space. There is approximately a liter of liquid and clotted blood in the right pleural space.

**CARDIOVASCULAR:** The pericardial sac is opened. There is a ragged, approximately 3/4 inch wound close to the apex of the left ventricle in this relatively horizontal lying heart. There is a large ragged defect in the mid and upper portion of the intraventricular septum. A similar defect is present in the mid and upper portion of the right ventricular wall. A superficial transverse tear is present parallel to the tricuspid ring in the right atrium. There is but modest free blood in the adjacent soft tissues. The heart weighed 360 grams. The coronaries were delicate and patent. There were endothelial tears in the second centimeter of the right coronary artery and some free blood in the fat and muscle beneath the coronary at that site. The vasculature in general elsewhere in the body was intact.

**LUNGS:** 710 grams. These are relatively collapsed. Other than a 4 x 5 cm relatively superficial contusion in the parenchyma of the right lung adjacent to the bullet track, no pathological features were noted. There was considerable carbon pigment in the lung. There was moderate slight mucoid blood in the tracheobronchial tree.

**NECK ORGANS:** No evidence of foreign body obstruction, neoplasm, unusual inflammation or trauma. The thyroid is of the usual size and consistency.

**LIVER:** 2015 grams. The lower margin is rounded. The parenchyma is flabby and slightly soft. It is pale and mildly mottled. The extrahepatic biliary tract is quite intact except that there is mild cholesterolosis of the mucosa.

**SPLEEN:** 344 grams. The parenchyma is firm and dark and no abnormalities are seen.

**J.A. 2461**

EC-94-0050
Page 3

**PANCREAS:** This has the usual size, shape and configuration. It is rather soft.

**GASTROINTESTINAL TRACT:** The esophagus is intact. The stomach is empty except for approximately 1 ounce of mildly thick, khaki-colored fluid. The rugae are low. There is minimal content in the small intestine. The appendix is intact. The colon shows no lesions.

**GENITOURINARY TRACT:** The right kidney weighs 165 grams, the left 170 grams. The surfaces are smooth and the capsules are intact. The collecting systems and vasculature are intact. The parenchyma shows no unusual features. The bladder is essentially empty. The prostate shows no lesions.

**PELVIS:** Unremarkable.

**8LONG BONES:** No abnormalities seen.

**VERTEBRAE:** Unremarkable.

**HEAD:** The scalp and skull show no evidence of trauma or other disease other than the small, very superficial scrape on the right forehead. The brain weighs 1543 grams and shows no lesions on its surface or upon the multiple coronal surfaces created by sectioning. This includes sectioning down to and involving the upper cervical spinal cord.


**MICROSCOPIC:**

**HEART:** There is mild to moderate fracturing of myocardial fibers. The contraction bands are rather prominent.

**LUNG:** The two sections show considerable collapse of parenchyma.

**ADRENAL:** There is ample corticolipid. The vessels show no unusual features.

**PANCREAS:** Extensive postmortem autolysis.

**LIVER:** There is marked fatty vacuolization of hepatocyte. Many of the portal areas show moderate to large collections of lymphocytes. There is moderate bridging of fine by fine bands of fibrous tissue among portal areas. Central veins are more difficult to find than usual.

**LYMPH NODE:** The node from porta hepatis shows slight mineral oil vacuolization.

**PARATHYROID:** Unremarkable.

**THYROID:** Within normal limits. Lymph node follicles are mildly prominent. Mineral oil vacuolization is seen. The red pulp is moderately congested with blood.

**KIDNEY:** No histological abnormalities are seen. There is mild to moderate autolysis.

**BRAIN:** The two sections show no histological abnormalities.

Sharpe 005354

EC-94-0050
Page 4

**SUMMARY AND COMMENT:** History at this time is that the deceased was driving his automobile when it was found to have crashed. On examination by the EMT's, it appeared that the victim had gunshot wounds. Resuscitation was begun and he was brought to the hospital where resuscitative efforts including opening of the chest were continued. He was soon pronounced dead. As this was a suspected unnatural death, jurisdiction was assumed by Pitt County Medical Examiner, Page Hudson, MD, in cooperation with the Greenville Police Department. Autopsy was considered to be in the public interest.

The several gunshot wounds are in my opinion the result of a single bullet. I am convinced at this time the bullet entered the left arm from the side then passed through the arm then entered the left chest. The bullet went across the chest from left to right, perforating the heart. It exited the chest and entered the right arm. It was from the outside of the right arm that I recovered a large jacketed bullet that was in good condition. This I gave to Mr. John Baker of the Greenville Police Department. It is my opinion that the wound would have very rapidly incapacitated and quickly killed this man. Blood alcohol concentration at the time of death was 100 mg/dL which is equivalent to 0.10% on the breathalizer scale. The condition of the liver indicated considerable and prolonged alcohol abuse. Testing is underway at the Office of the Chief Medical Examiner for presence of other drugs. Blood stains and related evidentiary material were given to Mr. John Baker in exchange for a written receipt.

Sharpe 005355

DEPARTMENT OF CLINICAL PATHOLOGY &
DIAGNOSTIC MEDICINE
EAST CAROLINA UNIVERSITY
SCHOOL OF MEDICINE

## BODY DIAGRAM



Front        Back

ABRASION X2

ET

CENTRAL LINE

EKG X3

TUBE

20½" SUTURED INCISION

IV

IV

HANDS BAGGED

N P

FOLEY

½" CUT

CHT-DOWN W/IV

WTDOWN

Decedent's Height _____ 70 _____ inches
Approx. Weight _____ 224 _____ lbs.

Name RADCLIFFE, GEORGE E.
Examined By _____ Date 2/12

Sharpe 005356

**PART B:** Description of Incident (Brief summary of the events of the crime)

On 2-11-94 George Radcliff was found dead in his pickup truck which was located at 6th & Sheppard St. Greenville, NC. It was later learned that the victim had died on a result of a gunshot wound to left arm that traveled thru the body and lodged in his right arm.

For Firearms Examination Only



(Show Entrance and Exit Wounds)

**PART C:** For Serology Cases

Have samples from all possible bleeders or body fluid donors been included? _____ Yes _____ No

Have any of above subjects been transfused in the last 120 days? _____ Yes _____ No

No typing tests will be done on semen or saliva cases without submission of known blood and saliva standards from all victims and suspects. Do you plan to submit these standards? _____ Yes _____ No  When? _____

**PART D:** For Hair, Fiber and Other Particle Analysis Cases

Crime occurred:  Suspect's residence _____    Victim's residence _____   (You may check more than one item)

Suspect's vehicle _____    Victim's vehicle _____

Other location (describe) _____

Have the Suspect(s) and Victim(s) lived at the same residence? _____ Yes _____ No

Be sure to indicate the race of victim(s) and suspect(s) on Page 1.

Please retain all hair and fiber evidence until either the hair samples from all suspect(s) as well as victim(s) are obtained for hair analysis or all fiber standards (carpeting, upholstery, clothing of suspect/victim) are obtained for fiber analysis. YOU MUST SUBMIT THE NECESSARY STANDARDS BEFORE ANALYSIS CAN BE PERFORMED.

Sharpe 005357

DEPARTMENT OF CLINICAL PATHOLOGY &
DIAGNOSTIC MEDICINE
EAST CAROLINA UNIVERSITY
SCHOOL OF MEDICINE

## BODY DIAGRAM

Left                    Right



RE-ENTRY
18" ∠ TOP OF
HEAD

SUTURED
INCISION
20½"

EXIT
17" ∠ TOP OF
HEAD

CHEST
TUBE

Decedent's Height ___70___ inches
Approx. Weight ___224___ lbs.

Name __RADCLIFFE, GEORGE E.__
Examined By _____ Date _2/12_

Sharpe 005358

**J.A. 2466**

DIVISION OF FORENSIC PATHOLOGY
DEPARTMENT OF CLINICAL PATHOLOGY &
DIAGNOSTIC MEDICINE
EAST CAROLINA UNIVERSITY
SCHOOL OF MEDICINE

Page _____

## BODY DIAGRAM— ARM



RIGHT

RE-ENTR;
8" < SHOULDE

bullet
in or
near skin

×

LEFT

EXIT
1½" < SHOULDER

ENTRY
4" < SHOULDER

Decedent's Name   _RADCLIFFE, GEORGE E._

Examined

By _____ Date _2/12_

352 3463 (Revised 3/91)
PCE (Review 3/94)

Sharpe 005359

GREENVILLE POLICE DEPARTMENT

INVESTIGATIVE SUPPLEMENT

CASE NO. 94-1108          INCIDENT Murder

INVESTIGATOR'S ACTIVITY

INTERVIEW:          ON VIEW ✓     TELEPHONE ____

WITNESS ____ VICTIM ____     SUSPECT ✓

SITE VISIT: CRIME SCENE ____   OTHER ____   NA ____

NAME Wilbert Junior Mercer (Marshanna)

RELATIONSHIP TO THE CRIME _____ Witnesses

ACTIVITY LOCATION/ADDRESS Brown Building

ON VIEW ✓ · TELEPHONE ____

INVESTIGATOR'S NAME AND NO. Carilyn J Melvin

DATE 2-14-94

DETAILS OF ACTIVITY

R/o interviewed Marshanna at the Brown Building
1040 hrs. 2-14-94. Marshanna stated that at approx
7:00 p.m 2-11-94 he was standing in front of
the West fifth street convenience mart located at
West 5th and 14th Street. He stated that he saw
the victim's vehicle the first time on Tyson Street.
Marshanna stated that the victim made a
right turn towards the Raven and a left turn
onto ford Street. Marshanna stated that the vehicle

(CONTINUATION PAGE)

drove back up W. 14th Street near him. He stated that at that time he approached the vehicle and asked the victim what was he looking. Marshanna stated that the vehicle told him to get into the truck. The victim stated that he wanted powder Cocaine. Marshanna told him to take a left turn onto W. 5th Street and then another left turn onto Hudson Street near Theo's mart. Marshanna stated at that time the victim asked "You got it". Marshanna stated that he said no "I got to get it for you". Marshanna stated that the victim asked "will I be able to taste it before I get it". Marshanna stated that he said yes. Marshanna stated to Rfo that his only plan was to take him for his money.

Marshanna stated that he had the victim drive him to Battle Street and park at the first white house on the Right. Marshanna stated that he then got out of the truck and walked a guy name greasey's house (William Earl) on W. 14th Street. Marshanna stated that he walked into the house and

REVIEWED BY: _____  DATE 7-7-94
SUPERVISOR'S SIGNATURE

Mercer, Wilbert
(page 2)

asked Greasey for some foil paper. Marshanna
stated that Greasey did not have any foil.
Marshanna then asked where he could
find a 50 cent piece of powder cocaine.
Marshanna stated that Greasey stated no.
Marshanna stated that he got back into
the truck. Marshanna stated that they
drove around and he told the victim to
park near an oil ridge on W. 6th Street.
Marshanna stated that he told the victim
that these people normally don't send
the drugs out without the money. Marshanna
stated that he told the victim to let
him go check. Marshanna stated that the
victim stated " Do me right, I'll look out
for you". Marshanna got out of the truck
and walked down Hudson Street. Marshanna
stated that he stopped by Shaggy dog's
mother's house. (Willie Armwood). Marshanna
stated that he told Shaggy dog about the
victim and that he had plan to take his
money. Marshanna stated that he walked
back to the truck and told the victim that
they had the cocaine but that they won't
send the drugs without the money.

Page 3
Mercer, Wilbert

Marshanna stated that he told the victim that "I know that you don't know me, and I don't blame you for not trusting me". Marshanna states that the victim wanted him to leave some type of identification or something of value. Marshanna stated that he gave the victim his army jacket. The victim agreed to pay $75.00 in US currency but gave Marshanna $50.00.

Marshanna walked away from the truck and walked back down Hudson Street. Marshanna stated that he went to several different locations trying to buy some time. Marshanna stated that he wanted the $75.00. Marshanna stated that he then walked back to the truck and told the victim that the guy won't give up the drug without having all the money. Marshanna told the victim that if he was going to do him currency he would have taken the $50.00 and left. Marshanna stated that the victim gave him the twenty-five additional dollars and he left. Marshanna stated that later on while riding with his wife to pick up his niece some one told him about the police up the street with the street blocked off.

Sharpe 003689

GREENVILLE POLICE DEPARTMENT

INVESTIGATIVE SUPPLEMENT

CASE NO. **94-1108**          INCIDENT __Murder__

INVESTIGATOR'S ACTIVITY

INTERVIEW:     ON VIEW ✓     TELEPHONE ____

WITNESS ✓     VICTIM ____     SUSPECT ____

SITE VISIT:  CRIME SCENE ____    OTHER ____  NA ____

NAME __Martha Ann Stewart__

RELATIONSHIP TO THE CRIME __Witness__

_____

ACTIVITY LOCATION/ADDRESS __Brown Building__

_____

ON VIEW ✓     TELEPHONE ____

INVESTIGATOR'S NAME AND NO. __Carolyn J Melvin__

DATE __2-14-94 @ 1300hrs__

DETAILS OF ACTIVITY

R/o and Detective W. Reid transported the witness from her residence at 1009 B. W. 10th Street to the Brown Building.

Stewart advised R/o and Detective Reid that approx five (5) minutes prior to the murder she was walking from the guy house next door using the telephone. Stewart stated that her daughter had call her cousin for a ride from the hospital.

GPD:52:03-94

**(CONTINUATION PAGE)**

Stewart stated that while she was walking
home she heard two Blm's whisle at the
Victims truck. At that time Stewart stated
that she saw the victim's truck pull over
and the two (2) Blm's approach the vehicle.
Stewart stated that at that time she
walked into her house. Stewart stated
that a minute or so later she heard
a shot. Stewart stated that she could
not identify the two Blm's because
it was dark. Stewart stated that they
both looked to be between 17-20 y.o.
Stewart stated one was taller than the
other and muscular built.

REVIEWED BY: _____  :  DATE _____

**SUPERVISOR'S SIGNATURE**

Sharpe 005029

SBI-5

# N.C. STATE BUREAU OF INVESTIGATION
Post Office Box 2000
Garner, North Carolina 27529-2000
(919) 779-1400

## REQUEST FOR EXAMINATION OF PHYSICAL EVIDENCE

**PART A:**

Requesting Officer _Det. DRBest_ County _Pitt_ SBI Lab # _R94-3391_

Requesting Agency _Greenville P.D._ ORI # _0740300_ SBI File # _____

Agency Address _PO Box 0156_ City _Greenville_ Zip _27835_

Agency File # _94-1108_ Type of Case _Murder_ Date of Offense _2-11-94_

Investigating Officer _Det. C.J. Melvin_ Phone # _830-4352_ DCI TID # _GVA-1_

**VICTIM(S)**

| | | Race | Sex | DOB | **SUSPECT(S)** | | Race | Sex | DOB | SID # |
|---|---|---|---|---|---|---|---|---|---|---|
| 1. | George Edward Radcliff | W | m | 9/9/62 | 1. UNK | | | | | |
| 2. | | | | | 2. | | | | | |
| 3. | | | | | 3. | | | | | |
| 4. | | | | | 4. | | | | | |

Has any evidence in this case been submitted to the laboratory previously? _NO_ To which section? _____

Do any subjects have the following:
(Circle)　AIDS　V.D.　HEPATITIS　TETANUS　TB　LICE

Which subject(s)? _____

| Item(s) | Type Container / Description of Evidence | Examine For | Origin of Evidence (Exact Location) |
|---|---|---|---|
| 1. | envelope　Ammo Casing | Fingerprints | 6th St. |
| 2. | " " | " " | " " |
| 3. | " | " " | " " " |
| 6 | " | projectile | Caliber | Body of Victim Radcliff |
| 7 | | Victim Clothing | Gunshot Residue | George Radcliff |
| 8 | " | Gunshot Residue Kit | Residue | Hands of George Radcliff |
| 10 | " | (2) paper bags on Victim hands | " " | |

Sharpe 004975

Additional Analysis Requested / Instructions: _Please check Item 1-3 for Caliber & Brand of weapon and also Item #6 for brand & caliber_

Return Evidence To (if different from Requesting Officer): _____

CHAIN OF CUSTODY
SBI USE ONLY

| Item(s) | Received By: (Print) | (Initial) | From: (Print) | (Initial) | Date/Time |
|---|---|---|---|---|---|
| 1,2,3,8,10 | Rhea | RR | WJRTeel | JRT | 2-16-94 |
| #6 | T.R. Tewthin | TRT | WJRTeel | JRT | 2-16-94 |
| #10 #8 #6 | C.F. Nichol | | Rhea | RR | 2-16-94 |
| 1,2,3 | JRichardson | | Rhea | RR | 2-17-94 |
| 1,2 +3 | T.R. Tewthing | TRT | JRichardson | | 3-3-94 |
| 15-Box TOTAL | Rhea | | T.R. Tewthin | | 6-1-94 |
| | UPS 157-8683-556 | | Rhea | | 6-1-94 |

**J.A. 2474**

**N.C. STATE BUREAU OF INVESTIGATION**
Post Office Box 2000
Garner, North Carolina 27529-2000
(919) 779-1400

TRT

## REQUEST FOR EXAMINATION OF PHYSICAL EVIDENCE

**PART A:**

Requesting Officer _Det. DRBest_    County _Pitt_   SBI Lab # _R94-3391_

Requesting Agency _Greenville P.D._   ORI # _NC 0760306_ SBI File # _____

Agency Address _P.O. Box 0156_   City _Greenville, NC_ Zip _27834_

Agency File # _94-1108_   Type of Case _Murder_   Date of Offense _2-11-94_

Investigating Officer _Det. DRBest_   Phone # _830-4354_ DCI TID # _6UA1_

**VICTIM(S)**

| | | Race | Sex | DOB | SUSPECT(S) | | Race | Sex | DOB | SID # |
|---|---|---|---|---|---|---|---|---|---|---|
| 1. | George Edward Ratcliffe | | M | 9/4/60 | 1. Donte Sharpe | | B | M | | |
| 2. | | | | | 2. Mark Joyner | | B | M | | |
| 3. | | | | | 3. | | | | | |
| 4. | | | | | 4. | | | | | |

Has any evidence in this case been submitted to the laboratory previously? _YES_ To which section? _Firearms_

Do any subjects have the following:

        (Circle)    AIDS    V.D.    HEPATITIS    TETANUS    TB    LICE

Which subject(s)? _____

| Item(s) | Type Container / Description of Evidence | Examine For | Origin of Evidence (Exact Location) |
|---|---|---|---|
| 12 | Plastic Bag 45 cal. Pistol Ser# 013499 | Compare to Item # 1,2,3,6 | Derwin Wallace |
| 13 | " " (7) 45 cal. bullets | " " " " " | Drwin Wallace |
| | | | |
| | | | |
| | | | |
| | | | |

Additional Analysis Requested / Instructions: _____

Return Evidence To (if different from Requesting Officer): _____

| Item(s) | Received By: (Print) (Initial) | From: (Print) (Initial) | Date/Time |
|---|---|---|---|
| 1-5-p. Bag | Riles    RR | DRBest | 4-14-94 |
| Joe Bag | T.R. Trochum    TR | Riles    RR | 4-14-94 |
| 1-5 box total | Riles | T.R. Trochum | 6-1-94 |
| | UPS 157-8683-556 | Riles | 6-1-94 |

CHAIN OF CUSTODY
SBI USE ONLY

Sharpe 004976

Evidence being submitted for Firearms, Serology, Trace Evidence, Poison, and/or Tampering Examinations
including those additional Examinations as outlined in the instruction sheet.

**J.A. 2475**

## NORTH CAROLINA STATE BUREAU OF INVESTIGATION
## FIREARMS AND TOOL MARK SECTION

LABORATORY # _294-334_
REPORT # _1_ EXAMINER'S INITIALS _TTT_ REVIEWER'S INITIALS _____ DATE _5/10/94_

**************************************************************

( Item [ Agency # ], Make, Caliber /Gauge, Type, SN, Model )

The following items were recieved from S/A Richardson of the S.B.I. Latent Evidence Section on 3-3-94. Q-2, Q-3 and Q-4 (Your Items 1, 2 and 3 respective (ly) Three (3) Remington, caliber 45 Automatic, fired cartridge cases.

The following items was submitted by the addressee on 4-14-94. K-1 (Your Item 12) One (1) Haskell Mfg, caliber 45 Automatic, semi-automatic pistol, serial number 013499, model JS-45.
K-1A (Your Item 13) Seven (7) Winchester, caliber 45 Automatic, cartridges.

The following was previously submitted by the addressee on 2-16-94 and retained by the examiner. Q-1 (Your Item 6) One (1) caliber .45 fired bullet.

Cont

**************************************************************

TYPE(S) _500, 504_ ___ ___ ___ ___ AGENT # _641_ DATE COMPLETED _5-9-94_

DISPOSITION _UPS_ DATES WORKED _5-7-94_

Sharpe 004977

LABORATORY #  _R94-3371_

REPORT #  _2_
INITIALS  _~~TPT~~_

## <u>Results of Examination</u>

The q-1 bullet has the same class characteristics as test bullets that were fired in the K-1 pistol. However, there are no microscopic indications that q-1 was fired from K-1.

The q-2 through q-4 cartridge cases have the same class characteristics to test cartridge cases that were fired in the K-1 pistol. However, there is insufficient microscopic detail to indicate that q-2 through q-4 were fired in K-1

The q-2 through q-4 cartridge cases were fired in the same firearm.

Sharpe 004978

PAGE _3_ OF _6_

| N.C. State Bureau of Investigation Firearm Section Worksheet | SBI LABORATORY # _R94-3391_ |
|---|---|
| | REPORT # _2_ EXAMINERS INITIALS _TRT_ |
| | DATE _5-2-94_ |

## FIREARMS

| ITEM # _1 - K-1_ | MAKE _Haskell Mfg._ | | CALIBER/GAUGE _25 Automatic_ |
|---|---|---|---|
| TYPE/ACTION _S/a simple blowback_ ✓ | | SERIAL NUMBER _013499_ | |
| MODEL _JS-45_ | | FINISH _Black_ | |
| CAPACITY _7 +1_ | | MAGAZINE _Straight column box_ ✓ | |

| REVOLVERS | DIRECTION OF CYLINDER | _n/a_ | |
|---|---|---|---|
| | FLARES | _n/a_ | |

| FIRING PIN SHAPE | BORE CONDITION ✓ _Powder fouling, copper wash_ |
|---|---|
| BARREL LENGTH _≈ 4 2/16"_ | OVERALL LENGTH _≈ 8"_ |

| GRC'S _06R_ | L & G MEAS. | LWD _.075_ | GWD _.150_ ± _.003_ |
|---|---|---|---|

SAFETIES _Thumb type that blocks trigger from releasing the striker_

OPERATING CONDITION

| SINGLE ACTION TRIGGER PULL | ) _7 ½_ ≤ _8_ | POUNDS |
|---|---|---|
| DOUBLE ACTION TRIGGER PULL | ) _n/a_ ≤ _n/a_ | POUNDS |

NOTES: _Black plastic checkered grips_

LOCATION OF IDENTIFYING MARKS/TAG: _Etch on trigger guard_

J.A. 2478

PAGE _4_ OF _6_

| | |
|---|---|
| **N.C. State Bureau of Investigation Firearm Section Worksheet** | SBI LABORATORY # _R94-3391_ <br> REPORT # _2_  EXAMINERS INITIALS _TRT_ <br> DATE _5-2-94_ |

## BULLETS/PROJECTILES

| ITEM # 6 - Q-1 | ITEM # |
|---|---|
| CALIBER 45 | CALIBER |
| GRC'S 06R | GRC'S |
| LWD .075  GWD .150 ± .003 | LWD    GWD    ± |
| WEIGHT 229.98  GRAINS FMJ | WEIGHT    GRAINS |
| MANUFACTURER Consistent w/several brands | MANUFACTURER |
| DESCRIPTION Q-1 has no major mutilation or distortion | DESCRIPTION |
| TRACE EVIDENCE/NOTES N/A | TRACE EVIDENCE/NOTES |

List of possible guns in Report #1

| ITEM # | ITEM # |
|---|---|
| CALIBER | CALIBER |
| GRC'S | GRC'S |
| LWD    GWD    ± | LWD    GWD    ± |
| WEIGHT    GRAINS | WEIGHT    GRAINS |
| MANUFACTURER | MANUFACTURER |
| DESCRIPTION | DESCRIPTION |
| TRACE EVIDENCE/NOTES | TRACE EVIDENCE/NOTES |

Sharpe 004980

PAGE _5_ OF _6_

**N.C. State Bureau of Investigation**
**Firearm Section Worksheet**

SBI LABORATORY # _R94-3391_

REPORT # _2_ EXAMINERS INITIALS _TRT_

DATE _5-7-94_

## CARTRIDGES/CARTRIDGE CASES

| ITEM # 13    KIA |
|---|
| CALIBER/GAUGE  45 Automatic |
| MANUFACTURER  Winchester 230grn FMJ |
| DESCRIPTION Cartridge cases (Total 7) Brass case w/nickle primer who cannot be loaded in M1 magazine |
| FIRING PIN SHAPE  _ |
| EXTRACTOR  — |
| EJECTOR  — |
| TRACE EVIDENCE/NOTES  none |



| ITEM # 1, 2 & 3 (9-2, 9-3 & 9-4 casp.) |
|---|
| CALIBER/GAUGE  45 Automatic |
| MANUFACTURER  Remington |
| DESCRIPTION Fired cartridge cases(3) Brass case w/nickle primer, no cannot/not |
| FIRING PIN SHAPE  Hemi |
| EXTRACTOR |
| EJECTOR |
| TRACE EVIDENCE/NOTES |



| ITEM # |
|---|
| CALIBER/GAUGE |
| MANUFACTURER |
| DESCRIPTION |
| FIRING PIN SHAPE |
| EXTRACTOR |
| EJECTOR |
| TRACE EVIDENCE/NOTES |

| ITEM # |
|---|
| CALIBER/GAUGE |
| MANUFACTURER |
| DESCRIPTION |
| FIRING PIN SHAPE |
| EXTRACTOR |
| EJECTOR |
| TRACE EVIDENCE/NOTES |

Sharpe 004981

LABORATORY # R94-3391          REPORT # 2 EXAMINER'S INITIALS TRT
*************************************************************

ITEM # K-1

TESTS FIRED: NUMBER OF ROUNDS  3  MANUFACTURER AND TYPE 3 Remington

230 grn FMT

TESTS MARKED T-1 thru T-3          DATE FIRED 5-7-94

ITEM # K-1

TESTS FIRED: NUMBER OF ROUNDS  3  MANUFACTURER AND TYPE 3 Winchester

230 grn FMT

TESTS MARKED T-4 thru T-6          DATE FIRED 5-7-94
*************************************************************

DATE(S) OF MICROSCOPIC COMPARISON: 5-7-94   and 5-9-94

CONCLUSIONS WITH EXPLANATIONS:

The T-1 thru T-6 bullets match on gares and fine striais that
runs the length of the leading and trailing edges of the
and at the base of the land impressions. T-1 to T-4 bert
match of two different bands.
Q-1 has vary width lands and grooves, however; there are
no micro indications that Q-1 was fired in K-1.
The T-1 thru T-6 FCC's match on both breech-face marks
on primer as well as distinctive chamber marks.
The Q-2 thru Q-4 FCC's match each other on breech-face
marks. there are no indications that Q-2 thru Q-4 were
fired in K-1.
*************************************************************

| ITEM # K-1 / Item 12&13 | ITEM # Q-2 Q-4 / Item 1, 2&3 | ITEM # |
|---|---|---|
| Sealed ✓ Yes ___ No | Sealed ✓ Yes ___ No | Sealed ___ Yes ___ No |
| Marked ✓ Yes ___ No | Marked ✓ Yes ___ No | Marked ___ Yes ___ No |
| Entry made through original seal: | Entry made through original seal: | Entry made through original seal: |
| Yes ___ No ✓ | Yes ___ No ✓ | Yes ___ No ___ |
| Container(s): Sealed together in a plastic bag. | Container(s) Each sealed in separate manila envelopes | Container(s) |

NOTES: /
Conventional the Q-1 bullet and Q-2 thru Q-4 cartridge cases
are a class as FMT fired in K-1. However no
micro indications that Q-1 thru Q-4 were fired

J.A. 2481

Report #2

TO: Detective D. R. Best
    Greenville Police Department
    500 South Washington Street
    Greenville, N. C. 27834

TYPE OF CASE: Murder

LOCATION: Pitt County

SUBJECT: GEORGE EDWARD RADCLIFF (VICTIM)
        DONTE SHARPE (SUSPECT)
        MARK JOYNER (SUSPECT)

DATE: May 11, 1994

SBI LAB NO.: R940003391

SBI FILE NO.:

AGENCY FILE NO.: 94-1108

EXAMINED BY: T. R. Trochum

MATERIAL SUBMITTED BY: See Below

DATE OF OFFENSE: February 11, 1994

DATE SUBMITTED: See Below

---

ITEMS SUBMITTED BY ADDRESSEE ON FEBRUARY 16, 1994 AND RETAINED BY THE EXAMINER:

Q-1 (Your Item 6) - One (1) caliber .45 fired bullet.

ITEMS RECEIVED FROM S/A JERRY RICHARDSON ON MARCH 3, 1994:

Q-2, Q-3, and Q-4 (Your Items 1, 2, and 3 respectively) - Three (3) Remington caliber
                                            45 Automatic, fired
                                            cartridge cases.

ITEMS SUBMITTED BY ADDRESSEE ON APRIL 14, 1994:

K-1 (Your Item 12) - One (1) Haskell Mfg. caliber 45 Automatic, semi-automatic pistol,
                  serial number 013499, Model JS-45.
K-1A (Your Item 13) - Seven (7) Winchester caliber 45 Automatic cartridges.

TYPE EXAMINATION REQUESTED:

Firearms examination and identification.

RESULTS OF EXAMINATION:

The Q-1 bullet has the same class characteristics as test bullets that were fired in

Mr. Thomas D. Haigwood, D. A.

T. R. Trochum

Sharpe 004983

Page 2                              R940003391

RESULTS OF EXAMINATION (CONTINUED):

the K-1 pistol.  However, there are no microscopic indications that Q-1 was fired from K-1.

The  Q-2 through Q-4 cartridge cases have the same class characteristics to test cartridge cases that were fired in the K-1 pistol.  However, there is insufficient microscopic detail to indicate that Q-2 through Q-4 were fired in K-1.

The Q-2 through Q-4 cartridge cases were fired in the same firearm.

DISPOSITION OF EVIDENCE:

The evidence is being returned via United Parcel Service, delivery confirmation requested.

TRT:cmw
Attachment

Sharpe 004984

GREENVILLE POLICE DEPARTMENT

INVESTIGATIVE SUPPLEMENT

CASE NO. 94-1108          INCIDENT  Murder

INVESTIGATOR'S ACTIVITY

INTERVIEW:      ON VIEW  ✓      TELEPHONE ____

WITNESS ____    VICTIM ____    SUSPECT ____

SITE VISIT:  CRIME SCENE ____    OTHER ____    NA ____

NAME   Alonza Vines

RELATIONSHIP TO THE CRIME   Witness

_____

ACTIVITY LOCATION/ADDRESS   Brown Building

_____

ON VIEW  ✓    TELEPHONE ____

INVESTIGATOR'S NAME AND NO.  Carolyn J Melvin #75

DATE   2-16-94 @ 0940 hrs

DETAILS OF ACTIVITY

R/o transported Mr. Vines from 1602 Shepherd St to the Brown Building 2-16-94 @ 0940 hrs. R/o was advised by Vines that he heard a loud noise while in the house. Vines stated that he went to the Kitchen and turn the lights off. Vines stated that he then peeped out to see what was going on. Vines stated that he saw the tower appearing to have wrecked and two people standing

(CONTINUATION PAGE)

Outside the truck, Vines stated that the two people were standing at the rear of the truck. Vines advised Mc that he did not see the people's face and could not identify them.

REVIEWED BY: _____    DATE 7-7-94
                SUPERVISOR'S SIGNATURE

GREENVILLE POLICE DEPARTMENT

INVESTIGATIVE SUPPLEMENT

CASE NO. __94-1108__ .    INCIDENT __Murder__

INVESTIGATOR'S ACTIVITY

INTERVIEW:    ON VIEW __✓__    TELEPHONE ____

WITNESS ____   VICTIM __✓__    SUSPECT ____

SITE VISIT:   CRIME SCENE ____   OTHER ____   NA ____

NAME __Trisia Clarice Radcliffe__

RELATIONSHIP TO THE CRIME __Victim's wife__

ACTIVITY LOCATION/ADDRESS __Brown Building__ .

ON VIEW __✓__    TELEPHONE ____

INVESTIGATOR'S NAME AND NO. __Carolyn Mel- #75__

DATE __2-16-94 @ 1005 hrs.__

DETAILS OF ACTIVITY

R/o and Detective DR Best interviewed the victim's wife at the Brown Building 2-16-94 @ 1005 hrs. Trisia stated that the victim call her twice before 2:30 pm 2-11-94. She stated that he came home from work at 5:00 pm. Trisia stated that he stuck his head through the door and yelled that he was going to pick up the money from the loan company and get some tires put on the car at Collins.

Sharpe 003702
GPD:52:03-94

GREENVILLE POLICE DEPARTMENT

INTERVIEW WORKSHEET

Name: NAthan FARMER

Address: Mendenhall  ARA FOOD SERVICES

Race: W   Sex: M   DOB:           POB:

Social Security #:

Home Phone: 957-4754

Business Phone:

Place of Employment:

Address:

OCA #: 94-1108

Interview Took Place:

Time: 1020        Date: 2-24-94

Conducted by:

Persons Present:

Relationship to Investigation:

Miranda Rights:

Time Interview Ended:

Farmer advised that the victim's wife was at work until
5:30 p.m the day of the incident. and back at 7:00 p m –
for A work function. Transfered from Jones. (Linda Weede)


Fred Bissinger – Stayed at his house the night
of the incident

SBI-5

# N.C. STATE BUREAU OF INVESTIGATION
Post Office Box 2000
Garner, North Carolina 27529-2000
(919) 779-1400

## REQUEST FOR EXAMINATION OF PHYSICAL EVIDENCE

**PART A:**

Requesting Officer __Det. DRBest__ County __Pitt__ SBI Lab # __R94-3391__

Requesting Agency __Greenville P.D.__ ORI # __0740300__ SBI File # _____

Agency Address __PO Box 0156__ City __Greenville__ Zip __27835__

Agency File # __94-1108__ Type of Case __Murder__ Date of Offense __2-11-94__

Investigating Officer __Det. C.J. Melvin__ Phone # __830-4352__ DCI TID # __GUA-1__

**VICTIM(S)** Race Sex DOB **SUSPECT(S)** Race Sex DOB SID #

1. George Edward Radcliff | W | M | 9/9/62 | 1. UNK
2. 
3. 
4. 

Has any evidence in this case been submitted to the laboratory previously? __NO__ To which section? _____

Do any subjects have the following:
(Circle) AIDS V.D. HEPATITIS TETANUS TB LICE

Which subject(s)? _____

| Item(s) | Type Container / Description of Evidence | Examine For | Origin of Evidence (Exact Location) |
|---|---|---|---|
| 1. | envelope | Ammo Casing | Fingerprints | 6th St. |
| 2. | " " | " " | " | " " |
| 3. | " | " " | " | " " " |
| 6 | " | projectile | Caliber | Body of Victim Radcliff |
| 7 | " | Victim clothing | Gunshot Residue | George Radcliff |
| 8 | " | Gunshot Residue Kit | Residue | Hands of George Radcliff |
| 10 | " | (2) paper bags on Victim hands | " " | |

Sharpe 004975

Additional Analysis Requested / Instructions: __Please check Item 1-3 for Caliber & Brand of weapon and also Item #6 for brand & caliber__

Return Evidence To (if different from Requesting Officer): _____

| Item(s) | Received By: (Print) | (Initial) | From: (Print) | (Initial) | Date/Time |
|---|---|---|---|---|---|
| 1,2,3,8,10 | Riles | RR | HJRTee | GR | 2-16-94 |
| #6 | T.R. Tewthon | TRT | HJRTee | GRT | 2-16-94 |
| #10 #8 | C.F.McII | | Riles | RR | 2-16-94 |
| 1,2,3 | Richardson | | Riles | RR | 2-17-94 |
| 1,2 +3 | T.R. Tewthon | TRT | Richardson | | 3-3-94 |
| 15-Box TOTAL | Riles | | T.R. Tewthon | | 6-1-94 |
| | VPS 157-8683-556 | | Riles | | 6-1-94 |

CHAIN OF CUSTODY SBI USE ONLY

Evidence may be submitted for Firearms, Documents, Trace Evidence, Latent, and/or Tampering Examinations

J.A. 2488

STATE OF NORTH CAROLINA
COUNTY OF PITT

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
FILE NO. 94-CRS-7660

STATE OF NORTH CAROLINA     )
                                   )
       VS.                  )
                                     )
MONTOYAE DONTAE SHARPE    )

1997 MAR TRANSCRIPT
(Pages 1-201)

GREENVILLE POLICE DEPARTMENT

INVESTIGATIVE SUPPLEMENT

CASE NO. 94-1108      INCIDENT Murder

INVESTIGATOR'S ACTIVITY

INTERVIEW:    ON VIEW ✓    TELEPHONE _____

WITNESS _____   VICTIM _____    SUSPECT _____

SITE VISIT:   CRIME SCENE _____   OTHER _____   NA _____

NAME Charlene Natasha Johnson

RELATIONSHIP TO THE CRIME _____ witness _____

_____

ACTIVITY LOCATION/ADDRESS Brown Building

_____

ON VIEW _____    TELEPHONE _____

INVESTIGATOR'S NAME AND NO. C. J. Melvin # 75

DATE 4-7-94 @ 1334 hrs.

DETAILS OF ACTIVITY

R/O and Detective D.R Best interviewed Johnson at the Brown Building. Johnson write a statement as to the facts as she saw them the night of the murder. Johnson stated that she was in the area and witnessed the murder. (Her Statement attached).

_____

_____

_____

GPD:52:03-94

Sharpe 005005



ON Feb. 11, 1994    I WAS WALKiNG downN4th ON MY
WAy TOO Lucky Spot, I STOp At the STOp siGN.
AND I SO DON+A AND A white MAle AND MARK JON
DON+A WAS About TO SAle that white MAle
A Rock but he ONly had 18.00 DON+A SAid
I can't do it you have to have the money
straight up. ANd the white MAle SAid Fuck you MAN
DON+A push him AND then he pulled Oxt A GON
A shot him.                    Charle NutshA jon v
                                  4-7-94 1:30 pM

Also DON+A move the truck A RAN it iN the
rul. AND MARK AND DON+A pick the white Male
up AND put him iN the truck ANd DON+A throw
the Keys ANd the gun some where ANd MARK AND SPlit
Split up ANd meet each oucl ANd got into A
Red escort.
                                  CharlEVE NalshA jon
                                  4-7-94 1:34 pM

Sharpe 005007
Page 1 of 1

## REQUEST FOR CRIME STOPPER COVERAGE

DEPARTMENT  Greenville Police Dept

OFFICER  Detective C.S. Melvin

CRIME OR OFFENSE  Murder

DATE OCCURRED  2-11-94

LOCATION  W. 6th & Sheppard St

DETAILS OF CRIME  → See Attached copy

Of Report ←

SUSPECTS  Unkn

SPECIAL INSTRUCTIONS

DATE TO BE FEATURED

MEDIA USED: WNCT-TV( )  WITN ( )  WCTI ( )  WRQR ( )
            WNCT-RADIO ( )  OTHER(              )

DATE OF REQUEST  2-15-94

Interview - 4.7.94　　　4:25 pm

Montoyae Dontae Sharpe
1202 Farmville Blvd
Greenville, N.C.
████████████
████████████████
Pitt Co.

5:00　me & Carston Robinson - 18 yr.
we together
Carston works at Bob Barbour
Honda
We were riding around in my
Grey BMW

Sharpe 007669

8:00 pm. We left my house at 1202 Farmville
Blvd - We were driving my mother
car
We went to Grimesland to
Prissy's house - She use to be Mack
girl
Played for awhile and then came
back to Greenville & rode over
to New Town then down 14th St.
Saw truck with white male
inside

J.A. 2493

I was riding around looking
for Audie + Mark
looked for them about 45 min-
1 hr.
could not find them
went to Kim Paige's house
1601 S. Green St.
She was crying + said some one
had gotten shot on 14th St.
Carlton Robinson said that Victor
Barrett told him that a Brown
Skin dude from New York was playing
with a 9mm on 6th St. beside the
yellow house - liquor house
at 11:00 pm I saw the news at
601-Broc 14th R. - Patricia Hicks house
said man was killed on 14th St.
11:00 pm - After New
went to University Inn
I bought a 45 caliber gun at the
Gun Rack last summer
- I had gun stolen from my house on
14th St.
I also bought a M-1 Carbine

Sharpe 007670

May 10, 74
124 Detenton Dr.

Dear Sahara Sharpe,

I don't know how to start out this letter, but How are you holding up? I am trying to make it but that's not what, why I am writeing. am writeing because of your son, and Mark, and also myself. I know that Donta nor Mark had any thing to do with a murder, Because I heard Candy Johnson say the Day when Mark and Donta got arrested, she called Ricky Best and told him that donta Killed a man, She told him they weird I heard her and also Tonya Freedom, and I know that you're saying If I heard her why did not I say anything. Well, first of all, I was Drinking that day, Thursday, I'll tell you from the begining, Thursday Morning I was with Candy and Tonya, I Stay with Candy on that ~~Wesday~~ Wensday at the Camelot, and she set me up that Night I expose to be with Mark that night ect. But anyway, That Thursday morning we went to Darlene house and that when I was with them, at Darlen House

ome of the fellows that there was a police looking
for Candy, and Candy, played it off. She said
they were looking for her for something But
anyway remeber that police was looking for Candy
they they were looking for her because she
had got in some murder case and, Thursday
they were looking for Candies But Candy
ad it So I was looking and, not knowing
thinking that they were looking for Cherlen.
but that's not who Said that Don't a murder
anyone, The police was to Cherlen house for
andy, Because Candy told them that She
Stayed where, Cherlen Stayed Remeber Johnson.
andy and Cherlen got the same last name!
they got Cherlen because they thought that
he had some information, But She didn't they
took her down for questioning, and They found
out that she was a runaway, and She was
a minor So they had to let her go. Remeber
they were looking for candy, and
Cherlen was a valible So they picked her.
up, & now, I Saw Candice when She went
to Cherlen house when Cherlen had gone & came
Back but I did not think anything about it because
I did not think candy was that Dam Cricket.
Anyway afther we left for there I was with
Candy and Tonya we left and went to the
Store, and I ran into mark and we
was fussing because He was looking for
me on Wensday, and Candy told him

that I was with someone else. So anyway
We got candy on a lie. And Mark & Dorla told
Me to stop hanging around Candy because she
was trouble. But I did not listen so what happen
was, we had went to the store and I don't
know what happen, I know candy kept useing
the telephone. I went in the store and played
a game and bought some cigzerettes. Then candy
Came in the store and said to me and Jonya
Lets go to Darlen house, again so I left the store
Me, Jonya, Candice, we went to Darlen house.
for a while. Then, we went outside on the porch
Candy said Lets go to the boot house I said
yea, So we went and got some wine, well
we sat there for a while I did not spend
any money, because Jonya had money,
Candice ask me did I want to, drink so
I Said yes, I got a beer, and candy got
a gin & Juice, and Jonya had a bear, I
Stared drinking my beer I watched candy,
She did not drink the gin & Juice, She did not
Woent to drink I did not know why, So she ask
me did I want it so I said yea, but I did,
have to go to the bathroom, I went and came
back, and I drunt the gin and Juice. I
finish my beer, and I was talking shit. So
I was ready to go. So we went back to
the Store, and candy used the phone

the way to the Store. I want to set down,
I never felt that bad before, and yes I can
handle alcohol very well but not this day,
I kept Smoking Ciggeretts and I got higher,
We was to the Store and candy waited
to use the phone I was talking to Tanya
about Mark. So then, Mark and Donta comed
up. Candy was on the phone I heard her Say
Something about Donta, his name hit me, and
She Didn't just Say Donta She Said Donta Sharpe.
Killed Some man, I did not pay her anymine
because I was thinking that I was fucked
up, and I was hearing things at the Same
time Tonya Freedom heard the Same thing,
But, I did know for Sure that She heard her.
So Candy hanged up the phone, and called
Some one eles and it throwed me off. She
Called C. J nevin, know, I never been in
trouble I don't know this people, well
This kind of trouble I have a drug
Charge, parphnica, and I payed that. I did
not know anything about Ricky Best or C. J nevin
and She was telling other Something I walked
away me and Tonya, and Donta, Mark went
I the Store, and Mark went in the Store and
Camed Back out, I went in the Store
a Stood to the door and Mark was on his
bike and Donta was in the Store. I think Playing
a game. And he Walk back out and, Mark
was out, and cops camed up, well one car

C9

then Candy said Donta look at the turns,
and me and Donta look at each other
a burst out laugh because It exposed
to been some joke, I think, so I walk in
the store and Donta went in the store
Mark was out side the hold time candy
Was outside, So then when I Was in
The store I saw the cop and they
had not said anything, they was
getting out of the car, I walk for
from the door because I was dirty.
and Drunt, So when I walked to the
middle out the line and this guy
guy camed in and bumped in to me
and I went off, and he was tring
to get to Donta and He said Something
about Some one being arrested, I heard
Mark Calling and I looked and
Mark was being hand cuffed, and
he was Calling me, I heard Jim
Cursing Said I did not kill no God D Body,
I ain't killed no god D Body and He
Call me and Said you know what they
got me for I said Wat. I Was about
to cry when I said murder, and
Then Donta camed out Some how they
got him and cuffed him and He was
Calling Candy telling Her to Call

and told her to tell his mom. Dot, they put them In the car and Drove off. With them I look at Candy and Tonya I was stunned. I Could not Say, Say anything. I went In the Store and ask what was going on and They said Something about a white Man, and I went back outside and Candy was on the phone and She said Cherlen. I was So mad. I Said Cherlen what She Said that She was the one that told that I Said How She know She Said Ricky Best told her, and When, Mark mother camed She Told her that It was Cherlon Johnson, and When you got there I was on the Bycile Going to met you on the highway to tell you that Donta had Been Arrested But Chris had told you, and you Stopped for Candy and She Told you Cherlen was the one, Then Kenzy camed and he told Cherlen, when I went to your house to take he bycile back, I camed back and when I got back Kenzy was still there, So I went to the car and Kenzy told us to get in and, We did And That where all that Stared from Candy. I know that I was wrong, but, I must Say I am a Women, young but I'll take my time like a man, but not because Candy, Because She Will get hers. I told mark and Kenzy what I Wrote, My lawyer Robert Cherry Stokes, haven't talked to me yet but I pray, I get Probation! Got to go tell Family

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF NORTH CAROLINA
 2                         EASTERN DIVISION
                     No. 4:21-CV-000185-BO
 3
 4        _____

          Montoyae Dontae Sharpe,              )
 5                                              )
              Plaintiff,                        )
 6                                              )
          V.                                    )
 7                                              )
          R.L. "Ricky" Best, Jeffrey D.         )
 8        Shrock, and the City of Greenville,   )
          North Carolina,                       )
 9                                              )
              Defendants.                       )
10
11        _____

          Montoyae Dontae Sharpe,              )
12                                              )
              Plaintiff,                        )
13                                              )
          V.                                    )
14                                              )
                                                )
15        Carolyn Melvin,                       )
                                                )
16            Defendants.                       )
17
                  VIDEO DEPOSITION OF SARAH SHARPE BLAKELY
18                      (Taken by Defendants)
                     Greenville, North Carolina
19                   Friday, August 25, 2023
20
21
22
                        Reported via Stenomask by
23                       Kathryn F. Kilpatrick
                     Court Reporter, Notary Public
24
25        Job No. CS6000696
```

STATE OF NORTH CAROLINA
COUNTY OF PITT

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
FILE NO.: 94CRS007660

STATE OF NORTH CAROLINA      ]
           ]
     v.           ]
           ]
MONTOYAE DONTAE SHARPE,    ]
     Defendant        ]

**AFFIDAVIT OF CONNIE ELKS**

NOW COMES, Connie Elks, who being duly sworn, deposes and says the following:

1. My name is Connie Elks and I am a retired officer from the Greenville Police Department. I spent almost my entire law enforcement career with that agency and my assignment as of my retirement date in 2012 was as a Detective with the Major Crimes Unit.

2. After retiring from the Greenville Police Department, I worked as an Investigator with the Pitt County District Attorney's Office in 2016 and 2017.

3. In 1994, my assignment with the Greenville Police Department was as a Detective handling juvenile cases. I was the charging officer for the felonious assault that occurred against Charlene Johnson on April 7, 1994. April 7, 1994 was the date that Dontae Sharpe was arrested for murdering George Radcliffe and at that point, Charlene Johnson was the only eyewitness who had come forward.

4. As part of my investigation into the assault against Charlene Johnson, I interviewed her mother Deborah Bandy. Ms. Bandy told me "I asked Charlene what happened, did she tell on those boys? She said she did, cause they did."

5. I had contact with Charlene Johnson on several occasions from the time she was assaulted until Dontae Sharpe's murder trial in July of 1995. At no point during that time did she indicate that her statement about Dontae Sharpe shooting George Radcliffe was fabricated.

6. I did not participate in the investigation or trial preparation for Dontae Sharpe's murder case so that it would be an investigation separate and apart from the assault where Charlene Johnson was the victim.

7. In October of 2000, I attended an evidentiary hearing in federal court in Elizabeth City that addressed one of Dontae Sharpe's post-conviction appeals. I heard Dearl Powell

1

testify in that hearing that Damien Smith, who had committed suicide a month prior to Dontae Sharpe's arrest, was the person responsible for killing George Radcliffe.

8. Before hearing Dearl Powell testify in October of 2000, he did not, to my knowledge, make known to anybody at the Greenville Police Department or the Pitt County District Attorney's Office that he was a witness to George Radcliffe's murder and that Damien Smith was the true murderer.

9. I was the lead detective in a 2009 double-murder case, State of North Carolina v. James Richardson and attended the trial of that case in its entirety. In that trial, Dearl Powell testified as a defense witness and gave a statement that directly conflicted the credible evidence regarding whether that defendant was in possession of the vehicle used to commit the murders at issue.

10. I am aware that at the time of the Richardson trial, Carolyn Melvin was working as a private investigator who had been retained by the defendant's family.

11. Just prior to trial, Ms. Melvin was involved in rallies on the steps of the courthouse and radio commentary in which she attempted to poison the jury pool, to the extent that the trial judge had to admonish her for her conduct.

12. In 2016, while I was working as an investigator at the Pitt County District Attorney's Office, I was present for a meeting between Theresa Newman and Caitlin Swain of the Duke School of Law Wrongful Convictions Clinic and the elected District Attorney Kimberly Robb.

13. Based on that meeting, District Attorney Robb requested that I conduct an investigation as part of a "fresh" evaluation of the Dontae Sharpe murder case.

14. To the best of my recollection, in the meeting with Defendant's current counsel, they mentioned Wilbur Mercer, a.k.a. Marshanna, and not Damien Smith as a potential alternate murder suspect.

15. As part of my investigation, I had a face to face conversation with Mr. Mercer who gave the same version of events that he had given Detective Carolyn Melvin, Detective Jeff Baxter, and any other party that inquired as to his whereabouts at the time of George Radcliffe's murder.

16. Based on my interview with Mr. Mercer, I made contact with his estranged wife and her daughter, who separately and independently corroborated that he was not present in George Radcliffe's vehicle at the time Radcliffe was killed.

2

17. Upon information and belief, Wilbur Mercer is now deceased due to natural causes and is unavailable for further interview.

18. As part of my investigation I made contact with Beatrice Stokes who indicated that she had been harassed by Carolyn Melvin, Dontae Sharpe's mother, and others on his behalf due to her involvement in the case. She also indicated that they had offered her a thousand dollars to change her statement, but she refused to take their money and maintained that she had told the truth at trial and was continuing to try to do the right thing. Ms. Stokes also stated that at the time of the murder, it was not unusual for Dontae Sharpe to carry a gun and to threaten people in his drug-selling territory.

19. As part of my investigation I made contact with an employee of the Greenville Police Department responsible for information technology/recordkeeping to see if he could locate a police report for Damian Smith's shooting of Horace Worsley, Damian Smith's suicide, and felonious assaults that Dontae Sharpe was involved in before he was arrested on the murder charge at issue.

20. Based on my investigation, it does not appear that any reports pertaining to the suicide of Damian Smith were ever previously turned over to the Pitt County District Attorney's Office by the lead detective in that case, Carolyn Melvin, or any other officers who responded.

This the 28th day of December, 2018.

C. A. Elks
Greenville Police Department (Ret.)

_____

Subscribed and sworn to before me this 28th day of December, 2018.

Notary Public Jackie F. Castle

My commission expires on: 3/25/2022

3

May 10, 74
124 Detention Dr.

Dear Sahara Sharpe,

I don't know how to start out this letter, but How are you holding up? I am trying to make it but that's not what why I am writeing. I am writeing because of your Son, and Mark, and also myself. I know that Donta nor Mark had any thing to do with a Murder Because I heard Candy Johnson say The Day when Mark and Donta got arrested, She called Ricky Best and told him that donta killed a man, She told him that and I heard her and also Tonya Freedom, and I know that you'r saying if I heard her why did'n't I say anything. Well, first of all, I was Drinking that day, Thursday, I'll tell you from the begining, Thursday, Morning I was with candy and Tonya, I Stay With Candy on that ~~~~~~~~~ Wensday at the Camolot, and She Set me up that Night I expose to be with Mark that night ect. But anyway, That Thursday morning We went to Darlene house and that when I was with them, at Darlen House.

~~~~~~ Earlier Lauray Told Me Donta and

Sharpe 003833

**J.A. 2505**

'ome of the fellows that there was a police looking
for Candy, and Candy, played it off. She said
They were looking for her for something But
anyway remeber that police was looking for Candy
they they were looking for her because she
had got in some murder case, and Thursday
they were looking for Candies But Candy
'ad it So I was looking and, not knowing
hinking that they were looking for Cherlen.
'ut that's not who Said that Don't a murder
'nyone, The police was to Cherlen house for
'andy, Because Candy told them that She
Stayed where, Cherlen Stayed Remeber Johnson.
'andy and Cherlen got the same last name!
hey got Cherlen because they thought that
= had some information, but She didn't they
took her down for questioning, and They found
'ut that she was a runaway, and She was
'' minor So they had to let her go. Remeber
they were looking for candy, and
Cherlen was a valible So they picked her
up, Now, I Saw Candice when She went
'o Cherlen house when Cherlen had gone & Camed
Back but I didn't think anything about It because
I did not think candy was that Dam Cricket.
anyway after we left for there I was with
'andy and Tonya we left and went to the
Store, and I ran into mark and we
Has fussing because He was Looking for
ne on Weisaday, and Candy told him

that I was with someone else. So anyway.
We got Candy In a lie. and mark & Dorita told
me to stop hanging around Candy because she
was trouble. But I did not listen so what happen
was, we had went to the store and I don't
know what happen, I know Candy kept on useing
the telephone. I went in the store and played
a game and bought some ciggerettes. Then Candy.
Came in the store and said to me and Tonya
Lets go to Darien house, again so I left the store
Me, Tonya, Candice, we went to Darien house.
for a while. Then, we went outside on the pourch
Candy said Lets go to the boot house I said
yea, so we went and got some wine, well
we sat there for a while I did not spined
any money, because Tonya had money,
Candice ask me did I want to, drink so
I said yes, I got a beer, and Candy got
a gin & Juice, and Tonya had a beer. I.
Stared Drinking my beer I watched Candy,
She did not drink the gin & Juice, She did not
want to drink I did not know why, so she ask
me did I want it, so I said yea, but I did
have to go to the bathroom, I went and came
back, and I drunk the gin and Juice. I
finish my beer, and I was talking Shit So.
I was ready to go, so we went back to
the store, and Candy used the phone
one, and I was nothing really drunk on the

Sharpe 003835

the way to the Store. I want to set down,
I never felt that bad before, and you I can
handle alcohol, very well but not this day,
I kept Smoking Cigerretts and I got higher,
we was to the Store and candy waited
to use the phone I was talking to tanya
about mark. So Glen, mark and Donta camed
up. Candy was on the phone I heard her Say
Something about Donta, his name hit me, and
She didn't just Say Donta She Said Donta Sharpe,
killed some man, I did not pay her anymine
because I was thinking that I was fucked
up, and I was hearing things at the same
time Tonya Freedom heard the Same thing.
But, I did know for Sure that She heard her.
So Candy hanged up the phone, and called
Some one eles and it throwed me off. She
Called C. J melvin, know, I never been in
trouble I don't know this people, well
this kind of trouble, I have a drug
Charge, parphnica, and I payed that. I did
not now anything, about ricky Best of C. J melvin
and She was telling her Something I walked
away me and Tonya, and Donta, mark went
I the Store, and mark went in the Store and
Camed Back out, I went in the Store
a stood to the door and mark was on his
bike and Donta was in the Store, I think Playing
a game, and he walk back out and, mark
was out, and Cops camed up, well one car

Sharpe 003836

**J.A. 2508**

(9

then Candy said Donta look at the twins,
and me and Donta look at each other
a burst out laugh because It exposed
to been Some joke, I think so I walk in
the Store and Donta went In the Store
Mark was out side The hold Time Candy
was outside, So Then when I was in
The Store I Saw the cop and They
had not Said anything they was
getting out of the Car, I walk
from The door because I was dirty.
and Drunk, So when I walked to the
middle out the line and the
guy camed in and bumped in to me
and I went off, and he was Trying
to get to Donta and He Said Something
about Some one being arrested, I heard
Mark calling and I looked and
Mark was being hand Cuffed, and
he was Calling me, I heard Jim
Cursing Said I did not kill no God D Body,
I ain't killed no god D Body and He
Call me and Said you know what they
got me for. I Said Wait. I Was about
to Cry When I said murder, and
Then Donta camed out Some how they
got him and Cuffed him and He was
Calling Candy telling Her to Call

Sharpe 003837

**J.A. 2509**

and told her to tell his mom. Dot, they put
them in the car and Drove off. with for them
I look at Candy and Tonya I was stunned.
I could not say, say anything. I went
in the store and ask what was going on
and They said something about a white
Man, and I went back out side and candy
was on the phone and she said Cherlen,
I was so mad, I said cherlen what a she
said that She was the one that told that
I said How she know She said Ricky Best
told her, and When, Mark mother came I
She told her that It was cherlon Johnson
and When you got there I was on the Bycile
going to met you on the highway to tell you
that Donta had been arrested But Chris had
told you, and you stopped for Candy and She Told
you cherlen was the one, Then Kenzy came and
the told cherlen, when I went to your house to take
the boy bycile back, I camed back and when I
got back Kenzy was still there, so I went to the
car and Kenzy told us to get in and, we did
and That where all that Stared from Candy,
I Know that I was wrong, but I must
say, I am a women, young but I'll take my
time like a man, but not because Candy,
Because She will get hers. I told Mark
and Kenzy what I wrote, My lawyer Robert
Cherry Stokes, haven't talked to me yet but
I pray, I get probation! Got to go tell Family

**STATE OF NORTH CAROLINA**
In the General Court of Justice
Superior Court Division

Pitt _____ County

File No.

94 CRS 7660

Film No.

STATE VERSUS

Defendant
Montoyae Dontae Sharpe

Date of Offense
2/11/94

Offense in Violation of G.S.
14-17

**INDICTMENT
MURDER**

The jurors for the State upon their oath present that on or about the date of offense shown and in the county named above the defendant named above unlawfully, willfully and feloniously and of malice aforethought did kill and mu[rder]

George Edward Radcliffe

[Note: This indictment is sufficient to charge both First and Second Degree Murder. G.S. 15-144; G.S. 15-155. prosecutor who only intends to prosecute for Second Degree Murder may want "Second Degree" typ[ed] before "Murder" in the offense block.]

Signature of Prosecutor

**WITNESSES**

| | | | |
|---|---|---|---|
| ☐ C.J. Melvin | GPD | ☐ | |
| ☒ D.R. Best | GPD | ☐ | |
| ☐ | | ☐ | |
| ☐ | | ☐ | |

The witnesses marked "X" were sworn by the undersigned Foreman of the Grand Jury and, after hearing te[sti]mony, this bill was found to be:

☒ A TRUE BILL by twelve or more grand jurors, and I the undersigned Foreman of the Grand Jury, attest the concurrence of twelve or more grand jurors in this Bill of Indictment.

☐ NOT A TRUE BILL

Sharpe 001671

Date
4-18-94

Signature of Grand Jury Foreman

J.A. 2511



SBI-53                                                                    7-86

### N.C. STATE BUREAU OF INVESTIGATION
### POLYGRAPH REPORT

**POLYGRAPH FILE #**  (207)RPG94JA065          **EXAMINER** J.R. Adcox

**SBI INVESTIGATIVE FILE #**    N/A

**DATE OF EXAM** 04-19-94          **EXAM LOCATION** Pitt          Greenville
                                                    **(County)**      **(City)**

**REQUESTING AGENCY** Greenville Police Dept.          **OCA#** 94 1108

**INVESTIGATORS**  Det. R. Best, Det. C.J. Melvin

**OFFENSE**    Homicide          **OFFENSE DATE**  02-11-94

**CRIME LOCATION**          Pitt                    Greenville
                         **(County)**              **(City)**

**VICTIM**    George Edward Radcliffe

    **RACE** W          **SEX**    M      **DOB** 09-04-60

    **ADDRESS**  1404 Rhondo Ave., Greenville

**EXAMINEE**   Charlene Natasha Johnson

    **RACE**  B ·   **SEX**    F   **DOB** 03-02-80   **HEIGHT** 5'8"   **WEIGHT** 143

    **ADDRESS**    Rt. 13, Box 158, Bell's Chapel Rd., Bell's Fork, NC

    **TYPE**   Witness     **(Victim, Witness, Suspect, Defendant, Applicant)**

**#TESTS**    3

**OPINION**     **NDI**          **DI**          **I**    XX

      **R**          **S**          **RE**

      **C**          **NS**

**NUMERICAL EVALUATION**        +1

**REMARKS:**   5) Did you see Dante' shoot that man? YES

      7) Did you lie to me when you said you saw Dante' shoot that man? NO

      10) Have you told me the complete truth about seeing that man get shot? YES

RECEIVED

SBI POLYGRAPH SECTION

Sharpe 004947

J.A. 2512



## NORTH CAROLINA STATE BUREAU OF INVESTIGATION
## NUMERICAL CHART ANALYSIS

File # (207)RPG94JA065    Evaluator: _____

Examinee: JOHNSON (Homicide, Witness)

| | C1/R1 | | | C2/R2 | | | C3/R3 | | |
|---|---|---|---|---|---|---|---|---|---|
| | 4/5 | | | 6/7 | | | 9/10 | | |
| Pneumo | 0 | 0 | O | 0 | O(E) | O | X | DD | XDB |
| G.S.R. | 0 | 0 | O | 0 | 0 | O | 0 | 0 | O |
| Cardio | + | +/ | + | — | -/ | — | — | ZD | — |
| Total | -1 | +1 | +( | -1 | -1 | -1 | -1 | -1 | -1 |
| Grand Total | | | | | | | -1 | -1 | -1 |
| Pneumo | 0 | 0 | — | 0 | 0 | O | 0 | 0 | O |
| G.S.R. | 0 | 0 | O | 0 | 0 | O | 0 | 0 | O |
| Cardio | — | — | — | + | +/ | + | + | +/ | + |
| Total | -1 | -1 | -2 | +1 | +/ | +1 | +1 | +/ | +1 |
| Grand Total | | | | | | | +1 | +/ | O |
| Pneumo | 0 | 0 | — | + | ++ | + | 0 | 0 | O |
| G.S.R. | 0 | 0 | O | 0 | 0 | O | — | -/ | — |
| Cardio | + | +/ | + | + | +/ | + | — | -/ | — |
| Total | +1 | +/ | 0 | +2 | +2 | +2 | -2 | -2 | -2 |
| Grand Total | | | | | | | +1 | +/ | O |

TOTAL NUMERICAL EVALUATION    **RECEIVED**    +1   +/   -1

SBI 107        SBI POLYGRAPH SECTION

Sharpe 004948

North Carolina
# STATE BUREAU OF INVESTIGATION
Department of Justice
RALEIGH

Report #2                    **LABORATORY REPORT**

TO: Detective D. R. Best                DATE: May 16, 1994
    Greenville Police Department
    500 South Washington Street         SBI LAB NO.: R940003391
    Greenville, N. C. 27834
                                        SBI FILE NO.:

TYPE OF CASE: Murder                    AGENCY FILE NO.: 94-1108

LOCATION: Pitt County                   EXAMINED BY: T. R. Trochum

SUBJECT: GEORGE EDWARD RADCLIFF (VICTIM)   MATERIAL SUBMITTED BY: See Below
         DONTE SHARPE (SUSPECT)
         MARK JOYNER (SUSPECT)           DATE OF OFFENSE: February 11, 1994

                                        DATE SUBMITTED: See Below

---

ITEMS SUBMITTED BY ADDRESSEE ON FEBRUARY 16, 1994 AND RETAINED BY THE EXAMINER:

Q-1 (Your Item 6) - One (1) caliber .45 fired bullet.

ITEMS RECEIVED FROM S/A JERRY RICHARDSON ON MARCH 3, 1994:

Q-2, Q-3, and Q-4 (Your Items 1, 2, and 3 respectively) - Three (3) Remington caliber
                                                           45 Automatic, fired
                                                           cartridge cases.

ITEMS SUBMITTED BY ADDRESSEE ON APRIL 14, 1994:

K-1 (Your Item 12) - One (1) Haskell Mfg. caliber 45 Automatic, semi-automatic pistol,
                     serial number 013499, Model JS-45.
K-1A (Your Item 13) - Seven (7) Winchester caliber 45 Automatic cartridges.

TYPE EXAMINATION REQUESTED:

Firearms examination and identification.

RESULTS OF EXAMINATION:

The Q-1 bullet has the same class characteristics as test bullets that were fired in

I, Michael F. Easley, Attorney General of the State of North Carolina, hereby certify that the form identified as
North Carolina State Bureau of Investigation, Department of Justice, Laboratory Report is a form approved by me for
the purpose stated in G.S. 90-95(g) and approved by me in compliance with the said statute.

COPIES TO:                          THIS REPORT IS TO BE USED ONLY IN CONNECTION WITH AN OFFICIAL
    Mr. Thomas D. Haigwood, D. A.   CRIMINAL INVESTIGATION

                                    _____
                                    James J. Coman, Director

                                    This report represents a true and accurate result of my analysis
                                    on the item(s) described.

                                    T. R. Trochum

CONFIDENTIAL. This is an official file of the North Carolina State Bureau of Investigation. To make public or expose
the contents thereof to any unauthorized person is a violation of the General Statutes of North Carolina.

Page 2                          R940003391

RESULTS OF EXAMINATION (CONTINUED):

the K-1 pistol.  However, there are no microscopic indications that Q-1 was fired from K-1.

The  Q-2 through Q-4 cartridge cases have the same class characteristics to test cartridge cases that were fired in the K-1 pistol.  However, there is insufficient microscopic detail to indicate that Q-2 through Q-4 were fired in K-1.

The Q-2 through Q-4 cartridge cases were fired in the same firearm.

DISPOSITION OF EVIDENCE:

The evidence is being returned via United Parcel Service, delivery confirmation requested.

TRT:cmw
Attachment

Sharpe 004974

SBI-5

## N.C. STATE BUREAU OF INVESTIGATION
Post Office Box 2000
Garner, North Carolina 27529-2000
(919) 779-1400

### REQUEST FOR EXAMINATION OF PHYSICAL EVIDENCE

**PART A:**

Requesting Officer _Det. D.R. Best_    County _Pitt_    SBI Lab # _R94-3391_

Requesting Agency _Greenville P.D._    ORI # _0740300_    SBI File # _____

Agency Address _P.O. Box 0156_    City _Greenville_    Zip _27835_

Agency File # _94-1108_    Type of Case _Murder_    Date of Offense _2-11-94_

Investigating Officer _Det. C.J. Melvin_    Phone # _830-4352_    DCI TID # _GUA-1_

**VICTIM(S)**      Race Sex DOB      **SUSPECT(S)**      Race Sex DOB SID #

1. _George Edward Radcliff_   W   m   9/9/62    1. _UNK_

2. _____

3. _____

4. _____

Has any evidence in this case been submitted to the laboratory previously? _NO_ To which section? _____

Do any subjects have the following:

     (Circle)    AIDS    V.D.    HEPATITIS    TETANUS    TB    LICE

Which subject(s)? _____

| Item(s) | Type Container / Description of Evidence | Examine For | Origin of Evidence (Exact Location) |
|---|---|---|---|
| 1. | envelope    Ammo Casing | Fingerprints | 6th St. |
| 2. | "    " | " | " " |
| 3. | "    " " | " | " " |
| 6 | "    projectile | Caliber | Body of Victim Radcliff |
| 7 | "    Victim clothing | Gunshot Residue | George Radcliff |
| 8 | "    Gunshot Residue Kit | Residue | Hands of George Radcliff |
| 10 | "    (2) paper bags on Victim hands | " | |

Sharpe 004975

Additional Analysis Requested / Instructions: _Please check Item 1-3 for Caliber & Brand of weapon and also Item #6 for brand & caliber_

Return Evidence To (if different from Requesting Officer): _____

<table>
<tr><th colspan="2">Item(s)</th><th>Received By: (Print)</th><th>(Initial)</th><th>From: (Print)</th><th>(Initial)</th><th>Date/Time</th></tr>
<tr><td colspan="2">1,2,3,8,10</td><td>Rivas</td><td>RR</td><td>W.J.R.Teel</td><td>qrt</td><td>2-16-94</td></tr>
<tr><td colspan="2">#6</td><td>T.R. Trouthon</td><td>TRI</td><td>W.J.R.Teel</td><td>SRT</td><td>2-16-94</td></tr>
<tr><td colspan="2">#10 #8</td><td>C.F. Nicole</td><td>CN</td><td>Rivas</td><td>RR</td><td>2-16-94</td></tr>
<tr><td colspan="2">1,2,3</td><td>J. Richardson</td><td></td><td>Rivas</td><td>RR</td><td>2-17-94</td></tr>
<tr><td colspan="2">1,2+3</td><td>T.R. Trouthon TRI</td><td></td><td>J. Richardson</td><td></td><td>3-3-94</td></tr>
<tr><td colspan="2">15-Box Total</td><td>Rivas</td><td></td><td>T.R. Trouthon</td><td></td><td>6-1-94</td></tr>
<tr><td colspan="2"></td><td>U/S 157-8683-556</td><td></td><td>Rivas</td><td>RR</td><td>6-1-94</td></tr>
</table>

**CHAIN OF CUSTODY** SBI USE ONLY

## J.A. 2516

TRT

## N.C. STATE BUREAU OF INVESTIGATION
Post Office Box 2000
Garner, North Carolina 27529-2000
(919) 779-1400

### REQUEST FOR EXAMINATION OF PHYSICAL EVIDENCE

**PART A:**

Requesting Officer _Det. DRBest_    County _Pitt_   SBI Lab # _R94-3391_

Requesting Agency _Greenville P.D._   ORI # _NC 0760300_ SBI File # _____

Agency Address _P.O. Box 0156_   City _Greenville, NC_ Zip _27834_

Agency File # _94-1108_   Type of Case _Murder_   Date of Offense _2-11-94_

Investigating Officer _Det. DRBest_   Phone # _830-4354_ DCI TID # _6UA1_

**VICTIM(S)**

| | | Race | Sex | DOB |
|---|---|---|---|---|
| 1. | George Edward Radcliffe | W | M | 9/4/60 |
| 2. | | | | |
| 3. | | | | |
| 4. | | | | |

**SUSPECT(S)**

| | | Race | Sex | DOB | SID # |
|---|---|---|---|---|---|
| 1. | Donte Sharpe | B | M | | |
| 2. | Mark Joyner | B | M | | |
| 3. | | | | | |
| 4. | | | | | |

Has any evidence in this case been submitted to the laboratory previously? _YES_ To which section? _Fire Arms_

Do any subjects have the following:
(Circle)   AIDS    V.D.    HEPATITIS    TETANUS    TB    LICE

Which subject(s)? _____

| Item(s) | Type Container / Description of Evidence | Examine For | Origin of Evidence (Exact Location) |
|---|---|---|---|
| 12 | Plastic Bag 45cal. Pistol Ser# 013499 | Compare to Item # 1,2,3,6 | Derwin Wallace |
| 13 | " " (7) 45cal. bullets | " ", ", ", " | Derwin Wallace |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

Additional Analysis Requested / Instructions: _____

Return Evidence To (if different from Requesting Officer): _____

**CHAIN OF CUSTODY SBI USE ONLY**

| Item(s) | Received By: (Print) | (Initial) | From: (Print) | (Initial) | Date/Time |
|---|---|---|---|---|---|
| 1-5 p. Bag | Riles | RR | DRBest | | 4-14-94 |
| 12 Bag | T.R. Trochum | TR | Riles | RR | 4-14-94 |
| 1-5 Bot | Riles | | T.R. Trochum | | 6-1-94 |
| | UPS 157-8683-556 | | Riles | | 6-1-94 |

Sharpe 004976

Evidence being submitted for Firearms, Serology, Trace Evidence, Poison, and/or Tampering Examinations
must include additional documentation as outlined on the instruction page.

## J.A. 2517

## NORTH CAROLINA STATE BUREAU OF INVESTIGATION
## FIREARMS AND TOOL MARK SECTION

LABORATORY # _294-334_
REPORT # _1_  EXAMINER'S INITIALS _TTT_  REVIEWER'S INITIALS _____ DATE _5/10/94_
**************************************************************
( Item [ Agency # ], Make, Caliber /Gauge, Type, SN, Model )

The following items were recieved from S/a Richardson of the S.B.I. Latent Evidence Section on 3-3-94. Q-2, Q-3 and Q-4 (Your Items 1, 2 and 3 respectively) Three (3) Remington, caliber 45 Automatic, fired cartridge cases.

The following items was submitted by the addressee on 4-14-94. K-1 (Your Item 12) One (1) Haskell Mfg, caliber 45 Automatic, semi-automatic pistol, serial number 013499, model JS-45.
K-1A (Your Item 13) Seven (7) Winchester, caliber 45 Automatic, Cartridges.

The following was previously submitted by the addressee on 2-16-94 and retained by the examiner. Q-1 (Your Item 6) One (1) caliber .45 fired bullet.

Cont

**************************************************************
TYPE(S) _500, 504_ ___ ___ ___ ___ AGENT # _641_ DATE COMPLETED _5-9-94_
DISPOSITION _UPS_  DATES WORKED _5-9-94_

LABORATORY # _R94-3371_

## Results of Examination

The q-1 bullet has the same class characteristics as test bullets that were fired in the K-1 pistol. However, there are no microscopic indications that q-1 was fired from K-1.

The q-2 through q-4 cartridge cases have the same class characteristics to test cartridge cases that were fired in the K-1 pistol. However, there is insufficient microscopic detail to indicate that q-2 through q-4 were fired in K-1.

The q-2 through q-4 cartridge cases were fired in the same firearm.

Sharpe 004978

PAGE _3_ OF _6_

| N.C. State Bureau of Investigation Firearm Section Worksheet | SBI LABORATORY # _R94-3391_ |
| --- | --- |
| | REPORT # _2_ EXAMINERS INITIALS _TRT_ |
| | DATE _5-2-94_ |

## FIREARMS

| ITEM # _1 - K-1_ | MAKE _Haskell Mfg._ | | CALIBER/GAUGE _25 Automatic_ |
| --- | --- | --- | --- |
| TYPE/ACTION _S/a simple blowback_ ✓ | | SERIAL NUMBER _013499_ | |
| MODEL _JS-45_ | | FINISH _Black_ | |
| CAPACITY _7+1_ | | MAGAZINE _Straight column box_ ✓ | |

| REVOLVERS | DIRECTION OF CYLINDER | _n/a_ ✓ | |
| --- | --- | --- | --- |
| | FLARES | _n/a_ | |

| FIRING PIN SHAPE | ✓ | BORE CONDITION ✓ _Powder fouling & copper wash_ |
| --- | --- | --- |

| BARREL LENGTH _≈ 4 9/16"_ | OVERALL LENGTH _≈ 8"_ |
| --- | --- |

| GRC'S _06R_ | L & G MEAS. | LWD _.075_ | GWD _.150_ ± _.003_ |
| --- | --- | --- | --- |

SAFETIES _Thumb type that blocks trigger from releasing the striker_

OPERATING CONDITION

| SINGLE ACTION TRIGGER PULL | ) _7½_ | ≤ | _8_ | POUNDS |
| --- | --- | --- | --- | --- |
| DOUBLE ACTION TRIGGER PULL | ) _n/a_ | ≤ | _n/a_ | POUNDS |

NOTES: _Black plastic checkered grips_

LOCATION OF IDENTIFYING MARKS/TAG: _Etch on trigger guard_

J.A. 2520

PAGE _4_ OF _6_

| | |
|---|---|
| **N.C. State Bureau of Investigation Firearm Section Worksheet** | SBI LABORATORY # _R94-3391_ <br> REPORT # _2_   EXAMINERS INITIALS _TRT_ <br> DATE _5-7-94_ |

### BULLETS/PROJECTILES

| ITEM # 6   - Q-1 |
|---|
| CALIBER  45 |
| GRC'S  06R |
| LWD  .075  GWD  .150  ± .023 |
| WEIGHT  229.98  GRAINS _FMJ_ |
| MANUFACTURER Consistent w/several brands |
| DESCRIPTION Q-1 has no major mutilation or distortion |
| TRACE EVIDENCE/NOTES  N/A |

| ITEM # |
|---|
| CALIBER |
| GRC'S |
| LWD  GWD  ± |
| WEIGHT  GRAINS |
| MANUFACTURER |
| DESCRIPTION |
| TRACE EVIDENCE/NOTES |

list of possible guns
in report #1

| ITEM # |
|---|
| CALIBER |
| GRC'S |
| LWD  GWD  ± |
| WEIGHT  GRAINS |
| MANUFACTURER |
| DESCRIPTION |
| TRACE EVIDENCE/NOTES |

| ITEM # |
|---|
| CALIBER |
| GRC'S |
| LWD  GWD  ± |
| WEIGHT  GRAINS |
| MANUFACTURER |
| DESCRIPTION |
| TRACE EVIDENCE/NOTES |

Sharpe 004980

PAGE _5_ OF _6_

**N.C. State Bureau of Investigation**
**Firearm Section Worksheet**

SBI LABORATORY # _R94-3391_

REPORT # _2_ EXAMINERS INITIALS _TRT_

DATE _5-7-94_

## CARTRIDGES/CARTRIDGE CASES

| | |
|---|---|
| ITEM # _13_   _KIA_ | ITEM # _1, 2 & 3 (9-2, 9-3 & 9-4 corresp.)_ |
| CALIBER/GAUGE _45 Automatic_ | CALIBER/GAUGE _45 Automatic_ |
| MANUFACTURER _Winchester 230 gr FMJ_ | MANUFACTURER _Remington_ |
| DESCRIPTION _Cartridge case (fired?) Brass case w/nickle primer who cannot be loaded in K1 magazine_ | DESCRIPTION _Fired cartridge cases (3) Brass case w/nickle primer, no cannolos_ |
| FIRING PIN SHAPE _—_ | FIRING PIN SHAPE _Hemi_ |
| EXTRACTOR _—_ | EXTRACTOR |
| EJECTOR _—_ | EJECTOR |
| TRACE EVIDENCE/NOTES _none_ | TRACE EVIDENCE/NOTES |

KIA



9-2, 9-3 & 9-4



| | |
|---|---|
| ITEM # | ITEM # |
| CALIBER/GAUGE | CALIBER/GAUGE |
| MANUFACTURER | MANUFACTURER |
| DESCRIPTION | DESCRIPTION |
| FIRING PIN SHAPE | FIRING PIN SHAPE |
| EXTRACTOR | EXTRACTOR |
| EJECTOR | EJECTOR |
| TRACE EVIDENCE/NOTES | TRACE EVIDENCE/NOTES |

Sharpe 004981

LABORATORY # _R94-3391_   REPORT # _2_ EXAMINER'S INITIALS _TRT_

**************************************************************

ITEM # _K-1_

TESTS FIRED: NUMBER OF ROUNDS _3_   MANUFACTURER AND TYPE _3 Remington_

_230 grn FMJ_

TESTS MARKED _T-1 thru T-3_   DATE FIRED _5-2-94_

ITEM # _K-1_

TESTS FIRED: NUMBER OF ROUNDS _3_   MANUFACTURER AND TYPE _3 Winchester_

_230 grn FMJ_

TESTS MARKED _T-4 thru T-6_   DATE FIRED _5-2-94_

**************************************************************

DATE(S) OF MICROSCOPIC COMPARISON: _5-7-94_   _arfee M. Marrs 5-9-94_

CONCLUSIONS WITH EXPLANATIONS:

The T-1 thru T-6 bullets match on groove and fine striations that runs the length of the leading and trailing edges of the ridge at the base of the land impressions. T-1 to T-4 best match of two different brands.

Q-1 has same width lands and grooves, however; there are no micro indications that Q-1 was fired in K-1.

The T-1 thru T-6 FCC's match on both breech-face marks on primer as well as distinctive chamber marks.

The Q-2 thru Q-4 FCC's match each other on breech-face marks. There are no indications that Q-2 thru Q-4 were fired in K-1.

**************************************************************

| ITEM # _K-1_ / Item 12-13 | ITEM # _Q-2 Q-4_ / Item 1, 2-3 | ITEM # |
|---|---|---|
| Sealed _✓_ Yes ___ No | Sealed _✓_ Yes ___ No | Sealed ___ Yes ___ No |
| Marked _✓_ Yes ___ No | Marked _✓_ Yes ___ No | Marked ___ Yes ___ No |
| Entry made through original seal: | Entry made through original seal: | Entry made through original seal: |
| Yes ___ No _✓_ | Yes ___ No _✓_ | Yes ___ No ___ |
| Container(s): _sealed_ | Container(s) _Each sealed_ | Container(s) |
| _together in a plastic_ | _in seperate manila_ | |
| _bag._ | _Envelopes_ | |

NOTES: _Conclusion: the Q-1 bullet and Q-2 thru Q-4 cartridge cases are same class as FMJ fired in K-1. However, no micro indications that Q-1 thru Q-4 were fired_

Report #2

TO: Detective D. R. Best
    Greenville Police Department
    500 South Washington Street
    Greenville, N. C. 27834

DATE: May 11, 1994

SBI LAB NO.: R940003391

SBI FILE NO.:

TYPE OF CASE: Murder

AGENCY FILE NO.: 94-1108

LOCATION: Pitt County

EXAMINED BY: T. R. Trochum

SUBJECT: GEORGE EDWARD RADCLIFF (VICTIM)
    DONTE SHARPE (SUSPECT)
    MARK JOYNER (SUSPECT)

MATERIAL SUBMITTED BY: See Below

DATE OF OFFENSE: February 11, 1994

DATE SUBMITTED: See Below

---

ITEMS SUBMITTED BY ADDRESSEE ON FEBRUARY 16, 1994 AND RETAINED BY THE EXAMINER:

Q-1 (Your Item 6) - One (1) caliber .45 fired bullet.

ITEMS RECEIVED FROM S/A JERRY RICHARDSON ON MARCH 3, 1994:

Q-2, Q-3, and Q-4 (Your Items 1, 2, and 3 respectively) - Three (3) Remington caliber
                                        45 Automatic, fired
                                        cartridge cases.

ITEMS SUBMITTED BY ADDRESSEE ON APRIL 14, 1994:

K-1 (Your Item 12) - One (1) Haskell Mfg. caliber 45 Automatic, semi-automatic pistol,
                 serial number 013499, Model JS-45.
K-1A (Your Item 13) - Seven (7) Winchester caliber 45 Automatic cartridges.

TYPE EXAMINATION REQUESTED:

Firearms examination and identification.

RESULTS OF EXAMINATION:

The Q-1 bullet has the same class characteristics as test bullets that were fired in

Mr. Thomas D. Haigwood, D. A.

T. R. Trochum

Sharpe 004983

Page 2                              R940003391

RESULTS OF EXAMINATION (CONTINUED):

the K-1 pistol.  However, there are no microscopic indications that Q-1 was fired from
K-1.

The  Q-2 through Q-4 cartridge cases have the same class characteristics to test
cartridge cases that were fired in the K-1 pistol.  However, there is insufficient
microscopic detail to indicate that Q-2 through Q-4 were fired in K-1.

The Q-2 through Q-4 cartridge cases were fired in the same firearm.

DISPOSITION OF EVIDENCE:

The evidence is being returned via United Parcel Service, delivery confirmation
requested.

TRT:cmw
Attachment

Sharpe 004984



-53                                                                7-86

N.C STATE BUREAU OF INVESTIGATION

POLYGRAPH REPORT

*Reel 27*
*Loc. 31487*

POLYGRAPH FILE # (612)RPG94KM027    EXAMINER: KELLY MOSER

SBI INVESTIGATIVE FILE # N/A

DATE OF EXAM: 08-29-94 EXAM LOCATION: PITT          GREENVILLE
                                        (COUNTY)         (CITY)
REQUESTING AGENCY:GREENVILLE POLICE DEPT.    OCA# 94-1108

INVESTIGATORS:DET. RICKY BEST

OFFENSE: HOMICIDE                    DATE: 02-11-94

CRIME LOCATION: PITT                      GREENVILLE
                    (COUNTY)              (CITY)
VICTIM: GEORGE EDWARD RADCLIFF

RACE: WHITE      SEX: MALE      DATE OF BIRTH:

ADDRESS: UNK.

EXAMINEE: MONTOYA DONTE SHARPE

RACE: BLACK    SEX: MALE   DOB: 03-15-75  HEIGHT: 6'4"  WEIGHT: 220

ADDRESS: 1202 FARMVILLE ROAD, GREENVILLE, N.C.

TYPE: SUSPECT        (VICTIM, WITNESS, SUSPECT, DEFENDANT, APPLIC)

NUMBER OF TESTS: THREE

OPINION    ND1        DI   XXX    *RECEIVED*
           R          S            *AUG 29 1994*
           C          NS           *NORTH... RE SBI ...DISTRICT*

NUMERICAL EVALUATION: -9

REMARKS: 5. DID YOU SHOOT GEORGE RADCLIFF?  NO   7. DID YOU
PARTICIPATE IN ANY WAY IN THE SHOOTING OF GEORGE RADCLIFF?
NO  10. DO YOU KNOW FOR SURE WHO SHOT GEORGE RADCLIFF?
NO  THE EXAMINEE WAS IN CUSTODY FOR THIS CRIME AT THE TIME
OF THIS TEST. THE ADVICEMENT OF RIGHTS WAS ADMINISTERED BY
& IN THE PRESENCE OF HIS ATTORNEY. THE EXAMINEE DENIED ANY
INVOLVEMENT IN THE CRIME.                    SBI ... SECTION

Sharpe 008942



NORTH CAROLINA STATE BUREAU OF INVESTIGATION
NUMERICAL CHART ANALYSIS

File #    Evaluator: Bridges

Examinee: M.P. Sharpe

USCA4 Appeal: 25-1155    Doc: 24-5    Filed: 04/14/2025    Pg: 294 of 567    Total Pages:(294 of 567)

# SHEET A = FIRST READS



**NORTH CAROLINA STATE BUREAU OF INVESTIGATION**
**NUMERICAL CHART ANALYSIS**

File # 612RB684KPK27          Evaluator: Bridges

Examinee: M.P. Sharpe

SBI POLYGRAPH SECTION

SBI 107

Case 4:21-cv-00185-BO    Document 267-12    Filed 11/27/24    Page 3 of 4

Sharpe 008944

**J.A. 2528**

## SHEET B = SECOND READS

**NORTH CAROLINA STATE BUREAU OF INVESTIGATION**
**NUMERICAL CHART ANALYSIS**

File # 612RB94KNK27    Evaluator: Bridges

Examinee: M. P. Sharpe



| | C1/R1 First Question/Second Read | C2/R2 Second Question/Second Read | C3 Third Question/Second Read |
|---|---|---|---|

TOTAL NUMERICAL EVALUATION **RECEIVED**    -9    -7

SBI 107              SBI POLYGRAPH SECTION

Sharpe 008945

**From:**          Jeff Baxter <JBaxter@greenvillenc.gov>
**Sent:**          Tuesday, July 22, 2014 12:02 PM
**To:**            Bill Little
**Cc:**            Hassan Aden
**Subject:**        Re: Dontae Sharpe

Good Morning Gentleman,

I'v been tasked with working the surveillance op and am just getting up and around and have just read your e-mail. It appears I have "ruffled" some feathers with the people from Duke Law. Sgt. Groccia and I have made contact with as many witnesses and people of interest as we can thus far regarding this case. All interviews we have conducted have been done in a professional manner and have been audio recorded and transcribed.

From what I gather Ms. Melvin was the lead Detective along with Det. Reid, however, a week or so later is when Det. Ricky Best began working the case along with Ms. Melvin. Charlene Johnson was/is the main witness and she has recanted her recollection of events from the night of the murder.

As you know the case file is very thin. I have contacted the DA's Office and they lost the whole case file in the flood several years ago. I'm a fact finder and thats what I enjoy doing. I'm in search of the truth surrounding what happened that night whether it helps or hurts this case. For whatever reason it appears to me Duke Law wants to dictate who we interview and who we don't which raises my suspicion on their intentions. So far those we have spoken with have already been notified by students from Duke Law.

I received the letter from Buddy Conner late last night and have scanned and forwarded same to Sgt. Groccia and up my chain of command.

Take care,
Jeff

Det. Jeff Baxter
Major Crimes Unit
Greenville Police Department
500 S. Greene St.
Greenville,NC 27834
Ofc. 252.329.4389
jbaxter@greenvillenc.gov

Sent from my iPad

On Jul 22, 2014, at 7:59 AM, "Bill Little" <BLittle@GREENVILLENC.GOV> wrote:

> ok
> Bill Little
> Assistant City Attorney
> P.O. Box 7207
> Greenville, NC 27835-7207
> Tel: 252-329-4426
> Fax: 252-329-4626
> blittle@greenvillenc.gov
> www.greenvillenc.gov
> <image001.png>

**From:** Hassan Aden
**Sent:** Tuesday, July 22, 2014 7:59 AM
**To:** Bill Little

STATE OF NORTH CAROLINA

COUNTY OF _____

MONTOYAE DONTAE SHARPE,
        Plaintiff,

v.

R.L. "RICKY" BEST, JEFFREY D.
SHROCK, CAROLYN MELVIN, AND THE
CITY OF GREENVILLE, NORTH
CAROLINA
        Defendants.

IN THE GENERAL COURT OF JUSTICE
EASTERN DISTRICT OF NORTH CAROLINA
4:21-CV-00185-BO

**AFFIDAVIT OF JEFF BAXTER**

The undersigned, being first duly sworn, deposes and states under oath as follows:

1. In 2014, I was employed as an active duty officer with the Greenville Police Department ("GPD" or the "Department") working as a detective in the GPD's Investigations Division.

2. In early 2014, I was assigned to assist the Pitt County District Attorney's Office and re-interview witnesses related to the investigation into the 1994 murder of George Radcliffe.

3. During the summer of 2014, while attempting to locate the original 1994 investigative file for the murder of George Radcliffe, I discovered the original 1994 case file was missing from GPD records. Subsequently, I contacted the Pitt County District Attorney's Office and requested its file related to the 1995 prosecution of Dontae Sharpe for the murder of George Radcliffe and discovered their file had been destroyed in a flood several years before 2014.

4. Upon realizing that neither the GPD nor Pitt County District Attorney's Office had access to the original file related to the murder of George Radcliffe, I took the initiative to create a "case file" using materials submitted in previous court filings.

This the ___ day of _February_, 2024.

_[signature]_

_provided FL Driver License 13236-421-68-170-0_

Sworn to and
subscribed before me
this _2nd_ day of
_February_, 2024.

_Pinellas County, Florida_

*Marria Adamfi-Quevedo*
Notary Public

My Commission
Expires:
11/27/2025

MARIA ADAMFI-QUEVEDO
Notary Public, State of Florida
My Comm. Expires Nov. 27, 2025
No. HH 194208

Page 1

```
 1                IN THE UNITED STATES DISTRICT COURT
              FOR THE EASTERN DISTRICT OF NORTH CAROLINA
 2                        EASTERN DIVISION
                      No. 4:21-CV-000185-BO
 3

   MONTOYAE DONTAE SHARPE,          )
 4                                  )
                    PLAINTIFF,      )       V-I-D-E-O-T-A-P-E-D
 5   V.                             )       D-E-P-O-S-I-T-I-O-N
                                    )
 6   R.L. "RICKY" BEST, JEFFREY D.  )            OF
     SHROCK, AND THE CITY OF        )
 7   GREENVILLE, NORTH CAROLINA     )       WILLIAM CLARK EVERETT
                                    )
 8                  DEFENDANTS.     )
 9    *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
10   ON JUNE 5, 2023, AT HOLIDAY INN, 203 S.W. GREENVILLE
     BOULEVARD, GREENVILLE, NORTH CAROLINA.
11

     APPEARANCES OF COUNSEL:
12

     FOR THE PLAINTIFF:    MR. DAVID RUDOLF
13                         MR. PHILLIP LEWIS
                           MS. SONYA PFEIFFER (VIA ZOOM)
14                         RUDOLF WIDENHOUSE AND FIALKO
                           225 EAST WORTHINGTON AVENUE, SUITE 200
15                         CHARLOTTE, NORTH CAROLINA 28203
16   FOR DEFENDANTS        MR. PETER CLEMENTS, JR.
     CITY OF GREENVILLE    MS. ELIZABETH A. MARTINEAU (VIA ZOOM)
17   MR. SCHROCK AND       MARTINEAU KING
     MR. BEST:             8701 RED OAK BOULEVARD, SUITE 100
18                         CHARLOTTE, NORTH CAROLINA 28224
19   FOR DEFENDANT MELVIN: MR. J. NICHOLAS ELLIS
                           MS. SYDNEY PLUMMER
20                         POYNER SPRUILL, LLP
                           1151 FALLS ROAD, SUITE 1000
21                         ROCKY MOUNT, NORTH CAROLINA 27804
22
23
24
25   Job No. CS5901547
```

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF NORTH CAROLINA
 2                       EASTERN DIVISION
                     No. 4:21-CV-000185-BO
 3                                    )
     Montoyae Dontae Sharpe,          )
 4                                    )
             Plaintiff,               )
 5                                    )
     V.                               )
 6                                    )
     R.L. "Ricky" Best, Jeffrey       )
 7   D. Shrock, and the City of       )
     Greenville, North Carolina,      )
 8                                    )
             Defendants.              )
 9                                    )
                                      )
10   Montoyae Dontae Sharpe,          )
                                      )
11           Plaintiff,               )
                                      )
12   V.                               )
                                      )
13   Carolyn Melvin,                  )
                                      )
14           Defendants.              )
15
16           VIDEOTAPED VIDEOCONFERENCE DEPOSITION
17                          of
18                    R. CHERRY STOKES
19                 (Taken by Defendants)
20        at witness's stated physical location of
21              PITT COUNTY, NORTH CAROLINA
22                Tuesday, August 29, 2023
23                      10:09 a.m.
24
     Job No. CS5993516
25   Reported by: Leslie Christian Lentkowski
```



IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

File No.: 5:04-HC-886-BO

MONTOYAE DONTAE SHARPE, )
   Petitioner )
                              )
      vs.                )
                              )
MICHAEL T.W. BELL, Superintendent )
of Pender Correctional Institution, )
   Respondent )
                              )

<u>Memorandum of Law In Support of
Motion for Issuance of Certificate
of Appealability</u>
(F.R.A.P., Rule 22)

I.    <u>STATEMENT OF THE PROCEDURAL HISTORY</u>

      Petitioner was indicted on April 18, 1994 for the February 1, 1994, murder of

George Radcliffe. Petitioner was tried by a jury in Pitt County Superior Court and on

July 17, 1995 he was found guilty of First Degree Murder and sentenced to life in

prison.

      On direct appeal to the North Carolina Supreme Court Petitioner argued, *inter*

*alia*, that the trial court erred in not admitting the testimony of Tracy Highsmith regarding

statements made by Damien Smith to the effect that he committed the murder for which

the defendant was charged. On July 31, 1996, Petitioner's direct appeal was denied by

the North Carolina Supreme Court. *State v. Sharpe,* 334 N.C. 190, 473 S.E.2d 3

(1996).

      On February 14, 1997, Petitioner filed a Motion For Appropriate Relief based on

ineffective assistance of counsel as well as on a key witness's recantation of her trial

testimony.

<div align="center">1</div>

On May 6, 1998, following an evidentiary hearing, the Honorable W. Russell Duke, Jr. denied Petitioner's Motion For Appropriate Relief.

On September 30, 1998, Petitioner appealed the denial of his Motion For Appropriate Relief to the North Carolina Supreme Court. In his appeal, Petitioner alleged that his trial counsel rendered ineffective assistance by failing to argue the proper grounds for admission of essential exculpatory evidence in violation of the Sixth and Fourteenth Amendments to the United States Constitution. Petitioner further contended that the trial court erred in finding that the recantation of one of the State's key witnesses was not credible. Petitioner's Petition For a Writ of Certiorari was denied on August 19, 1999.

Petitioner filed a Petition for Writ of Habeas Corpus with the United States District Court for the Eastern District of North Carolina on December 22, 1999. By order dated March 15, 2001, the United States District Court denied his petition finding that the issue of Ineffective Assistance of Counsel was procedurally barred. The Court also found that the recantation evidence was insufficient standing on its own to raise constitutional questions but determined that the cumulative effect of the recantation evidence, coupled with the failure of the trial court to admit Highsmith's testimony concerning Damien Smith, bring into question grave questions about Sharpe's due process rights.

On November 30, 2001, Petitioner filed a Motion for Appropriate Relief in the Pitt County Superior Court raising the ground of "newly discovered evidence" and reasserting the grounds previously raised based on the recantation of trial testimony by Charlene Johnson and ineffective assistance of counsel. Following an evidentiary

2

hearing the trial court denied the motion for appropriate relief on October 21, 2002 and November 14, 2002.

Petitioner filed a Petition for Writ of Certiorari with the North Carolina Court of Appeals on September 29, 2003. By order entered November 18, 2003, the petition was denied.

On November 17, 2004, Petitioner filed a Petition for Writ of Habeas Corpus with the United States District Court for the Eastern District of North Carolina.

Respondent, on February 3, 2005, filed a Motion for Summary Judgment and Answer to Petition. On March 29, 2006, the Honorable Terrence W. Boyle dismissed, *sua sponte*, Petitioner's Petition for Writ of Habeas Corpus based on Petitioner's failure to seek authorization from the Fourth Circuit Court of Appeals to file what the Court concluded was a second, or successive, Petition for Writ of Habeas Corpus.

## II.    STATEMENT OF THE LAW

### A. Generally

A Petitioner may appeal from a judgment denying him relief as prescribed by Rule 3 of the Federal Rules of Appellate Procedure. Rule 22(b)(1) of the Rules of Appellate Procedure provides as follows:

"(1) In a habeas corpus proceeding in which the detention complained of arises from process issued by a state court, or in a 28 U.S.C. § 2255 proceeding, the applicant cannot take an appeal unless a circuit justice or a circuit or district judge issues a certificate of appealability under 28 U.S.C. § 2253(c) . If an applicant files a notice of appeal, the district judge who rendered the judgment must either issue a certificate of appealability or state why a certificate should not issue. The district clerk must send the certificate or statement to the court of appeals with the notice of appeal and the file of the district-court proceedings. If the district judge has denied the certificate, the applicant may request a circuit judge to issue the certificate."

3

F.R.A.P. Rule 22.

The purpose of issuing a certificate of appealability is to avoid frivolous appeals and the courts will decline to issue a certificate of appealability where there has been no showing by a petitioner that a federal right has been denied.  White v. Collins, 959 F.2d 1319 (5th Cir. 1992), cert. denied, 112 S.Ct. 1714 (1992).  However, a certificate of appealability must issue if the petitioner demonstrates that issues are debatable among jurists of reason, that courts could resolve issues in different manners, or that questions are adequate to deserve discouragement to proceed further.  Rogers v. State of Wisconsin, 812 F.Supp. 905 (E.D.Wis. 1993).


B.      Second or Successive Petitions for Writ of Habeas Corpus

28 U.S.C. Section 2244 (b) (3) (A) provides:

> Before a second or successive application permitted by this section is filed in the district court, the applicant shall move in the appropriate court of appeals for an order authorizing the district court to consider the application.

The United States Supreme Court in Slack v. McDonald, 529 U.S. 473 (2000) held that a habeas petition which is filed after an initial petition is dismissed without adjudication on the merits for failure to exhaust state remedies is not a second or successive petition as that term is understood in the habeas corpus context.  The Supreme Court's opinion was predicated on the holding in Rose v. Lundy, 455 U.S. 509 (1982) which requires a district court judge to dismiss a petition which contains both exhausted and unexhausted claims.  The Fourth Circuit Court of Appeals has likewise addressed this issue in accord with the United States Supreme Court's decision in

4

Slack, supra.

Petitioner's Petition for Writ of Habeas Corpus was denied on March 12, 2001. The order specifically recited that, because the Petitioner had not exhausted his state remedies, the case was remanded to the State courts for further proceedings. Although the order did state that Petitioner's claim for ineffective assistance of counsel was denied, this is inconsistent with the remand language in the same order. The other claims asserted by Petitioner were not adjudicated. See also, Stewart v. Martinez-Villareal, 523 U.S. 637 (1998). It is also important to recognize that the State, in its comprehensive response to the petition, did not consider Petitioner's Petition for Writ of Habeas Corpus subject to the requirements of 28 U.S.C. Section 2244 (b) (3) (A).

This issue as to whether Petitioner's Petition for Writ of Habeas Corpus was a second or successive petition is debatable among jurists of reason and, in fact, courts could resolve this issue in different manners.

III.    CONCLUSION

Petitioner is entitled to an order granting a certificate of appealability pursuant to Rule 22 of the Federal Rules of Appellate Procedure.

This the 27th day of April 2006.

W. Gregory Duke
Attorney for Petitioner Sharpe
P.O. Box 855
Greenville, N.C. 27835-855
(252) 758-4444 Telephone
(252) 758-4080 Fax
N.C. State Bar No.:

5

Sharpe 001427

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
NO. 5:04-HC-886-BO

MONTOYAE DONTAE SHARPE,      )
                             )   MEMORANDUM OF RESPONSE
          Petitioner,        )   OPPOSING PETITIONER'S MOTION
     v.                      )   FOR ISSUANCE OF A CERTIFICATE
                             )   OF APPEALABILITY
MICHAEL T.W. BELL, Supt. of, )   28 U.S.C. § 2253(c)
Pender Correctional Inst.,   )
                             )
          Respondent.        )

### Summary of the Nature of the Case and Pertinent Facts

For a summary of the nature of this case and pertinent
facts, Respondent refers this Court to his originally filed brief
supporting his answer and motion for summary judgment.

### Legal Argument

In order to obtain a certificate of appealability under 28
U.S.C. §2253(c)(2) and (3), Petitioner must make a "substantial
showing of the denial of a constitutional right" for each issue
he wishes to raise.  To make the required showing, a petitioner
must establish that "reasonable jurists could debate whether (or,
for that matter, agree that) the petition should have been
resolved in a different manner or that the issues presented were
'adequate to deserve encouragement to proceed further.'"  Slack
v. McDaniel, 529 U.S. 473, 483-84, 120 S.Ct. 1595, 146 L.Ed.2d
542 (2000), quoting Barefoot v. Estelle, 463 U.S. 880, 893 & n.4,
103 S.Ct. 3383, 77 L.Ed.2d 1090 (1983).  See also, Miller-El v.
Cockrell, 537 U.S. 322, 123 S.Ct. 1029, 154 L.Ed.2d 944 (2003).

In addition, if a certificate of appealability is granted,
this Court must specify which issue or issues satisfy the above
standard.  §2253(c)(3).  See also Rose v. Lee, 252 F.3d 676 (4th
Cir.), cert. denied, 534 U.S. 941, 122 S.Ct. 318, 151 L.Ed.2d 237
(2001); Yeatts v. Angelone, 166 F.3d 255, 266 (4th Cir.), cert.
denied, 526 U.S. 1095, 119 S.Ct. 1517, 143 L.Ed.2d 668 (1999);
Murphy v. Netherland, 116 F.3d 97, 101 (4th Cir.), cert. denied,
521 U.S. 1144, 118 S.Ct. 26, 119 L.Ed.2d 1474 (1997).  Here, for
the reasons set forth in this Court's final order, Respondent
believes Petitioner has made no "substantial showing of the
denial of a constitutional right."  Therefore, Petitioner's
request for a certificate of appealability should be denied.

In addition, Petitioner raised the substance of his current
federal habeas contentions in his first federal habeas petition
and/or during the October 17, 2000 federal evidentiary hearing.
This Court denied Petitioner's ineffective assistance of counsel
claim in this first federal habeas petition on grounds of
procedural bar and dismissed the claim of "newly discovered
evidence" of actual innocence, i.e., Dearl Powell's testimony, on
grounds of non-exhaustion.  Sharpe v. Bell, No. 5:99-HC-856-BO
(E.D.N.C. March 15, 2001) (unpublished).  Then, after completing
another round of state post-conviction review, Petitioner filed a
second or successive petition raising substantially the same
claims.  Petitioner is not entitled to file this second or

-2-

successive federal habeas petition under 28 U.S.C. § 2244(b)(1),
which reads as follows;

> A claim presented in a second or successive habeas corpus
> application under section 2254 that was presented in a
> prior application shall be dismissed.

Furthermore, this Court's denial of Petitioner's ineffective
assistance of counsel claim on grounds of procedural bar
constitutes a denial on the merits for purposes of
successiveness. See Harvey v. Horan, 278 F.3d 370, 379-80 (4th
Cir. 2002) (dismissal of federal habeas petition for procedural
default is a "dismissal on the merits" for purposes of
determining whether subsequent habeas petition is successive).
Also, the fact that some of his assertions raised in his first
federal habeas application and reasserted in his second, were not
exhausted at the time of his first application is of no
consequence.  In other words, non-exhaustion of certain specific
claims at the time of a first federal habeas petition does not
prevent those claims from being dismissed on successiveness
grounds when later raised in a second federal habeas petition.
See Benchoff v. Colleran, 404 F.3d 812, 820 (3rd Cir. 2005) and
Crone v. Cockrell, 324 F.3d 833, 837 (5th Cir.), cert. denied,
540 U.S. 910, 124 S.Ct. 287, 157 L.Ed.2d 200 (2003).  In
addition, this is not a case in which Petitioner's first federal
habeas petition was dismissed in its **entirety** on grounds of non-
exhaustion.  See Slack v. McDaniel, 529 U.S. 473, 120 S.Ct. 1595,

-3-

146 L.Ed.2d 542 (where first federal habeas petition was dismissed in its entirety on grounds non-exhaustion without an adjudication on the merits, second federal habeas petition was not second or successive).

In sum, for the above reasons Petitioner's motion for issuance of a certificate of appealability should be denied.

Respectfully submitted, this 2nd day of May, 2006.

                                ROY COOPER
                                ATTORNEY GENERAL

                                /s/ Clarence DelForge
                                Clarence J. DelForge, III
                                Assistant Attorney General

                                9001 Mail Service Center
                                Raleigh, N.C. 27699-9001
                                cdelforg@ncdoj.com
                                (919) 716-6571
                                State Bar No. 12925

-4-

## CERTIFICATE OF SERVICE

I hereby certify that on May 2, 2006, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification to the following: N/A, and I hereby certify that I have mailed the document to the following non CM/ECF participants:

> Mr. Gregory Duke, Attorney at Law
> P.O. Box 855
> Greenville, N.C. 27835-855

Respectfully submitted,

ROY COOPER
ATTORNEY GENERAL

/s/ Clarence DelForge
Clarence J. DelForge, III
Assistant Attorney General

9001 Mail Service Center
Raleigh, N.C. 27699-9001

cdelforg@ncdoj.com
(919) 716-6571
State Bar No. 12925

-5-

Sharpe 001432

J.A. 2544

Don Hicks

↓

Re: Kizzey Paige

① Med Records — Charlene Johnson
② Statements by codefendants

This same
discovery
put in all
atty's boxes
5/24/94

**EXHIBIT**

76

PITT COUNTY MEMORIAL HOSPITAL, INC. / P.O. BOX 6028 / GREENVILLE, NC 27834

# TRIAGE

152-0650 

| SUGGESTED RX AREA | CATEGORY 1 (2) 3 4  F.T. |
|---|---|
| EX | |

DATE 4-7-94
TRIAGE TIME 1955

| ALLERGIES NKDA | LAST TETANUS |
|---|---|
| MEDICATIONS None | TRIAGE TREATMENT call when in room |

| PATIENT'S M.D./HMO ECU Peds |
|---|
| RESIDENT/MD TO SEE PT. Hendrick |
| REFERRED/REQUESTED MD |
| PATIENT'S SIGNATURE |

| PATIENT'S NAME Charlene Johnson | AGE 14 | SEX F | WEIGHT |
|---|---|---|---|

CHIEF COMPLAINT/EVALUATION: Presents amb. stating she was beaten c hands by several girls. Sustained ½ lac. to left lower lip. Minimal bleeding at this time. Has hematoma over rt. ear and patch of hair pulled out. Also heat on rt. hip.

| VITAL SIGNS | |
|---|---|
| T | 98.9 |
| P | 120 |
| R | 20 |
| BP | 110/80 |

## NON-ED DISPOSITION

Based on a discussion with _____ (physician or his agent) at _____ (time), the physician has determined that the patient is in stable condition or in a non-emergent condition and the physician has agreed that the patient be seen by the physician at _____ (place).

_____
Signature - Responsible Party

| TRIAGE NURSE'S SIGNATURE Christine DeFelice RN |
|---|

Mother Delisa Bandy gave phone permission for treatment.
Christine DeFelice RN

069/2260

2260-ED/Rev. 10-92/TRIAGE NURSING RECORD

04-07-94 3691522 EDA
ET JOHNSON, CHARLENE
COUCH JOHN EDWARD  MD
EOR 03-23-1976
TAVA

5

Sharpe 014456



PITT COUNTY MEMORIAL HOSPITAL • GREENVILLE, N.C. 27834

ED/OP REPORT

TRIAGE CAT. 2   DISCHARGE CAT. 4

PATIENT NAME & ADDRESS
JOHNSON   CHARLENE
826 FLEMING ST
GREENVILLE   NC  27834

RESPONSIBLE PARTY NAME & ADDRESS
BANDY   DEBORAH
826 FLEMING ST
GREENVILLE   NC  27834
SSN: 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
PHONE: 919-111-1111

NOTIFY IN CASE OF EMERGENCY
BANDY   DEBORAH
826 FLEMING ST   GREENVILLE
919-111-1111

FATHER: CHARLES
MOTHER: DEBORAH

NAME OF INSURANCE COMPANY
MCD   MEDICAID OP

CALL OR TYPE OF INJURY
CAR   BEATEN

PHYSICIAN
GOUGH, JOHN EDWARD   8859

**HPI:**
Charlene is a 14 yo BF who was released from adolescent psych unit 3-94 to her Gram in Winterville (adm dt behavior). Was taken to her house in Greenville today by a detective. This afternoon a girl came by her house & talked to her. Later 3 other people came by and they told them Charlene was not home. At that time they told that they were planning to assault __. Three people came back by & mom told them to please leave them alone. Mom then went to work down the street. Charlene sent her dad down the block to call her mom so she could go say hi to her. In the meantime, 8-9 drove up and broke into Charlene's mom's house. They held Charlene at gun pt & then dragged her out her house and physically beat her w/ their fists. All happened @ 1730 hr. lot 15 min. A friend driving by witnessed assault and pulled the girls off who drove away. Charlene ran into the house & locked the door. Friend came in & gave her a cold compress & brought her to ED by contact man. Another neighbor witnessed assault & went to notify police...

...Charlene states she knows most of the girls age 17-19 who assaulted her.

(right column orders, partially legible:)
Heplock IV
2mg Versed
pulse ox
Td
800 mg Motrin now
500 mg Keflex now
May dc to travel ortho
DC, SS & police
X-ray CXR, Pelvic, @Hip

DISCHARGE CONDITION: Improved

RESIDENT'S SIGNATURE: N. Hendrix, MS
ATTENDING: Stephen Dahlem

J.A. 2547

NORTH CAROLINA                    IN THE GENERAL COURT OF JUSTICE
                                  SUPERIOR COURT DIVISION
PITT COUNTY                       FILE NO.: 94-CRS-7997

STATE OF NORTH CAROLINA

vs.                               RITCHIE MOTION

CANDICE JOHNSON

    NOW COMES the Defendant, through her undersigned counsel,
and moves the court pursuant to Pennsylvania v. Ritchie, 94 L.Ed.
2d 40 (1987) as follows:

    1.   To obtain by subpoena duces tecum the medical and
psychiatric records of Charlene Johnson.

    2.   To review all such records in camera.

    3.   To reveal all information contained in the records
material and relevant to a hearing on the trustworthiness and
credibility attributable to those statements and potential
testimony of Charlene Johnson.

    This the ___ day of May, 1994.

                                  _____
                                  W. Gregory Duke
                                  Attorney for Defendant
                                  200 E. Fourth Street
                                  PO Box 859
                                  Greenville, NC  27835-0859
                                  (919) 758-1403

EXHIBIT
77

**MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.**
**David Ricky Best on 04/28/2023**

```
 1                    IN THE UNITED STATES DISTRICT COURT
              FOR THE EASTERN DISTRICT OF NORTH CAROLINA
 2                           EASTERN DIVISION
                       Civil No.:  4:21-CV-000185-BO
 3

 4   MONTOYAE DONTAE SHARPE,                    :
                              Plaintiff         :
 5                                              :
     v.                                         :
 6                                              :
     DAVID RICKY BEST, JEFFREY D. SHROCK,       :
 7   CAROLYN MELVIN and the CITY OF             :
     GREENVILLE, NORTH CAROLINA,                :
 8                             Defendants        :
                                                :
 9   _____:
                                                :
10   MONTOYAE DONTAE SHARPE,                    :
                              Plaintiff         :
11                                              :
     v.                                         :
12                                              :
     CAROLYN MELVIN,                            :
13                             Defendant         :
                                                :
14   _____:

15

16        Deposition of DAVID RICKY BEST, taken pursuant to notice,

17   before Cherryl J. Maddox, a Notary Public, at the Greenville

18   City Hall, 200 West 5th Street, Greenville, North

19   Carolina, on April 28, 2023, at 9:39 a.m.

20

21                       Reported by:  Cherryl J. Maddox

22

23

24

25
```

**J.A. 2549**

**MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.**
**Carolyn Melvin on 04/02/2024**

```
 1            IN THE UNITED STATES DISTRICT COURT
        FOR THE EASTERN DISTRICT OF NORTH CAROLINA
 2                    EASTERN DIVISION
              Civil No.:  4:21-CV-000185-BO
 3

 4  MONTOYAE DONTAE SHARPE,               :
                      Plaintiff          :
 5                                        :
    v.                                    :
 6                                        :
    DAVID RICKY BEST, JEFFREY D. SHROCK,  :
 7  CAROLYN MELVIN and the CITY OF        :
    GREENVILLE, NORTH CAROLINA,           :
 8                      Defendants        :
                                          :
 9  _____:
                                          :
10  MONTOYAE DONTAE SHARPE,               :
                      Plaintiff          :
11                                        :
    v.                                    :
12                                        :
    CAROLYN MELVIN,                       :
13                      Defendant         :
                                          :
14  _____:

15

16      Deposition of CAROLYN MELVIN, taken pursuant to notice,

17  before Cherryl J. Maddox, a Notary Public, at the Hilton

18  Greenville, 207 SW Greenville Boulevard, Greenville, North

19  Carolina, on April 2, 2024, at 9:06 a.m.

20

21                      Reported by:  Cherryl J. Maddox

22

23

24

25
```

**MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.**
Jeffery D. Shrock on 05/09/2023

```
 1              In the United States District Court
         for the Eastern District of North Carolina
 2                     Eastern Division
               Civil No.: 4:21-CV-000185-BO
 3
     Montoyae Dontae Sharpe,                        )
 4
                 Plaintiff,                         )
 5
         v.                                         )
 6
     David Ricky Best, Jeffrey D. Shrock, Carolyn)
 7
     Melvin and the City of Greenville, North     )
 8
     Carolina,                                      )
 9
                 Defendants.                        )
10   _____
     Montoyae Dontae Sharpe,                        )
11
                 Plaintiff,                         )
12
         v.                                         )
13
     Carolyn Melvin,                                )
14
                 Defendant.                         )
15

16

17    VIDEOTAPED VIDEOCONFERENCE DEPOSITION OF

18             JEFFERY D. SHROCK

19                 10:27 a.m.

20

21

22

23   Raleigh, North Carolina

24   Tuesday, May 9, 2023

25   Reported By:  Marta J. Charles
```

**J.A. 2551**

# Expert Opinion Report

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA

Civil No. 4:21-CV-000185

MONTOYAE DONTAE SHARPE, Plaintiff,

*vs.*

DAVID RICKY BEST, JEFFREY D. SHROCK, CAROLYN MELVIN and
the CITY OF GREENVILLE, NORTH CAROLINA, Defendants.

| Prepared By | Date Completed |
| --- | --- |
| Jon B. Blum | June 19, 2024 |

| Civil No. 4:21-CV-000185 | Expert Opinion Report |
|---|---|

## I. Case Materials

All case materials were provided by defense counsel before June 19, 2024. My opinions herein were reached after reviewing all items in the table below and applying my 33 years of combined experience as a sworn municipal police officer, academy instructor, and author of government-mandated law enforcement training curriculums throughout the United States. My resume and case vitae are attached to this report. Should additional information relevant to my opinion be discovered later, I respectfully request an opportunity to review same and amend this report if needed.

| # | Case Materials |
|---|---|
| 1 | Complaint |
| 2 | Personnel Files: Jeffrey D. Shrock |
| 3 | Personnel Files: David R. Best |
| 4 | Personnel Files: Carolyn Melvin |
| 5 | Basic Law Enforcement Training (BLET) Archives |
| 6 | *State v. Sharp* Trial Transcript (Pitt County; 1995) |
| 7 | Greenville Police Department Policies (1994 & 1999) |
| 8 | Greenville Police Department CALEA certification (1995) |
| 9 | Deposition: Charles E. Hinman + Exhibits |
| 10 | Deposition: William Bonner + Exhibits |
| 11 | Deposition: David R. Best + Exhibits |
| 12 | Deposition: Jeffery D. Shrock + Exhibits |
| 13 | Affidavits: Cecil Hardy, Susan Bass, Tommy Forrest |

## II. Opinions

### A. Training provided to defendants exceeded minimum standards mandated by the State of North Carolina.

1. To be certified as a sworn law enforcement officer in North Carolina, one must successfully complete the state-mandated Basic Law Enforcement Training (BLET) course. Since the 1970's, BLET has been the State's sole entry-level training course that consists of classroom instruction, practical application, written testing, and physical skills testing. BLET is an evidence-based curriculum that is supported by job task analyses and developed using recognized best practices for adult learners. The BLET curriculum remains in a constant state of revision. Updates occur

| Civil No. 4:21-CV-000185 | Expert Opinion Report |
| --- | --- |

annually according to changes in the law, industry standards, and research.

Defendants successfully completed BLET, which was hundreds of hours long and included dozens of topics such as *Elements of Criminal Law*, *Criminal Investigations*, *Arrest, Search and Seizure, Dealing with Victims and the Public, Juvenile Laws and Procedures,* and *Field Notetaking and Report Writing*.[1]

2.  Until 2005, and with the exception of annual firearms qualification, BLET was the only training mandated by the State of North Carolina for law enforcement officers.[2] However, the Greenville Police Department (GPD) has consistently provided career development and advanced-level training to its officers throughout the employment lifecycle since the 1980's.

    a)  In 1983, David Best earned his Intermediate Law Enforcement Certificate[3] for successfully completing more than 600 hours of training and having served at least eight years as a full-time law enforcement officer.

    b)  The following is a list of multi-day advanced-level training courses completed by David Best before 1994 and the plaintiff's investigation:[4]

        (1)  Legal Issues in Interrogations

        (2)  Arrest, Search Warrants, and Seizures

        (3)  Criminal Investigations

        (4)  Advanced Criminal Investigations

        (5)  Raid Planning & Procedures

        (6)  Death Investigations

        (7)  Officer Survival

---

[1] Personnel Files: David R. Best, Jeffrey D. Shrock and Carolyn Melvin; BLET Archives
[2] 12 NCAC 9E .0105 and .0106
[3] Personnel Files: David R. Best
[4] Personnel Files: David R. Best

| Civil No. 4:21-CV-000185 | Expert Opinion Report |
| --- | --- |

     (8)     Police-Community Relations

c)     The following is a list of multi-day advanced-level training courses completed by Carolyn Melvin <u>before</u> 1994 and the plaintiff's investigation:[5]

     (1)     Crime Scene Processing

     (2)     Processing Arrests

     (3)     Basic Narcotics Investigation

     (4)     Criminal Investigations

     (5)     Rape Investigations

ci)     Training provided to defendants was in compliance with agency policy in 1994.

"Advanced training may be provided through such institutions as the Southern Police institute, the FBI National Academy, North Carolina State University Administrative Officers Program, the North Carolina Justice Academy and other available programs. Such training is designed to improve the professional competence of police officers who have demonstrated leadership abilities."[6]

"Well-trained officers with experience in multiple areas of law enforcement are better prepared to act decisively and correctly in a broad range of situations. This department desires to provide opportunities for development at all levels of an individual's career. The responsibilities entailed in specialized functions within the Department exceed the scope of basic police duties. Certain positions within the Department requires skills in addition to the knowledge, skills and abilities gained in basic or other in-service training."[7]

---

[5] Personnel Files: Carolyn Melvin
[6] GPD policy 33.5.1. Advanced Training
[7] GPD policy 33.6.1. Specialized In-Service Training

| Civil No. 4:21-CV-000185 | Expert Opinion Report |
|---|---|

**B.    Greenville Police Department policies were accredited by CALEA and considered best-in-class standards for the law enforcement industry.**

The Commission on Accreditation for Law Enforcement Agencies (CALEA) is a credentialing authority through joint efforts of major law enforcement executive associations including the International Association of Chiefs of Police (IACP) and National Organization of Black Law Enforcement Executives (NOBLE).

"CALEA exists to improve the delivery of public safety services by maintaining a credible and best-in-class body of standards, developed by a highly regarded group of public safety practitioners; establishing and administering an accreditation process; and recognizing professional excellence through a highly coveted, comprehensive awards program."[8]

1.    The Greenville Police Department (GPD) was at the forefront of the accreditation movement back in the early 1990s, nearly 25 years before the President's Task Force on 21st Century Policing recommendation to "provide technical assistance and funding to national, state, local, and tribal accreditation bodies that evaluate policing practices."[9]

2.    The GPD earned its initial CALEA accreditation on November 18, 1995, and was one of the first agencies in North Carolina to do so.[10]  Earning accreditation is a tedious process that requires an unwavering commitment by an entire law enforcement agency and its personnel. There are only 838 accredited agencies in the United States out of approximately 18,000 and less than one percent (<1%) of agencies in the United States hold some form of accreditation.[11]

3.    Earning CALEA accreditation required the GPD to develop specific policies to meet hundreds of standards <u>and</u> show documented proofs of compliance with those standards. It is important to note that the GPD began its accreditation process in 1993 which meant the agency needed to implement CALEA standards and begin

---

[8] The CALEA Difference: The Gold Standard in Public Safety Accreditation. Police1. Lexipol Media Group. July 5, 2011. https://www.police1.com/police-products/police-technology/police-software/police-accreditation-management/press-releases/the-calea-difference-the-gold-standard-in-public-safety-accreditation-fFbgTUUX76dIE0xU/
[9] President's Task Force on 21st Century Policing. The Final Report. May 2015. https://cops.usdoj.gov/pdf/taskforce/taskforce_finalreport.pdf
[10] https://www.calea.org/calea-client-database
[11] Accreditation and Standards. Hearing Thirteen. President's Commission on Law Enforcement and the Administration of Justice. June 30, 2020. U.S. Department of Justice. https://www.justice.gov/ag/page/file/1319441/dl?inline

Civil No. 4:21-CV-000185 | Expert Opinion Report

demonstrating proofs of compliance with all policy standards for the next two years and well before November 18, 1995.

4. All policies were written in compliance for CALEA standards on or before 1994.[12] For GPD to earn initial accreditation in 1995, it had to demonstrate proofs of compliance with CALEA standards during 1994.

5. Earning CALEA accreditation is not a one-time event. To maintain accreditation, agencies must show continuous compliance with standards. The GPD's commitment to maintaining policies and practices that adhere to CALEA standards is demonstrated by its earning reaccreditation seven times over the last two-plus decades.

   a)   November 18, 2000

   b)   November 18, 2003

   c)   November 18, 2006

   d)   November 18, 2009

   e)   November 18, 2015

   f)   November 18, 2019

   g)   November 18, 2023

**C.   It was a common practice and reasonable for Officer Shrock to verbally share information with Detective Best about the Sharpe investigation.**

Officer Shrock's decision to relay information shared by a potential witness in the Sharpe case to Detective Best verbally was neither unusual nor inconsistent with 1994 protocols. Although the GPD was larger than the average-size law enforcement agency, the concentrated number of detectives assigned to the investigative division were well known by uniform patrol officers. Relaying case information verbally allows officers and investigators to have more robust exchanges (e.g., asking real-time questions) that are otherwise not possible when done in writing.

---

[12] Affidavits: Cecil Hardy, Susan Bass, Tommy Forrest

| Civil No. 4:21-CV-000185 | Expert Opinion Report |

### III. Authorship

I, Jon B. Blum, a resident of Willow Spring, North Carolina, spent a total of 32.75 hours reviewing case materials listed in **Section I** and authoring this report at a rate of $175.00 per hour.

Signature: _____

Date Completed: June 19, 2024

# JON B. BLUM

Willow Spring, North Carolina | Jon.blum@embarqmail.com | 919.524.2191

## AREAS OF EXPERTISE

Personnel Management | Project Management | Training | Research & Data Analysis

Law enforcement veteran with nationally recognized expertise in policing best practices. Leader with proven organization, stakeholder collaboration, written communication, and public speaking skills.

### EXPERIENCE

| SELF-EMPLOYED | Willow Spring, N.C. | 2007-present |

Contract with individual law enforcement agencies, states, the IACP, U.S. COPS Office, BJA, and international bodies to collect data, conduct audits, and develop evidence-based solutions to ensure clients are in compliance with legislative mandates, community needs, and 21st Century Policing best practices. Collaborate with stakeholders, supervise teams of up to 10 members, and manage large-scale projects with 6-8 figure budgets.

*Representative projects within the last 10 years:*

- **Colorado POST:** Develop a state-mandated, 16-hour curriculum for Ethical Decision Making Under Stress (EDMUS)
- **USDOJ COPS Office Academy Innovations:** Lead researcher tasked with evaluating how de-escalation skills can be reinforced during a basic academy environment and throughout the employment lifecycle to improve on-the-job performance.
- **New Jersey State Police:** Conducted a comprehensive audit of the agency's basic and in-service training programs to ensure compliance with State Attorney General mandates.
- **North Carolina's Basic Law Enforcement Training (BLET) course:** Lead curriculum developer for the complete revision of BLET.
- **Charlotte-Mecklenburg Police Department training needs analysis:** Conducted job task and training needs analysis for the department's basic academy recruits with a specific focus on new hires with no prior experience vs. lateral transfers
- **Washington's 720-hour Basic Law Enforcement Academy (BLEA) training course:** Conducted a gap analysis and completely revised the state-mandated BLEA training certification course.
- **Baton Rouge, Louisiana Police Department, BJA NTTAC technical assistance initiative:** Implemented strategies to generate a needed shift in BRPD culture by fusing concepts of procedural justice and community engagement throughout the agency's basic academy curriculum.
- **Newark, New Jersey Division of Police, BJA NTTAC technical assistance initiative:** Developed a new use of force policy training course with a corresponding train-the-trainer curriculum per US DOJ consent decree mandate.
- **Massachusetts' 720-hour Recruit Officer Course (ROC):** Overhauled ROC. Project deliverables included state-wide job task analysis, piloting, and technical support for state-wide rollout.
- **Pennsylvania's (MPOETC) basic law enforcement curriculum:** Developed all end-of-topic tests and final certification exam.

*Trial consultant and expert witness:*
Retained by defense and plaintiff teams in 50+ cases that include 42 U.S. Code § 1983 Civil actions for deprivation of rights. Report contents have been cited by 4th Circuit justices to establish case law standards for emergency response driving and use of force. See addendum for case listing.

## CRI-TAC | Washington, DC
**2018-present**

The Collaborative Reform Initiative Technical Assistance Center (CRI-TAC) is a partnership between the USDOJ COPS Office and nine other leading law enforcement agencies (e.g., IACP, FBINAA, IADLEST) to provide customized training and technical assistance to state, local, tribal, territorial, and campus agencies throughout the United States.

*Lead curriculum developer and trainer for instructors who deliver the following courses nationwide:*
- Peer Intervention/Active Bystandership
- Hate Crimes: Recognition and Reporting
- Hate Crimes: Preliminary Investigations
- Human Trafficking: Preliminary Investigations

## GARNER POLICE DEPARTMENT | Garner, NC
**2003-2007**

*Internationally accredited agency with 75+ full-time employees protecting and serving 30K residents.*

**Personnel Manager/PIO**

Managed all agency recruitment, professional development, training, promotion, and related compliance record systems. Implemented comprehensive short- and long-term strategies that enhanced community relations, managed department's overall image, and created agency brand. Authored and distributed press releases in a Top 20 market. Granted print, previously recorded, and live television interview requests from media.

- Overhauled job applicant selection process with quantifiable cognitive and physical skill tests.
- Created social media and electronic platforms for cohesive messaging, timeliness, and efficiency.
- Implemented an online learning platform to deliver state- and agency-mandated training courses.

## NORTH CAROLINA JUSTICE ACADEMY | Salemburg, NC
**2000-2003**

*Internationally accredited agency that oversees certification curricula and trains ~24K criminal justice personnel annually.*

**BLET Coordinator**

Oversaw research, development, and implementation of state-mandated 17-week Basic Law Enforcement Training (BLET or POST) certification curriculum. This involved collaborating with 300+ stakeholders and practitioners for 37 individual lessons; developing practical skill exercise scripts and testing instruments; providing technical assistance to 50+ training academies throughout North Carolina; chairing BLET Advisory Group; reporting research findings; and advising NC Criminal Justice Education & Training Commission.

- Implemented state-wide electronic distribution systems for BLET training materials.
- Delivered Academy's first distance learning course.
- Received NC Attorney General's Award for BLET leadership.

## TOWN OF CHAPEL HILL, NORTH CAROLINA | Chapel Hill, NC
**2000-2003**

*Internationally accredited agency with 80+ full-time employees protecting and serving 60K residents.*

**Reserve Police Officer (Volunteer)**

Fulfilled all duties customary to working patrol and specialized events. Required to work 8 hours per month.

## WINSTON-SALEM POLICE DEPARTMENT | Winston-Salem, NC
**1991-2000**

*Internationally accredited agency with 700+ full-time employees protecting and serving 200K+ residents.*

**Corporal/Police Officer**

Served as first-line supervisor for 10 patrol division officers. Enforced criminal laws, investigated violations, and arrested offenders. Conducted interviews, completed official reports, and testified in state and federal courts. Additional roles and assignments: SWAT, Planning & Research Unit, Field Training Officer, Academy Instructor, and Accreditation Coordinator.

- Earned numerous awards including Recruit Class XXIX Aaron Tise Award, DWI Enforcement Award, and Citizen Satisfaction Award. Additionally, Earned MPA degree while working full-time.
- Promoted to corporal within four years.

## EDUCATION & PROFESSIONAL DEVELOPMENT

*Degrees*
**Master of Public Administration**, University of North Carolina at Greensboro, 1998
**Bachelor of Science, Criminal Justice**, University of North Carolina at Charlotte, 1991

*Continuing Education*
**Fellow & Graduate**, NC Institute of Political Leadership, 2013
**IRB Human Subjects Research: Behavioral Education Focus**, CITI Program, 2021 (#43031711)

*Certifications & Training*
**National Certified Instructor**, International Association of Directors of Law Enforcement Standards and Training
**Basic Law Enforcement Training (BLET)**, North Carolina Department of Justice
**Advanced Law Enforcement Certificate**, North Carolina Department of Justice
**General Instructor (BLET)**, North Carolina Department of Justice
**Specialized Subject Control Instructor**, North Carolina Department of Justice
**Specialized Physical Fitness Instructor**, North Carolina Department of Justice

## PUBLICATIONS

300K+ publications sold to law enforcement throughout the United States and Canada.

*Handguns: Ownership & Safety*, Quick Series Publications, ISBN# 0-9786592-1-X
*Domestic Violence Investigations*, Quick Series Publications, ISBN# 1-932990-16-4
*Documenting the Use of Force: Corrections*, Quick Series Publications, ISBN# 1-932990-60-7
*Documenting the Use of Force: Police*, Quick Series Publications, ISBN# 1-932990-15-7

## MEMBERSHIPS

International Association of Directors of Law Enforcement Standards and Training (IADLEST)
International Law Enforcement Educators & Trainers (ILEETA)

JON B. BLUM | Ⓒ| 919.524.2181

J.A. 2561

## RULE 26(2)(B)(V) CASE LIST

| Case | # | Issues | Notes |
|------|---|--------|-------|
| Hyatt and Barrett v. Buncombe County Sheriff | 1:19-CV-00250 | Arrest, Search and Seizure | R; D |
| Aleman v. City of Charlotte | 3:19-CV-491 | Use of Deadly Force; Training | R; D |
| Pinkins v. City of Racine, WI | 19-CV-368 | Use of Force; Training | R; D; T |

Notes column: **R=R**eport/Affidavit submitted; **D=D**eposition taken; **T=T**rial testimony

# Department of Justice

OF THE STATE OF  NORTH CAROLINA

## Criminal Justice Education and Training Standards Commission

In recognition of meritorious progress in pursuing the training and educational objectives commensurate with the role of a professional criminal justice officer and of dedicated service to the people of North Carolina, the Criminal Justice Education and Training Standards Commission, by virtue of the power vested in it by the laws of the State, hereby awards to

DAVID RICKY BEST

this

# General
## Intermediate Law Enforcement Certificate



Signed this 27th day of May, 1983

Wade Barber, Jr.
Commission Chairman

Justus C. Rudisill Jr.
Director, Criminal Justice Standards Division

**MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.**
**Charles E. Hinman on 10/16/2023**

```
 1              IN THE UNITED STATES DISTRICT COURT
         FOR THE EASTERN DISTRICT OF NORTH CAROLINA
 2                    EASTERN DIVISION
                    4:21-CV-000185-BO
 3    _____

      MONTOYAE DONTAE SHARPE,            :
 4                                       :
              Plaintiff,                 :
 5                                       :
           vs.                           :
 6                                       :
      DAVID RICKY BEST, JEFFREY D.       :
 7    SHROCK, and THE CITY OF            :
      GREENVILLE, NORTH CAROLINA,        :
 8                                       :
              Defendants,                :
 9    _____

      MONTOYAE DONTAE SHARPE,            :
10                                       :
              Plaintiff,                 :
11                                       :
           vs.                           :
12                                       :
      CAROLYN MELVIN,                    :
13                                       :
              Defendant.                 :
14

15    _____

         VIDEOTAPED DEPOSITION OF CHARLES E. HINMAN
16    _____

17    DATE TAKEN:       Monday, October 16, 2023

18    TIME BEGAN:       11:01 a.m.

19    TIME ENDED:       12:15 p.m.

20    LOCATION:         Landfall Executive Suites
                        1213 Culbreth Drive
21                      Wilmington, North Carolina

22

23    REPORTED BY:      Cherie J. Anderson, RMR, RPR, CRR
                        Huseby
24                      1230 West Morehead Street, Suite 408
                        Charlotte, North Carolina  28208
25                      800-333-2082
```

STATE OF NORTH CAROLINA

COUNTY OF UNITED STATES
DISTRICT COURT

MONTOYAE DONTAE SHARPE,

      Plaintiff,

v.

R.L. "RICKY" BEST, JEFFREY D.
SHROCK, CAROLYN MELVIN, AND
THE CITY OF GREENVILLE, NORTH
CAROLINA

      Defendants.

IN THE GENERAL COURT OF JUSTICE
EASTERN DISTRICT OF NORTH
CAROLINA
4:21-CV-00185-BO

**<u>AFFIDAVIT OF CECIL HARDY</u>**

The undersigned, being first duly sworn, deposes and states under oath as follows:

1. I worked as an active duty officer with the Greenville Police Department ("GPD") from 1977 until my retirement from active duty in 2007 and was a reserve officer until 2021.

2. I attended Basic Law Enforcement Training ("BLET") at a local community college in 1977. During my time in BLET I reviewed the voluminous policy and practices manual provided to students.

3. After I formally joined the GPD, also in 1977, I undertook the GPD's field training program. Pursuant to field training I reviewed the department's written policies regarding investigations. The policies I reviewed were substantially similar to those taught during the BLET course.

4. In 1992, I was a Captain in the Greenville Police Department supervising the GPD Investigations Division which included the Major Crimes Unit. Pursuant to my role as supervisor I was familiar with the Greenville Police Department's written policies regarding investigations, impeachments evidence, exculpatory evidence, confidential informants, investigation assignments, investigation supervision, witness interviews,

and investigator training. The content of those policies was taken directly from the policies of larger North Carolina police departments.

5. Prior to 1994, I assisted in rewriting the department's policies as part of the GPD's application process for the Commission on Accreditation for Law Enforcement Agencies "CALEA".

6. The policies in place prior to November of 1994 were substantially similar to those rewritten to better conform to the CALEA framework in 1994. Specifically, I only remember changes to the formatting, headings, definitions, font, and wording of the investigative policy. I also remember all policies were rewritten to include references to specific CALEA standards. The content of investigative policy prior to 1994 was substantially similar to the policy approved by CALEA in 1995.

7. Additionally, I was the indirect supervisor of investigators Melvin and Best during the investigation into the murder of George Radcliffe.

8. On April 7, 1994, I was present in the "Brown Building" when witness Charlene Johnson was interviewed. I witnessed investigators Melvin and Best enter the interview room together with Ms. Johnson. Later, I witnessed both Melvin and Best leave the interview room together. Then, Melvin and Best told me that Ms. Johnson claimed to have seen Dontae Sharpe shoot George Radcliffe and was writing her statement. I did not see anything out of the ordinary during the interview.

9. In August of 2023, I was asked questions regarding prior GPD policy by SGT William Bonner. I responded truthfully to the best of my recollection.

This the 23ʳᵈ day of October, 2023.

Cecil Hardy

Sworn to and subscribed before me
this 23ʳᵈ day of October, 2023.

_____
            Notary Public
My Commission Expires:
_____

Olivia Lewis
Dec. 15th 2023

OLIVIA A. LEWIS
Notary Public
Lenior
County
NORTH CAROLINA

J.A. 2567

STATE OF NORTH CAROLINA

COUNTY OF UNITED STATES
DISTRICT COURT

IN THE GENERAL COURT OF JUSTICE
EASTERN DISTRICT OF NORTH
CAROLINA
4:21-CV-00185-BO

MONTOYAE DONTAE SHARPE,

      Plaintiff,

v.

R.L. "RICKY" BEST, JEFFREY D.
SHROCK, CAROLYN MELVIN, AND
THE CITY OF GREENVILLE, NORTH
CAROLINA

      Defendants.

**AFFIDAVIT OF SUSAN BASS**

The undersigned, being first duly sworn, deposes and states under oath as follows:

1. I worked as an active-duty officer with the Greenville Police Department "GPD" from 1987 to my retirement from active duty in 2016.

2. Prior to joining the Greenville Police Department, I attended Basic Law Enforcement Training at Pitt Community College in 1987.

3. During my time at BLET training I reviewed the voluminous policy and practices manual provided to me.

4. After I formally joined the Greenville Police Department, also in 1987, I undertook the Greenville Police Department's field training program. Pursuant to that training I reviewed the GPD's written policies. The 1987 GPD policies were consistent with the policies I reviewed as part of my BLET training.

5. In 1991, I was a GPD patrol officer when Chief Charles Hinman was hired. Soon after Chief Hinman's arrival the GPD began rewriting policies to conform to those required for CALEA accreditation.

6. Prior to the GPD's completing the CALEA accreditation process in 1995 I was still a GPD patrol. I remember observing Officer Joe Friday and others working in an office rewriting the GPD policy as part of the CALEA process. Those policies were finalized prior to CALEA's final onsite evaluation in September of 1995.

7. In the 2007 I began working as a CALEA assessor. In my experience as an assessor, it was common for departments to rewrite their existing policy to include changes to the formatting or wording of policies and include specific numerical references to CALEA requirements. I don't recall any department not having a written policy prior to applying for CALEA accreditation.

8. On or about August of 2023, I spoke with SGT William Bonner over the phone, and he asked me questions concerning GPD policy. I answered his questions truthfully and to the best of my ability.

This the _13th_ day of November 2023.

PHYSICALLY PRESENT

_Susan Bass_

Sworn to and subscribed before me this _13_ day of November 2023.

_____
Notary Public
My Commission Expires:
_11/17/2025_

XAVIER INTRIAGO DILLON
Notary Public
State of Florida
Comm# HH200048
Expires 11/17/2025

ubscribed and sworn before me this
_13_ day of _November 2023_
County _Orange_ State _FL_
Notary Public _Xavier Intriago_

STATE OF NORTH CAROLINA

COUNTY OF UNITED STATES DISTRICT COURT

MONTOYAE DONTAE SHARPE,

     Plaintiff,

v.

R.L. "RICKY" BEST, JEFFREY D. SHROCK, CAROLYN MELVIN, AND THE CITY OF GREENVILLE, NORTH CAROLINA

     Defendant(s).

IN THE GENERAL COURT OF JUSTICE
EASTERN DISTRICT OF NORTH
CAROLINA
4:21-CV-00185-BO

**AFFIDAVIT OF THOMAS FORREST**

The undersigned, being first duly sworn, deposes and states under oath as follows:

1. I am currently a reserve officer with the Greenville Police Department but previously worked as an active duty officer with the Greenville Police Department from 1986 to my retirement from active duty in 2012.

2. Prior to joining the Greenville Police Department I attended Basic Law Enforcement Training at Wilson Community College in Wilson North Carolina in 1986.

3. During my time at the Justice Academy I reviewed the voluminous policy and practices manual commonly referred to as the "Green Book."

4. After I formally joined the Greenville Police Department, also in 1986, I undertook the Departments field training. Pursuant to the training I reviewed the departments written policies.

5. I specifically remember reading the Greenville Police written policies regarding identifying and disclosing impeachment or exculpatory evidence, investigations, and interviews. To the best of my recollection it appeared substantially similar to the policy articulated in the "Green Book."

J.A. 2570

6. In 2023, I was approached by SGT William Bonner and asked questions related to the departments policies, customs, and practices in the early 1990's and answered his questions truthfully to the best of my recollection.

This the __16__ day of October, 2023.

Thomas Forrest

Sworn to and subscribed before me this __16__ day of October, 2023.

Notary Public

My Commission Expires:
__12/16/2027__

```
                                                    Page 1

 1            IN THE UNITED STATES DISTRICT COURT
          FOR THE EASTERN DISTRICT OF NORTH CAROLINA
 2                     EASTERN DIVISION
                   No. 4:21-CV-000185-BO
 3

      MONTOYAE DONTAE SHARPE,
 4                     Plaintiff,
 5          vs.
 6      R.L. "RICKY" BEST, JEFFREY D.
      SHROCK, AND THE CITY OF
 7      GREENVILLE, NORTH CAROLINA,
 8                     Defendants.
 9      ~~~~~~~~~~~~~~~~~~~~~~~~~~
10      MONTOYAE DONTAE SHARPE,
                       Plaintiff,
11
12          vs.
13      CAROLYN MELVIN,
14                     Defendants.
15      ~~~~~~~~~~~~~~~~~~~~~~~~~~
16
17                 VIDEO-RECORDED DEPOSITION
                            OF
18                    ROBERT R. PUSINS
19
20                    June 11, 2024
                       10:12 a.m.
21
22              Law Offices of Rudolf Widenhouse
                225 E. Worthington Avenue, Suite 200
23                Charlotte, North Carolina 28203
24         Wanda Araujo, Notary Public No. 202003100022
25      Job No. CS6741953
```

File No. **94CR 02660**

## WARRANT FOR ARREST

**THE STATE OF NORTH CAROLINA VS.**

Name, Address And Telephone No. Of Defendant

Montoyae Dontae Sharpe
1202 Farmville Blvd.,
Greenville,N.C.

| Race | Sex | Date Of Birth | Age |
|------|-----|---------------|-----|
| B | M | | 19 |

Social Security No.          Driver's License No.

Name Of Defendant's Employer

| Offense Code | Offense In Violation Of G.S. |
|--------------|------------------------------|
| | 14-17 |
| | Date Of Offense |
| | 02-11-94 |

Date Of Arrest And Check Digit No. (From Fingerprint Card)
4-7-94 M023592

Complainant (Name, Address Or Department, Phone No.)

Det. C. J. Melvin
Greenville Police Dept.
Greenville,N.C.

Witnesses (Names, Addresses, Phone Numbers)

Det. D. R. Best
Greenville Police Dept.
Greenville,N.C.

Date Issued   4-7-94

Date Of Service

AOC-CR-100
Rev. 10/91

---

## STATE OF NORTH CAROLINA

Pitt          County

In The General Court Of Justice
District Court Division

To any officer with authority and jurisdiction to execute a warrant for arrest for the offense(s) charged below:

I, the undersigned, find that there is probable cause to believe that on or about the date of offense shown and in the county named above the defendant named above unlawfully, willfully and feloniously did of malice aforethought kill and murder George Edward Radcliffe.

This act was in violation of the law referred to in this Warrant. This Warrant is issued upon information furnished under oath by the complainant listed. You are DIRECTED to arrest the defendant and bring him before a judicial official without unnecessary delay to answer the charge(s) above.

Signature

☒ Magistrate   ☐ Deputy CSC
☐ Assistant CSC   ☐ Clerk Of Superior Court

Location Of Court   Greenville

Court Date   | Court Time 7.00 ☒AM ☐PM

FILED

95 JUL 26 AM 9: 16

PITT COUNTY, C.S.C.

CC

FILE NO. 94 CRS 07880

FILM NO. _____

NORTH CAROLINA

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION

PITT COUNTY

| | |
|---|---|
| STATE OF NORTH CAROLINA | ) |
| | ) |
| VS. | )    **MOTION** |
| | ) |
| MONTOYAE DONTAE SHARPE | ) |

THE DEFENDANT, by and through his attorney, comes into Court, and shows unto the Court the following facts:

1.    In the trial of the above named Defendant, the first witness the State of North Carolina offered on or about the 25th day of July, 1995, was one Charlene Johnson;

2.    The Defendant verily believes at the end of the cross-examination of Charlene Johnson, that Charlene Johnson testified under oath she had been told either by the District Attorney's office or the Greenville Police Department (she could not remember which) not to speak with anyone else about her involvement in the above entitled case;

3.    The Assistant District Attorney, Clarke Everette, stated in open Court, and on the record, that the State was not going to furnish the Defendant with the names of their witnesses because they were afraid for their witness's safety;

4.    The Defendant made a motion in May of 1995 for the State to produce a list of their witnesses prior to trial, said motion being denied;

5.    Johnny Rose, Private Investigator hired by the defense and approved by the Court, made diligent efforts to locate the person now known as Charlene Johnson, but was totally unable to do so;

6.    The Defendant verily believes there has been an intentional effort by the State of North Carolina not only to not disclose the name of their witness, but also to insure that the witness, even if discovered, would not make any statements whatsoever, by intentionally telling that witness not to speak to anyone else outside the Greenville Police Department or the District Attorney's office about the facts of this case;

7.    The Defendant verily believes because of the facts and circumstances surrounding the testimony of Charlene Johnson, the State of North Carolina placed the Defendant in a position where he could not prepare for trial, could not interview

**Page Two - Motion**

this witness, and was intentionally placed in such a position he could never have discovered the witness nor talked to her prior to trial, even though he may diligent efforts to do so;

        8.    The Defendant verily believes this Court should hold a hearing in this matter and at the close of the hearing enter its appropriate order striking the testimony of Charlene Johnson from the evidence, and instruct the Jury to totally disregard that witness's testimony;

        WHEREFORE,  the Defendant prays the Court that:

        1.    He have a hearing into the matters and things raised in this motion, and that after such hearing the Court strike in its entirety the testimony of Charlene Johnson, and instruct the Jury to totally disregard her testimony and wipe it from their minds;

        2.    He have such other and further relief as to the Court may seem just and proper from time to time.

        This the 26th day of July, 1995.

                R. CHERRY STOKES
                Attorney for the Defendant
                P. O. Box 1712
                Greenville, N. C.  27835
                (919) 758-2200

Page 1

1

IN THE UNITED STATES DISTRICT COURT

2     FOR THE EASTERN DISTRICT OF NORTH CAROLINA
      EASTERN DIVISION          No. 4:21-CV-000185-BO

3

4

      Montoyae Dontae Sharpe,

5

              Plaintiff,

6

          vs.

7

      "RL" Ricky Best, Jeffrey D.

8     Shrock, and the City of
      Greenville, North Carolina,

9

              Defendants.

10    ------------------------------
11    Montoyae Dontae Sharpe,
12            Plaintiff,
13        vs.
14    Carolyn Melvin,
15            Defendant.
16
17
18

       VIDEOTAPED DEPOSITION OF CHARLENE JOHNSON FRAZIER

19

                  (Taken by Defendants)

20

                  Greenville, North Carolina

21

                  Tuesday, September 12, 2023

22

23

24

      Job No. CS6093742

25    Reported by Andrea L. Kingsley, RPR

# REGIONAL ORGANIZED CRIME INFORMATION CENTER

## *"Solving Cases Through Communication"*

# Certificate of Attendance and Training

### This Certifies That

## Ricky Best

## Greenville Police Department, NC

### Attended and completed all Law Enforcement Training
### (24 Hours Total)

### Presented at the ROCIC Training Seminar

## "ROCIC Summer 2003 Training Conference, Preparing For Tomorrow"

### June 1 - 4, 2003, in North Charleston, SC

*James A. Rogers*

Director, ROCIC

## Serving Since 1973 • Member, Regional Information Sharing Systems (RISS)

# REGIONAL ORGANIZED CRIME INFORMATION CENTER

### *"Solving Cases Through Communication"*

# Certificate of Attendance and Training

### This Certifies That

## David Best

### Greenville Police Department, NC

### Attended and completed all Law Enforcement Training
### (3 Hours Total)

### Presented at the ROCIC Training Seminar

## "Law Enforcement Officers Flying Armed"
**(In accordance with TSA Regulations, 49 CFR 1544, February 17, 2002)**

### June 2, 2003, in North Charleston, SC

*James A. Rogers*

Director, ROCIC

## Serving Since 1973 • Member, Regional Information Sharing Systems (RISS)

**J.A. 2578**

X

# Pitt Community College

## Economic & Community Development Division
## Greenville, North Carolina

*This certifies that*

**DAVID R. BEST**

*has successfully completed*

**DEFENSIVE TACTICS: COLLAPSIBLE BATON**
**S – SATISFACTORILY COMPLETED**
**4 HOURS**
**10/21/2002**





Dean

President

X

# Pitt Community College

### Economic & Community Development Division
### Greenville, North Carolina

*This certifies that*

**DAVID R. BEST**

*has successfully completed*

**OC AEROSOL PROJECTOR USER CERTIFICATION**
**S -- SATISFACTORILY COMPLETED**
**4 HOURS**
**10/21/2002**





Dean                                                    President

**J.A. 2580**

NAME _Ricky Best_                                    DATE _10-29-98_

(100%)

GREENVILLE POLICE DEPARTMENT

IN-SERVICE FIREARMS TRAINING

TEST

ANSWER T OR F

F  1. To properly load the shotgun to the "cruiser safe" position, you should load one round into the chamber and then fill the magazine to capacity.  The safety must be in the "safe" position.

T  2. Sight picture is achieved when the front and rear sights are properly aligned and then put into the proper relationship with the target.

F  3. The shotgun should be carried in the "combat ready" position in the patrol car so it will be ready for immediate action when needed.

T  4. The standardized challenge that should be used by officers is "Police, Don't Move".

F  5. When you holster your weapon, two hands should be used whenever possible to insure that you get the weapon safely into the holster.

F  6. When reloading the semi-automatic handgun you should immediately drop the magazine out of the gun and then reach for your second magazine and insert it as quickly as possible into the weapon.

F  7. The Smith & Wesson semi-automatic handguns issued by this department is designed to fire with the magazine out of the gun as long as a round is in the chamber.

## CIRCLE THE CORRECT LETTER

8. When utilizing the "hot range" concept of range operation:

a. Officers will be required to engage multiple targets while moving from position to position.

b. It is the responsibility of each officer to ensure that their weapon remains loaded once firing has begun.

c. Officers may choose what shooting position (standing, kneeling, etc.) they shoot from at each stage of fire.

c. No time limits are utilized and each officer fires as quickly as he/she feels is appropriate.

9. When considering home safety, which of the following is not a recommended practice when other people may be present in the household.

a. the weapon and ammunition should be secured separately when children are present.

b. the weapon should be loaded and close by your bed so that it will be readily accessible in the event you are suddenly awakened during the night.

c. Children should be taught the dangers of weapons and strict restrictions should be established.

c. All of the above are recommended practices.

10. When OOS is fired from a standard police shotgun the rate of spread is approximately:

a. 1 inch for each yard traveled down range.
b. 1 inch for each yard traveled down range.
c. 5 inches for each yard traveled down range.
c. there is no standard rate of spread.

11. Which of the following is not one of the Cardinal Rules of Firearms Safety?

a. All guns are always loaded.
b. Never let the muzzle cover anything you are not willing to destroy.
c. Always give loud verbal warning before firing warning shots.
c. Be sure of your target and what is beyond.

rear sight and utilize only the front sight.



   a.    True
   Ⓑ    False

13. When discussing the operation of a semi-automatic handgun, match the definition with the correct function:

  a.    feeding
  b.    firing
  c.    extracting
  d.    ejecting

  _D_  Throwing the expended casing out of the weapon by way of the ejection port.

  _C_  removing the cartridge from the chamber by means of the extractor located on slide which engages the rim of the cartridge.

  _A_  Takes place when a cartridge is placed in the path of the slide while it is traveling forward after recoil. The magazine is used for this purpose.

  _B_  Takes place when the firing pin strikes the primer causing it to detonate sending the bullet through the barrel.

14. Performing a "tap rack" malfunction drill will usually correct all of the following stoppages except which one:

  a.    Stovepipe
  Ⓑ    Double feed
  c.    Bad ammunition or misfire
  d.    Magazine not properly seated

15. When carrying a concealed handgun outside the territorial arrest jurisdiction, an off-duty officer is only allowed to use deadly or non-deadly force under identical circumstances that a private citizen would be authorized.

  Ⓐ True
  b. False

arrest jurisdiction, an off-duty officer may not consume any amount of alcohol or any medicine or substance that impairs mental or physical capabilities, nor shall a concealed handgun be carried for a period of __8__ hours after the most recent consumption of alcohol or impairing substances.

17. Off-duty officers, carrying a concealed handgun outside the territorial arrest jurisdiction are not restricted from areas such as Federal buildings, places where alcoholic beverages are sold, educational property, etc., which private citizens are restricted.

    a. True
    (b) False

18. List in order the procedure for clearing a "Double Feed" in a semi-automatic pistol.

    a. ~~Drop~~ Lock Slide back
    b. release magazine
    c. Release Slide
    d. reinsert magazine
    e. rerack Slide

19. Define "Deadly Force".

    Any force to could cause serious injury of death

20. A police officer may use deadly force to protect himself or a third person when the police officer reasonably believes it is necessary to prevent immediate, imminent death or serious bodily injury to himself or others.

    (a) True
    b. False



1. Hammer
2. Decocking Lever
3. Rear Sight
4. Extractor
5. Ejection Port
6. Slide
7. Front Sight
8. Frame
9. Trigger Guard
10. Trigger
11. Grip



1. _Stock_
2. _Safety_
3. _Ejection Port_
4. _rear sight_
5. _barrel_
6. _Front Sight_
7. _Forearm or Slide_
8. _magazine Tube - Loading Port_
9. _~~Ejection Port~~_
10. _trigger_
11. _Slide release_

NORTH CAROLINA DEPARTMENT OF HUMAN RESOURCES

DIVISION OF HEALTH SERVICES

# PERMIT TO PERFORM CHEMICAL ANALYSES OF BREATH

APPLICATION HAVING BEEN MADE, a permit is hereby granted, or a renewal of same, to:



_____ DAVID RICKY BEST _____          PERMIT NO. __2756__

to perform chemical analyses of the breath to determine alcohol concentration.

Evidence of qualifications has been examined, and it has been determined that the applicant herein has met the standards prescribed by the law and regulations.

This permit is limited to the performance of chemical analyses of the breath in accordance with current regulations of the North Carolina Commission for Health Services, utilizing the Breathalyzer, models 900, 900A _____.

This permit is non-transferable, and is issued under authority of G. S. 20-139.1 (b) and Rules and Regulations of the North Carolina Commission for Health Services.

Authority to perform chemical analyses of breath under this permit shall be effective for the period specified herein.



In witness whereof, I set my hand and seal this

__FOURTEENTH__ day of __SEPTEMBER__, 19 87 .

Effective Date __10-1-87__

Expiration Date __10-1-89__

Department of Human Resources
Division of Health Services

_Donald H. Levine_
State Health Director

DHS 1154   (REV. 9/83)

**J.A. 2587**



STATE OF NORTH CAROLINA
DEPARTMENT OF JUSTICE

North Carolina Justice Academy

LEGAL ISSUES IN INTERROGATION

DAVID RICKY BEST

THIS 2nd DAY OF APRIL, 1987.

_M. A. Stanford_
DIRECTOR

_signature_
ATTORNEY GENERAL

_Philip E. Mills_
COURSE COORDINATOR

NORTH CAROLINA
DEPARTMENT OF JUSTICE
*State Bureau of Investigation*
*Division of Criminal Information*
THIS CERTIFIES THAT

David R. Best

HAS COMPLETED THE DCI TERMINAL CERTI-
FICATION COURSE AND IS AN AUTHORIZED DCI
TERMINAL OPERATOR. THIS CERTIFICATION
EXPIRES ON _____ 09/20/88 _____ .

Director

# State of North Carolina
## Department of Justice

### CRIMINAL JUSTICE EDUCATION AND TRAINING STANDARDS COMMISSION

### ELECTRONIC SPEED-MEASURING INSTRUMENT

# Operator  Certification

In compliance with Chapter 17C of the General Statutes of the State of North Carolina and specifically with the appropriate Rules of Chapter 9 to Title 12 of the North Carolina Administrative Code, as promulgated by the Criminal Justice Education and Training Standards Commission under the authority of that statutory chapter,

### DAVID R. BEST

now comes before the Commission for evaluation of qualifications to serve as a speed-measuring instrument operator within this State. Having been provided by appropriate authorities with documentation that the requirements for certification, including requisite operator training, appear to have been fulfilled, the Commission has made its evaluation in this matter.

The Commission FINDS and hereby CERTIFIES that the above-named officer has met the requirements for the operation of electronic speed-measuring instrument(s) as indicated below provided they are not equipped with dual antennas:

|  |  |  |
|---|---|---|
| ____ Kustom HR8 (S) | ____ Kustom KR-10 SP (M/S) | ____ Decatur MVR 715 (M/S) |
| ____ Kustom HR12 (M/S) | ____ MPH K-55 With SOS Adapter (M) | ____ Decatur MVR 724 (M/S) |
| ____ Kustom KR11 (M/S) | ____ MPH S-80 With SOS Adapter (M) | ____ Kustom KR11(Stopwatch Mode) |
| _X_ MPH K15 (S) | ____ Kustom Falcon (S) | ____ Stephenson TDS |
| _X_ MPH K55 (M/S) | ____ Kustom Roadrunner (S) | ____ Federal Vascar I |
| ____ MPH S80 (M/S) | ____ Kustom Trooper (M/S) | ____ Federal Vascar II |
| ____ Decatur Ra-Gun (RAS | ____ _____ | ____ TSSI Vascar Plus |
| & N Series) (S) | ____ _____ | ____ _____ |
| ____ Simplex FAR 54 (S) | ____ _____ | ____ _____ |

Now therefore, the Commission serves notice that this officer is awarded OPERATOR CERTIFICATION. This Certification shall remain in effect for a period of TWO (2) YEARS FROM DATE OF ISSUANCE unless suspended or revoked by the Commission for cause. Further, the Commission shall permit transfer of this Electronic Speed-Measuring Instrument Operator Certification between law enforcement agencies within this State, subject to the provisions of applicable Rules of the Administrative Code.

Issuance of Certification ___ R ___ 238869461

Approved this 7th day of ___ July ___ , 19 86

_John W. Boles_
Commission Chairman

By: _David D. Cashwell_
Director, Criminal Justice Standards Division

CERTIFIED AS A TRUE AND ACCURATE COPY OF THE ORIGINAL ON FILE IN THIS OFFICE.

DAVID D. CASHWELL
(DIRECTOR)

_Jamie Blackmon_
(Staff Member)

_July 7, 1986_

J.A. 2590



# Pitt Community College

of

## Department of Community Colleges
## Greenville, N.C.



Awards this certificate to:

DAVID RICKY BEST

in recognition of satisfactory completion of a course in

RADAR RE-CERTIFICATION  12 HOURS (1.2 CEU)

JUNE 26    19   86

_Lloyd F. Huggins_
School Official

_Charles B. Corbett_
Instructor

_Clifton W. Everett Sr._
Chairman, Board of Trustees

_Charles E. Russell_
President

**J.A. 2591**

# State of North Carolina

## Human Relations Council

Established 1963

### Awards This Certificate

To

DAVID RICKY BEST

For

COMPLETING SIXTEEN HOURS IN POLICE COMMUNITY RELATIONS TRAINING



_____
Chairman

_____
Director

_____
James G. Martin _____
Governor

May, 1986

_____
Date

**J.A. 2592**

USCA4 Appeal: 25-1155     Doc: 24-5     Filed: 04/14/2025     Pg: 359 of 567     Total Pages:(359 of 567)

NORTH CAROLINA DEPARTMENT OF HUMAN RESOURCES

DIVISION OF HEALTH SERVICES

# PERMIT TO PERFORM CHEMICAL ANALYSES OF BREATH

APPLICATION HAVING BEEN MADE, a permit is hereby granted, or a renewal of same, to:



<u>DAVID RICKY BEST</u>　　　　　　　　　PERMIT NO. 2756

to perform chemical analyses of the breath to determine alcohol concentration.

Evidence of qualifications has been examined, and it has been determined that the applicant herein has met the standards prescribed by the law and regulations.

This permit is limited to the performance of chemical analyses of the breath in accordance with current regulations of the North Carolina Commission for Health Services, utilizing the Breathalyzer, models 900, 900A

This permit is non-transferable, and is issued under authority of G. S. 20-139.1 (b) and Rules and Regulations of the North Carolina Commission for Health Services.

Authority to perform chemical analyses of breath under this permit shall be effective for the period specified herein.



Effective Date   10-1-85

Expiration Date   10-1-87

In witness whereof, I set my hand and seal this

<u>TWENTY-FIFTH</u> **day of** SEPTEMBER , 19<u>85</u> .

Department of Human Resources
Division of Health Services

*Donald H. Levine*

State Health Director

(REV. 9/83)

Case 4:21-cv-00185-BO     Document 269-8     Filed 11/27/24     Page 17 of 73

**J.A. 2593**

**NORTH CAROLINA
DEPARTMENT OF JUSTICE**

*Police Information Network*

THIS CERTIFIES THAT

David R. Best

has completed the **North Carolina Police Information Network**
certification course in accordance with G.S. 114-10.1 and Title 12,
Chapter 4 of the North Carolina Administrative code. This certification
expires on 09/20/86

Director



NORTH CAROLINA

DEPARTMENT OF JUSTICE

*Police Information Network*

THIS CERTIFIES THAT

DAVID R. BEST

Has completed the North Carolina Police Information Network Certification Course on

SEPTEMBER 20 , _____ 19 84 , in accordance with G.S. 114-10.1 and Title 12, Chapter 4 of

the North Carolina Administrative Code.

_____
Instructor

_____
Director

# State of North Carolina
## Department of Justice

### CRIMINAL JUSTICE EDUCATION AND TRAINING STANDARDS COMMISSION

### ELECTRONIC SPEED-MEASURING INSTRUMENT

# Operator  Certification

In compliance with Chapter 17C of the General Statutes of the State of North Carolina and specifically with the appropriate Rules of Chapter 9 to Title 12 of the North Carolina Administrative Code, as promulgated by the Criminal Justice Education and Training Standards Commission under the authority of that statutory chapter,

_____ DAVID R. BEST _____

now comes before the Commission for evaluation of qualifications to serve as a speed-measuring instrument operator within this State. Having been provided by appropriate authorities with documentation that the requirements for certification, including requisite operator training, appear to have been fulfilled, the Commission has made its evaluation in this matter.

The Commission FINDS and hereby CERTIFIES that the above-named officer has met the requirements for the operation of electronic speed-measuring instrument(s) as indicated below provided they are not equipped with dual antennas:

| | | |
|---|---|---|
| ____ Kustom HR8 (S) | ____ Kustom KR-10 SP (M/S) | ____ Decatur MVR 715 (M/S) |
| ____ Kustom HR12 (M/S) | ____ MPH K-55 With SOS Adapter (M) | ____ Decatur MVR 724 (M/S) |
| ____ Kustom KR11 (M/S) | ____ MPH S-80 With SOS Adapter (M) | ____ Kustom KR11(Stopwatch Mode) |
| _X_ MPH K15 (S) | ____ Kustom Falcon (S) | ____ Stephenson TDS |
| _X_ MPH K55 (M/S) | ____ Kustom Roadrunner (S) | ____ Federal Vascar I |
| ____ MPH S80 (M/S) | ____ Kustom Trooper (M/S) | ____ Federal Vascar II |
| ____ Decatur Ra-Gun (RAS | ____ _____ | ____ TSSI Vascar Plus |
| & N Series) (S) | ____ _____ | ____ _____ |
| ____ Simplex FAR 54 (S) | ____ _____ | ____ _____ |

Now therefore, the Commission serves notice that this officer is awarded OPERATOR CERTIFICATION. This Certification shall remain in effect for a period of TWO (2) YEARS FROM DATE OF ISSUANCE unless suspended or revoked by the Commission for cause. Further, the Commission shall permit transfer of this Electronic Speed-Measuring Instrument Operator Certification between law enforcement agencies within this State, subject to the provisions of applicable Rules of the Administrative Code.

CERTIFIED AS A TRUE AND ACCURATE COPY OF THE ORIGINAL ON FILE IN THIS OFFICE.

JUSTUS C. RUDISILL, JR.
-----------------------------
(Director)

BY: _Christy Jeffries_
(Staff Member)

DATE: _7/01/__

Issuance of Certification _____ R 238069261 _____

Approved this __20th__ day of _____ June _____, 19 _84_

_Wade Barber, Jr._
Commission Chairman

By _Justus C. Rudisill Jr._
Director, Criminal Justice Standards Division

**J.A. 2596**

NORTH CAROLINA DEPARTMENT OF HUMAN RESOURCES

DIVISION OF HEALTH SERVICES

# PERMIT TO PERFORM CHEMICAL ANALYSES OF BREATH

APPLICATION HAVING BEEN MADE, a permit is hereby granted, or a renewal of same, to:



     DAVID RICKY BEST                     PERMIT NO. 2756

to perform chemical analyses of the breath to determine blood alcohol concentration.

Evidence of qualifications has been examined, and it has been determined that the applicant herein has met the standards prescribed by the law and regulations.

This permit is limited to the performance of chemical analyses of the breath in accordance with current regulations of the North Carolina Commission for Health Services, utilizing the Breathalyzer, models 900, 900A .

This permit is non-transferable, and is issued under authority of G. S. 20-139.1 (b) and Rules and Regulations of the North Carolina Commission for Health Services.

Authority to perform chemical analyses of breath under this permit shall be effective for the period specified herein.



Effective Date 10-1-83

Expiration Date 10-1-85

In witness whereof, I set my hand and seal this

TWENTY-SEVENTH day of SEPTEMBER , 19 83 .

Department of Human Resources
Division of Health Services

_Donald H. Levine_

State Health Director

DHS 1164
1-82 Hwy. Safety

**J.A. 2597**



**RUFUS L. EDMISTEN**
ATTORNEY GENERAL

North Carolina Department of Justice
Criminal Justice Standards Division

**JUSTUS C. RUDISILL, JR.**
DIRECTOR

POST OFFICE DRAWER 149, RALEIGH, NC 27602-0149
TELEPHONE (919) 733-2530

May 27, 1983

Chief E.G. Cannon
Greenville Police Department
Post Office Box 78
Greenville, North Carolina  27834

RE:  Officer David Ricky Best
     Sub-Program: Intermediate

Dear Chief Cannon:

I am pleased to advise you that the above named employee of your
agency has been approved for award of the Intermediate Law Enforcement
Certificate.  You will find the certificate enclosed so that you may
present it as you so desire.  Those of us associated with the Criminal
Justice Education and Training Standards Commission share your pride
in this officer's achievement.  We sincerely hope that he will continue
his professional progress through experience, education and training.

Please extend our heartiest congratulations to this officer.  We shall
look forward to receiving his application for the Advanced Certificate
upon fulfillment of the requirements for that award.

Sincerely,

RUFUS L. EDMISTEN
ATTORNEY GENERAL

Justus C. Rudisill Jr.

Justus C. Rudisill, Jr.
Director

JCR/cj
Enc.

ADMINISTERING PROGRAMS OF THE
North Carolina Criminal Justice Education And Training Standards Commission

**J.A. 2598**

# Department of Justice

OF THE STATE OF  NORTH CAROLINA

### Criminal Justice Education and Training Standards Commission

In recognition of meritorious progress in pursuing the training and educational objectives commensurate with the role of a professional criminal justice officer and of dedicated service to the people of North Carolina, the Criminal Justice Education and Training Standards Commission, by virtue of the power vested in it by the laws of the State, hereby awards to

DAVID RICKY BEST

this

## General
## Intermediate Law Enforcement Certificate



Signed this 27th day of May, 1980

Wade Barber, Jr.
Commission Chairman

Justus C. Rudisill, Jr.
Director, Criminal Justice Standards Division

J.A. 2599

# State of North Carolina

## Department of Justice

### CRIMINAL JUSTICE EDUCATION AND TRAINING STANDARDS COMMISSION

## ELECTRONIC SPEED-MEASURING INSTRUMENT

O P E R A T O R  C E R T I F I C A T I O N

In compliance with Chapter 17C of the General Statutes of the State of North Carolina and specifically with the appropriate Rules of Chapter 9 to Title 12 of the North Carolina Administrative Code, as promulgated by the Criminal Justice Education and Training Standards Commission under the authority of that statutory chapter,

DAVID R. BEST

now comes before the Commission for evaluation of qualifications to serve as a speed-measuring instrument operator within this State. Having been provided by appropriate authorities with documentation that the requirements for certification, including requisite operator training, appear to have been fulfilled, the Commission has made its evaluation in this matter.

The Commission FINDS and hereby CERTIFIES that the above-named officer has met the requirements for the operation of electronic speed-measuring instrument(s) as indicated below:

| | | |
|---|---|---|
| ___ CMI Speed Gun (S) | ___ Kustom HR4 (S) | ___ MPH S80 (M/S) |
| ___ CMI Speed Gun Five (M/S) | ___ Kustom TR6 (S) | ___ Sa-So (S) |
| ___ CMI Speed Gun Eight (M/S) | ___ Kustom HR8 (S) | ___ Simplex FAR23 (S) |
| ___ Decatur DCP (S) | ___ Kustom HR12 (M/S) | ___ Kustom KR11 |
| ___ Decatur Ra-Gun 1 & 2 (S) | ___ Kustom MR7 (M/S) | ___ Stephenson TDS |
| ___ Decatur Ra-Gun 5 & 6 (S) | ___ Kustom MR9 (M/S) | ___ Federal Vascar I |
| ___ Decatur R-M 715 (S) | ___ Kustom KR11 (M/S) | ___ Federal Vascar II |
| _X_ Decatur R-M 715 (M/S) | _X_ MPH K15 (S) | ___ TSSI Vascar Plus |
| ___ Decatur MV724 (M/S) | ___ MPH K55 (M/S) | ___ |

Now, therefore, the Commission serves notice that this officer is awarded OPERATOR CERTIFICATION. This Certification shall remain in effect for a period of TWO (2) YEARS FROM DATE OF ISSUANCE unless suspended or revoked by the Commission for cause. Further, the Commission shall permit transfer of this Electronic Speed-Measuring Instrument Operator Certification between law enforcement agencies within this State, subject to the provisions of applicable Rules of the Administrative Code.

CERTIFIED AS A TRUE AND ACCURATE
COPY OF THE ORIGINAL ON FILE IN
THIS OFFICE.

JUSTUS C. RUDISILL, JR.
------------------------------
(Director)

BY: _Belinda Eadie_
(Staff Member)

DATE: _3-2-82_

Issuance of Certification ___R238869261___

Approved this _1st_ day of _March_, 19_82_

_[signature]_
Commission Chairman

By: _[signature] Justus C. Rudisill Jr._
Director, Criminal Justice Standards Division

DEPARTMENT OF HUMAN RESOURCES
DIVISION OF HEALTH SERVICES
Raleigh



PERMIT TO PERFORM BREATH ALCOHOL TESTS


APPLICATION HAVING BEEN MADE, a permit is hereby granted, or a renewal of same,

to: _____ DAVID RICKY BEST _____


Permit Number _____ 2756 _____

to perform chemical analyses of the breath to determine blood alcohol level.


Evidence of qualifications have been examined, and it has been determined that

the applicant herein has met the standards prescribed by the law and regulations.


This permit is limited to the performance of chemical analyses of the breath in

accordance with current regulations of the North Carolina Commission for Health Services

utilizing models 900, 900A, or 1000 of the Breathalyzer, manufactured by Stephenson

Corporation, Red Bank, New Jersey, or by Smith & Wesson Electronics Company,

Eatontown, New Jersey, a successor corporation.

This permit is not transferable, and is issued under authority of G.S. 20-139.1(b)

and Rules and Regulations of the North Carolina Commission for Health Services.


Authority to perform tests under this permit shall expire _____ OCTOBER 1, 1983 _____

IN WITNESS WHEREOF, I hereto set my hand and seal this _____ FIRST _____

day of _____ OCTOBER _____, 19 81 .


Department of Human Resources
Division of Health Services

(Seal)

Konald H. Levine, M.D.

Acting   Director

# REGIONAL ORGANIZED CRIME INFORMATION CENTER

### *"Solving Cases Through Communication"*

# Certificate of Attendance and Training

This Certifies that

**Daryl Best**

## Greenville Police Department, NC

Attended and completed all Law Enforcement Training
(17 Hours Total)

Presented at the ROCIC Training Seminar

## "Homicide, Capital Crimes and Punishment"
### October 22 - 24, 2001, in Knoxville, TN



*James F. ...*

Director, ROCIC

## INTEGRITY    SECURITY    SERVICE

---

### Serving Since 1973 • Member, Regional Information Sharing Systems (RISS)



# NORTH CAROLINA
# STATE BUREAU OF INVESTIGATION
## DEPARTMENT OF JUSTICE

3320 Garner Road
P. O. Box 29500
Raleigh, NC 27626-0500
(919) 662-4500
Fax (919) 662-4523



**Michael F. Easley**
ATTORNEY GENERAL

**Bryan E. Beatty**
DIRECTOR

JANUARY 9, 2001

Intrm. Chief Major Joe Simonowich
Greenville Police Department
P.O. Box 7207
Greenville, NC  27835

Dear Intrm. Chief Simonowich:

The SBI's Division of Criminal Information Administrative Code requires each person operating a DCI terminal to be initially certified, and to be re-certified every two years by successfully completing the module class(es) or challenged written examination.

BEST,DAVID R, of your staff, has been tested in the following modules and is granted certification in modules with a STATUS of COMPLETE. A complete certification status for BEST,DAVID R can be obtained through a DCI terminal transaction "FS QCC".

| MODULE | HOURS | TEST | RE-TEST | STATUS | EXPIRES |
|--------|-------|------|---------|--------|---------|
| INTRC03 | N/A | 95 | | COMPLETE | 11/09/2002 |
| INQUC03 | N/A | 97 | | COMPLETE | 11/09/2002 |
| AOCQC03 | N/A | 80 | | COMPLETE | 11/09/2002 |
| CCHQC03 | N/A | 85 | | COMPLETE | 11/09/2002 |
| TRANC03 | N/A | 85 | | COMPLETE | 11/09/2002 |

There are no training hours(N/A) credited for challenge sessions.

Sincerely,

*Donald K. Roberts*

Donald K. Roberts
Supervisor
Crime Reporting and Field Services



A Nationally Accredited State Agency

An ASCLD/LAB Accredited Laboratory Since 1988





**David Best**

has successfully completed the national cognitive and skills evaluations in accordance with the curriculum of the American Heart Association for the BLS for Healthcare Providers Program.

| 10/16/2000 | 10/16/2002 |
|---|---|
| Issue Date | Recommended Renewal Date |

| | |
|---|---|
| Name of AHA Region | North Carolina |
| Name of Community Training Center | PCMH-Community Training Center |
| Name of Training Site | PCMH-Independent |
| Instructor's Name | Sammy Modlin |
| Holder's Signature | |

# REGIONAL ORGANIZED CRIME INFORMATION CENTER

## "Solving Cases Through Communication"



**RISS**

## INTEGRITY
## SECURITY
## SERVICE



"Guilt shall not escape,
nor innocence suffer"

### Certificate

of

## Attendance & Training

—— This Certifies That ——

### Ricky Best
### Greenville P.D.,  NC

Attended and completed all Law Enforcement Training
(17 Hours Total)
Presented at the ROCIC Training Seminar
"9th National ROCIC Homicide Conference"
June 11-14, 2000 in Atlanta, Georgia



**Director, ROCIC**

**Serving Since 1973 • Member, Regional Information Sharing System (RISS)**



# NATIONAL LAW ENFORCEMENT INSTITUTE

It is hereby certified that

*Ricky Best*

successfully completed **NLEI's** 23-hour

## Advanced Investigators' School

Georgia P.O.S.T. Course No. NBU00G

**Charlotte**
**October 15, 16 & 17, 1997**

Robert M. Jenkins
Executive Director

**J.A. 2606**



This certifies that

David Best

has completed the **ADULT CPR**

course of instruction

at GPD

9-30-93

Date course completed

Larry J Moody
Chairman, American Red Cross

American Red Cross

This certifies that

David Best

has completed the

STANDARD FIRST AID

course of instruction sponsored by

GPD

Date course completed

9-30-93



# LAW ENFORCEMENT TRAINING CONSULTANTS

## CERTIFICATE OF COMPETENCY

This is to verify that

DAVID BEST

has been properly trained in the uses and concepts of the

DEFENSIVE POLICE BATON.

No. 1946858

Exp. Date AUG. 1992

Certified Instructor

**J.A. 2608**



**North Carolina**
**State Bureau of Investigation**
**DEPARTMENT OF JUSTICE**

407 N. BLOUNT STREET
RALEIGH 27601-1009
(919) 733-3171



LACY H. THORNBURG
ATTORNEY GENERAL

ROBERT MORGAN
DIRECTOR

December 8, 1988

Chief Jerry M. Tesmond
Chief of Police
Greenville Police Department
P. O. Box 7207
Greenville, North Carolina  27835

Dear Chief Tesmond:

In compliance with the rules and regulations governing the Division of
Criminal Information the following personnel on your staff has successfully
passed the test administered by the Division of Criminal Information and are
re-certified DCI terminal operators.

09/20/88  Best, David R.    09/11/88  Johnson, Wilma Jean

DCI's rules and regulations require all personnel to be re-certified every
two years by attending a class and passing a written examination.

I would like to congratulate you and your personnel on this achievement.

Sincerely,

Doug Kappler
Section Supervisor
Crime Reporting & Field Services

DK:vl

> NORTH CAROLINA
> DEPARTMENT OF JUSTICE
> *State Bureau of Investigation*
> *Division of Criminal Information*
> THIS CERTIFIES THAT
>
> David R. Best
>
> HAS COMPLETED THE DCI TERMINAL CERTI-
> FICATION COURSE AND IS AN AUTHORIZED DCI
> TERMINAL OPERATOR. THIS CERTIFICATION
> EXPIRES ON _____09/20/90_____
>
> Director

**J.A. 2609**



STATE OF NORTH CAROLINA

DEPARTMENT OF JUSTICE

North Carolina Justice Academy

for participation

ARREST, SEARCH WARRANTS, SEARCH & SEIZURE

awards this Certificate to

DAVID RIGHT BEST

THIS 18th DAY OF MARCH , 19 88 .

_____
DIRECTOR

_____
ATTORNEY GENERAL

_____
COURSE COORDINATOR

**J.A. 2610**



# NATIONAL INSTITUTE FOR TRUTH VERIFICATION

*This Certifies That*

# David R. Best

*has satisfactorily completed the*

## CERTIFIED EXAMINERS COURSE

*in Truth Verification*

*Testing and Examination Techniques*

*and is therefore entitled to this*

# Diploma

**December 1, 2001**

This diploma is valid
for three years from
the above date.



*Charles Humble, Ph.D.*
*Chairman & CEO*

RE CED   11-2-81 cw

INITIAL

FILE

DISTRIBUTION

**RUFUS L. EDMISTEN**
ATTORNEY GENERAL

*North Carolina Department of Justice*
*Criminal Justice Standards Division*

**JUSTUS C. RUDISILL, JR.**
DIRECTOR

POST OFFICE DRAWER 149, RALEIGH, NC 27602
TELEPHONE: (919) 733-2530

October 30, 1981

David R. Best, Patrolman
Greenville Police Department
P. O. Box 78
Greenville, North Carolina   27834

RE:   INTERMEDIATE LAW ENFORCEMENT CERTIFICATE

Dear Patrolman Best:

This letter is to advise you that your application for the above-referenced award has been received and evaluated by this agency.

In addition to having seven years and seven months of full-time, sworn, paid law enforcement experience, you have been credited with a total of 614 hours of approved training. However, since a minimum of eight years of experience and 600 hours of training is required for the Intermediate Certificate, you are presently some five months short of having the requisite eight years of experience.

Your application for the Basic award has been approved and it will be forwarded to your chief for presentation to you. In order to activate your application for the Intermediate award in April of 1982, you should have Chief Cannon submit a short letter to this office recommending you for the award. This procedure will prevent you from having to reapply in five months.

If you should have any questions concerning this matter, please feel free to contact my office.

Sincerely,

JUSTUS C. RUDISILL, JR.
DIRECTOR

Scott Perry
Associate Program Administrator

SP/cj

cc:   Chief E. G. Cannon
      Greenville Police Department

ADMINISTERING PROGRAMS OF THE
*North Carolina Criminal Justice Education And Training Standards Commission*

**J.A. 2612**

# International Association of Credit Card Investigators

*Law Enforcement Officers and Special Agents of the Credit Card Industry*

**This Certifies that** _____ D. R. Best _____ has satisfactorily

completed the prescribed course of instruction in "FINANCIAL TRANSACTION CARD CRIME ACT"

held in __Greenville, N.C.__ from __12/6/79__ to __12/6/79__ Credit Hours __Two (2)__

and is hereby awarded this

# ❦ CERTIFICATE ❦

as an acknowledgment of his/her proficiency in said subjects.

**In Witness Whereof:** We have hereunto affixed our signatures and the official seal of the IACCI

this __6th__ day of __December, 1979__



CHAPTER PRESIDENT             SECRETARY

**J.A. 2613**

# WILSON COUNTY TECHNICAL INSTITUTE

## AWARDS TO

DAVID RICKY BEST

___1.2___ Continuing Education Units

In Recognition of Satisfactory Completion of ___12___ Hours in

CHEMICAL TEST FOR ALCOHOL RECERTIFICATION – PSC 3630

On This __28TH__ Day Of __SEPTEMBER__ 19 __79__

Instructor                          President

**J.A. 2614**

DEPARTMENT OF HUMAN RESOURCES
DIVISION OF HEALTH SERVICES
Raleigh



PERMIT TO PERFORM BREATH ALCOHOL TESTS

APPLICATION HAVING BEEN MADE, a permit is hereby granted, or a renewal of same,

to: _____ DAVID RICKY BEST _____

Permit Number ___2756___

to perform chemical analyses of the breath to determine blood alcohol level.

Evidence of qualifications have been examined, and it has been determined that the applicant herein has met the standards prescribed by the law and regulations.

This permit is limited to the performance of chemical analyses of the breath in accordance with current regulations of the North Carolina Commission for Health Services, utilizing models 900 or 900A of the Breathalyzer, manufactured by Stephenson Corporation, Red Bank, New Jersey, or by Smith & Wesson Electronics Company, Eatontown, New Jersey, a successor corporation.

This permit is not transferable, and is issued under authority of G. S. 20-139.1(b) and Rules and Regulations of the North Carolina Commission for Health Services.

Authority to perform tests under this permit shall expire ___March 1, 1976___

IN WITNESS WHEREOF, I hereto set my hand and seal this ___First___

day of _____February_____, 19 _75_.

Department of Human Resources
Division of Health Services

(Seal)

_Jacob Koomen_
Director

DHS Form 1164 5/74
Highway Safety

J.A. 2615

# NORTH CAROLINA
## Department of
# COMMUNITY COLLEGES
### Raleigh, North Carolina
## Certificate of Proficiency
### To Operate
# COMPUTERIZED SPEED DETECTION EQUIPMENT

### This Certificate is hereby granted to

D A V I D   R.   B E S T

Having satisfactorily completed the eight-hour course of instruction in the operation of the Doppler Radar.



In witness whereof, I set my hand and seal this twenty-third

day of _____ September _____, 19 75.

NORTH CAROLINA STATE BOARD OF EDUCATION
DEPARTMENT OF COMMUNITY COLLEGES
LAW ENFORCEMENT TRAINING

Ralph G. Strother
Supervisor

Robert M. Stevenson
Director

Certificate No. ____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____

Student's Name _David R. Best_ Date _04.17.03_

Evaluators: _Forrest/Lucas_ Date _____

_____ Date _____

_____ Date _____

_____ Date _____

_____ Date _____

| | ADEQUATE | INADEQUATE | |
|---|---|---|---|
| 1. Baton Strike - Primary Forward Strike | ✓ | | |
| 2. Baton Strike - Forward Secondary Strike | ✓ | | |
| 3. Baton Strike - Backhand Strike | ✓ | | |
| 4. Baton Block - Forward Block | ✓ | | |
| 5. Baton Block - Backhand Block | ✓ | | |
| 6. Baton Block - Down Block | ✓ | | |

TITLE:    Arrest techniques / handcuffing practical

Student's Name: _DAVID R. BEST_    Date: _04-17-03_

Evaluators:    _FORREST / LUCAS_

| | Adequate | Inadequate | Instructor Initials |
|---|---|---|---|
| Handcuffing – standing | ✓ | | |
| Handcuffing - kneeling | ✓ | | |
| Handcuffing - prone | ✓ | | |

J.A. 2618

Greenville Police Department
In-Service Firearms Training
Written Test

Name _David R Best_
Date _10-24-__

<u>True/False</u>

1. _T_ To properly load the shotgun to the "cruiser safe" position, you should load one round into the chamber and then fill the magazine to capacity. The safety must be in the "safe" position.

2. _T_ Sight picture is achieved when the front and rear sights are properly aligned and then put into the proper relationship with the target.

3. _F_ The shotgun should be carried in the "combat ready" position in the patrol car so it will be ready for immediate action when needed.

4. _T_ The standardized challenge that should be used by officers is, "Police, don't move."

5. _F_ When you holster your weapon, two hands should be used whenever possible to insure that you get the weapon safely into the holster.

6. _F_ When reloading the semi-automatic handgun you should immediately drop the magazine out of the gun and then reach for your second magazine and insert it as quickly as possible into the weapon.

7. _F_ The Smith & Wesson semi-automatic handgun issued by this department is designed to fire with the magazine out of the gun as long as a round is in the chamber.

8. _F_ When firing a police handgun, the officer should disregard the rear sights, and utilize only the front sight.

<u>Circle the Correct Letter</u>

9. When utilizing the "hot range" concept of range operation:
   a. Officers will be required to engage in multiple targets while moving from position to position
   b. It is the responsibility of each officer to ensure that his or her weapon remains loaded once firing has begun.
   c. Officers may choose what shooting position (standing, kneeling, etc) they shoot from at each stage of fire
   d. No time limits are utilized and each officer fires as quickly as he/she feels appropriate

10. When considering home safety, which of the following <u>is not</u> a recommended practice when other people may be present in the household:
   a. The weapon and ammunition should be stored separately when children are present
   b. The weapon should be load and close by your bed so that it will be readily accessible in the event you are suddenly awakened during the night
   c. Children should be taught the dangers of weapons and strict restrictions should be established
   d. All of the above are recommended practices

J.A. 2619

11. When OOB is fired from a standard police shotgun, the rate of spread is approximately:
 a. 1 inch for each yard traveled down range
 b. 3 inches for each yard traveled down range
 c. 5 inches for each yard traveled down range
 d. There is no standard rate of spread

12. Which of the following is not one of the cardinal rules of firearm safety:
 a. All guns are always loaded
 b. Never let the muzzle cover anything you are not willing to destroy
 c. Always give loud verbal warning before firing warning shots
 d. Be sure of your target and what is beyond

13. When discussing the operation of a semi-automatic handgun, match the definition with the correct function.

a. feeding        __d__ Throwing the expended casing out of the weapon by way of the ejection port

b. firing         __c__ Removing the cartridge from the chamber by means of the extractor

c. extracting     __a__ Takes place when a cartridge is placed in the path of the slide while it is traveling forward after recoil. The magazine is used for this purpose.

d. ejecting       __b__ Takes place when the firing pin strikes the primer causing it to detonate sending the bullet through the barrel.

14. Performing a "tap rack" malfunction drill will usually correct all of the following stoppages except which one:
 a. Stovepipe
 b. Double feed
 c. Bad ammunition or misfire
 d. Magazine not properly seated

15. List in order the procedure for clearing a "double feed" in a semi-automatic pistol
 a. _Lock Slide to rear_
 b. _Release magazine_
 c. _Release slide_
 d. _Reinsert magazine._
 e. _Rerack_

16. Define "deadly force"
 _Any force used that may/h cause_
 _Bodily Injury or Death_

1. Hammer
2. Decocking Lever
3. Rear Sight
4. Extractor
5. Ejection Port
6. Slide
7. Front Sight
8. Frame
9. Trigger Guard
10. Trigger
11. Grip

Greenville Police Department
In-Service Firearms Training
Written Test

Name _Ricky Best_
Date _10-11-01_

True/False

_T_ 1. To properly load the shotgun to the "cruiser safe" position, you should load one round into the chamber and then fill the magazine to capacity. The safety must be in the "safe" position.

2. _T_ Sight picture is achieved when the front and rear sights are properly aligned and then put into the proper relationship with the target.

3. _F_ The shotgun should be carried in the "combat ready" position in the patrol car so it will be ready for immediate action when needed.

4. _T_ The standardized challenge that should be used by officers is, "Police, don't move."

5. _F_ When you holster your weapon, two hands should be used whenever possible to insure that you get the weapon safely into the holster.

6. _F_ When reloading the semi-automatic handgun you should immediately drop the magazine out of the gun and then reach for your second magazine and insert it as quickly as possible into the weapon.

7. _F_ The Smith & Wesson semi-automatic handgun issued by this department is designed to fire with the magazine out of the gun as long as a round is in the chamber.

8. _F_ When firing a police handgun, the officer should disregard the rear sights, and utilize only the front sight.

Circle the Correct Letter

9. When utilizing the "hot range" concept of range operation:
   a. Officers will be required to engage in multiple targets while moving from position to position
   b. It is the responsibility of each officer to ensure that his or her weapon remains loaded once firing has begun.
   c. Officers may choose what shooting position (standing, kneeling, etc) they shoot from at each stage of fire
   d. No time limits are utilized and each officer fires as quickly as he/she feels appropriate

10. When considering home safety, which of the following is not a recommended practice when other people may be present in the household:
   a. The weapon and ammunition should be stored separately when children are present
   b. The weapon should be load and close by your bed so that it will be readily accessible in the event you are suddenly awakened during the night
   c. Children should be taught the dangers of weapons and strict restrictions should be established
   d. All of the above are recommended practices



1. Hammer
2. Decocking Lever
3. Rear sight
4. ejector
5. ejection port
6. Slide
7. Front Sight
8. Frame
9. Trigger guard
10. Trigger
11. Grip

## PRECISION EXERCISE

TIME: BEGIN EXERCISE_____ END EXERCISE _____ TOTAL TIME _____

NAME _David Ricky Best_____ SSN _238·86·9261_

DATE _10-10.01_ INSTRUCTOR _Brewington_ //MM//

VEHICLE: MAKE _Ford_ MODEL _45_ VIN _____

## DAY/NIGHT (circle)

Attempt # 1 ___    Time _2.00_            Points =    100
        Cones touched/knocked down        ____ @ 5 points each = -____
        Fail to look to rear              ____ @ 3 points each = -____
        Fail to signal intent             ____ @ 2 points each = -____
        Spinning/skidding tires           ____ @ 2 points each = -____
        Score............................................................    _98_

Attempt # 2 ___    Time _2.00_            Points =    100
        Cones touched/knocked down        _1_ @ 5 points each = -_5_
        Fail to look to rear              ____ @ 3 points each = -____
        Fail to signal intent             ____ @ 2 points each = -____
        Spinning/skidding tires           ____ @ 2 points each = -____
        Score............................................................    _95_

Attempt # 3 ___    Time ____:____         Points =    100
        Cones touched/knocked down        ____ @ 5 points each = -____
        Fail to look to rear              ____ @ 3 points each = -____
        Fail to signal intent             ____ @ 2 points each = -____
        Spinning/skidding tires           ____ @ 2 points each = -____
        Score............................................................    ____

124

# OFFSET LANE

TIME: BEGIN _____ END _____ TOTAL TIME _____

STUDENT NAME _David Ricky Best_ SSN _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_

DATE _10·20·01_ INSTRUCTOR _Worthington_

VEHICLE: MAKE _Ford_ MODEL _43_ VIN _____

Attempt # _1_  TIME _44 :24_                _100_ points

45 seconds
(time less than ~~two minutes~~ = 100 points, any time exceeding this = 0 points)
     Cones touched/knocked down   ___@ 5 points each = -____
     Fail to look to rear       ___@ 3 points each = -____
     Spinning/skidding tires    ___@ 2 points each = -____

Score.......................................................................... _100_

Attempt # _2_  TIME _37 :34_                _100_ points

(time less than two minutes = 100 points, any time exceeding this = 0 points)
     Cones touched/knocked down   ___@ 5 points each = -____
     Fail to look to rear       ___@ 3 points each = -____
     Spinning/skidding tires    _✓_@ 2 points each = -____

Score.......................................................................... _100_

Attempt # _3_  TIME _____:_____                _____ points

(time less than two minutes = 100 points, any time exceeding this = 0 points)
     Cones touched/knocked down   ___@ 5 points each = -____
     Fail to look to rear       ___@ 3 points each = -____
     Spinning/skidding tires    ___@ 2 points each = -____

Score.......................................................................... _____

116

NAME _David R. Best_                    DATE _10.18.03_

_-2_

GREENVILLE POLICE DEPARTMENT

IN-SERVICE FIREARMS TRAINING

TEST

ANSWER T OR F

_F_  1. To properly load the shotgun to the "cruiser safe" position, you should load one round into the chamber and then fill the magazine to capacity. The safety must be in the "safe" position.

_T_  2. Sight picture is achieved when the front and rear sights are properly aligned and then put into the proper relationship with the target.

_F_  3. The shotgun should be carried in the "combat ready" position in the patrol car so it will be ready for immediate action when needed.

_T_  4. The standardized challenge that should be used by officers is "Police, Don't Move".

_F_  5. When you holster your weapon, two hands should be used whenever possible to insure that you get the weapon safely into the holster.

_F_  6. When reloading the semi-automatic handgun you should immediately drop the magazine out of the gun and then reach for your second magazine and insert it as quickly as possible into the weapon.

_F_  7. The Smith & Wesson semi-automatic handguns issued by this department is designed to fire with the magazine out of the gun as long as a round is in the chamber.

CIRCLE THE CORRECT LETTER

8. When utilizing the "hot range" concept of range operation:

   a. Officers will be required to engage multiple targets while moving from position to position.
   (b.) It is the responsibility of each officer to ensure that their weapon remains loaded once firing has begun.
   c. Officers may choose what shooting position (standing, kneeling, etc.) they shoot from at each stage of fire.
   d. No time limits are utilized and each officer fires as quickly as he/she feels is appropriate.

9. When considering home safety, which of the following is not a recommended practice when other people may be present in the household:

    a. The weapon and ammunition should be stored separately when children are present.

    (b) The weapon should be loaded and close by your bed so that it will be readily accessible in the event you are suddenly awakened during the night.

    c. Children should be taught the dangers of weapons and strict restrictions should be established.

    d. All of the above are recommended practices.

10. When 00B is fired from a standard police shotgun the rate of spread is approximately:

    (a) 1 inch for each yard traveled down range.

    b. 3 inches for each yard traveled down range.

    c. 5 inches for each yard traveled down range.

    d. There is no standard rate of spread.

11. Which of the following is not one of the Cardinal Rules of Firearms Safety?

    a.    All guns are always loaded.

    b.    Never let the muzzle cover anything you are not willing to destroy.

    (c.)    Always give loud verbal warning before firing warning shots.

    d.    Be sure of your target and what is beyond.

12. When firing a police handgun the officer should disregard the rear sight and utilize only the front sight.

    a.    True

    (b.)    False

13. When discussing the operation of a semi-automatic handgun, match the definition with the correct function:

a. feeding
b. firing
c. extracting
d. ejecting

_c_ Throwing the expended casing out of the weapon by way of the ejection port.

_d_ removing the cartridge from the chamber by means of the extractor located on slide which engages the rim of the cartridge.

_a_ Takes place when a cartridge is placed in the path of the slide while it is traveling forward after recoil. The magazine is used for this purpose.

_b_ Takes place when the firing pin strikes the primer causing it to detonate sending the bullet through the barrel.

14. Performing a "tap rack" malfunction drill will usually correct all of the following stoppages except which one:

a. Stovepipe
(b) Double feed
c. Bad ammunition or misfire
d. Magazine not properly seated

15. List in order the procedure for clearing a ░Double Feed░ in a semi-automatic pistol.

a. _Lock slide back_
b. _Release magazine_
c. _Reinsert magazine_
d. _Release slide_
e. _Run_

16. Define ░Deadly Force░.

_Any force that could Result in Death or Serious bodily injury_



1. Hammer
2. Decocking Lever
3. Rear Sight
4. Extractor
5. Ejection Port
6. Slide
7. Front Sight
8. Frame
9. Trigger guard
10. Trigger
11. Grip



1.   Stock
2.   ~~Ree~~ Safety
3.   Ejection Port
4.   Rear Sight
5.   barrel
6.   Front Sight
7.   Slide
8.   magazine tube
9.   Loading port
10.   ~~Bolt Release~~ Trigger
11.   Slide Release

NAME _David Ricky Best_          DATE _11-16-99_

(100)

GREENVILLE POLICE DEPARTMENT

IN-SERVICE FIREARMS TRAINING

TEST

ANSWER T OR F

F  1. To properly load the shotgun to the "cruiser safe" position, you should load one round into the chamber and then fill the magazine to capacity.  The safety must be in the "safe" position.

T  2. Sight picture is achieved when the front and rear sights are properly aligned and then put into the proper relationship with the target.

F  3. The shotgun should be carried in the "combat ready" position in the patrol car so it will be ready for immediate action when needed.

T  4. The standardized challenge that should be used by officers is "Police, Don't Move".

F  5. When you holster your weapon, two hands should be used whenever possible to insure that you get the weapon safely into the holster.

F  6. When reloading the semi-automatic handgun you should immediately drop the magazine out of the gun and then reach for your second magazine and insert it as quickly as possible into the weapon.

F  7. The Smith & Wesson semi-automatic handguns issued by this department is designed to fire with the magazine out of the gun as long as a round is in the chamber.

CIRCLE THE CORRECT LETTER

8. When utilizing the "hot range" concept of range operation:

   a. Officers will be required to engage multiple targets while moving from position to position.
   (b) It is the responsibility of each officer to ensure that their weapon remains loaded once firing has begun.
   c. Officers may choose what shooting position (standing, kneeling, etc.) they shoot from at each stage of fire.
   d. No time limits are utilized and each officer fires as quickly as he/she feels is appropriate.

J.A. 2631

9. When considering home safety, which of the following is not a recommended practice when other people may be present in the household:

    a. The weapon and ammunition should be stored separately when children are present.

    b. The weapon should be loaded and close by your bed so that it will be readily accessible in the event you are suddenly awakened during the night.

    c. Children should be taught the dangers of weapons and strict restrictions should be established.

    d. All of the above are recommended practices.

10. When 00B is fired from a standard police shotgun the rate of spread is approximately:

    a. 1 inch for each yard traveled down range.

    b. 3 inches for each yard traveled down range.

    c. 5 inches for each yard traveled down range.

    d. There is no standard rate of spread.

11. Which of the following is not one of the Cardinal Rules of Firearms Safety?

    a. All guns are always loaded.

    b. Never let the muzzle cover anything you are not willing to destroy.

    c. Always give loud verbal warning before firing warning shots.

    d. Be sure of your target and what is beyond.

12. When firing a police handgun the officer should disregard the rear sight and utilize only the front sight.

    a. True

    b. False

13. When discussing the operation of a semi-automatic handgun, match the definition with the correct function:

a.  feeding
b.  firing
c.  extracting
d.  ejecting

_d_  Throwing the expended casing out of the weapon by way of the ejection port.

_c_  removing the cartridge from the chamber by means of the extractor located on slide which engages the rim of the cartridge.

_a_  Takes place when a cartridge is placed in the path of the slide while it is traveling forward after recoil. The magazine is used for this purpose.

_b_  Takes place when the firing pin strikes the primer causing it to detonate sending the bullet through the barrel.

14. Performing a "tap rack" malfunction drill will usually correct all of the following stoppages except which one:

a.  Stovepipe
b.  Double feed
c.  Bad ammunition or misfire
d.  Magazine not properly seated

15. List in order the procedure for clearing a ⸬Double Feed⸬ in a semi-automatic pistol.

a.  _Slide to the rear_
b.  _drop magazine_
c.  _Release Slide_
d.  _Reinsert magazine_
e.  _rerack_

16. Define ⸬Deadly Force⸬.

_Any force - t that could cause death
or bodily injury_



1. Hammer
2. Decocking Lever
3. Rear sight
4. Extractor
5. Ejection Port
6. Slide
7. front sight
8. Frame
9. Trigger guard
10. Trigger
11. grip

1. stock
2. rear safty
3. ejection port
4. rear sight
5. barrel
6. front sight
7. Slide or forearm
8. magazine tube
9. loading port
10. trigger
11. slide release



# CRIMINAL JUSTICE EDUCATION AND TRAINING STANDARDS COMMISSION



NORTH CAROLINA DEPARTMENT OF JUSTICE

CRIMINAL JUSTICE STANDARDS DIVISION

POST OFFICE DRAWER 149 RALEIGH, NC 27602

TELEPHONE: 919-733-2530

**FORM F-9A**

## FIREARMS QUALIFICATION RECORD

This form must be utilized to record the annual In-Service Firearms Training and Qualification for each certified law enforcement officer in compliance with 12 NCAC 9E .0100. A copy must be maintained in each officer's personnel file at the employing agency, and must be available for inspection by a Commission Staff member. DO NOT SUBMIT THIS FORM TO STANDARDS DIVISION.

### INSTRUCTIONS

**SECTION I:**    Must be completed for every officer.
**SECTION II:**   Must be completed for every officer and signed and dated by the instructor.
If the instructor is qualifying officers from his/her own agency, that agency's qualification records may be used in lieu of completing Section V on the back side of this form. At a minimum, the agency records must contain the information noted on the back of this form and must be attached to this Record.
Instructors qualifying officers from agencies other than his/her own **must** utilize Section V of this form.
**SECTION III:**  Must be signed and dated by the officer.
**SECTION IV:**   Must be completed if the instructor is qualifying officers from agencies other than his/her own and must be completed in all cases if the officer fails to qualify.

**I.    OFFICER'S NAME:** _David R. Best_   **SSN:** ▓▓▓▓▓▓▓

   **EMPLOYING/APPOINTING AGENCY:** _Greenville P.D._

**II.   INSTRUCTOR COMPLIANCE CERTIFICATION:**

The officer listed above has participated in the annual In-Service Firearms Training and Qualification, and (check one of below):

[☒]  has qualified with all required weapons as indicated on the reverse side of this form, or on the agency records attached.

[ ]  has failed to qualify with one or more required weapons as indicated on the reverse side of this form, or on the agency records attached.

As Specific Firearms Instructor, I do hereby certify that the officer listed above has attained the qualification scores as documented. I further attest that this in-service training program was conducted consistent with the minimum requirements established by the Commission. I understand that if this officer has failed to qualify, that I must deliver a copy of this form to the officer's agency head or designated representative within 72 hours, either in person or by certified mail.

_Lt Chng E Cnt_ _____    ▓▓▓▓▓▓▓    _10/11/2001_
Signature of Firearms Instructor            SSN          Date Signed

**III.  ACKNOWLEDGEMENT OF QUALIFICATION SCORES:**

I do hereby certify that I have been advised of my firearms qualification scores by the Specific Firearms Instructor(s) indicated. I also understand that if I have failed to qualify with any weapon(s) required that I may not carry and/or have access to the weapon until such time that I have qualified. I further understand that I must notify my agency head or designated representative within 24 hours of my failure to qualify.

_[signature]_ _____    _10-11-01_
Signature of Officer                      Date Signed

**IV.  AGENCY ACKNOWLEDGEMENT OF QUALIFICATION SCORES:**

As agency head, or designated representative, I acknowledge receipt of the above listed officer's firearms qualification scores. I understand that if the officer has failed to qualify with any weapon(s) that I must restrict access to all applicable weapon(s) until such time as the officer qualifies with same.

_____    _____
Signature of Agency Head/Representative        Date Received

**J.A. 2636**

**OFFICER'S NAME:** DAVid R. BESt    **RANGE LOCATION:** Farmville RANGE

## V. SERVICE HANDGUN QUALIFICATION:

| Date | Weapon Type | Make | Model | Caliber or Guage | Serial # | Ammunition | Day(D) Nite(N) | Score (%) | Qualify Yes/No | Instructor Signature |
|------|------|------|------|------|------|------|------|------|------|------|
| 1. 10-11-01 | SA | SW | 4566 | 45caL | V2D3716 | SPEER 185gr GDHP | D | 91.6% | YES | Lt LeCont. |
| 2. " " " | " | " | " | " | " | " " " | N | 81.0% | YES | Lt LeCont. |
| 3. | | | | | | | | | | |
| 4. | | | | | | | | | | |

## OFF-DUTY HANDGUN QUALIFICATION:

| Date | Weapon Type | Make | Model | Caliber or Guage | Serial # | Ammunition | Day(D) Nite(N) | Score (%) | Qualify Yes/No | Instructor Signature |
|------|------|------|------|------|------|------|------|------|------|------|
| 1. | | | | | | | | | | |
| 2. | | | | | | | | | | |
| 3. | | | | | | | | | | |
| 4. | | | | | | | | | | |

## SHOTGUN/RIFLE QUALIFICATION

| Date | Weapon Type | Make | Model | Caliber or Guage | Serial # | Ammunition | Day(D) Nite(N) | Score (%) | Qualify Yes/No | Instructor Signature |
|------|------|------|------|------|------|------|------|------|------|------|
| 1. 10-11-01 | SG | Mos | 590 | 12 ga | L552362 | Fed. 00B-Slugs | D | 100% | YEs | Lt LeCont. |
| 2. " " " | " | " | " | " | " | " " | N | 100% | YEs | Lt LeCont. |
| 3. | | | | | | | | | | |
| 4. | | | | | | | | | | |

## AUTOMATIC/SPECIALTY WEAPONS

| Date | Weapon Type | Make | Model | Caliber or Guage | Serial # | Ammunition | Day(D) Nite(N) | Score (%) | Qualify Yes/No | Instructor Signature |
|------|------|------|------|------|------|------|------|------|------|------|
| 1. | | | | | | | | | | |
| 2. | | | | | | | | | | |
| 3. | | | | | | | | | | |
| 4. | | | | | | | | | | |

| WEAPON | MAKE | | OTHER |
|------|------|------|------|
| R - Revolver | SW - Smith & Wesson | REM - Remington | Ammunition - Must be actual duty round. |
| SA - Semi Auto Handgun | COLT - Colt | WIN - Winchester | Include sufficient information to fully describe. |
| SG - Shotgun | BER - Beretta | ITH - Ithaca | |
| AW - Automatic Weapon | RUG - Ruger | HS - High Standard | |
| RF - Rifle | SIG - Sig Sauer | MOS - Mossberg | |
| SW - Specialized Weapon | HK - Heckler & Koch | BRO - Browning | |
| | GL - Glock | | |

# CRIMINAL JUSTICE EDUCATION AND TRAINING STANDARDS COMMISSION



NORTH CAROLINA DEPARTMENT OF JUSTICE

CRIMINAL JUSTICE STANDARDS DIVISION

POST OFFICE DRAWER 149 RALEIGH NC 27602

TELEPHONE 919 733-2530

FORM F-9A

## FIREARMS QUALIFICATION RECORD

> This form must be utilized to record the annual In-Service Firearms Training and Qualification for each certified law enforcement officer in compliance with 12 NCAC 9E .0100. A copy must be maintained in each officer's personnel file at the employing agency, and must be available for inspection by a Commission Staff member. **DO NOT SUBMIT THIS FORM TO STANDARDS DIVISION.**

### INSTRUCTIONS

> **SECTION I:** Must be completed for every officer.
> **SECTION II:** Must be completed for every officer and signed and dated by the instructor.
> If the instructor is qualifying officers from his/her own agency, that agency's qualification records may be used in lieu of completing Section V on the back side of this form. At a minimum, the agency records must contain the information noted on the back of this form and must be attached to this Record.
> Instructors qualifying officers from agencies other than his/her own **must** utilize Section V of this form.
> **SECTION III:** Must be signed and dated by the officer.
> **SECTION IV:** Must be completed if the instructor is qualifying officers from agencies other than his/her own and must be completed in all cases if the officer fails to qualify.

**I.   OFFICER'S NAME:** _David Ricky BEST_   **SSN:** ▮▮▮▮▮▮▮▮

**EMPLOYING/APPOINTING AGENCY:** _Greenville Police Dept_

**II.   INSTRUCTOR COMPLIANCE CERTIFICATION:**

The officer listed above has participated in the annual In-Service Firearms Training and Qualification, and (check one of below):

[X] has qualified with all required weapons as indicated on the reverse side of this form, or on the agency records attached.

[ ] has failed to qualify with one or more required weapons as indicated on the reverse side of this form, or on the agency records attached.

As Specific Firearms Instructor, I do hereby certify that the officer listed above has attained the qualification scores as documented. I further attest that this in-service training program was conducted consistent with the minimum requirements established by the Commission. I understand that if this officer has failed to qualify, that I must deliver a copy of this form to the officer's agency head or designated representative within 72 hours, either in person or by certified mail.

_T. D. Smith_                              ▮▮▮▮▮▮▮         _10/24/02_
Signature of Firearms Instructor              SSN              Date Signed

**III.   ACKNOWLEDGEMENT OF QUALIFICATION SCORES:**

I do hereby certify that I have been advised of my firearms qualification scores by the Specific Firearms Instructor(s) indicated. I also understand that if I have failed to qualify with any weapon(s) required that I may not carry and/or have access to the weapon until such time that I have qualified. I further understand that I must notify my agency head or designated representative within 24 hours of my failure to qualify.

_David Best_                                      _10/24/02_
Signature of Officer                                 Date Signed

**IV.   AGENCY ACKNOWLEDGEMENT OF QUALIFICATION SCORES:**

As agency head, or designated representative, I acknowledge receipt of the above listed officer's firearms qualification scores. I understand that if the officer has failed to qualify with any weapon(s) that I must restrict access to all applicable weapon(s) until such time as the officer qualifies with same

_____        _____
Signature of Agency Head/Representative            Date Received

OFFICER'S NAME: _D. R. Best_    RANGE LOCATION: _Farmville, NC_

**V.  SERVICE HANDGUN QUALIFICATION:**

| Date | Weapon Type | Make | Model | Caliber or Guage | Serial # | Ammunition | Day(D) Nite(N) | Score (%) | Qualify Yes/No | Instructor Signature |
|------|-------------|------|-------|------------------|----------|------------|----------------|-----------|----------------|----------------------|
| 1. 1-02-02 | SA | SW | 4566 | .45 | V203771 | Spear 185 GDHP | D | 76.8 | YES | T.D. Saul |
| 2. " | " | " | " | " | " | " " " | N | 89.4 | YES | BC H |
| 3. | | | | | | | | | | |
| 4. | | | | | | | | | | |

**OFF-DUTY HANDGUN QUALIFICATION:**

| Date | Weapon Type | Make | Model | Caliber or Guage | Serial # | Ammunition | Day(D) Nite(N) | Score (%) | Qualify Yes/No | Instructor Signature |
|------|-------------|------|-------|------------------|----------|------------|----------------|-----------|----------------|----------------------|
| 1. | | | | | | | | | | |
| 2. | | | | | | | | | | |
| 3. | | | | | | | | | | |
| 4. | | | | | | | | | | |

**SHOTGUN/RIFLE QUALIFICATION**

| Date | Weapon Type | Make | Model | Caliber or Guage | Serial # | Ammunition | Day(D) Nite(N) | Score (%) | Qualify Yes/No | Instructor Signature |
|------|-------------|------|-------|------------------|----------|------------|----------------|-----------|----------------|----------------------|
| 1. 1-10-24-02 | SG | MOS | 590 | 12 GA. | L552371 | Fed. 00B/Slugs | D | 99 | YES | Ted Saul |
| 2. " | " | " | " " | " " | " " | " " " | N | 45 | YES | BC H |
| 3. | | | | | | | | | | |
| 4. | | | | | | | | | | |

**AUTOMATIC/SPECIALTY WEAPONS**

| Date | Weapon Type | Make | Model | Caliber or Guage | Serial # | Ammunition | Day(D) Nite(N) | Score (%) | Qualify Yes/No | Instructor Signature |
|------|-------------|------|-------|------------------|----------|------------|----------------|-----------|----------------|----------------------|
| 1. | | | | | | | | | | |
| 2. | | | | | | | | | | |
| 3. | | | | | | | | | | |
| 4. | | | | | | | | | | |

| WEAPON | MAKE | | OTHER |
|--------|------|--|-------|
| R - Revolver | SW - Smith & Wesson | REM - Remington | Ammunition - Must be actual duty round. |
| SA - Semi Auto Handgun | COLT - Colt | WIN - Winchester | Include sufficient information to fully describe. |
| SG - Shotgun | BER - Beretta | ITH - Ithaca | |
| AW - Automatic Weapon | RUG - Ruger | HS - High Standard | |
| RF - Rifle | SIG - Sig Sauer | MOS - Mossberg | |
| SW - Specialized Weapon | HK - Heckler & Koch | BRO - Browning | |
| | GLO - Glock | OTHER - Write In | |

**J.A. 2639**

## CRIMINAL JUSTICE EDUCATION AND TRAINING STANDARDS COMMISSION



NORTH CAROLINA DEPARTMENT OF JUSTICE

CRIMINAL JUSTICE STANDARDS DIVISION

POST OFFICE DRAWER 149 RALEIGH NC 27602

TELEPHONE 919-733 2530                    **FORM F-9A**

### FIREARMS QUALIFICATION RECORD

This form must be utilizied to record the annual In-Service Firearms Training and Qualification for each certified law enforcement officer in compliance with 12 NCAC 9E .0100. A copy must be maintained in each officer's personnel file at the employing agency, and must be available for inspection by a Commission Staff member. DO NOT SUBMIT THIS FORM TO STANDARDS DIVISION.

### INSTRUCTIONS

**SECTION I:** Must be completed for every officer.
**SECTION II:** Must be completed for every officer and signed and dated by the instructor.
If the instructor is qualifying officers from his/her own agency, that agency's qualification records may be used in lieu of completing Section V on the back side of this form. At a minimum, the agency records must contain the information noted on the back of this form and must be attached to this Record.
Instructors qualifying officers from agencies other than his/her own **must** utilize Section V of this form.
**SECTION III:** Must be signed and dated by the officer.
**SECTION IV:** Must be completed if the instructor is qualifying officers from agencies other than his/her own and must be completed in all cases if the officer fails to qualify.

I.  **OFFICER'S NAME:** DAVid Ricky BEST **SSN:** ▮▮ ▮ ▮▮▮▮

    **EMPLOYING/APPOINTING AGENCY:** GREENViLLE PoLice Dept.

II. **INSTRUCTOR COMPLIANCE CERTIFICATION:**

The officer listed above has participated in the annual In-Service Firearms Training and Qualification, and (check one of below):

[X] has qualified with all required weapons as indicated on the reverse side of this form, or on the agency records attached.

[ ] has failed to qualify with one or more required weapons as indicated on the reverse side of this form, or on the agency records attached.

As Specific Firearms Instructor, I do hereby certify that the officer listed above has attained the qualification scores as documented. I further attest that this in-service training program was conducted consistent with the minimum requirements established by the Commission. I understand that if this officer has failed to qualify, that I must deliver a copy of this form to the officer's agency head or designated representative within 72 hours, either in person or by certified mail.

_Seth Richard Dohmann_      ▮▮▮▮▮      10-18-00
Signature of Firearms Instructor      **SSN**      Date Signed

III. **ACKNOWLEDGEMENT OF QUALIFICATION SCORES:**

I do hereby certify that I have been advised of my firearms qualification scores by the Specific Firearms Instructor(s) indicated. I also understand that if I have failed to qualify with any weapon(s) required that I may not carry and/or have access to the weapon until such time that I have qualified. I further understand that I must notify my agency head or designated representative within 24 hours of my failure to qualify.

_David Ricky Best_      10-18-00
Signature of Officer      Date Signed

IV. **AGENCY ACKNOWLEDGEMENT OF QUALIFICATION SCORES:**

As agency head, or designated representative, I acknowledge receipt of the above listed officer's firearms qualification scores. I understand that if the officer has failed to qualify with any weapon(s) that I must restrict access to all applicable weapon(s) until such time as the officer qualifies with same

_____      _____
Signature of Agency Head/Representative      Date Received

**J.A. 2640**

OFFICER'S NAME: _DAVid Ricky BEST_    RANGE LOCATION: _FARMViLLE RANGE_

## V. SERVICE HANDGUN QUALIFICATION:

| | Date | Weapon Type | Make | Model | Caliber or Guage | Serial # | Ammunition | Day(D) Nite(N) | Score (%) | Qualify Yes/No | Instructor Signature |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. | 10/18/18 | SA | SW | 4566 | .45 | V2D3716 | Speer 185 gr. GDHP | D | 85.6% | Yes | S.A.O.C Johnson |
| 2. | " | " | " | " | " | " | " " " | N | 82.4% | Yes | S.A.O.C Johnson |
| 3. | | | | | | | | | | | |
| 4. | | | | | | | | | | | |

## OFF-DUTY HANDGUN QUALIFICATION:

| | Date | Weapon Type | Make | Model | Caliber or Guage | Serial # | Ammunition | Day(D) Nite(N) | Score (%) | Qualify Yes/No | Instructor Signature |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. | | | | | | | | | | | |
| 2. | | | | | | | | | | | |
| 3. | | | | | | | | | | | |
| 4. | | | | | | | | | | | |

## SHOTGUN/RIFLE QUALIFICATION

| | Date | Weapon Type | Make | Model | Caliber or Guage | Serial # | Ammunition | Day(D) Nite(N) | Score (%) | Qualify Yes/No | Instructor Signature |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. | 10/18/18 | SG | MOS | 590 | 12 GA | P249241 | Fed. 00B. S/455 | D | 100% | Yes | S.A.O.C Johnson |
| 2. | " | " | " | " | " | " | " " " | N | 100% | Yes | S.A.O.C Johnson |
| 3. | | | | | | | | | | | |
| 4. | | | | | | | | | | | |

## AUTOMATIC/SPECIALTY WEAPONS

| | Date | Weapon Type | Make | Model | Caliber or Guage | Serial # | Ammunition | Day(D) Nite(N) | Score (%) | Qualify Yes/No | Instructor Signature |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. | | | | | | | | | | | |
| 2. | | | | | | | | | | | |
| 3. | | | | | | | | | | | |
| 4. | | | | | | | | | | | |

| WEAPON | MAKE | | OTHER |
|---|---|---|---|
| R - Revolver | SW - Smith & Wesson | REM - Remington | Ammunition - Must be actual duty round. |
| SA - Semi Auto Handgun | COLT - Colt | WIN - Winchester | Include sufficient information to fully describe. |
| SG - Shotgun | BER - Beretta | ITH - Ithaca | |
| AW - Automatic Weapon | RUG - Ruger | HS - High Standard | |
| RF - Rifle | SIG - Sig Sauer | MOS - Mossberg | |
| SW - Specialized Weapon | HK - Heckler & Koch | BRO - Browning | |
| | GLO - Glock | OTHER - Write In | |

# CRIMINAL JUSTICE EDUCATION AND TRAINING STANDARDS COMMISSION



NORTH CAROLINA DEPARTMENT OF JUSTICE

## CRIMINAL JUSTICE STANDARDS DIVISION

POST OFFICE DRAWER 149 RALEIGH, NC 27602

TELEPHONE 919 733 2530

FORM F-9A

### FIREARMS QUALIFICATION RECORD

This form must be utilized to record the annual In-Service Firearms Training and Qualification for each certified law enforcement officer in compliance with 12 NCAC 9E .0100. A copy must be maintained in each officer's personnel file at the employing agency, and must be available for inspection by a Commission Staff member. DO NOT SUBMIT THIS FORM TO STANDARDS DIVISION.

### INSTRUCTIONS

SECTION I:   Must be completed for every officer.
SECTION II:  Must be completed for every officer and signed and dated by the instructor.
    If the instructor is qualifying officers from his/her own agency, that agency's qualification records may be used in lieu of completing Section V on the back side of this form. At a minimum, the agency records must contain the information noted on the back of this form and must be attached to this Record.
    Instructors qualifying officers from agencies other than his/her own **must** utilize Section V of this form.
SECTION III: Must be signed and dated by the officer.
SECTION IV:  Must be completed if the instructor is qualifying officers from agencies other than his/her own and must be completed in all cases if the officer fails to qualify.

I.   OFFICER'S NAME: _David Ricky Best_   SSN: ▮▮▮▮▮▮▮▮
     EMPLOYING/APPOINTING AGENCY: _Greenville Police Dept._

II.  **INSTRUCTOR COMPLIANCE CERTIFICATION:**

The officer listed above has participated in the annual In-Service Firearms Training and Qualification, and (check one of below):

[X] has qualified with all required weapons as indicated on the reverse side of this form, or on the agency records attached.

[ ] has failed to qualify with one or more required weapons as indicated on the reverse side of this form, or on the agency records attached.

As Specific Firearms Instructor, I do hereby certify that the officer listed above has attained the qualification scores as documented. I further attest that this in-service training program was conducted consistent with the minimum requirements established by the Commission. I understand that if this officer has failed to qualify, that I must deliver a copy of this form to the officer's agency head or designated representative within 72 hours, either in person or by certified mail.

_Sgt. David M. Johnson_ ▮▮▮▮▮▮ SSN    **11-16-99**
Signature of Firearms Instructor                         Date Signed

III. **ACKNOWLEDGEMENT OF QUALIFICATION SCORES:**

I do hereby certify that I have been advised of my firearms qualification scores by the Specific Firearms Instructor(s) indicated. I also understand that if I have failed to qualify with any weapon(s) required that I may not carry and/or have access to the weapon until such time that I have qualified. I further understand that I must notify my agency head or designated representative within 24 hours of my failure to qualify.

_David Ricky Best_    **11-16-99**
Signature of Officer                                     Date Signed

IV. **AGENCY ACKNOWLEDGEMENT OF QUALIFICATION SCORES:**

As agency head, or designated representative, I acknowledge receipt of the above listed officer's firearms qualification scores. I understand that if the officer has failed to qualify with any weapon(s) that I must restrict access to all applicable weapon(s) until such time as the officer qualifies with same

_____        _____
Signature of Agency Head/Representative          Date Received

OFFICER'S NAME: David Ricky Best     RANGE LOCATION: Farmville

## V. SERVICE HANDGUN QUALIFICATION:

| Date | Weapon Type | Make | Model | Caliber or Guage | Serial # | Ammunition | Day(D) Nite(N) | Score (%) | Qualify Yes/No | Instructor Signature |
|------|-------------|------|-------|------------------|----------|------------|----------------|-----------|----------------|----------------------|
| 1. 11-16-99 | SA | SW | 4566 | 45 | V203716 | Federal 185 GDHP | D | 86.5% | Yes | Sgt R Johnson |
| 2. " " " | " " | " " | " | " | " | " " " " | N | 92.4% | Yes | Sgt R Johnson |
| 3. | | | | | | | | | | |
| 4. | | | | | | | | | | |

## OFF-DUTY HANDGUN QUALIFICATION:

| Date | Weapon Type | Make | Model | Caliber or Guage | Serial # | Ammunition | Day(D) Nite(N) | Score (%) | Qualify Yes/No | Instructor Signature |
|------|-------------|------|-------|------------------|----------|------------|----------------|-----------|----------------|----------------------|
| 1. | | | | | | | | | | |
| 2. | | | | | | | | | | |
| 3. | | | | | | | | | | |
| 4. | | | | | | | | | | |

## SHOTGUN/RIFLE QUALIFICATION

| Date | Weapon Type | Make | Model | Caliber or Guage | Serial # | Ammunition | Day(D) Nite(N) | Score (%) | Qualify Yes/No | Instructor Signature |
|------|-------------|------|-------|------------------|----------|------------|----------------|-----------|----------------|----------------------|
| 1. 11-16-99 | SG | MOS | 590 | 12 | L854040 | Fed. 00B - Slug | D | 100% | Yes | Sgt R Johnson |
| 2. | | | | | | | | | | |
| 3. | | | | | | | | | | |
| 4. | | | | | | | | | | |

## AUTOMATIC/SPECIALTY WEAPONS

| Date | Weapon Type | Make | Model | Caliber or Guage | Serial # | Ammunition | Day(D) Nite(N) | Score (%) | Qualify Yes/No | Instructor Signature |
|------|-------------|------|-------|------------------|----------|------------|----------------|-----------|----------------|----------------------|
| 1. | | | | | | | | | | |
| 2. | | | | | | | | | | |
| 3. | | | | | | | | | | |
| 4. | | | | | | | | | | |

| WEAPON | MAKE | | OTHER |
|--------|------|---|-------|
| R - Revolver | SW - Smith & Wesson | REM - Remington | Ammunition - Must be actual duty round. |
| SA - Semi Auto Handgun | COLT - Colt | WIN - Winchester | Include sufficient information to fully describe. |
| SG - Shotgun | BER - Beretta | ITH - Ithaca | |
| AW - Automatic Weapon | RUG - Ruger | HS - High Standard | |
| RF - Rifle | SIG - Sig Sauer | MOS - Mossberg | |
| SW - Specialized Weapon | HK - Heckler & Koch | BRO - Browning | |
| | GLO - Glock | OTHER - Write In | |

**J.A. 2643**

# CRIMINAL JUSTICE EDUCATION AND TRAINING STANDARDS COMMISSION



NORTH CAROLINA DEPARTMENT OF JUSTICE

CRIMINAL JUSTICE STANDARDS DIVISION

POST OFFICE DRAWER 149 RALEIGH NC 27602

TELEPHONE 919-733-2530

FORM F-9A

### FIREARMS QUALIFICATION RECORD

> This form must be utilized to record the annual In-Service Firearms Training and Qualification for
> each certified law enforcement officer in compliance with 12 NCAC 9E .0100. A copy must be main-
> tained in each officer's personnel file at the employing agency, and must be available for in-
> spection by a Commission Staff member. DO NOT SUBMIT THIS FORM TO STANDARDS DIVISION.

### INSTRUCTIONS

> SECTION I:  Must be completed for every officer.
> SECTION II:  Must be completed for every officer and signed and dated by the instructor.
>   If the instructor is qualifying officers from his/her own agency, that agency's qualification records
>   may be used in lieu of completing Section V on the back side of this form  At a minimum, the agency
>   records must contain the information noted on the back of this form and must be attached to this
>   Record.
>   Instructors qualifying officers from agencies other than his/her own **must** utilize Section V of this
>   form.
> SECTION III:  Must be signed and dated by the officer.
> SECTION IV:  Must be completed if the instructor is qualifying officers from agencies other than
>   his/her own and must be completed in all cases if the officer fails to qualify.

I.   OFFICER'S NAME: _David R. Best_     SSN: ▓▓▓▓▓▓▓

   EMPLOYING/APPOINTING AGENCY: _Greenville P.D._

II.  INSTRUCTOR COMPLIANCE CERTIFICATION:

   The officer listed above has participated in the annual In-Service Firearms Training and Qualification,
   and (check one of below):

   [X] has qualified with all required weapons as indicated on the reverse side of this form, or on the
       agency records attached.

   [ ] has failed to qualify with one or more required weapons as indicated on the reverse side of this
       form, or on the agency records attached.

   As Specific Firearms Instructor, I do hereby certify that the officer listed above has attained the
   qualification scores as documented. I further attest that this in-service training program was
   conducted consistent with the minimum requirements established by the Commission. I understand
   that if this officer has failed to qualify, that I must deliver a copy of this form to the officer's agency head
   or designated representative within 72 hours, either in person or by certified mail.

   _Sgt. OC Johnson_                    ▓▓▓▓▓▓▓          _12-8-98_
   Signature of Firearms Instructor          SSN           Date Signed

III. ACKNOWLEDGEMENT OF QUALIFICATION SCORES:

   I do hereby certify that I have been advised of my firearms qualification scores by the Specific Firearms
   Instructor(s) indicated. I also understand that if I have failed to qualify with any weapon(s) required
   that I may not carry and/or have access to the weapon until such time that I have qualified. I further
   understand that I must notify my agency head or designated representative within 24 hours of my
   failure to qualify.

   _David R Best_                               _12-08-58_
   Signature of Officer                          Date Signed

IV.  AGENCY ACKNOWLEDGEMENT OF QUALIFICATION SCORES:

   As agency head, or designated representative, I acknowledge receipt of the above listed officer's
   firearms qualification scores. I understand that if the officer has failed to qualify with any weapon(s)
   that I must restrict access to all applicable weapon(s) until such time as the officer qualifies with same

   _____          _____
   Signature of Agency Head/Representative          Date Received

OFFICER'S NAME: _David R. Best_    RANGE LOCATION: _Farmville_

## V.  SERVICE HANDGUN QUALIFICATION:

| | Date | Weapon Type | Make | Model | Caliber or Guage | Serial # | Ammunition | Day(D) Nite(N) | Score (%) | Qualify Yes/No | Instructor Signature |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. | | | | | | | | | | | |
| 2. | | | | | | | | | | | |
| 3. | | | | | | | | | | | |
| 4. | | | | | | | | | | | |

## OFF-DUTY HANDGUN QUALIFICATION:

| | Date | Weapon Type | Make | Model | Caliber or Guage | Serial # | Ammunition | Day(D) Nite(N) | Score (%) | Qualify Yes/No | Instructor Signature |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. | 1,20x.98 | SA | SW | 690r | 9 mm | TH86253 | Fed  1476r JHP | D | 96% | Yes | Sgt DC Johnson |
| 2. | " | " | " | " | " | " | " | N | 96.6% | Yes | Sgt DC Johnson |
| 3. | | | | | | | | | | | |
| 4 | | | | | | | | | | | |

## SHOTGUN/RIFLE QUALIFICATION

| | Date | Weapon Type | Make | Model | Caliber or Guage | Serial # | Ammunition | Day(D) Nite(N) | Score (%) | Qualify Yes/No | Instructor Signature |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. | | | | | | | | | | | |
| 2. | | | | | | | | | | | |
| 3. | | | | | | | | | | | |
| 4. | | | | | | | | | | | |

## AUTOMATIC/SPECIALTY WEAPONS

| | Date | Weapon Type | Make | Model | Caliber or Guage | Serial # | Ammunition | Day(D) Nite(N) | Score (%) | Qualify Yes/No | Instructor Signature |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. | | | | | | | | | | | |
| 2. | | | | | | | | | | | |
| 3. | | | | | | | | | | | |
| 4. | | | | | | | | | | | |

| WEAPON | MAKE | | OTHER |
|---|---|---|---|
| R - Revolver | SW - Smith & Wesson | REM - Remington | Ammunition - Must be actual duty round. |
| SA - Semi Auto Handgun | COLT - Colt | WIN - Winchester | Include sufficient information to fully describe |
| SG - Shotgun | BER - Beretta | ITH - Ithaca | |
| AW - Automatic Weapon | RUG - Ruger | HS - High Standard | |
| RF - Rifle | SIG - Sig Sauer | MOS - Mossberg | |
| SW - Specialized Weapon | HK - Heckler & Koch | BRO - Browning | |
| | GLO - Glock | OTHER - Write In | |

J.A. 2645

## CRIMINAL JUSTICE EDUCATION AND TRAINING STANDARDS COMMISSION



NORTH CAROLINA DEPARTMENT OF JUSTICE

CRIMINAL JUSTICE STANDARDS DIVISION

POST OFFICE DRAWER 149  RALEIGH  NC 27602

TELEPHONE  919-733-2530

**FORM F-9A**

### FIREARMS QUALIFICATION RECORD

This form must be utilized to record the annual In-Service Firearms Training and Qualification for each certified law enforcement officer in compliance with 12 NCAC 9E .0100. A copy must be maintained in each officer's personnel file at the employing agency, and must be available for inspection by a Commission Staff member. **DO NOT SUBMIT THIS FORM TO STANDARDS DIVISION.**

### INSTRUCTIONS

**SECTION I:**  Must be completed for every officer.
**SECTION II:**  Must be completed for every officer and signed and dated by the instructor.
If the instructor is qualifying officers from his/her own agency, that agency's qualification records may be used in lieu of completing Section V on the back side of this form. At a minimum, the agency records must contain the information noted on the back of this form and must be attached to this Record.
Instructors qualifying officers from agencies other than his/her own **must** utilize Section V of this form.
**SECTION III:**  Must be signed and dated by the officer.
**SECTION IV:**  Must be completed if the instructor is qualifying officers from agencies other than his/her own and must be completed in all cases if the officer fails to qualify.

**I.**   OFFICER'S NAME: _David Ricky Best_  SSN: ██████████

EMPLOYING/APPOINTING AGENCY: _Greenville Police Dept_

**II.**  **INSTRUCTOR COMPLIANCE CERTIFICATION:**

The officer listed above has participated in the annual In-Service Firearms Training and Qualification, and (check one of below):

☒ has qualified with all required weapons as indicated on the reverse side of this form, or on an agency records attached.

☐ has failed to qualify with one or more required weapons as indicated on the reverse side of this form, or on the agency records attached.

As Specific Firearms Instructor, I do hereby certify that the officer listed above has attained the qualification scores as documented. I further attest that this in-service training program was conducted consistent with the minimum requirements established by the Commission. I understand that if this officer has failed to qualify, that I must deliver a copy of this form to the officer's agency head or designated representative within 72 hours, either in person or by certified mail.

_Signature of Firearms Instructor_              ██████████  _10-29-98_
                                               **SSN**        Date Signed

**III.**  **ACKNOWLEDGEMENT OF QUALIFICATION SCORES:**

I do hereby certify that I have been advised of my firearms qualification scores by the Specific Firearms Instructor(s) indicated. I also understand that if I have failed to qualify with any weapon(s) required that I may not carry and/or have access to the weapon until such time that I have qualified. I further understand that I must notify my agency head or designated representative within 24 hours of my failure to qualify.

_David Ricky Best_                            _10-28-98_
Signature of Officer                          Date Signed

**IV.**  **AGENCY ACKNOWLEDGEMENT OF QUALIFICATION SCORES:**

As agency head, or designated representative, I acknowledge receipt of the above listed officer's firearms qualification scores. I understand that if the officer has failed to qualify with any weapon(s) that I must restrict access to all applicable weapon(s) until such time as the officer qualifies with same

Signature of Agency Head/Representative                          Date Received

**J.A. 2646**

OFFICER'S NAME: David Ricky Best     RANGE LOCATION: Farmville Range

## V. SERVICE HANDGUN QUALIFICATION:

| Date | Weapon Type | Make | Model | Caliber or Gauge | Serial # | Ammunition | Day(D) Nite(N) | Score (%) | Qualify Yes/No | Instructor Signature |
|------|-------------|------|-------|------------------|----------|------------|----------------|-----------|----------------|---------------------|
| 1. 10-25-98 | SA | S&W | 4566 | .45 | V2D3716 | Speer 185gr. GDHP | D | 81.2% | Yes | Sgt DROJohnson |
| 2. " " " | " " | " " | " | " | " | " " " | N | 75.2% | Yes | Sgt DROJohnson |
| 3. | | | | | | | | | | |
| 4. | | | | | | | | | | |

## OFF-DUTY HANDGUN QUALIFICATION:

| Date | Weapon Type | Make | Model | Caliber or Guage | Serial # | Ammunition | Day(D) Nite(N) | Score (%) | Qualify Yes/No | Instructor Signature |
|------|-------------|------|-------|------------------|----------|------------|----------------|-----------|----------------|---------------------|
| 1. | | | | | | | | | | |
| 2. | | | | | | | | | | |
| 3. | | | | | | | | | | |
| 4. | | | | | | | | | | |

## SHOTGUN/RIFLE QUALIFICATION

| Date | Weapon Type | Make | Model | or Guage | Serial # | Ammunition | Day(D) Nite(N) | Score (%) | Qualify Yes/No | Instructor Signature |
|------|-------------|------|-------|----------|----------|------------|----------------|-----------|----------------|---------------------|
| 1. 10-25-98 | SG | MOS | 590 | 12 | L763609 | Federal 00B- Sluss | D | 100 | Yes | Sgt DROJohnson |
| 2. | | | | | | | | | | |
| 3. | | | | | | | | | | |
| 4. | | | | | | | | | | |

## AUTOMATIC/SPECIALTY WEAPONS

| Date | Weapon Type | Make | Model | Caliber or Guage | Serial # | Ammunition | Day(D) Nite(N) | Score (%) | Qualify Yes/No | Instructor Signature |
|------|-------------|------|-------|------------------|----------|------------|----------------|-----------|----------------|---------------------|
| 1. | | | | | | | | | | |
| 2. | | | | | | | | | | |
| 3. | | | | | | | | | | |
| 4. | | | | | | | | | | |

| WEAPON | MAKE | OTHER |
|--------|------|-------|
| R - Revolver | SW - Smith & Wesson     REM - Remington | Ammunition - Must be actual duty round. |
| SA - Semi Auto Handgun | COLT - Colt     WIN - Winchester | Include sufficient information to fully describe. |
| SG - Shotgun | BER - Beretta     ITH - Ithaca | |
| AW - Automatic Weapon | RUG - Ruger     HS - High Standard | |
| RF - Rifle | SIG - Sig Sauer     MOS - Mossberg | |
| SW - Specialized Weapon | HK - Heckler & Koch     BRO - Browning | |
| | GLO - Glock     OTHER - Write in | |

## J.A. 2647



# CRIMINAL JUSTICE EDUCATION AND TRAINING STANDARDS COMMISSION



NORTH CAROLINA DEPARTMENT OF JUSTICE

**CRIMINAL JUSTICE STANDARDS DIVISION**

POST OFFICE DRAWER 149 RALEIGH NC 27602

TELEPHONE 919·733·2530          **FORM F-9A**

### FIREARMS QUALIFICATION RECORD

---

This form must be utilized to record the annual In-Service Firearms Training and Qualification for each certified law enforcement officer in compliance with 12 NCAC 9E .0100. A copy must be maintained in each officer's personnel file at the employing agency, and must be available for inspection by a Commission Staff member. **DO NOT SUBMIT THIS FORM TO STANDARDS DIVISION.**

---

### INSTRUCTIONS

**SECTION I:**   Must be completed for every officer.

**SECTION II:**   Must be completed for every officer and signed and dated by the instructor.
If the instructor is qualifying officers from his/her own agency, that agency's qualification records may be used in lieu of completing Section V on the back side of this form. At a minimum, the agency records must contain the information noted on the back of this form and must be attached to this Record.
Instructors qualifying officers from agencies other than his/her own **must** utilize Section V of this form.

**SECTION III:**   Must be signed and dated by the officer.

**SECTION IV:**   Must be completed if the instructor is qualifying officers from agencies other than his/her own and must be completed in all cases if the officer fails to qualify.

---

**I.**   OFFICER'S NAME: _David Ricky Best_   SSN: ▬▬▬▬

    EMPLOYING/APPOINTING AGENCY: _Greenville Police Department_

**II.**   **INSTRUCTOR COMPLIANCE CERTIFICATION:**

The officer listed above has participated in the annual In-Service Firearms Training and Qualification, and (check one of below):

☒   has qualified with all required weapons as indicated on the reverse side of this form, or on the agency records attached.

☐   has failed to qualify with one or more required weapons as indicated on the reverse side of this form, or on the agency records attached.

As Specific Firearms Instructor, I do hereby certify that the officer listed above has attained the qualification scores as documented. I further attest that this in-service training program was conducted consistent with the minimum requirements established by the Commission. I understand that if this officer has failed to qualify, that I must deliver a copy of this form to the officer's agency head or designated representative within 72 hours, either in person or by certified mail.

_Sgt. D. C. Johnson_         ▬▬▬▬       _11-6-97_
Signature of Firearms Instructor       **SSN**        Date Signed

**III.**   **ACKNOWLEDGEMENT OF QUALIFICATION SCORES:**

I do hereby certify that I have been advised of my firearms qualification scores by the Specific Firearms Instructor(s) indicated. I also understand that if I have failed to qualify with any weapon(s) required that I may not carry and/or have access to the weapon until such time that I have qualified. I further understand that I must notify my agency head or designated representative within 24 hours of my failure to qualify.

_David Ricky Best_               _11-6-97_
Signature of Officer                Date Signed

**IV.**   **AGENCY ACKNOWLEDGEMENT OF QUALIFICATION SCORES:**

As agency head, or designated representative, I acknowledge receipt of the above listed officer's firearms qualification scores. I understand that if the officer has failed to qualify with any weapon(s) that I must restrict access to all applicable weapon(s) until such time as the officer qualifies with same

_____       _____
Signature of Agency Head/Representative       Date Received

OFFICER'S NAME: _David Ricky Best_     RANGE LOCATION: _Farmville Range_

## V. SERVICE HANDGUN QUALIFICATION:

| Date | Weapon Type | Make | Model | Caliber or Guage | Serial # | Ammunition | Day(D) Nite(N) | Score (%) | Qualify Yes/No | Instructor Signature |
|---|---|---|---|---|---|---|---|---|---|---|
| 1. 11-6-91 | SA | SW | 4566 | .45 | V2D39116 | Speer 185 Gr. GDHP | D | 96.0% | Yes | SAO Johnson |
| 2. " " | " | " | " | " | " | " " " " | N | 81.6% | Yes | SAO Johnson |
| 3. | | | | | | | | | | |
| 4. | | | | | | | | | | |

## OFF-DUTY HANDGUN QUALIFICATION:

| Date | Weapon Type | Make | Model | Caliber or Guage | Serial # | Ammunition | Day(D) Nite(N) | Score (%) | Qualify Yes/No | Instructor Signature |
|---|---|---|---|---|---|---|---|---|---|---|
| 1. | | | | | | | | | | |
| 2. | | | | | | | | | | |
| 3. | | | | | | | | | | |
| 4. | | | | | | | | | | |

## SHOTGUN/RIFLE QUALIFICATION

| Date | Weapon Type | Make | Model | Caliber or Guage | Serial # | Ammunition | Day(D) Nite(N) | Score (%) | Qualify Yes/No | Instructor Signature |
|---|---|---|---|---|---|---|---|---|---|---|
| 1. 11-6-91 | S.G. | mos | 590 | 12 ga. | L763631 | Fed 00B-8Lugs | D | 100% | Yes | SAO Johnson |
| 2. | | | | | | | | | | |
| 3. | | | | | | | | | | |
| 4. | | | | | | | | | | |

## AUTOMATIC/SPECIALTY WEAPONS

| Date | Weapon Type | Make | Model | Caliber or Guage | Serial # | Ammunition | Day(D) Nite(N) | Score (%) | Qualify Yes/No | Instructor Signature |
|---|---|---|---|---|---|---|---|---|---|---|
| 1. | | | | | | | | | | |
| 2. | | | | | | | | | | |
| 3. | | | | | | | | | | |
| 4. | | | | | | | | | | |

| WEAPON | MAKE | | OTHER |
|---|---|---|---|
| R - Revolver | SW - Smith & Wesson | REM - Remington | Ammunition – Must be actual duty round. |
| SA - Semi Auto Handgun | COLT - Colt | WIN - Winchester | Include sufficient information to fully describe. |
| SG - Shotgun | BER - Beretta | ITH - Ithaca | |
| AW - Automatic Weapon | RUG - Ruger | HS - High Standard | |
| RF - Rifle | SIG - Sig Sauer | MOS - Mossberg | |
| SW - Specialized Weapon | HK - Heckler & Koch | BRO - Browning | |
| | GLO - Glock | OTHER - Write In | |

**J.A. 2649**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
## EASTERN DIVISION
### No. 4:21-CV-000185-BO

| | |
|---|---|
| **Montoyae Dontae Sharpe,** | |
| **Plaintiff,** | |
| **V.** | |
| **R.L. "Ricky" Best, Carolyn Melvin, Jeffrey D. Shrock, and the City Of Greenville, North Carolina,** | **AFFIDAVIT OF DAVID "RICKY" BEST** |
| **Defendants.** | |

The undersigned, David "Ricky" Best, being first duly sworn, deposes and states under oath as follows:

1.     I am over the age of eighteen years and am otherwise under no legal disability.

2.     Those matters stated herein are based upon my own personal knowledge, except as to those stated upon information and belief, and as to those matters, I believe them to be true.

3.     In preparing this Affidavit, I have reviewed Plaintiff's Amended Complaint, which is designated Document Number 243 to this action.

4.     I retired from the Greenville Police Department in October of 2003. At no time since my retirement have I ever been to the Greenville Police Department's Property and Evidence Section, nor have I authorized the destruction of any property or evidence since my retirement.

5.     I did not interfere with Beatrice Stokes recantation in 2000. I did not tell Beatrice Stokes that I wanted Dontae Sharpe found guilty. I did not tell Beatrice Stokes that I would take care of her. I did not pay Beatrice Stokes $200 at any time before or after Dontae Sharpe's criminal trial.

1

6.    I knew nothing of Charlene Johnson's alleged mental or psychiatric issues at any time prior to or during Dontae Sharpe's criminal trial in July 1995.

7.    I was called to testify at a December 1997 MAR hearing. I did not speak with anyone from the D.A.'s office or with then District Attorney Clark Everett about my testimony prior to, or in preparation for, that hearing. I answered questions posed to me to the best of my recollection while I was on the stand.

8.    Charlene Johnson never told me that she had lied about Dontae Sharpe's involvement in the murder of George Radcliffe.

9.    I had no involvement in, and was not aware of until well after the fact, that Sergeant Nichols interviewed Beatrice Stokes on or around December 2000. Nor was I was involved in any way in securing a statement from Ms. Stokes during this time.

10.    I was retired from the Greenville Police Department prior to 2004 and was not involved in, nor aware of, the proper disposition or destruction of any evidence collected during the investigation into the homicide of George Radcliffe.

11.    I have reviewed a document identified as Exhibit 23 (Bates No. "Sharpe 004929 – 004932"), identified on the first page as "Greenville Police – Property Report." The "Date Property Released" vertical column does not say "Best," nor did I have anything to do with the release of any such property identified in this document. I did not destroy or authorize the destruction of any evidence collected in this case.

12.    I was not aware of Dontae Sharpe's post-conviction efforts between 1998 and 2012.

13.    I was not contacted by anyone from the Innocence Project, or Duke's Wrongful Conviction Clinic, on or near 2004 in any way as alleged in Plaintiff's Complaint.

14.    On or about 2012, I was approached several times by individuals who identified themselves as being associated with the Duke Wrongful Conviction Clinic. I declined to be interviewed and, instead, directed them to meet with Carolyn Melvin.

[SIGNATURE NEXT PAGE]

2

This the 26th day of November 2024.

David "Ricky" Best

Sworn to and subscribed before me this 26th day of November, 2024.

Terri B. Stansbury
Notary Public



My Commission Expires:
12-14-26

3

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
## EASTERN DIVISION
### No. 4:21-CV-000185-BO

| |
|---|
| Montoyae Dontae Sharpe, |
| **Plaintiff,** |
| **V.** |
| R.L. "Ricky" Best, Carolyn Melvin, Jeffrey D. Shrock, and the City Of Greenville, North Carolina, |
| **Defendants.** |

**AFFIDAVIT OF MOLLY MUISE**

The undersigned, Molly Muise, being first duly sworn, deposes and states under oath as follows:

1.    I am over the age of eighteen years, and am otherwise under no legal disability.

2.    Those matters stated herein are based upon my own personal knowledge except as to those stated upon information and belief and, as to those matter, I believe them to be true.

3.    I formally joined the Greenville Police Department in April of 2007 and am currently employed as the supervisor for the Greenville Police Department's Property & Evidence Division.

4.    I am familiar with the generally accepted and customary practices of property and evidence destruction within the Greenville Police Department.

5.    In preparing this Affidavit, I have reviewed the property report attached hereto as **Exhibit A**.

6.    Prior to 2007, the procedure in place for the destruction of all items was that it had to be notated in the Record Management System ("RMS") and on the property report. Specifically, employees were to indicate that an item was destroyed

1

by writing "DEST" in red ink on the right side of the property report under the "Date property released" column. Additionally, employees were instructed to write "NIPOC" which indicated that the item was "Not in Possession of Custodian" on the left side on the property report.

7.     The policy described above was in place when I arrived at the Greenville Police Department in April of 2007 until June of 2009 when we began to use a different RMS and transitioned away from handwritten property reports.

8.     There is no way to determine who actually wrote "DEST" on the November 29, 2004 property report. Nonetheless, the RMS indicates that Larry Hopkins and John Teel were the individuals that destroyed a checkbook, car keys, the victim's clothes, blood viles, and miscellaneous items in this matter.

9.     Because so much time has passed, I do not know whether there was a court order or written direction for the destruction of any items in this case.

10.     The normal practice within our division in regards to evidence testing was for the Forensics division to complete testing prior to submitting the evidence to the Property & Evidence division. It is not common practice to complete additional testing before destruction.

This the 25 day of November 2024.

*Molly W. Meuse*

Sworn to and subscribed
before me this 25 day
of November, 2024

*[signature]*

Notary Public

My Commission Expires:
1/18/2025

2

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION
Lead Case No. 4:21-CV-00185-BO**
*Consolidated with 4:22-CV-00088-BO*

|  |  |
|---|---|
| **MONTOYAE DONTAE SHARPE,**<br><br>                                  **Plaintiff,**<br><br>**V.**<br><br>**DAVID RICKY BEST, JEFFREY D. SHROCK, CAROLYN MELVIN, and the CITY OF GREENVILLE, NORTH CAROLINA,**<br><br>                                  **Defendants.** | **DEFENDANT THE CITY OF GREENVILLE NORTH CAROLINA'S STATEMENT OF UNDISPUTED MATERIAL FACTS** |

Pursuant to Local Rule 56.1(a)(1), Defendant the City of Greenville North Carolina (hereinafter referred to as the "Defendant" or "the City"), by and through undersigned counsel, hereby submits this Statement of Undisputed Material Facts. Pursuant to Local Civil Rule 56.1(a)(4), all exhibits or other documents referenced herein are being included in an appendix and denominated as "Defendants Joint Appendix to Local Civil Rule 56.1 Statement of Undisputed Material Facts." Citations to the evidence contained in the Defendants' Appendix shall be made herein as "App _." The undisputed facts are as follows:

**<u>The Investigation of the Murder of George Radcliffe</u>**

1.      On February 11, 1994, George Radcliffe (the "Victim") was found shot to death around 9:15 pm (the "Murder"). App. A, p. 1. "Officer Jones Report" SHARPE 003707-003709).

2.      The Victim's body was found in the driver's seat of his pickup truck. App. A, p. 2.

3.      The Greenville Police Department ("GPD") responded to and investigated the shooting that night. App. A, p. 1.

4.      Officer Kevin Jones spoke with witness Tony Johnson and Wilber Mercer the night of the Murder.  App. A. p. 1.

5.      GPD Detectives also spoke with witness Alonzo Vines the night of the Murder. Mr. Vines saw trucks drivers side door open and two men standing near the truck. App. B, ("1995 Trial") p. 93:3-20 SHARPE 000005-000429.

6.      The night of the Murder, GPD Officers conducted a sweep of the street looking for Physical Evidence. App. B. ("1995 Trial") p. 139:16-25.

7.      On February 12, 1994, GPD Detective Carolyn Melvin ("Melvin") submitted physical evidence collected from the crime scene to the GPD Property Department. App. C, SHARPE 004929-004932.

8.      On February 13, 1994, Melvin and CPL Baker attend the autopsy of the Victim performed by Dr. Page Hudson. CPL Baker received evidence including fingerprints, the bullet, blood, and gunshot residue. App. D, ("CPL Baker Report") SHARPE 003802.

9.      The autopsy concluded that a bullet entered the Victim's upper left arm, entered the left side of his chest, traveled across his chest, exited the right side of his chest, and lodged in his right arm. Appx. E, ("Autopsy") p. 1-2 SHARPE 005352-005359.

10.      On February 14, 1994, Melvin interviewed Wilber Mercer at the GPD Headquarters and created a written report. Mr. Mercer claimed he was with the Victim attempting to obtain drugs shortly before the Murder. App. F, ("Mercer Report") SHARPE 003686-003689.

11.     Also on February 14, 1994, Melvin interviewed witness Martha Stewart at the GPD Headquarters and created a written report. Ms. Stewart claimed she had seen the Victim pull his truck over after two black males had whistled at him and approached his car. Ms. Stewart then heard a gunshot approximately a minute later. Appx. G, ("Stewart Report") SHARPE 005028-005029.

12.     That same day, GPD Officer Mendenhall completed processing the crime scene and logged the following evidence:

   a.   Three shell casings;

   b.   One wallet belonging to the Victim;

   c.   One wallet belonging to the Victims wife;

   d.   One set of Car keys;

   e.   One gunshot residue kit;

   f.   Victims clothing;

   g.   Two blood vials;

   h.   Two paper bags found in Victims truck;

Appx. H, ("Mendenhall Report") Sharpe 004975-4984.

13. Witness Wilber Mercer's jacket was also entered into evidence as it was found in the Victim's truck. Appx. B, ("1995 Trial") pp. 152:2-5.

14. On February 15, 1994, GPD Detective David Ricky Best ("Best") was assigned to assist Melvin with the investigation. Best and Melvin returned to the scene of the Murder to canvas the neighborhood but could not locate any willing witnesses. App. B, ("1995 Trial") pp. 247:1-3.

15. Also on February 15, 1994, Melvin requested Crime Stopper Coverage in relation to the Murder. Appx. P, ("Crime Stoppers Request") Sharpe 003803.

16. On February 14, 1994, Melvin interviewed witness Alonzo Vines again at the GPD Headquarters and created a written report. Mr. Vines claimed that he witnessed two men standing around the Victims truck after the Murder. App. I, ("Vines Report") SHARPE 003690-003691.

17. Also on February 16, 1994, Melvin interviewed the Victim's wife, Tricia Clarice Radcliffe. Appx. J, SHARPE 003702.

18. Before any arrest was made, Melvin performed surveillance of the area around the Murder and observed Plaintiff Dontae Sharpe ("Plaintiff") and a man named Mark Joyner selling drugs. Melvin determined that the area was Sharpe family territory. Appx. B, ("1995 Trial") pp. 277:1-25-2781-5.

19. On or around February 17, 1994, GPD Officer Jeffrey D. Shrock ("Shrock") met witness Charlene Johnson ("Charlene") near scene of the Murder when she was acting belligerent with a group of youths. Shrock eventually drove Charlene to her mother's home and then the hospital. While driving to the hospital, Charlene told Shrock that she had witnessed a man named Dontae shoot the victim. Charlene told Shrock she was close enough to see the flash of the gun. Appx. M, ("1997 MAR") pp. 105:12-25-106:1-23.

20. On February 24, 1994, Melvin interviewed witness Nathan Farmer at GPD Headquarters. Appx. K, ("Farmer Report") SHARPE 003701.

21. On March 3, 1994, Best submitted physical evidence collected during the investigation to the SBI. Appx. L, ("SBI Evidence Submission") SHARPE 004975.

22. Prior to any arrest for the Murder, Best and Melvin spoke with GPD narcotics investigators who confirmed the area around the Murder was Sharpe family territory. Appx. M, ("1997 MAR") pp. 134:14-25.

23. On April 7, 1994, Best and Melvin located Charlene and brought her to GPD Headquarters. There, Charlene stated that she witnessed the Murder. Appx. N, ("Charlene Report") SHARPE 005005.

24. At 1:30pm on April 7, 1994, Charlene wrote a statement in her own handwriting implicating Plaintiff in the Murder of the Victim. Charlene's statement was corroborated by the statements of witnesses Alonzo Vines and Martha Stewart in that two black males were involved in the Murder. Her statement was also corroborated by witness Wilber Mercer in that both witnesses recalled the Victim was attempting to obtain drugs prior to the Murder. The statement read:

"On February 11, 1994, I was walking down 14th on my way to the Lucky Spot, I stop at the stop sign. And I so Donta and a white male and Mark Joy. Donta was about to sale that white male a rock but he only had 18.00 Donta said I cant do it you have to have the money straight up and the white male said fock you man. Donta push him and then he pulled out a gun and shot him. Charlene Natasha Johnson 4 7, 94 1:30pm [sic]."

Appx. O, ("Charlene Statement") pp. 1.

25. At 1:34, Charlene provided a second statement reading:

"Also Donta move the trck and ran it in the fence and mark and Donta pick the white male up and, from where he got shot, pot him in the trick and Donta throw the keys and the gun somewhere and Mark [illegible] split up and meet each other and got into a red escort. Charlene Natasha Johnson 4-7-94 1:34, pm [sic]."

Appx. O, (Charlene Statement") pp. 1.

26. After Charlene provided her statement implicating Plaintiff in the Murder, Melvin presented evidence to Magistrate K. Hall who subsequently found probable cause and issued an arrest warrant for Plaintiff. Appx. OO ("Warrant for Arrest").

27. Plaintiff's cousin, Mark Joyner, was also arrested in relation to the Murder and eventually pled to accessory after the fact. Appx. BB, ("DA Everett Deposition") pp. 104:17-25-105:1-3.

28. That night Plaintiff was arrested by GPD officers and questioned by Best and Melvin. Plaintiff provided a statement that he was with a man named Karsen Robinson and his girlfriend Kizzy Paige at 1601 Greene St the night of the murder. Plaintiff claimed he owned a .45 caliber gun, the same caliber used in the murder, but it was recently stolen. Plaintiff also owned an M-1 Carbine. Appx. Q, ("Notes Interview of Sharpe") Sharpe 007669-007670.

29. The night of Plaintiff's arrest, Plaintiff's girlfriend Kizzy Paige and 4 other women assaulted Charlene and threatened her at gunpoint for providing information to police. Appx. R, Pitt DA Copies 001983-1988.

30. Plaintiff's mother, Sara Staton, was present during the assault and took Charlene to the hospital after the beating. Plaintiff's Aunt, Sharon Sharpe, asked Charlene "word is you're the one who told on Dontae" while driving to the hospital. Appx. S, ("Staton Deposition") pp. 97:18-25.

31. Charlene was interviewed at the hospital by GPD officer Connie Elks. Charlene received 3 stiches in her lip, 2 in her face, and 2 in the back of her head as a result of the retaliatory assault. Charlene told her mother that Plaintiff had shot the white man while at the hospital. Appx. T, ("Elks Report") Pitt DA Docs 002838-002840.

32. Best attended GPD interviews of two of the women, Kizzy Paige and Candice Johnson, who assaulted Charlene. Appx. M, ("1997 MAR") pp. 125:17-25-126:1-3.

33. On April 8, 1994, Best drove Charlene, her mother, and a social worker to a safe house in Wilmington North Carolina. Appx. M, "1997 MAR" pp. 127:2-18.

34. On May, 16, 1994, Lisa Evans, one of the women who assaulted Charlene, wrote a letter to Plaintiff's mother claiming she overheard another women "Candy Johnson" call Best and inform him that Plaintiff and Mark Joyner had killed a man. She also stated that Robert Cherry Stokes was her attorney. Appx. U. ("Lisa Evans Letter") Sharpe 003833-003838.

35. Around two or three weeks after Plaintiff's arrest, Charlene was given $500.00 pursuant to the Crimestoppers program for providing information related to the Murder. Appx. B, ("1995 Trial Transcript") p. 250-251 SHARPE 000005-000429.

36. On April 18, 1994, a grand jury indicted Plaintiff for the Murder. Appx. V, SHARPE 00161.

37. On April 19, 1994, Charlene was administered a polygraph by Agents for the State Bureau of Investigations related to the Murder. The results of the polygraph were a +1 inconclusive. Appx. W, ("Charlene Polygraph") SHARPE 004947-004948.

38. Sometime in May 1994, a witness named Beatrice Stokes ("Beatrice") approached Best and claimed to have seen Plaintiff murder the Victim. Beatrice asked Best not to write anything down and told him she was scared to provide information. Best did not make a report of this interaction but provided Beatrice information to District Attorney Clark Everett ("DA Everett"). Appx. GG, ("Best Deposition") p. 74:13-14.

39. On May 16, 1994, Best submitted a .45 caliber pistol for comparison in the Murder. Appx. Y, ("Pistol Comparison") SHARPE 004973-004984.

40.  On August 29, 1994, Plaintiff was administered a polygraph related to the Murder which indicated deception. Appx. Z, ("Sharpe Polygraph").

41. After Plaintiff's arrest, Best attempted to contact multiple witnesses including Wilber Mercer, Tony Johnson, and Martha Stewart but was unsuccessful. Appx. B, ("1995 Trial") p. 265:1-14.

42. In 2014, GPD Officer Jeff Baxter attempted to locate the file from the Murder investigation from the GPD and Pitt County District Attorney's Office but discovered both were destroyed due to flooding. Appx. AA, City of Greenville 3334 and ("Baxter Affidavit").

**Pre-Trial**

43.    Cherry Stokes was Plaintiffs attorney at trial. Appx. CC, ("Stokes Deposition") p. 12:11-13.

44.    Plaintiff's mother told Cherry Stokes that Charlene had provided information to the GPD implicating him in the Murder. Appx. S, ("Staton Deposition") pp. 71:14-15.

45.    In May 1994, the Pitt County District Attorney's Office obtained Charlene's medical records indicating that she has received mental health treatment and been committed at the Pitt County Hospital's adolescent psych unit in March of 1994 ("Medical Documents"). Appx. BB, ("DA Everett Deposition") pp. 89:21-25-90:1-7.

46.    On May 24, 1994, Charlene's Medical Records were disclosed by the District Attorney's Office and "put in all atty's boxes" [sic] by public defender Don Hicks. Appx. EE, SHARPE  0141155.

47.    Cherry Stokes knew Don Hicks in his capacity as a public defender. Appx. CC, ("Stokes Deposition") p. 56:11-17.

48.     The next day, defense attorney Greg Duke filed a Ritchie Motion seeking to review Charlene's mental health treatment records in response to the disclosure. Appx. FF, ("Richie Motion").

49.     On May 31, 1995, before the Murder Trial, the court denied Cherry Stokes motions to "Compel Disclosure of All Evidence by Investigative Officers to the District Attorney", and "Motion for List of Witnesses." The court also denied Cherry Stokes Motion to Continue the trial because his office was broken into on June 16th and his files were strewn about. Appx. DD, ("Pretrial Motions") SHARPE 014233-01439; SHARPE 003403.

50.     Cherry Stokes retained an investigator on behalf of Plaintiff named Johnny Rose who made diligent efforts to locate Charlene prior to the trial. Appx. PP, ("Stokes Motion to Strike") p. 1 ¶ 5 Pitt DA Copies 000631-000632.

51.     The Friday before the Murder trial DA Everett and Charlene met in his office. Charlene told DA Everett that she was afraid of testifying because she would get hurt. DA Everett told Charlene that if she had not seen the Murder she could leave with no consequences. Charlene confirmed to DA Everett that she had seen the Murder but was afraid. Appx. BB, ("DA Everett Deposition") pp. 30:22-25-1-11.

52.     On the first day of trial, DA Everett again spoke with Charlene in his office. Charlene reaffirmed to DA Everett that she was afraid to testify. Again, DA Everett told Charlene she would not face any consequences if she was not telling the truth. Charlene again affirmed that she had seen the Murder and was willing to testify. Appx. BB, ("DA Everett Deposition") pp. 49:20-25-50:1-9.

**July 1995 Criminal Trial**

53.    Plaintiff was tried for the Murder of George Radcliff in July 1995. Appx. B ("1995 Trial").

54.    Charlene testified that she knew Plaintiff and had sold crack with Plaintiff prior to the Murder. Charlene also Appx. B, ("1995 Trial") p. 39:1-6.

55.    Charlene testified that police drove her to the Greenville hospital. Appx. B, ("1995 Trial") 49:15-21.

56.    Charlene maintained that she had witnessed Plaintiff, along with Mark Joyner, murder the Victim during a drug sale throughout her entire five-hundred question testimony. Charlene testified that the Plaintiff shot the Victim while standing face to face but stated that the Victim may have been turned when shot. Appx. B, ("1995 Trial") pp. 37-87.

57.    Beatrice testified that she witnessed Plaintiff shoot the Victim. Beatrice admitted she was an active crack user. Appx. B, ("1995 Trial") pp. 236:1-7.

58.    Melvin testified that the area around the Murder was Sharpe family territory and no other organized drug dealers operated in the area. Appx. B, ("1995 Trial") pp. 276:23-25-280:1-24.

59.    After the close of the States evidence, Cherry Stokes moved to strike the testimony of Charlene, which was denied. Appx. B. ("1995 Trial") p. 288.

60.    Plaintiff called his family members Patrica Ward and Patrica Hicks as alibi witnesses at the trial in contrast to his previous claim to Best and Melvin during his interview upon arrest. Appx. B, ("1995 Trial") pp. 302-318.

61.    After the close of all evidence the jury unanimously found Plaintiff guilty of first-degree murder. Appx. B, ("1995 Trial") 413:15-20.

62.     Officer Shrock was not called as a witness in the 1995 trial. Appx. B, ("1995 Trial").

63.     After the verdict, supporters of the Plaintiff broke windows and damaged property in the courthouse forcing Melvin and DA Everett to take shelter in the jury room. Appx. BB, ("DA Everett Deposition") p. 63:13-25.

## Deposition Testimony of Charlene Johnson

64.     Charlene testified that she did not witness the Murder of the Victim.  App. QQ, ("Deposition of Charlene Johnson") p. 121:19-22.

65.     Charlene testified that she wrote the statement implicating Plaintiff while alone in a room at the GPD Headquarters.  App. QQ, ("Deposition of Charlene Johnson") p. 117:2-6.

66.     Charlene testified that Best gave her a blank piece of paper and asked her to write down what she knew about the Murder. Charlene wrote down what she independently knew about the Murder in the first part of her statement.  Appx. QQ, ("Deposition of Charlene Johnson") p. 40:1-17.

67.     Charlene testified that Best provided her the information in the second part of her statement. Appx. QQ. ("Deposition of Charlene Johnson") p. 40:18-24.

## Deposition Testimony of David Ricky Best

68.     Best testified that he was aware of the importance of documenting and collecting anything relevant to an investigation.  Appx. GG, ("Best Deposition") p. 39:17-20.

69.     Best testified that he expected all relevant evidence to be memorialized in a report.  Appx. GG, ("Best Deposition") p. 41:3-6.

70.    Best testified that it was his practice to take notes on all relevant information. Appx. GG, ("Best Deposition") p. 52:22-25-53:1-5.

71.    Best testified that the City had a written policy which it enforced. Appx. GG, ("Best Deposition") pp. 104:9-23.

72.    Best testified that Shrock informed him that a female witness claimed that she had witnessed Dontae Sharpe kill the Victim and that Shrock had driven the witness to the hospital because she was acting a little strange.  Appx. GG, ("Best Deposition") p. 118:3-12.

73.    Best testified that Charlene's mother had consented to Best and Melvin bringing Charlene to the GPD Headquarters. Appx. GG, ("Best Deposition") pp. 128:1-8-129:1.

74.    Best testified that Charlene told him and Melvin that she had witnessed Plaintiff murder the Victim after an argument over the price of drugs and Charlene provided the correct location of the Murder. Appx. GG, ("Best Deposition") p. 126:1-8.

75.    Best testified that Charlene had agreed to write down what she had seen. Best and Melvin then left the room. When Best returned to the room, Charlene had already written down the first part of her statement identifying Plaintiff as the man who shot the Victim. Best then asked her to write another statement because she had not written down all the details she had communicated to Best and Melvin verbally.  Appx. GG, ("Best Deposition") pp. 132:16-25-133:1-5.

76.    Best never provided Charlene any information to use in her second statement.  Appx. GG, ("Best Deposition") pp. 132:18-25-133:1-5.

77.    Best testified that Beatrice had approached him and claimed she witnessed Plaintiff murder the Victim. Best relayed Beatrice's claims directly to DA Everett. Appx. GG, ("Best Deposition") pp. 206:23-25-207:1-22.

### Deposition Testimony of Carolyn Melvin

78.    Melvin testified that during their multiple conversations prior to the July 1995 trial, Charlene was adamant that she had witnessed Plaintiff murder the Victim. Appx. HH, ("Melvin Deposition") p. 74:1-21.

79.    Melvin testified that she was in the room with Best when Charlene provided her written statement implicating Plaintiff in the murder of the Victim. Appx. HH, ("Melvin Deposition") pp. 115:21-25-116:1-7.

80.    Melvin testified that she did not provide any details about the Murder to Charlene and did not witness Best provide any details to Charlene. Appx. HH, ("Melvin Deposition") pp. 128:13-25-129:1-25.

### Deposition of Jeffrey D. Shrock

81.    Shrock testified that he met Charlene sometime after the Murder when she was with a group of young people acting disrespectfully towards him near the scene of the Murder. Shrock drove Charlene to her mother's and then Pitt County Memorial Hospital. While on the way to the hospital, Charlene told Shrock she had seen a Dontae murder the white man. Appx. M, ("1997 MAR") pp. 105:12-25-106:1-23

82.    After Charlene identified a man named Dontae as the man who committed the Murder, Shrock verbally relayed the information to Best. Appx. II, ("Shrock Deposition") p. 135:19-21.

83.     On March 13, 1997, Shrock left the GPD. After he left the GPD, Shrock was subpoenaed to testify at a related 1997 Motion for Appropriate Relief Hearing ("1997 MAR") along with Charlene. Appx. M, ("1997 MAR") pp. 105:1-8.

84.     At the hearing, Shrock had so little memory of his brief interaction with Charlene that he testified he spoke to her in 1995 rather than 1994. Appx. M, ("1997 MAR") p. 105.

85.     Shrock further testified that after speaking with Charlene's mother he took Charlene to the hospital at which point she told him Dontae had committed the murder. Appx. M, ("1997 MAR") p. 107:12-17.

86.     Shrock stated that Charlene told him she was close enough to see the gun go off. Appx. M, ("1997 MAR") p.112:19-21.

87.     Shrock also testified it was possible Charlene was on drugs because she was hyper, but she explained to him that she was only smoking cigarettes. Appx. M, ("1997 MAR") p. 110:13-23.

88.     Shrock did not speak with the District Attorney before the 1997 hearing. Appx. BB, ("DA Everett Deposition") p. 70:15-17.

**Training and Standards**

89.     At all times relevant to the Complaint, applicants for employment by the Greenville Police Department were required to complete Basic Law Enforcement Training ("BLET"), a multi-week course of instruction on all aspects of policing including Elements of Criminal Law, Criminal Investigations, Arrest, Search and Seizure, Dealing with Victims and the Public, Juvenile Laws and Procedures, and Field Note taking and Report Writing.  Appx. JJ, ("Blum Report") p. 1 ¶ 1.

90.    Shrock successfully completed BLET training through Wilson Community College prior to joining the GPD as a patrol officer. Appx. II, ("Shrock Deposition") p. 25:19-23.

91.    Melvin attended BLET prior to joining the GPD as a law enforcement officer. Appx. HH, ("Melvin Deposition") p. 8:16-19.

92.    Melvin also attended a number of advanced investigation courses while employed by the GPD. Appx. HH, ("Melvin Deposition") p. 119:8-17.

93.    These courses include Crime Scene Processing, Processing Arrests, Basic Narcotics Investigation, Criminal Investigations, Rape Investigations. Appx. JJ, ("Blum Report") p. 3.

94.    Best attended BLET prior to joining the GPD and attained his intermediate law enforcement certificate in 1983. Appx. KK, GPD 0957.

95.    Best attended a number of advanced level training courses including Legal Issues in Interrogations, Arrest, Search Warrants, and Seizures, Criminal Investigations, Advanced Criminal Investigations, Raid Planning & Procedures, Death Investigations, Officer Survival. Appx. JJ, ("Blum Report") pp. 2-3.

96.    Best completed extensive training over his time employed by the GPD and received many certificates for completing various comprehensive training courses. Appx. RR, ("Best Certificates") GPD 0935-1007.

97.    The GPD hired Charles Hinman ("Hinman") as its interim police chief in 1991 and later removed his interim status. Hinman began efforts to improve the GPD through conforming to the standard of the Commission on Accreditation for Law Enforcement Agencies ("CALEA"). Appx. LL, ("Hinman Deposition") p. 22:16-25.

98.    The GPD earned accreditation from CALEA in 1995, an achievement accomplished by less than one percent of all law enforcement agencies in the United States. Appx. JJ, ("Blum Report") p. 4.

99.    As part of its pursuit of CALEA accreditation the City completed a comprehensive assessment and rewriting of it policies and procedures as part of its application and proved compliance with those standards. Appx. MM, ("Affidavits of Hardy, Bass, and Forrest") at ¶ 5.

100.    Prior to 1995, the GPD's written policies were substantially similar to the standards taught in BLET training and included written policies regarding Investigations, Impeachment Evidence, Exculpatory Evidence, Confidential Informants, Investigation Assignments, Investigation Supervision, Witness Interviews, and Investigator Training. Appx. MM, ("Affidavits of Hardy, Bass, and Forrest") at ¶ 6.

101.    It is undisputed that if a police department met the standards for CALEA accreditation, they met the generally accepted police practices for the time. Appx. NN. ("Deposition of Robert Pusins") p. 61:1-4.

102.    The GPD has been continuously accredited by CALEA since 1995. Appx. NN. ("Deposition of Robert Pusins") p.65:17-21.

103.    CALEA is the most stringent law enforcement accreditation process in the United States. Only a minute number of law enforcement agencies are accredited in the United States. Appx. NN. ("Deposition of Robert Pusins") p. 290:18-25-291:1-10.

## Other Cases or Investigations Involving the City of Greenville

104.    Plaintiff has not identified any other case or investigation in which the City of Greenville or their police department where there was an allegation that the City or its

police department failed to enact policies or procedures for training its officers.  Appx. NN. ("Deposition of Robert Pusins") p 93:17-25-94:1-13.

**<u>Evidence Testing and Destruction</u>**

105.    Items in evidence that were destroyed were noted in the Record by writing "DEST," short for "destroyed" on the right side of the Property Report in the "Date Property Released". Appx. TT. ("Affidavit of Molly Muise" ¶ 6).

106.    The RMS indicates Larry Hopkins and John Teel were the individuals that destroyed a checkbook, car keys, the Victim's clothes, blood vials, and miscellaneous items in this matter. Appx. TT. ("Affidavit of Molly Muise" ¶ 8).

107.    Best did not sign BEST on any evidence form in 2004. Appx. SS. ("Affidavit of Ricky Best" ¶ 6).

108.    Best did not speak with students from Duke in 2012. Appx. SS. ("Affidavit of Ricky Best" ¶ 9-10).

Respectfully submitted this the 27th day of November 2024.

<u>s/ Peter Clements</u>
<u>Peter Clements</u>
<u>N.C. State Bar No. 57853</u>
<u>Peter.clementsjr@wilsonelser.com</u>
<u>22 West Trade Street # 300</u>
<u>Charlotte, NC 28217</u>
<u>Telephone: (401)688-0306</u>
   <u>*Attorneys for Defendants Shrock, Best,*</u>
<u>*and the City of Greenville*</u>

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I electronically filed the foregoing **DEFENDANT THE CITY OF GREENVILLE NORTH CAROLINA'S STATEMENT OF UNDISPUTED MATERIAL FACTS** using the CM/ECF system.  Notice of filing will be sent to all parties by operation of the Court's electronic filing system and/or via first class mail, including:

> David S. Rudolf
> Sonya Pfeiffer
> Phillip Lewis
> Rudolf Widenouse
> 225 East Worthington Avenue
> Charlotte, NC 28203
> *Attorneys for Plaintiff*
>
> J. Nicholas Ellis
> Sydney P. Davis
> Poyner Spruill LLP
> PO Box 353
> Rocky Mount, NC 27802-353
> Attorneys for Defendant Melvin

This the 27th day of November, 2024.

<div align="right">

/s/ Peter Clements
Peter Clements

</div>

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION
Civil No: 4:21-CV-00185-BO**

| | |
|---|---|
| MONTOYAE DONTAE SHARPE, <br><br> Plaintiff, <br><br> v. <br><br> DAVID RICKY BEST, JEFFREY D. SHROCK, and THE CITY OF GREENVILLE, NORTH CAROLINA, <br><br> Defendants. | **PLAINTIFF'S OMNIBUS RESPONSE IN OPPOSITION TO DEFENDANTS' RENEWED MOTIONS FOR SUMMARY JUDGMENT** |
| MONTOYAE DONTAE SHARPE, <br><br> Plaintiff, <br><br> v. <br><br> CAROLYN MELVIN, <br><br> Defendant. | Civil No: 4:22-CV-00088-BO-RJ <br> (Consolidated with 4:21-cv-00185-BO) |

Plaintiff Montoyae Dontae Sharpe ("Sharpe"), by and through undersigned counsel, hereby responds to the renewed Motions for Summary Judgment filed by Defendant Melvin, [D.E. 254]; Defendant Best, [D.E. 257]; Defendant Shrock, [D.E. 260]; and the City of Greenville, [D.E. 263], as follows. Plaintiff's citations to the record will be to docket-entry numbers and as set forth below.[1]

---

[1] References to Plaintiff's Response to Best's, Shrock's, and the City of Greenville's (Revised) Statements of Facts, [D.E. 258, 261, 264], will be cited as "Pl. Resp. to Defs.' RSOF ¶ ____."
References to Plaintiff's Fourth Appendix, filed with this Omnibus Response, will be cited as "Pl. Fourth App. ____."

With leave of court [D.E. 242], Sharpe incorporates by reference his previous Omnibus Response in Opposition to Defendants' Motions for Summary Judgment, [D.E. 214]; his statement of undisputed facts, [D.E. 245]; all appurtenant appendices, [D.E. 171, Pl. App.; D.E. 217, Pl. Resp. App.; D.E. 246, Pl. Third App.]; and Sharpe's responses to Defendants' statement of facts [D.E. 215, Pl. Resp. Melvin Statement Facts; D.E. 216, Pl. Resp. Defs.' Statement Facts]. Defendants' renewed memoranda in support of their respective motions for summary judgment largely mirror in substance their previous memoranda in support of summary judgment. In the interest of efficiency, this memorandum of law will address primarily the new or revised arguments set forth by Defendants in their renewed motions and memoranda of law. [D.E. 256, Melvin; D.E. 259, Best; D.E. 262, Shrock; and D.E. 265, City of Greenville.] For Defendants' unchanged arguments, Sharpe rests on his previous omnibus response. [D.E. 214.]

## I.    INTRODUCTION

The revised statements of fact submitted to the Court by Best, Shrock, and the City of Greenville, [D.E. 258, D.E. 261, and D.E. 264, respectively], and the statement of facts previously submitted by Melvin and incorporated by reference, [D.E. 185], contain numerous claims of "undisputed" facts that are either false or plainly in dispute between Plaintiff and Defendants. A close examination of these statements reveals they are primarily a cherry-picked compilation of alleged "facts" that are favorable to Defendants, but which ignore contrary evidence adduced by the parties in discovery and are therefore very much in dispute. Rather than attempting to identify facts that are truly undisputed and material, a significant number of Defendants' "undisputed facts" contain allegations that are contradicted by other evidence, often by their own sworn testimony from depositions and prior proceedings.

Sharpe, in responding to the numbered paragraphs of Defendants' statements of fact, has set forth the evidentiary basis for why particular assertions in those statements are, in fact, in

dispute or false. In addition, Sharpe has identified assertions that are not supported by specific citations or are simply not material to whether Sharpe's claims should be dismissed, even if these assertions are undisputed. [*See* D.E. 215, 216.]

As but one example of Defendants' improper characterization of disputed facts as undisputed facts, Shrock admitted in two separate interviews, one with the Greenville Police Department requested by the District Attorney, and one with a lawyer from the Duke Law School Wrongful Conviction Clinic, that his testimony at Plaintiff's 1997 MAR hearing was false. [D.E. 245 ¶¶ 63–64.] Shrock's admission that his testimony was false is further established and corroborated by medical and police records produced in discovery. [D.E. 245 ¶¶ 55–61.] Nonetheless, both Shrock and Best allege that the content of Shrock's testimony at the 1997 MAR hearing constitutes "undisputed facts," even though the testimony is demonstrably false on the basis of Shrock's own post-1997 admissions.

Best and Shrock also brazenly repeat the false claim that Sharpe had access to certain exculpatory evidence in 1994 prior to his trial because Sharpe's attorney, Cherry Stokes, allegedly represented a person named Lisa Evans in a related case. [D.E. 259 at 16:19–17:3; D.E. 262 at 6:5–6.] Shrock and Best claim " . . . the District Attorney had the allegedly exculpatory information and disclosed it to Plaintiff's defense attorney Cherry Stokes." [D.E. 262 at 6:5–6; D.E. 259 at 17:1–3.] This is simply false, and Defendants should be admonished for making such an argument. First, Cherry Stokes did not represent Lisa Evans in the related case. It would have been a conflict of interest for him to do so. District Attorney Clark Everett stated in his deposition: "I don't think [Cherry Stokes] was the lawyer for [Lisa Evans] in those cases." [D.E. 171-16, Pl. App. U, Everett Dep. Tr., at 46:23–25 to 47:1–3.] Cherry Stokes in his deposition stated, "I have no idea" when asked if Lisa Evans was one of his clients. [D.E. 217-8, Pl. Resp. App. H, Stokes Tr., at 60:5–7.]

Most tellingly, the Judgment and Commitment for Lisa Evans from the related case in question lists "Joseph Dupree" as Evans's attorney, not Cherry Stokes. [D.E. 217-9, Pl. Resp. App. I, Lisa Evans J. and Commitment.] Furthermore, District Attorney Everett testified under oath in his deposition that he was not aware of Charlene's psychiatric hospitalizations in February and March 1994 nor in September 1994. [D.E. 245 ¶¶ 188, 189, 190.] This is because the subpoena referenced by Defendants and issued by the District Attorney only sought documents from April 7, 1994, onwards. It did not seek, and did not obtain, documents related to her February involuntary commitment to the adolescent psychiatric ward, nor did it reveal documents related to her second psychiatric commitment in September 1994, just a few months before Sharpe's trial. [Pl. Resp. to Defs.' RSOF ¶ 45.]

Finally, the Court should note that Best and Melvin present conflicting versions of the facts that they rely upon in seeking summary judgment, each attempting to place the blame on the other for the investigation's failures, with their finger-pointing serving as a tacit acknowledgement of the misconduct described by Sharpe in the Amended Complaint. Best and Melvin, for example, offer markedly contrary accounts of their respective roles in the investigation, beginning with which of them was the lead detective in the case responsible for the preparation of field notes, the writing of reports, and the overall handling of the investigation.

Best claims that Melvin was the "lead detective" who was responsible for all decisions in the investigation and the writing of all the reports. [*See* D.E. 171-15, Pl. App. T, Best Dep. Tr., at 71:3 (Best claiming, "I wasn't the lead detective . . ."), 80:3–5 (Best alleging that Melvin, as the lead detective, secured the warrant), 92:19–21 (Best alleging that he had no decision-making responsibility in the case), 118:13–25 to 119:1–7 (Best claiming that he did not take notes regarding his communications with Shrock about witness Charlene Johnson because that was the

4

lead detective's responsibility, not his), 135:23–25 to 136:1–13 (Best claiming that he did not write a report about his interactions with Charlene Johnson because "I wasn't the lead detective"), 127:20–21 (Best claiming he didn't write a report about his communications with Charlene Johnson because "[i]t wasn't up to me, it was Detective Melvin's case").]

Melvin contradicts Best's account. Melvin claims that although she was initially assigned as lead detective, once Best was assigned to the case four days later *he* became the lead detective and assumed the responsibilities of the lead detective. [D.E. 171-18, Pl. App. W, Melvin Dep. Tr. Vol. I, at 6:10–19.] While Best claimed that Melvin made the critical decision to arrest Sharpe, Melvin testified that this was not true. [*Id.* at 21:7–13.] Melvin alleges that after Best was assigned, she had only a minimal role in the case. [D.E. 185 ¶ 25 (claiming that Melvin missed numerous days for health and personal reasons during the investigation); *see also* D.E. 200, Melvin Mem. Supp. Partial Summ. J., at 2 ("Given Detective Melvin's absence from work for sick leave, *she had minimal involvement* in the investigation of Radcliffe's murder." (emphasis added).] Melvin claims that after Best was assigned to the case, she was "reassigned to another building," was "taking sick leave," and that she "never touched any of the evidence." [D.E. 171-18 at 8:20–25 to 9:1–3.] The bottom line, for purposes of this section 1983 suit, is that neither Best nor Melvin (nor Shrock) documented exculpatory and impeachment evidence that is now known to exist and which is described in detail in Sharpe's statement of facts.

As another salient example, Best alleges that Beatrice Stokes, a known crack addict, came to him three months after the murder at the center of this case and offered to give a statement against Sharpe on the express condition that Best not take notes or create a report of the interaction. [D.E. 245 ¶¶ 123–126.] Stokes was one of two witnesses who gave testimony purporting to implicate Sharpe in the murder. [*Id.* ¶ 150.] Melvin, on the other hand, testified in her deposition

5

that the alleged encounter between Best and Stokes, in which Stokes got in Best's patrol car but refused to let him take notes or write a report, did not actually happen. [*Id.* ¶ 132.] Best and Melvin's competing accounts of which of them was responsible for the failures of the investigation highlight and confirm the misconduct alleged by Sharpe. Defendants' competing factual accounts also preclude their respective claims for summary judgment.

## II.    SUMMARY OF THE NATURE OF THE CASE

On July 27, 1995, Sharpe was wrongfully convicted of the murder of George Radcliffe. Sharpe endured more than twenty-five years in prison before his murder conviction was finally overturned on August 22, 2019. After numerous post-conviction proceedings and a multi-year investigation by the Duke Law Wrongful Convictions Clinic, Governor Roy Cooper, a former state prosecutor and North Carolina Attorney General, granted Sharpe a full and unconditional Pardon of Innocence on November 12, 2021. Notwithstanding the Pardon of Innocence, counsel for the Defendants have focused their efforts in this case on attempting to establish Sharpe's guilt.

Sharpe's wrongful conviction and the multiple harms he suffered were the result of misconduct by Shrock, Best, Melvin, and the City of Greenville. Defendants knowingly used false evidence to secure Sharpe's arrest, charges, and conviction, and in so doing, Defendants deliberately, and in bad faith, concealed material exculpatory and impeachment evidence from the District Attorney. Best and Shrock continued to conceal the exculpatory and impeachment evidence in bad faith in post-conviction proceedings to hide their original misconduct, which extended Sharpe's period of wrongful confinement by decades. Shrock, Best, and Melvin's misconduct was the direct result of the City of Greenville's failure to adequately train, supervise, and discipline its officers.

On December 20, 2021, Sharpe filed a civil action pursuant to 42 U.S.C. § 1983 against Best, Shrock, and the City of Greenville, alleging violations of Sharpe's First, Fourth, and

Fourteenth Amendment rights. [D.E. 1, Compl.] The case number for the original action is 4:21-CV-00185-BO. On July 29, 2022, Sharpe filed a separate civil action against Melvin in case number 4:22-CV-88-M. Along with the filing of the Complaint against Melvin, Sharpe filed a Motion to Consolidate Cases under Fed. R. Civ. P. 42(A) to consolidate the original action and the separate action filed against Melvin. [4:22-CV-88-M, D.E. 3.] On October 31, 2022, this Court entered an Order consolidating the original case (4:21-CV-00185-BO) and the action against Melvin (4:22-CV-88-M). [*See* 4:22-CV-88-M, D.E. 20.] At the Court's direction, Sharpe filed a Consolidated Complaint in the original action on November 14, 2022, [D.E. 53], and Shrock, Best, and the City filed their Answer to the Consolidated Complaint on November 28, 2022, [D.E. 59]. Melvin did not file an Answer or other response to the Consolidated Complaint. Following the conclusion of fact discovery; the compelled deposition of Melvin on April 2 and 4, 2024; the service of expert reports on May 14 and June 28, 2024; and the depositions of experts on June 11, July 15, and July 24, Sharpe filed a Motion to Amend the Consolidated Complaint on July 26, 2024. [D.E. 163.] Sharpe filed his motion for summary judgment on September 9, 2024, [D.E. 169], followed by motions for summary judgment by Shrock, [D.E. 179]; Best, [D.E. 189]; and the City of Greenville, [D.E. 194], and a motion for partial summary judgment by Melvin, [D.E. 184]. Defendants filed responses to Sharpe's motion for summary judgment, [D.E. 212, Melvin; D.E. 213, Best], followed by Sharpe's omnibus response to all four motions for summary judgment on October 3, 2024, [D.E. 214], with Sharpe and Defendants filing replies to all responses.

On October 31, 2024, the Court held a hearing on all pending motions. On November 6, the Court granted Sharpe's motion to amend complaint, [D.E. 242], and Sharpe filed his amended complaint on November 7, [D.E. 243]. On November 8, Sharpe renewed his motion for summary judgment as to Counts I, II, V, VI, and VII of the amended complaint. [D.E. 244.]  Melvin filed

her answer to the amended complaint on November 21, [D.E. 247], as did Best, Shrock, and the City, [D.E. 248]. Thereafter, Defendants filed their responses to Sharpe's renewed motion for summary judgment. [D.E. 250, Melvin; D.E. 252, Best, Shrock, and the City.] Melvin's motion for summary judgment as to the claims in the amended complaint was filed on November 27. [D.E. 254.] Best, Shrock, and the City each filed a separate motion for summary judgment as to the amended complaint. [D.E. 257, 260, 263, respectively.] By this memorandum, Sharpe now responds to Defendants' respective motions for summary judgment.[2]

### III.    STATEMENT OF FACTS

Plaintiff incorporates by reference, as if fully set out herein, Plaintiff's Statement of Undisputed Material Facts, [D.E. 245], Plaintiff's Responses to Best, Shrock, and the City's (Revised) Statements of Undisputed Material Facts, filed contemporaneously herewith, and Plaintiff's responses, [D.E. 215], to Melvin's Statement of Undisputed Material Facts, [D.E. 214-1].

### IV.    LEGAL ARGUMENT

The substance of Defendants' arguments in support of their respective renewed motions for summary judgment is, with noted exceptions, materially the same as set forth by Defendants in their previous memoranda in support of their prior motions for summary judgment. Sharpe, therefore, with leave of court, incorporates by reference the factual and legal arguments contained in his prior omnibus response to Defendants' motions for summary judgment. [D.E. 214.] Sharpe will address herein the new arguments made by Defendants with respect to Counts VIII and IX of

---

[2] In light of the four motions filed by Defendants, Plaintiff filed a motion to exceed the page limit of thirty pages on September 27, 2024, for his omnibus response. [D.E. 210.] Defendants consented to Plaintiff's motion. [D.E. 210, 211.]

8

the amended complaint, as well as any new or revised arguments put forth by Defendants in their memoranda. Each Defendant's renewed motion will be addressed in turn.

### DEFENDANT MELVIN'S RENEWED MOTION FOR SUMMARY JUDGMENT

**A. Sharpe is Entitled to Summary Judgment on His Claim for Malicious Prosecution (Count IV).**

Melvin's memorandum in support of her renewed motion for summary judgment contains two new sections of argument. The first addresses Count IV of the amended complaint regarding Sharpe's malicious-prosecution claim. The second pertains to both Count XI (wrongful imprisonment and civil conspiracy) and Count XII (gross and reckless negligence) of Sharpe's amended complaint, which are state-law claims.

With respect to Sharpe's claim for malicious prosecution, Melvin makes the following argument:

> . . . [B]ased on Charlene's handwritten statement, which contained her eyewitness account of the homicide identifying Sharpe as the shooter, *Melvin reasonably believed Sharpe murdered Radcliffe and had no reason to doubt the accuracy of Charlene's identification*.

[D.E. 256, Melvin Mem. Supp. Summ. J., at 18 (emphasis added).] Melvin then asserts: "Melvin had no reason to believe Charlene was lying and did not accurately describe what she witnessed on February 11, 1994." [*Id.* at 19:3–4.] These arguments *directly* contradict Melvin's own deposition testimony: first, that she believed Sharpe was innocent and that Charlene's account was not truthful; and second, that her beliefs in this regard were supported by objective evidence. [*See* D.E. 171-19, Pl. Appx. X, Melvin Dep. Tr. Vol. II, at 58:3–9, 60:22–24; *see also* D.E. 245 ¶¶ 87–92, 95–98, 100–108.]

Melvin stated in her deposition, "I never believed Dontae was guilty. . . . I have never believed he was guilty." [D.E. 171-19 at 60:22–24.] Melvin could not have expressed this fact

more explicitly nor more vehemently. Counsel for Best, Shrock, and the City then asked Melvin: "So you thought he was not guilty but you went forward anyway?" [*Id.* at 61:2–4.] Melvin responded, "Correct." [*Id*.] Melvin's belief that Sharpe was not guilty, and her statement that she had *never* believed Sharpe was guilty, logically preclude any speculation that Melvin might also have believed Charlene's statement that Sharpe murdered Radcliffe. On this point, Melvin testified that she "wasn't buying the Charlene issue," [D.E. 245 ¶ 92], and that—at the time of the investigation—she was skeptical of Charlene's statement and found it implausible:

> They were coming forward with an eyewitness, but the information wasn't adding up. . . . And that's why I went to Shrock, because *Ricky was notorious for lying.* And I said, Shrock . . . I hear what you are saying, but do you believe him? Well, you know, this is what the girl said. But I just, if you bought the lie that he got in the truck, he was too tall to get in the truck.

[D.E. 171-19 at 58:3–9 (emphasis added).] In this testimony, Melvin is recounting her contemporaneous doubt of Charlene's account because it didn't "add up," and because Melvin was aware *at the time* of Best's reputation for lying. She describes Charlene's nonsensical detail that Sharpe got in the truck on top of Radcliffe as a lie. Melvin went on to state the reasons why she did not believe Charlene's statement at the time:

> Number one, Dontae Sharpe did not sell drugs on the street. That is not his MO. . . . Number two, that was not his area. . . . And number three, there was no physical evidence, *there is no true ID evidence that placed the man there*. . . . *You know, I wasn't buying Charlene*, but I did not have seniority.

[D.E. 171-19 at 58:10–21 (emphasis added).][3]

By her own testimony, therefore, Melvin did not believe Charlene's statement, had articulable reasons not to believe the statement—including the objective fact that Charlene's

---

[3] Melvin used the same "not buying it" language in her deposition in reference to Wilbur Mercer: "[N]or did I buy his story that night when he came back [to the crime scene] with his wife," [D.E. 171-18 at 25:24–25], thus making clear that Melvin used this term to mean "did not believe."

statement was inconsistent with the physical evidence—and did not believe that probable cause existed to charge Sharpe with the murder of George Radcliffe. [D.E. 245 ¶ 105.] Despite this, Melvin nonetheless obtained a warrant charging Sharpe with Radcliffe's murder based solely on Charlene's false statement. On this point, Melvin admitted in her initial response to Sharpe's statement of undisputed fact that the *sole basis* for the arrest warrant was Charlene Johnson's statement, [D.E. 245 ¶ 108; D.E. 233, Melvin Resp. Pl.'s Statement Material Facts, ¶ 108], although Melvin now has attempted, without leave of court, to disavow that judicial admission, [D.E. 251, Melvin Resp. Pl.'s Statement Material Facts, ¶ 108].

Best, Shrock, and the City admit that Charlene's statement was the sole basis for the arrest warrant. [D.E. 253, Defs. Resp. Pl.'s Statement Material Facts, ¶ 108.] This defeats Melvin's assertion that Charlene's statement corroborated information previously provided by other witnesses. [D.E. 256 at 19.][4] Accordingly, the arguments put forth by Melvin's counsel that Melvin "had no reason to doubt the accuracy of Charlene's identification" and "no reason to believe Charlene was lying or did not accurately describe what she witnessed" are fallacious.

### B.  Melvin is Not Entitled to Public-Official Immunity.

The doctrine of public official immunity provides that "a public official is [generally] immune from personal liability for mere negligence in the performance of his duties, but he is not shielded from liability if his alleged actions were corrupt or malicious or if he acted outside and

---

[4] While a court can relieve a party of a judicial admission, the party must show that the fact is "clearly untrue" *and* "the party was laboring under a mistake when he made the admission." *New Amsterdam Cas. Co. v. Waller*, 323 F.2d 20, 24 (4th Cir. 1963); *see also Yates v. Ford Motor Co.*, 2015 WL 3932687, at *4 (E.D.N.C. June 26, 2015) (citing *Coral v. Gonse*, 330 F.2d 997, 999 n.1 (4th Cir. 1964) for the proposition that a court can relieve party from judicial admission only if "convinced that an honest mistake had been made, the original allegation was untrue and that justice required relief"). In the absence of such a showing, the Court should hold Melvin to the admissions made in her initial untimely response to Sharpe's statement of facts. [D.E. 233.]

beyond the scope of his duties." *Schlossberg v. Goins,* 141 N.C. App. 436, 445, 540 S.E.2d 49, 56 (2000) (alteration in original). "To withstand a law enforcement officer's motion for summary judgment on the issue of individual capacity, plaintiffs must allege and forecast evidence demonstrating that the officers acted maliciously, corruptly, or beyond the scope of duty." *Prior v. Pruett*, 143 N.C. App. 612, 623, 550 S.E.2d 166, 173–74 (2001).

Sharpe's amended complaint alleges that Melvin's conduct in obtaining a warrant without probable cause, failing to conduct a constitutionally adequate investigation, and knowingly and/or recklessly using false evidence was "reckless and malicious." [D.E. 243 ¶ 379; *see also id.* ¶¶ 380–389.] North Carolina courts have held that "[a] defendant acts with malice when he wantonly does that which a man of reasonable intelligence would know to be contrary to his duty and which he intends to be prejudicial or injurious to another." *Grad v. Kaasa*, 312 N.C. 310, 313, 321 S.E.2d 888, 890 (1984). "An act is wanton when it is done of wicked purpose, or when done needlessly, manifesting a reckless indifference to the rights of others." *Id.* at 313, 321 S.E.2d at 890–91. In *Wilcox v. City of Asheville*, 222 N.C. App. 285, 291, 730 S.E.2d 226, 232 (2012), the Court of Appeals relied on previous decisions of the Supreme Court of North Carolina to allow "constructive intent to satisfy the malice exception to public official immunity."

The *Wilcox* court went on to clarify what is necessary for a showing of malice: "[T]he officer's actions were '*so reckless or so manifestly indifferent to the consequences . . . as to justify a finding of [willfulness] and wantonness equivalent in spirit to an actual intent.*'" *Id.* at 292, 730 S.E.2d at 232 (emphasis and alteration in original) (quoting *Foster v. Hyman,* 197 N.C. 189, 192, 148 S.E. 36, 38 (1929)). Furthermore, public-official immunity does not apply when the official's acts are willful and deliberate. *Harwood v. Johnson*, 92 N.C. App. 306, 310, 374 S.E.2d 401, 404 (1988); *Reid v. Roberts*, 112 N.C. App. 222, 435 S.E.2d 116. 119 (1993). Finally, Sharpe's state-

law claim for malicious prosecution does not sound in negligence. Malicious prosecution and conspiracy to commit this tort are intentional torts. *Richmond v. City of Asheville*, 242 N.C. App. 252, 775 S.E.2d 925 (2015).

Given the severity of the allegations against Sharpe and the gravity of the punishment to be imposed if he were to be convicted, which might have included the death penalty, Melvin's use of false evidence to obtain a warrant for Sharpe's arrest without probable cause may fairly be characterized as malicious, reckless, and performed either intentionally or with reckless disregard for Sharpe's rights. Viewed in the light most favorable to Sharpe, there is a genuine issue of material fact with regard to whether Melvin acted maliciously or corruptly. *See Prior*, 143 N.C. at 623, 550 S.E.2d at 173 (holding that whether defendants committed gross violations of generally accepted police practice and custom and or acted with reckless and wanton disregard for the life and safety of the plaintiff were issues of fact, precluding summary judgment in favor of defendant police officers on the issue of public official immunity). Accordingly, Melvin's motion for summary judgment as to whether Melvin is entitled to public-official immunity should be denied.

### DEFENDANT BEST'S RENEWED MOTION FOR SUMMARY JUDGMENT

**A.   Best is Not Entitled to Summary Judgment on Sharpe's Counts I, II, and VII Regarding Best's Knowing and/or Reckless Use of False Evidence.**

Best argues that "[i]t is undisputed that Charlene independently provided a handwritten statement claiming Plaintiff shot Radcliffe over a drug related dispute which she later recanted." [D.E. 259, Best Mem. Supp. Summ. J., at 7.] Best concludes that, "[c]onsequently, that part of the statement, the part implicating Plaintiff in Radcliffe's murder, cannot be considered to be fabricated." [*Id*. at 8–9.]

The bifurcation of the portions of Charlene's statement is irrelevant. Charlene's April 7, 1994, statement consisted of two paragraphs written four minutes apart. The first paragraph

provided by Charlene was in response to the question "what do you know about the murder" and was based on what she *had heard* in the neighborhood and from news accounts and contained details that were inconsistent with the evidence discovered at the crime scene. [D.E. 269-7, Best App. QQ, Charlene Dep. Tr., at 20:12–21:1, 38:13–22; *see also* Pl. Resp. to Defs.' RSOF ¶ 66.] The second paragraph was an effort by Best to clean up the inconsistencies, with Best telling Charlene what details to provide. It matters not whether only one part of the statement was fabricated or concocted by Best. The use of both statements violates due process because the whole of Charlene's statement was known by Best and Melvin to be false.

Charlene testified during her deposition that Best provided her with information about the facts in the case and told her to insert that information the witness statement she signed at 1:34 p.m. on April 7, 1994. [D.E. 245 ¶ 90.] Melvin testified that she was present while Charlene wrote her statement, [D.E. 215, Pl.'s Resp. Melvin Statement Material Facts, ¶ 20]; that she did not believe the statement to be true, [D.E. 245 ¶ 92]; and that she used it to secure Sharpe's arrest even though she didn't believe probable cause existed, [D.E. 245 ¶¶ 105, 107–108]. Beatrice Stokes signed a statement—witnessed by three people, including Melvin—that Best paid her to say that Sharpe shot Radcliffe and coached her to corroborate Charlene's trial testimony. [D.E. 217-3, Pl. Resp. App. C, Stokes Recantation.] Melvin testified that Stokes was brought in by Best because Melvin "wasn't buying" Charlene's account and that Best's alleged encounter with Stokes did not happen. [D.E. 215 ¶ 77.]

Charlene's and Beatrice's statements are direct evidence of Best's actions to fabricate evidence against Sharpe, and that Melvin knew the evidence was false but nevertheless used it to obtain Sharpe's arrest warrant. This evidence precludes Defendants' motions for summary judgment on this claim. *See Black v. W. Va. State Police*, 696 F. Supp. 3d 236, 248–49 (S.D. W.

Va. 2023) (summary judgment inappropriate where plaintiff provided evidence that police fed information to vulnerable witnesses); *Winslow v. Smith*, 696 F.3d 716, 734 (8th Cir. 2012) (reinstating fabrication claim when evidence showed law enforcement "coached" vulnerable individuals "into giving false testimony that fit into the sheriff department's own narrative of events while ignoring evidence contrary, and potentially fatal, to the department's theory"); *Fulton v. Bartik*, 547 F. Supp. 3d 799, 813 (N.D. Ill. 2021) (relying on *Whitlock v. Brueggemann*, 682 F.3d 567, 576 (7th Cir. 2012) and acknowledging that a due process false evidence claim "can be supported by allegations that police fed details to witnesses in order to concoct narratives with detailed incriminating evidence"); *Waters v. Town of Ayer*, No. 04-10521-GAO, 2009 WL 10728977, at *15 (D. Mass. Feb. 27, 2009) (relying on *Limone v. Condon*, 372 F.3d 39, 44–45 (1st Cir. 2004) and declaring "[a]ssisting vulnerable witnesses in fabricating a story is a clear due process violation"). And though Best and Melvin argue that Charlene's and Beatrice's versions of events are not credible, credibility determinations are not appropriate at the summary-judgment stage. *Jacobs v. N.C. Admin. Office of the Cts.*, 780 F.3d 562, 569 (4th Cir. 2015).

Moreover, even if Sharpe had not produced direct evidence that Best invented the statements (which he has), there is ample circumstantial evidence that both officers knew, or reasonably should have known, that Charlene's and Beatrice's statements were false, yet still *used those statements against Sharpe to convict him at trial.* Courts in the Fourth Circuit and around the country have consistently ruled that officers can be held liable for the fabrication of evidence when they knowingly or recklessly use false witness testimony, even if the false statement originates from the witness. *See, e.g.*, *Hamric v. Bailey*, 386 F.2d 390, 393–95 (4th Cir. 1967) (condemning the use of misleading testimony from a witness when the government knew the

testimony—though originating from the witness—was incorrect); *Miller v. Pate*, 386 U.S. 1, 7 (1967); *Napue v. Illinois*, 360 U.S. 264, 269 (1959).

Therefore, to defeat Best's motion for summary judgment as to Counts I, II, and VII, Sharpe need only provide evidence that creates a reasonable inference that Best and Melvin knowingly, or with reckless disregard for the truth, *used* false evidence that caused Sharpe's indictment and conviction. *See Washington v. Buraker*, 322 F. Supp. 2d 702, 712 (W.D. Va. 2004).[5] The evidence establishes that Best procured, and Best and Melvin used, Charlene Johnson's and Beatrice Stokes's false evidence to secure Plaintiff's indictment and conviction. Best is not entitled to summary judgment on the use-of-false-evidence claims alleged in Counts I, II, and VII of the amended complaint.

### B.    Best is Not Entitled to Summary Judgment on Sharpe's Claims for Deprivation of Due Process / Access to Court and Bad-Faith Destruction of Evidence.

Best's memorandum of law in support of summary judgment addresses the two new claims against Best set forth in the amended complaint, namely, Count VIII (deprivation of due process

---

[5] Courts sometimes state that officers must *know* that the evidence is false to be held liable under the Fourteenth Amendment, though claims that officers used false evidence under the Fourth Amendment need only show that officers knew the evidence was false *or acted in reckless disregard of the truth. See, e.g.*, *Gilliam v. Sealey*, 932 F.3d 216, 241 (4th Cir. 2019). As some courts have observed, however, "[t]here is no moral, constitutional, common law, or common sense difference between providing phony evidence in support of an arrest and providing phony evidence in support of continued confinement and prosecution," *Pierce v. Gilchrist*, 359 F.3d 1279, 1299 (10th Cir. 2004), and have applied the same standard of knowledge *or* recklessness to claims that officers used false evidence in violation of the Fourteenth Amendment. *See, e.g.*, *Morse v. Fusto*, 804 F.3d 538, 544, 553 (2d Cir. 2015) (upholding liability under the Fourteenth Amendment for state actors who fabricated evidence when jury instructions required that defendants acted knowingly *or with reckless disregard*); *Stewart v. Donges*, 915 F.2d 572, 582–83 (10th Cir. 1990), *overruled on other grounds by County of Sacramento v. Lewis*, 523 U.S. 833 (1998) ("[I]t was a clearly established violation of plaintiff's Fourth and Fourteenth Amendment rights to knowingly *or recklessly* omit from an arrest affidavit information which, if included, would have vitiated probable cause."). The facts in this case are more than enough to create a reasonable inference that Best and Melvin actually knew that Charlene and Beatrice's statements were false. *See White v. Smith*, 696 F.3d 740, 754–57 (8th Cir. 2012) (pattern of witnesses adding details to their statements after conversations with police, when combined with evidence that police manufactured close relationships with witnesses, permitted a reasonable jury to infer that police coached and manipulated witnesses into making false statements).

and effective access to the courts) and Count IX (bad-faith destruction of evidence). Both pertain to Best's misconduct in the years 1998 to 2012 following Sharpe's 1997 MAR, during which time Best interfered with Sharpe's post-conviction efforts in 2001, 2004, and 2012. [D.E. 243 ¶¶ 158–200, 330–344.] The record evidence supports these allegations.

Best, recognizing he had no evidence to support his motion for summary judgment as to Counts VIII and IX, filed an affidavit on November 27, 2024, in which he avers: "I was not aware of Dontae Sharpe's post-conviction efforts between 1998 and 2012." [D.E. 269-9, Best Aff., ¶ 12.] This statement is then used to support Best's motion for summary judgment on those two counts. [D.E. 259 at 18–19.] However, Best's sworn statement that he was not aware of Sharpe's post-conviction efforts between 1998 and 2012 is demonstrably false, as Best surely knew.

In fact, Best testified in his own deposition on April 28, 2023, that he was aware of, and even attended, Sharpe's 2000 post-conviction hearing in Elizabeth City, North Carolina.

> Q.   In 2000, Dontae filed another motion for appropriate relief. Do you recall that?
>
> A.   I don't.
>
> Q.   This involved testimony from someone named Dearl Powell. Do you remember Dearl Powell?
>
> A.   *I do remember Dearl Powell in that, if this is the time, we were summoned to Federal Court in Elizabeth City. Is that what you are talking about?*
>
> Q.   Yes.
>
> A.   *I do remember that.*
>
> <p align="center">* * *</p>
>
> Q.   Do you remember speaking with Clark Everett about that MAR?
>
> A.   *Clark and I were there at the same time. . . .*

[D.E. 171-15 at 251:16–252:9 (emphasis added).] It was apparent to anyone attending that Elizabeth City hearing, including Best, that the validity of Sharpe's conviction was very much in dispute.

One of the issues raised in Sharpe's post-conviction efforts, including the hearing in Elizabeth City, was the recantation of trial witness Beatrice Stokes. In 2000, Melvin's private investigation revealed that Best had "paid, threaten[ed] and otherwise pressured" the key witnesses in Sharpe's murder trial, and she issued a press release saying the same. [Pl. Fourth App. A.] Documentary evidence establishes that *Best was aware of, and had a copy of, the written recantation provided by Beatrice Stokes* to Melvin in May 2000. [Pl. Fourth App. B (". . . Ricky has had this statement all along . . . .").]

As a result of the recantation, in November and December 2000, the Greenville Police Department conducted a series of interviews for the purpose of addressing Melvin's private investigation into Sharpe's conviction, the allegations made against Best, and Beatrice Stokes's recantation. [Pl. Fourth App. C and D.] In December 2000, Best himself participated in this investigation by attending at least one of the interviews conducted by Sgt. John Nichols for this purpose. [Pl. Fourth App. at 832, Interview of Stephen Carr (listing Best as being present for the interview).]

In February 2001, following Nichols's series of interviews, the SBI commenced an investigation regarding allegations that Melvin had offered to pay Stokes $1000 to change her testimony. [*See* Pl. Fourth App. E.] During the SBI's investigation, on March 6, 2001, *Best claimed that he received an unsolicited call from Beatrice Stokes and provided information to the SBI pertaining to Beatrice Stokes* that undermined her credibility and ended the SBI's investigation. [*Id*. at 2287.]

Other documents produced in discovery by the Pitt County District Attorney show that Diane Reeves, an attorney with the Attorney General's Office, and DA Clark Everett appear thereafter to have consulted with Best in preparation for the 2002 MAR, which followed the 2000 habeas hearing and, like the 2000 habeas hearing, focused in part on the testimony of Dearl Powell. [Pl. Fourth App. F at 1 (third unnumbered paragraph) ("Do you think you might need Ricky to establish some framework for the conduct of the investigation . . . ."), 3 (fourth bullet item) ("Should we ask Ricky if the area he canvassed included where Dearl Powell says he was the night of the murder and/or where he lived?").]

Some years later, after the Duke Wrongful Conviction Clinic began investigating Sharpe's conviction, the Clinic arranged a meeting with DA Everett in order to make a full presentation of the evidence they had uncovered. [Pl. Fourth App. G ¶ 5.] *Best accompanied Everett to this meeting*. [*Id*. ¶ 6.] The foregoing is evidence that Best and Everett collaborated throughout the period of Sharpe's post-conviction proceedings.

Related to this issue, Paragraph 14 of Best's affidavit contains another false statement that Best relies upon in support of his motion for summary judgment. In that paragraph, Best professes to have a specific memory of being "approached several times by individuals who identified themselves as being associated with the Duke Wrongful Conviction Clinic" in 2012, but swears that he "declined to be interviewed" by the Clinic in 2012. [*See also* D.E. 259 at 19 (claiming that ". . . Best was not interviewed by any of Plaintiff's representatives in 2012.").] This false statement was designed to rebut Sharpe's allegations in the amended complaint that Best was interviewed by the Duke Law Wrongful Conviction Clinic in 2012 and concealed exculpatory evidence from investigators. [D.E. 243 ¶¶ 194–200, 337–340.] Best's sworn statement that he declined to be interviewed by the Wrongful Conviction Clinic is false.

In fact, Best was interviewed by the Clinic on April 10, 2012, at the federal courthouse in Greenville, North Carolina, where Best was employed as a security guard. [*See* Pl. Fourth App. H, Aff. of James E. Coleman Jr.] The specificity of Best's statements in paragraph 14 of his affidavit belies any notion that he has simply forgotten what occurred.

The affidavit of James E. Coleman Jr. establishes that Best also conferred with Everett in 2012 prior to meeting with investigators from the Clinic, again proving the falsity of Best's assertion that he was not aware of Sharpe's post-conviction efforts between 1998 and 2012. Best's false statements continued into his testimony about this lawsuit. Specifically, Best was asked during his deposition whether he had communicated with anyone other than his attorney about the case generally, or about his deposition in particular. Best denied communicating with anyone about either topic. [D.E. 171-15 at 9:10–16.] Best's testimony that he had not communicated with anyone about this case since the complaint was filed was false. In fact, DA Everett testified at his deposition that he had met with Best *in person on January 5, 2022—after the filing of the lawsuit— to discuss the lawsuit and the facts of the case*. [D.E. 171-16 at 17:13–18, 261:1–13 ("Q. . . . did I hear you correctly say that when you met with Mr. Clements on January 5, '22, that Mr. Best was present? A. Yes, sir, he was.").] This was confirmed *by Best's counsel*—who submitted the false affidavit to the court—during Clark Everett's deposition. [*Id.* at 17:13–16.][6] Beyond this in-person meeting, Everett admitted in his deposition that he and Best had multiple other communications about the case prior to Best's deposition. [*Id.* at 281:18–282:20.] Phone records produced by Everett in response to a subpoena confirm these communications. [Pl. Fourth App. I.]

---

[6] The record also reflects that during the meeting on January 5, 2022, Best attempted to influence Mr. Everett's memory about the decision to obtain a warrant for Dontae Sharpe's arrest by suggesting that Everett had approved the April 7, 1994 warrant. Everett rebuffed this attempt. He was not involved in the Sharpe case until May 1994. [D.E. 171-16 at 20:2–13.]

20

The foregoing casts serious doubt on Best's claim in his affidavit that he did not speak with anyone from the District Attorney's office or with Clark Everett prior to or in preparation for the 1997 MAR hearing. This sworn statement is also contradicted by Everett, who testified in his deposition that he "*clearly would've talked to*" Best prior to the 1997 MAR hearing. [D.E. 171-16 at 69:14–19.] Best's affidavit also conflicts with his deposition testimony, in which he said it was a "normal practice" for him to meet with Everett prior to a hearing, although he "honestly [didn't] know" if he met with Everett prior to the 1997 MAR hearing. [D.E. 171-15 at 237:14–238:16.]

All these records taken together, along with Best's own sworn deposition testimony, establish conclusively that the sworn statement in his affidavit that he was not aware of Sharpe's post-conviction efforts between 1998 and 2012 is false and was known by Best to be false, and that in fact Best remained involved in Sharpe's case and took steps to preserve Sharpe's conviction and interfere with Sharpe's right of access to courts during that time.

With respect to the destruction-of-evidence claim, Best clearly had a motive to eliminate evidence of Sharpe's innocence to conceal his own misconduct in 1994. Following the denial of Sharpe's 1997 MAR, Sharpe continued, through counsel, to pursue his exoneration through a variety of legal proceedings. In August 1999 Sharpe filed a petition for certiorari with respect to his denied 1997 MAR; in December 1999 Sharpe filed a petition for writ of habeas corpus for which an evidentiary hearing was held on October 17, 2000. On November 30, 2001, Sharpe filed a second MAR, for which an evidentiary hearing was held on September 11, 2002. On September 29, 2003, Sharpe filed another petition for certiorari with respect to the denial of his second MAR.

Then, sometime prior to September 2004, Duke Law School professor James Coleman and the Duke Law Innocence Project ("Innocence Project") began to actively investigate Sharpe's case, and student investigators from the Innocence Project made calls and inquiries with known

21

witnesses as part of their investigation. The first person they intended to interview was Defendant Best. [*See* Pl. Fourth App. H.] On November 17, 2004, Sharpe, through counsel, filed a second habeas petition. On November 24, 2004, the remaining physical items of evidence in custody of the GPD were destroyed. [Pl. Fourth App. J, GPD Property Report.] In light of Best's misconduct and deliberately false testimony, the evidence is sufficient to create a dispute of fact regarding whether Best and the GPD destroyed the evidence from the Sharpe case in bad faith, or whether the disappearance of the evidence was simply an extraordinary coincidence.

In short, with respect to Counts VIII and IX of the amended complaint, Best has demonstrated that he will deliberately lie and attempt to mislead the Court in matters fundamental to the fair administration of justice for the purpose of hiding the truth and avoiding liability for his conduct. Best is not entitled to summary judgment as to Counts VIII and IX of the amended complaint.

### DEFENDANT SHROCK'S RENEWED MOTION FOR SUMMARY JUDGMENT

### A.  Shrock is Not Entitled to Summary Judgment on Counts VI, VII, and XI of the Amended Complaint.

Shrock attempts to minimize his involvement in Sharpe's wrongful conviction as well as his role in perpetuating Sharpe's period of wrongful incarceration. Shrock argues: "A reasonable officer in 1994 would not have understood that *transporting a juvenile witness to the emergency room* could constitute withholding evidence or violating a defendant's constitutional rights." [D.E. 262, Shrock Mem. Supp. Summ. J., at 6:18–20 (emphasis added).] Shrock's role in the case went far beyond simply driving Charlene to the hospital. Paragraphs 51 through 75 and 172 through 176 of Sharpe's statement of facts, [D.E. 245], reveal the extent of Shrock's involvement in detail. Critically, despite possessing significant exculpatory and impeachment evidence regarding Charlene and her credibility as a witness, Shrock concealed that evidence from the prosecutor.  The

fact that Shrock gave false in-court testimony is evidence that his concealment of this exculpatory and impeachment evidence was intentional and done in bad faith.

Shrock also falsely asserts that the "[Criminal] Court ordered the information related to witnesses suppressed." [D.E. 262 at 11.] In support of his erroneous observation, Shrock notes that, "before the criminal trial, the presiding judge denied Plaintiff's motions to 'Compel Disclosure of All Evidence by Investigative Officers to the District Attorney' and 'Motion for List of Witnesses.'" [*Id*.] Shrock then attempts to transform the judge's denial of these motions into permission that Shrock violate his obligations under *Brady v. Maryland*, 373 U.S. 83 (1963) by suppressing exculpatory and impeaching evidence regarding Charlene Johnson from the District Attorney and Sharpe. Shrock's mistaken reading of the court's order was that he "cannot be liable for failing to disclose evidence a court ordered should not be provided to the Plaintiff." [*Id*. at 11–12.]

That is not what the Court ordered, as a fair reading of the record and Shrock's due process obligations make clear. With regard to the factual record, on May 23, 1995, Sharpe's defense attorney filed *two* motions, both seeking the production of evidence. The first was Sharpe's "Motion to Compel Disclosure of All Evidence by Investigative Officers to the District Attorney" mentioned above, whereas the second was Sharpe's "Motion for Disclosure of Favorable Information." The record does not disclose why the first motion was denied. However, it is axiomatic that a police officer has a due process obligation under the Constitution to provide exculpatory and impeachment evidence to the prosecutor without any court order. The denial of a motion to enforce this constitutional obligation cannot be construed to allow the officer to evade his constitutional duty to provide such evidence to the prosecutor. In other words, the trial court's denial of Sharpe's "Motion to Compel" should not be read to have allowed Shrock to disregard his

constitutional obligations to disclose exculpatory and impeaching evidence to the District Attorney.

### DEFENDANT CITY OF GREENVILLE'S RENEWED MOTION FOR SUMMARY JUDGMENT

#### A.    The City of Greenville is Not Entitled to Summary Judgment on Counts VIII and IX of the Amended Complaint.

The City argues it is entitled to summary judgment on Counts VIII and IX because "Plaintiff has neither alleged that Best's actions were undertaken pursuant to an official policy or custom, nor provided evidence to support such an assertion." [D.E. 265, City Mem. Supp. Summ. J., at 15.] The City thus characterizes Counts VIII and IX as an improper imposition of "vicarious liability on a municipal defendant for the actions of individual employees." [*Id.*]

Contrary to the City's assertions, Counts VIII and IX are, in fact, well-pled *Monell* claims akin to that asserted in Count X, "Monell Claim for Unconstitutional Failure to Maintain Policies and Failure to Train, Supervise, and Discipline Officers." The City faults Sharpe for not alleging a "pattern or practice of similar constitutional violations" under the headings for Counts VIII and IX. [*Id.*] However, in deciding whether a claim has been adequately pled, a reviewing court must look to the entirety of the complaint, and not to individual allegations scrutinized in isolation. *See Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 310 (2007) ("[C]ourts must consider the complaint in its entirety . . . ."). Here, the Court should look to the language under Count X and in the "Facts" section of the Complaint to aid in the examination of Counts VIII and IX. Indeed, those counts were placed before Count X simply to improve chronological flow and readability, but Count X incorporates them by reference. [*See* D.E. 243 ¶ 345.]

Read in tandem, the allegations against the City contained in Counts VIII and IX should be understood to be the direct result of the claims detailed in Count X, *i.e.*, the City's failure to adopt necessary policies and to properly train, supervise, and discipline its officers to avoid the

constitutional violations at issue in this case. [*Id.* ¶¶ 345–376.] In other words, the City's failure to adequately train, supervise, and discipline its officers was also the "moving force" behind Best's obstructionism (Count VIII) and the 2004 bad-faith destruction of evidence (Count IX). Defendants' argument that Counts VIII and IX were inadequately pled is thus unavailing in light of the language in Count X establishing a single-incident theory of liability against the City for failure to adequately train, supervise, and discipline. [*See* D.E. 243 ¶¶ 345–376.]

Lastly, the City's one-paragraph argument concerning Counts VIII and IX does not address—and thus fails to show—that the undisputed material facts preclude these allegations. The City is therefore not entitled to summary judgment as to Counts VIII and IX of the Amended Complaint.

**B.     The City of Greenville is Not Entitled to Summary Judgment on Count X of the Amended Complaint.**

In a footnote, the City suggests that the city manager, and not the chief of police, was the final policymaker in the City of Greenville with respect to matters of law enforcement. [D.E. 265 at 6 n.1.] The City bases this assertion on the *current* Greenville ordinance, which was not enacted until February 11, 2010,[7] and was not applicable during the period of time relevant to this case. Even if the current ordinance cited by the City were to apply, which is disputed, the plain language of the ordinance, read together with other sections from the same code chapter, show that the chief of police would be the final policymaker for the police department.

Section 5-1-2 of the Greenville Code ("Chief of Police; Powers and Duties") reads in full:

> The Chief of Police shall have the supervision and control of the police force under the regulations of the Department prescribed by the City Manager. It shall be his or her duty, concurrently with the City Manager, to see that the rules governing the personal conduct and personal appearance of the members of the Department are rigidly enforced and that the discipline of the

---

[7] https://codelibrary.amlegal.com/codes/greenvillenc/latest/greenville_nc/0-0-0-30 (Adopting ordinance).

force is maintained in a high degree. He or she shall have power to suspend any member of the Department for a period of 30 days, whenever in his or her opinion it may be necessary. Upon suspending the member he or she shall immediately report his or her action to the City Manager in writing, stating his or her reasons for suspension. *He or she shall be the general custodian of the peace and safety of the city, and shall be charged with the apprehension, the arrest and the bringing before the proper courts of any offender, and to these ends he or she shall have power to control the police officers placed under him or her.*

Greenville, NC, Code § 5-1-2 (2024) (emphasis added).

This section vests the control and supervision of the police force in the chief of police, subject to regulations imposed by the city manager. The second sentence of the code section indicates that the regulations imposed by the city manager pertain to personnel issues—the personal conduct and personal appearance of the members of the department—and not their law enforcement duties. The section concludes by vesting the chief of police with the "power to control the police officers placed under him or her" with respect to "the peace and safety of the city" and the "apprehension and arrest" of offenders. *Id.*

Section 5-1-6 of the Greenville Code ("Departmental Rules and Regulations"), which must be read together with the above code section, vests the chief of police with the power to prepare rules and regulations for the police department, and to place the rules and regulations in a manual that the chief of police may unilaterally revise or amend:

> The Chief of Police may prepare rules and regulations in a standard operation procedure manual for the government of the Department and the conduct of its personnel. The Chief of Police may make any revision of or amendment to the manual which is necessary, and not inconsistent with the personnel policies. The Chief of Police will notify members of the Department. The changes will become effective when notice is posted or otherwise given to Department members.

Greenville, NC, Code § 5-1-6 (2024). Under this section, the rules and regulations for police-department operating procedures are promulgated by the chief of police and not the city manager.

Section 5-1-9 of the Greenville Code ("Reserve Police Officers; Powers, Duties, Privileges and Immunities") provides that reserve police officers "*while undergoing official training and while performing official duties on behalf of the city pursuant to orders or instructions of the Chief of Police*" are entitled to the powers and privileges of regularly employed police officers. Greenville, NC, Code § 5-1-9 (2024) (emphasis added). This section indicates that reserve officers receive training and perform their duties pursuant to orders and instructions from the chief of police. These sequential code sections, read together, make clear that the chief of police is the final policymaker with respect to the Greenville Police Department.

The City's resort to *Lytle v. Doyle*, 326 F.3d 463 (2003) is inapposite; *Lytle* is distinguishable. First, in *Lytle,* it is implicit from the court's discussion that the statutory section considered by the court—a city charter—was in effect at the time of the events at issue in that case. The court was not asked to apply a current charter to an event that occurred prior to the charter's enactment. Second, the city charter in *Lytle* is different than the ordinance cited by the City in this case. The charter in *Lytle* provided explicitly that the city manager, acting as the director of public safety, was in charge of the police department. *Lytle*, 326 F.3d at 472. All orders, rules, and regulations applicable to the police department had to be approved by the city manager. *Id*. The court concluded, therefore, that the city manager was the final policymaker for purposes of § 1983 liability. *Id*. In contrast, the current Greenville ordinances (set out above), to the extent applicable to the present case, do not give the Greenville city manager the same power and responsibility given to the city manager in *Lytle*.

Moreover, even though the city manager in *Lytle* had explicit power over the police department, the court nonetheless observed that "[s]ome policies for the police department, so-called standard operating procedures, may be approved by the Chief of Police rather than the City

Manager." *Lytle*, 326 F.3d at 472. On this basis, the court concluded that "the Chief of Police could be considered a final policymaker for the police department." *Id*. Applying the holdings in *Lytle* to the case *sub judice*, it is clear that, under the current ordinance scheme, the chief of police is the final policymaker for the Greenville Police Department.

### C.    The City of Greenville is Not Entitled to Summary Judgment on Count XII of the Amended Complaint.

The City argues it is entitled to summary judgment on Count XII (Gross and Reckless Negligence) because "governmental immunity and sovereign immunity protect the City from such claims." [D.E. 265 at 16.] It correctly notes that, "[u]nder the doctrine of governmental immunity, a county or municipal corporation is immune from suit for the negligence of its employees in the exercise of governmental functions absent waiver of immunity." *Est. of Williams ex rel. Overton v. Pasquotank Cnty. Parks & Recreation Dep't*, 366 N.C. 195, 198, 732 S.E.2d 137, 140 (2012) (quotations omitted). However, the City fails to mention that "[a] municipality may . . . waive its governmental immunity to the extent it has purchased liability insurance." *Meinck v. City of Gastonia*, 263 N.C. App. 414, 417, 823 S.E.2d 459, 462 (2019) (citation omitted). Indeed, in this case, the City has waived governmental or sovereign immunity by procuring liability insurance that provides coverage to each of the Defendants.

Count XII of the amended complaint alleges that "Defendants' governmental immunity has been waived by the City of Greenville's purchase and maintenance of law-enforcement liability insurance for Defendants' conduct." [D.E. 243 ¶ 391]; *see also Anderson By & Through Jerome v. Town of Andrews*, 127 N.C. App. 599, 603, 492 S.E.2d 385, 388 (1997) (finding a similar allegation by a plaintiff to be sufficient to allege waiver of governmental immunity against a municipal defendant). The City has since admitted that it is "insured under a policy of insurance issued by National Casualty," [D.E. 248, City Answer to Pl. Am. Compl., ¶ 391], and has produced, during

discovery, liability insurance policies that cover the conduct of each of the officer Defendants during the relevant time period. The City has not espoused a valid reason as to why the liability insurance policy it procured does not otherwise constitute a waiver of governmental immunity. Therefore, the City is not immune from suit and is not entitled to summary judgment on Count XII.

### QUALIFIED IMMUNITY

In their new memoranda in support of their motions for summary judgment, Shrock and Best complain that Sharpe has not identified sufficiently particularized rights in the specific circumstances presented of which a reasonable police officer would have been on notice in 1994 and 1997. [D.E. 262 at 6.] They contend that, in the absence of "existing precedent at the time of the occurrence showing that it was beyond debate" that their conduct violated constitutional protections, Plaintiff cannot show that the law was clearly established in order to defeat qualified immunity. [D.E. 259 at 21.]

Defendants' reliance on a lack of authority in the "specific factual scenario" that they confronted is misplaced. [*Id.*] The Fourth Circuit has clarified that this approach to the clearly established prong of qualified immunity is too limited. As thoroughly explained at pages 10 and 11 of Sharpe's omnibus response to Defendants' first motion for summary judgment, [D.E. 214], cases addressing misconduct identical to that committed by Defendants are not necessary for a right to be clearly established. Rather, through common-sense application of fundamental principles, a reasonable officer can be put on notice of unconstitutional behavior.

Supreme Court Justice Neil Gorsuch explained it this way:

> [S]ome things are so obviously unlawful that they don't require detailed explanation and sometimes the most obviously unlawful things happen so rarely that a case on point is itself an unusual thing. Indeed, it would be remarkable if the most obviously unconstitutional conduct should be the most

immune from liability only because it is so flagrantly unlawful that few dare its attempt.

*Browder v. City of Albuquerque*, 787 F.3d 1076, 1082−83 (10th Cir. 2015).

Sharpe's amended complaint does not allege that Best and Schrock violated obscure constitutional principles with which reasonable officers would struggle to comply. Rather, Sharpe claims that Defendants violated bedrock rules that define the American justice system. No reasonable officer could claim they were not on notice that it is illegal to: (a) knowingly use false evidence to convict a person; (b) mislead a magistrate by omitting facts material to a probable-cause determination; (c) fail to conduct a fair investigation for the purpose of concealing police misconduct; and (d) bury evidence that a fact-finder needs to evaluate the credibility of a star witness. A fulsome discussion of these clearly established rights can be found on pages 11−12, 20−21, 28−29, and 35−36 of D.E. 214.

## V.    CONCLUSION

For the reasons set forth above, Plaintiff respectfully requests that Defendants' Motions for Summary Judgment be denied in their entirety.

This the 11th day of December 2024.

/s/ David S. Rudolf
David S. Rudolf, NCSB # 8587
Sonya Pfeiffer, NCSB # 37300
Phillip Lewis NCSB # 27944
Pfeiffer Rudolf
2137 South Boulevard, Suite 300
Charlotte, NC 28203
Telephone: (704) 333-9945
dsr@pr-lawfirm.com
spf@pr-lawfirm.com
pel@pr-lawfirm.com
ATTORNEYS FOR PLAINTIFF

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that I electronically filed the foregoing using the CM/ECF system. Notice

of filing will be sent to all parties by operation of the Court's electronic filing system.

This 11th day of December 2024.


<u>/s/ David S. Rudolf</u>
David S. Rudolf

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION
Civil No: 4:21-CV-00185-BO**

MONTOYAE DONTAE SHARPE,

              Plaintiff,

v.

DAVID RICKY BEST, JEFFREY D.
SHROCK, and THE CITY OF
GREENVILLE, NORTH CAROLINA,

              Defendants.

_____

MONTOYAE DONTAE SHARPE,

              Plaintiff,

v.

CAROLYN MELVIN,

              Defendant.

**PLAINTIFF'S RESPONSE TO
DEFENDANT BEST'S, SHROCK'S, AND
THE CITY OF GREENVILLE'S
STATEMENTS OF UNDISPUTED
MATERIAL FACTS
AND
PLAINTIFF'S STATEMENT OF
ADDITIONAL MATERIAL FACTS**

Civil No: 4:22-CV-00088-BO-RJ
(Consolidated with 4:21-cv-00185-BO)

        Plaintiff Montoyae Dontae Sharpe, by and through the undersigned counsel, and pursuant to Rule 56 of the Federal Rules of Civil Procedure and Rule 56.1(a)(2) of the Local Rules for the Eastern District of North Carolina, respectfully submits this response to Defendant Best's, Shrock's, and the City of Greenville's Revised "Statement of Undisputed Material Facts."

        On November 27, 2024, Best, Shrock, and the City of Greenville each filed its own (revised) Statement of Undisputed Material Facts [D.E. 258, 261, 264], but all three statements are identical. Plaintiff has therefore prepared only one response to the three identical statements.

        Plaintiff's Statement of Undisputed Material Facts [D.E. 245] will be cited as "PSF ¶ ____."

1

Plaintiff's Appendix [D.E. 171] will be cited as "Pl. Appx., p. ___:___."

Plaintiff's Appendix in response [D.E. 217] to all Defendants' Motions for Summary Judgment will be cited as "Pl. Resp. Appx., p. ___:___."

Plaintiff's Fourth Appendix, filed contemporaneously herewith, will be cited as "Pl. Fourth Appx. ____."

Best, Shrock, and City of Greenville's Appendix [D.E. 191] will be cited simply as "Best Appx., p. ___:___."

Melvin's Appendix [D.E. 201] will be cited as "Melvin Appx., p. ___:___."

Plaintiff responds to Defendants' Statement of Undisputed Material Facts as follows:

1.      It is admitted George Radcliffe was murdered on February 11, 1994.

2.      It is admitted that Radcliffe's body was found inside his pickup truck.

3.      It is admitted that members of the Greenville Police Department ("GPD") came to the scene of the Radcliffe murder and took some investigatory steps.

4.      It is admitted that Ofc. Kevin Jones spoke with Tony Johnson and Wilbur Mercer the night of the murder.

5.      It is **disputed** that GPD detectives spoke with Alonza Vines the night of the murder.

    **Additional Material Facts:**

    No police reports reflect that a "detective" or any other member of the GPD spoke with Alonzo Vines on the night of the murder. Best Appx. A. It is unclear from the trial transcript the extent to which Vines interacted with any member of the GPD on the night of the murder. Pl. Appx. KK, p. 92:9-13; p. 95:10-11.

6.      It is admitted that GPD officers conducted a search "up and down the street" for evidence.

7.    It is **false** that on February 12, 1994, Melvin submitted physical evidence collected from the crime scene to the GPD Property Department. Best Appx. C, p. Sharpe 4929.

8.    It is **disputed** that Melvin attended the autopsy.

**Additional Material Facts:**

Melvin testified in this case that Best attended the autopsy rather than Melvin. Pl. Appx. W, p. 13:5; Pl. Appx. X, p. 89:1-4.

9.    It is admitted that the path of the bullet as described in the autopsy is accurate.

10.    It is admitted that Melvin interviewed Wilbur Mercer at the GPD headquarters on February 14, 1994, and that a written report exists documenting this interview (while missing the last page). It is **disputed** that Mercer claimed he was attempting to obtain drugs for Radcliffe, and it is disputed that Wilber Mercer was a credible source of information about the murder of George Radcliffe.

**Additional Material Facts:**

Mercer's statements, read in conjunction, show that Mercer gave facially inconsistent accounts of his interaction with the victim to the GPD. *Cf.* Best Appx. A, pp. Sharpe 3708-3709 (Mercer's statement on February 11, 1994), and Best Appx. F, pp. Sharpe 3686-3689 (Mercer's statement on February 14, 1994). Melvin considered Mercer the "prime suspect" in the murder after his bloody coat was found in the victim's truck and did not believe his statements to be truthful. Pl. Appx. W, p. 25:23-25 through p. 26:1. Mercer's desire to protect himself from being charged undermines the credibility of his statements.

11.     It is admitted that Melvin's notes reflect statements that Stewart allegedly made to her on February 14, 1994, three days after the murder, but it is **disputed** that these notes are admissible in evidence at the trial of this case.

**Additional Material Facts:**

Stewart, who lived in the same neighborhood as Dontae Sharpe, could not identify the two black males who she claimed approached Radcliffe's truck. Best Appx. G, p. Sharpe 5028-5029.

12.     **Disputed.**

**Additional Material Facts:**

The document filed by Defendants at Appx. H is not the "Mendenhall Report." It is **false** that Ofc. Mendenhall completed processing the crime scene on February 14, 1994. On February 15, 1994, Melvin filed an Internal Affairs complaint against Mendenhall on the grounds that he "failed to properly process a Major Crime Scene," specifically, George Radcliffe's truck. Pl. Resp. Appx. E, GPD 273. Mendenhall did not process the truck for fingerprints or examine it for evidence until February 15, 1994, after he had been called at home and instructed to do so by his supervisor. *Id.*, GPD 270, 271. An Internal Affairs report submitted by Mendenhall on February 15, 1994, shows that on February 15, 1994, Mendenhall was still planning to lay out the victim's clothing to dry. The GPD Internal Affairs investigation concluded that Mendenhall "did not process the victim's vehicle until he was called at home by his supervisor and told to do so on February 15, 1994." *Id.*, GPD 270. Mendenhall received disciplinary sanction for his misconduct. *Id.*

4

This information was concealed from the District Attorney prior to Sharpe's trial. Pl. Appx. U, p. 161:2-6.

13.    Defendants' statement of fact in paragraph 13 is **false**. Mercer's blood-stained jacket was not entered into evidence. Pl. Appx. KK, p. 151:4-25 through p. 152:1-14.

**Additional Material Facts:**

The trial court transcript shows that the GPD Ofc. Mendenhall was not even aware that he had taken custody of the bloody jacket (p. 151:11-14), had no notes pertaining to the whereabouts of the jacket (p. 151:20-21), and never submitted the jacket for forensic analysis (p. 152:7-8). Furthermore, the evidence indicates that Mendenhall, in addition to his failure to timely process the crime scene (Pl. Resp. Appx. E, GPD 273), was criticized by Melvin for leaving Mercer's bloody jacket in the truck for several days (*Id.*, GPD 277, bottom paragraph).

14.    It is admitted that Best was assigned to the Radcliffe investigation on February 15, 1994. It is **disputed** that Best and Melvin conducted a "canvass" of the neighborhood as that term is commonly understood, and it is further **disputed** that Best and Melvin "could not locate any willing witnesses."

**Additional Material Facts:**

There are no GPD notes or reports in the GPD's investigative file indicating that such a canvass was conducted, nor is there credible evidence that Best and Melvin "could not locate any willing witnesses." While Best alleges in self-serving testimony that he conducted interviews with people in the area regarding the Radcliffe murder, he claims he did not "write up" the interviews because, according to Best, "We don't write up interviews with people that are not affected unless they

have some information that will lead us to a suspect or that would be pertinent in the investigation." Pl. Appx. KK, p. 270:8-13. Accordingly, in the absence of notes or reports regarding any such canvass, it is impossible to know whether or to what extent a canvass occurred.

Furthermore, Best and Melvin, in their depositions, offered markedly contrary accounts of their respective roles in the investigation, including which of them was the lead detective in the case responsible for the preparation of field notes and the writing of reports. Incredibly, both of them deny being the lead detective, and both of them blame the other for the investigation's failures.

Best claims that Melvin was the "lead detective" who was responsible for all decisions in the investigation and writing all the reports. *See* Pl. Appx. T, p. 71:3 ("I wasn't the lead detective . . . ."); p. 80:3-5 (Best saying that Melvin, as the lead detective, secured the warrant); p. 92:19-21 (Best alleging that he had no decision-making responsibility in the case); p. 118:13-25 through 119:1-7 (Best claiming that he did not takes notes regarding his communications with Shrock about witness Charlene Johnson because that was the lead detective's responsibility, not his); p. 135:23-25 through 136:1-13 (Best claiming that he did not write a report about his interactions with Charlene Johnson because "I wasn't the lead detective."); p. 127:20-21 (Best claiming he didn't write a report about his communications with Charlene Johnson because "[i]t wasn't up to me, it was Detective Melvin's case."). Melvin flatly contradicts Best's account. She claims that while she was initially assigned as lead detective, once Best was assigned to the case four days later *he* became the lead detective and assumed the responsibilities of the lead detective. Pl.

Appx. W, p. 6:10-19. Melvin alleges that after Best was assigned, she only had a minimal role in the case. D.E. 185 ¶ 25 (claiming that Melvin missed numerous days for health and personal reasons during the investigation); D.E. 200 at 2 ("Given Detective Melvin's absence from work for sick leave, *she had minimal involvement* in the investigation of Radcliffe's murder") (emphasis added). Melvin claims that after Best was assigned to the case, she was "reassigned to another building," was "taking sick leave," and that she "never touched any of the evidence." Pl. Appx. W., p. 8:20-25 through 9:1-3.

15.    It is admitted that on or about February 15, 1994, Melvin filled out a request form for Crime Stopper Coverage.

16.    It is **false** that Melvin interviewed Alonzo Vines on February 14, 1994. Best Appx. I (which reflects a date of February 16, 1994). It is admitted that Melvin wrote notes of what Alonzo Vines allegedly told her *on February 16, 1994*. However, it is **disputed** that these notes are admissible in evidence at the trial of this case. It is also **disputed** that this was Melvin's *second interview* with Vines. *See* Plaintiff's response in paragraph 5, *supra*.

> **Additional Material Facts:**
>
> Melvin's notes do not reflect the race of the two males Vines allegedly observed standing around Radcliffe's truck, what time the men were observed (*i.e.*, how soon after the truck crashed in the yard), and do not reflect that Vines identified either person. Melvin Appx. B, pp. Sharpe 3690-3691 (filed out of sequence in Melvin's Appendix).

17.    It is admitted that on February 16, 1994, Best and Melvin interviewed Trisha Radcliffe.

**Additional Material Facts:**

Radcliffe provided no evidence regarding the murder of her husband. Best Appx. J.

18.    It is **disputed** that before any arrest was made, Melvin "performed surveillance" around the area of the murder, observed Sharpe and Mark Joyner selling drugs, and determined that the area was "Sharpe family territory."

**Additional Material Facts:**

The allegation that before any arrest was made Melvin performed "surveillance" and observed Plaintiff and Mark Joyner selling drugs is inconsistent with Melvin's trial testimony, which suggests that she did *not* personally observe any known and visible drug transactions. Pl. Appx. KK, p. 277:1-15. When asked how the drugs were sold, Melvin responded: "I'm not too familiar with how or I probably would have arrested them," *id*., indicating that she did not actually witness the transactions taking place. Furthermore, Melvin testified under oath in this case that "Dontae Sharpe did not sell drugs on the street," and that the area where Radcliffe was murdered "was not [Sharpe's] area. He wouldn't have been in that area." Pl. Appx. X, p. 58:10-13.

19.    **Disputed.**

**Additional Material Facts:**

Shrock's entire account of when and how Charlene Johnson came to be a witness in the case against Dontae Sharpe has been proven false by the evidence adduced in discovery. *See* PSF ¶¶ 39 – 82 (showing that Shrock's testimony at the 1997 MAR was false and that Shrock made admissions that his testimony was false, and containing citations to documentary evidence proving Shrock's account to be false).

It is undisputed, and Shrock has admitted—once in an interview with the GPD in 2014, and again to the Duke Law Wrongful Conviction Clinic—that Charlene Johnson's purported statement implicating Sharpe in the Radcliffe murder *did not* occur the night Shrock allegedly took Charlene to the hospital on February 17, 1994. PSF, ¶ 63, 64.

20.    It is admitted that on February 24, 1994, Melvin interviewed Nathan Farmer.

**Additional Material Facts:**

Farmer provided no evidence regarding the murder of Radcliffe. Best Appx. K.

21.    It is admitted that Best submitted some physical evidence to the SBI. It is **disputed** that the evidence was submitted to the SBI on March 3, 1994. Best Appx. L (which reflects a different date).

22.    It is **disputed** that prior to Sharpe's arrest Best and Melvin spoke with GPD narcotics investigators who confirmed that the area around the murder scene was Sharpe family territory. It is therefore **disputed** that this is material to any claim against Defendants.

**Additional Material Facts:**

At the 1997 MAR hearing, Best testified, "we were told" that the area in which the murder occurred was "Sharpe family area," but he did not specify who allegedly provided this information, to whom this information was allegedly communicated, or when this information was allegedly communicated. Pl. Appx. KK, p. 134:14-25. This statement was first made in December 1997, more than two years after Sharpe's conviction.

There is no evidence in the record that Best or Melvin spoke with GPD narcotics investigators or had any communications with GPD narcotics investigators *prior to*

*Sharpe's arrest*. To the contrary, *Best testified* that Sharpe was not a suspect prior to Charlene Johnson's statement. Pl. Appx. MM, p. 122:1-8 ("No, *we didn't have any information* that Dontae Sharpe was our suspect"). *Melvin testified* that other than Charlene Johnson's written statement, which was given on April 7, 1994, there was *no other evidence that connected Mark Joyner and Dontae Sharpe to the crime*. Pl. Appx. W, p. 22:1-3. Furthermore, Melvin testified in her April 2024 deposition that the area where Radcliffe was murdered "*was not [Sharpe's] area*. He wouldn't have been in that area." Pl. Appx. X, p. 58:10-13.

23.    It is admitted that Best and Melvin brought Charlene to the "Brown Building" on April 7, 1994, and that a police "report" prepared by Melvin recites that Charlene "stated that she was in the area and witnessed the murder." It is **disputed** that this was alleged statement was truthful or accurate.

**Additional Material Facts:**

At the time of the murder, Charlene Johnson was 13 years old.  As of April 7, 1994, she had a recent history of significant mental and emotional issues. Pl. Appx. L, p. Sharpe 4763; Pl. Appx. M, Sharpe 4766-4767. In the six months prior to the murder of George Radcliffe, Charlene had been living in and out her mother's house, drinking alcohol "heavily," using drugs, selling drugs, and not going to school. Pl. Appx. L, pp. Sharpe 4763; Pl. Appx. TT, p. Sharpe 4812. Charlene was committed to the Pitt County Memorial Hospital ("PCMH") adolescent psychiatric ward for evaluation and treatment on February 18, 1994, where she remained hospitalized until March 10, 1994. Pl. Appx. M, p. Sharpe 4766.

Following her discharge from the PCMH adolescent psychiatric unit, Charlene ran away from home and was missing for an additional three-week period, from March 14, 1994, to April 5, 1994, just two days before her alleged statement. Pl. Appx. RR, pp. 3303-3326. Thus, for the six-week period prior to Best and Melvin picking up Charlene and obtaining a statement from her purporting to implicate Sharpe, Charlene had been either hospitalized for psychiatric treatment or was a missing person.

Furthermore, beginning in September 1995, following the July 1995 trial of Sharpe, and continuing up to the present, Charlene Johnson has repeatedly maintained, and stated under oath in the form of affidavits, depositions, and in-court testimony, that the written statements signed by her were not true. Shortly after Dontae Sharpe was convicted, Charlene Johnson told Kay Lambert, a paralegal for Cherry Stokes, Sharpe's trial attorney, that she (Charlene) had lied at the trial. Pl. Appx. MM, p. 58:9-16. Charlene told Lambert that she (Charlene) "wasn't there" (when the shooting occurred); that Best had given her and her family a lot of gifts; that Best and the GPD gave her money; and that Beatrice Stokes didn't tell the truth either." Pl. Appx. MM, p. 59:15-20. On April 18, 1996, Charlene told Tina Lyda, the secretary and legal assistant for Sharpe's appellate lawyer, "Everything I said on the stand was a lie." Pl. Appx. P, Pitt Co. 203-211 (see Pitt Co. 207). Charlene told Lyda that she had not even been at the scene of the murder. *Id.* (see Pitt Co. 209). On September 10, 1996, Charlene signed an affidavit reiterating that her trial testimony had been a lie and that she had not witnessed George Radcliffe's murder. *Id.*, Pitt Co. 203-211. Charlene has been adamant and steadfast in her recantation

since that time. Pl. Appx. OO, GPD 135-181 (2014 GPD Interview with Charlene Johnson); Pl. Appx. QQ, p. 8:1-7; Pl. Appx. V, p. 121:19-25. Melvin herself did not believe at the time that Charlene's written statement was truthful. Pl. Appx. W, p. 34:16-17 (Best knew that Melvin did not believe Charlene's account); Pl. Appx. X, p. 58:3-9 (admitting that the information provided by Charlene "wasn't adding up").

24.      It is admitted that there is a statement in Charlene Johnson's handwriting dated April 7, 1994, that reflects a time of 1:30 pm. It is **disputed** that this statement was accurate or truthful. It is further **disputed** that Charlene's statement was "corroborated" by the statements of Alonzo Vines and Martha Stewart. It is further **disputed** that her statement was corroborated by Wilbur Mercer, who gave conflicting accounts of his interaction with Radcliffe to the GPD. See Plaintiff's response to paragraph 9, *supra*.

**Additional Material Facts:**

The evidence from the scene was that Radcliffe's dead body was found in his truck in a vacant lot. Best Appx. A, p. Sharpe 3708. Tony Johnson, an eyewitness at the scene, testified that the truck sped through the intersection after shots were fired, *id.*, and Alonzo Vines stated in an interview that the truck wrecked in his backyard and made a loud noise. Best Appx. I. The police report of the incident stated that the truck was facing southwest, with "fresh tracks" showing the path that the truck had taken westerly across the vacant lot. Pl. Appx. A, p. Sharpe 4995. (Best Appx. A is missing the second page of the incident report.) The first paragraph of Charlene's statement was facially inconsistent with the physical evidence from the scene and indicated that Charlene *had not* actually witnessed the murder.

In Charlene's first written paragraph, she made no mention of a truck, which was the salient fact observed by other eyewitnesses, and recites only that Sharpe pushed Radcliffe after Radcliffe lacked the money to buy drugs and then shot him. The statement failed to account for Radcliffe's body in the truck, the movement of the truck into the vacant lot, and the truck crashing through a stop sign and a fence and then coming to a stop. Additionally, Charlene's first statement says she was at "the stop sign" on 14th Street, whereas the truck had traveled west on 6th Street and come to rest at the corner of Shepherd and 6th Street. Pl. Appx. A, p. Sharpe 4995. Furthermore, Radcliffe's wallet contained $53.00. Melvin Appx. B, p. Sharpe 3703 (third paragraph), contradicting Charlene's statement that Radcliffe only had $18.00. Charlene's first written statement therefore contradicted, rather than corroborated, the physical evidence in the case.

Beginning in September 1995 following the July 1995 trial of Sharpe, and continuing up to the present, Charlene Johnson has repeatedly maintained, and stated under oath in the form of affidavits, depositions, and in-court testimony, that the written statements signed by her were not true. See Plaintiff's response to paragraph 23, *supra.*

25.    It is admitted that there is a statement in Charlene Johnson's handwriting dated April 7, 1994, that reflects a time of 1:34 pm. It is **disputed** that this statement was accurate or truthful.

**Additional Material Facts:**

See Plaintiff's responses in paragraph 23 and 24, *supra.* Charlene testified in her deposition in this case that Best told her what to write for the second part of her

statement. Pl. Appx. V, p. 40:14-20; p. 90:7-18. She also gave testimony to this effect during the 1997 MAR hearing. Pl. Appx. MM, p. 14:15-18. Charlene's testimony indicates that Best provided the information contained in the second paragraph of her written statement to account for the truck and the location of Radcliffe's body in the truck.

This second portion statement of Charlene's statement also contains information that contradicted the physical evidence at the scene. For example, the keys to the truck were found in the ignition (not thrown away). Melvin Appx. B, p. Sharpe 3703, unnumbered ¶ 2. No gun was found during the crime scene search. Pl. Appx. Z, p. 88:9-19. It is an issue of fact whether these facts were provided to Charlene by Best, but it is undisputed that they were inconsistent with the physical evidence at the scene.

26.    It is admitted that Melvin presented Charlene Johnson's statement of April 7, 1994, to Magistrate K. Hall, and that based on that statement Magistrate Hall issued an arrest warrant for Dontae Sharpe, charging him with the murder of George Radcliffe.

**Additional Material Facts:**

When she presented this evidence to Magistrate Hall, Carolyn Melvin did not believe Charlene Johnson's statement was true, and did not believe Dontae Sharpe was responsible for the murder of George Radcliffe. Pl. Appx. W, p. 21:7-25 through 22:1-13; p. 34:16-17; Pl. Appx. X, p. 16:23-25 through p. 17:1-11. *See also* Plaintiff's Omnibus Response in Opposition to Defendants' Renewed Motions for Summary Judgment, Sec. IV(A), pp. 8–11.

27.    It is admitted that Mark Joyner was arrested in relation to the Radcliffe murder. It is **disputed** that Joyner was an accessory to the murder.

> **Additional Material Facts:**
>
> Joyner entered an Alford plea on January 10, 1996, months after Sharpe's conviction. Pl. Resp. Appx. F, Depo. Ex. 178, pp. Sharpe 5062-5063. He explicitly refused to admit that he was guilty of this offense, and Plaintiff therefore disputes any suggestion that Joyner's plea was an admission.

28.    It is admitted that Best made handwritten notes of a statement Plaintiff made denying any involvement in the Radcliffe murder and providing evidence of an alibi during the time of the murder.

> **Additional Material Facts:**
>
> Neither Best nor Melvin attempted to interview these alibi witnesses. PSF ¶ 110.

29.    It is admitted that Kizzy Paige and four other women assaulted Charlene Johnson *after Plaintiff was wrongfully arrested*. It is **disputed** that this is material to any claim against Defendants.

> **Additional Material Facts:**
>
> At the hospital, in response to a question from medical staff, Charlene stated that she was assaulted for "lies told in the past." Pl. Resp. Appx. G, 2014 MAR, p. 36 ¶ 143. The women arrested for assaulting Charlene all separately claimed that they had attacked her for "lying" about Sharpe and Joyner. *Id*. at p. 37, ¶ 145.

30.    It is **disputed** that Sharon Sharpe said to Charlene, "word is you're the one who told on Dontae." The document relied upon by Defendants for this assertion in Best Appx. S does

not support this assertion. Furthermore, instead of citing to the page and lines to which the assertion

of fact pertains, Defendants merely cite to three deposition pages without any line references.

31.    It is **disputed** that Charlene told her mother while at the hospital that Plaintiff had

"shot the white man." The affidavit signed by GPD Ofc. Connie Elks does not support this

proposition. Furthermore, the Elks Affidavit does not contain evidence supporting Defendants'

other allegations of fact in this paragraph regarding Charlene's injuries.

> **Additional Material Facts:**

> Melvin testified in this case that Charlene's mother was not even aware that
> Charlene was a witness in a murder case. Pl. Appx. W, p. 65:23-25 through p. 66:1.

32.    It is admitted that Best testified during the 1997 MAR that he had attended

interviews of two of the women who assaulted Charlene.

> **Additional Material Facts:**

> Best provided false testimony during the 1997 MAR confirming Shrock's false
> account of how Charlene came to be a witness in the case. *See* PSF ¶¶ 56-65
> (showing that Shrock's testimony at the 1997 MAR was false; that Shrock later
> admitted its falsity; and that Best endorsed Shrock's false account in sworn
> testimony), calling into question the truthfulness of his remaining testimony.

33.    It is admitted that Best testified during the 1997 MAR that he had driven Charlene

to Wilmington, North Carolina, following the assault. The date this occurred is not contained in

the source cited by Defendants in their appendix.

**Additional Material Facts:**

Despite being in a car with Charlene for the entire trip, Best did not take notes of what he discussed with Charlene in the car, nor did he write a report about it. Pl. Appx. T, p. 184:17-25 through 185:1.

34.    It is admitted that more than a month after Sharpe was arrested, Lisa Evans wrote a letter to Plaintiff's mother. It is **disputed** that this document is admissible in evidence at the trial of this case.

**Additional Material Facts:**

The unauthenticated letter purportedly from Lisa Evans also states: (a) "I know that Donta [*sic*] nor Mark had anything to do with a murder" (Best Appx. U, Sharpe 3833); (b) that Lisa Evans was drinking and high on Thursday morning to the point that she had "never felt that bad before" (*id*. at Sharpe 3836); (c) that the police talked to Charlene Johnson because they thought Charlene had information about the murder, but in fact Charlene did not (*id*. at Sharpe 3834); (d) that the police found out that Charlene was a runaway (*id.*); and (e) that she (Lisa) avoided the police because she was "dirty and drunk" (*id.* at Sharpe 3837).

Additionally, contrary to the assertion that Cherry Stokes was Lisa Evans's attorney, District Attorney Clark Everett stated in his deposition: "I don't think [Cherry Stokes] was the lawyer for [Lisa Evans] in those cases." Pl. Appx. U, p. 46:23-25 through 47:1-3. Cherry Stokes stated, "I have no idea" when asked if Lisa Evans was one of his clients. Pl. Resp. Appx. H, Stokes Depo., p. 60:5-7. Most tellingly, the Judgment and Commitment for Lisa Evans from the case in question lists

"Joseph Dupree" as Evans's attorney, not Cherry Stokes. Pl. Resp. Appx. I (Lisa Evans Judgment and Commitment).

35.    It is admitted that Charlene received the $500.00 Crime Stoppers Award even though she did not qualify for it.

**Additional Material Facts:**

Best used his influence with Crime Stoppers to ensure that Charlene received a Crime Stoppers award of $500.00 even though she had not called Crime Stoppers and did not qualify for the award. Pl. Appx. T, p. 281:18-25 through p. 282:1-4; Pl. Appx. MM, p. 124:23-25; p. 138: 13-25.

36.    It is admitted that Plaintiff was indicted on April 18, 1994.  It is **disputed** that this indictment was based on truthful evidence.

37.    It is admitted that a polygraph was administered to Charlene Johnson on April 19, 1994, the day after Plaintiff was indicted.

**Additional Material Facts:**

The results of that polygraph were inconclusive with regard to the truthfulness of Johnson's April 7, 1994, statements. Pl. Appx. T, p. 309:19-25 through p. 310:1-2 (Best admitting that the polygraph was inconclusive).

38.    It is **disputed** that the encounter between Best and Stokes occurred in the manner described. Best's entire account of his interaction with Beatrice Stokes and how she came to be a witness in the case has been called into question.

**Additional Material Facts:**

Best wrote no notes or reports about the alleged interaction, PSF ¶¶ 125, 126, despite knowing that "all interviews" should go into a lead detective's report. *Id.* at

¶ 127. The District Attorney testified in his deposition that he was not aware of another case where Best had not written a report about a witness who he claimed was an eyewitness to a murder. *Id*. at ¶ 131. Melvin testified in her deposition that the alleged encounter between Best and Stokes in which Stokes got in Best's patrol car but refused to let him take notes *did not actually happen*. *Id*. at ¶ 132. Melvin also testified that Best brought in Beatrice Stokes as a witness because Melvin did not believe Charlene Johnson's account was true. Pl. Appx. W, p. 34:14-22; Vol II, p. 16:23-25 through p. 17:1-2.  Melvin, who was initially assigned as the lead detective, and who Best claims was the lead detective, did not even meet Stokes until the day of trial. Pl. Appx. W, p. 16:1-4. Furthermore, in a sworn affidavit witnessed by two members of the Greenville City Council, Stokes alleged that Best had told her what to say and paid her to say it. Pl. Resp. Appx. C, Depo. Ex. 86, Sharpe 3747, 3749. Stokes's recantation was given and signed in front of Defendant Melvin, as well as Pitt County Commissioners Rose Glover and Arielle Morris. Pl. Appx. W, p. 63, lines 6–23; Pl. Appx. U, p. 274, lines 19–25; p. 275, lines 1–5; Pl. Resp. Appx. C, Depo. Ex. 86, Sharpe 3747, 3749.

39.    It is **disputed** that Best submitted a .45-caliber pistol to the SBI on May 16, 1994. The document cited by Defendants as evidence for this proposition does not support this assertion.

40.    It is admitted that on August 29, 1994, after he was indicted and at his attorney's request, Plaintiff was administered a polygraph related to the murder.  It is **disputed** that the polygraph indicated deception about Plaintiff's involvement in the murder, and it is disputed that the result of this polygraph is a material fact as to any claim against Defendants.

41.    It is **disputed** that after Sharpe's arrest Best attempted to contact multiple witnesses, including Wilbur Mercer, Tony Johnson, and Martha Stewart, but was unsuccessful.

**Additional Material Facts:**

No police reports provide evidence of any such efforts. Furthermore, the source cited by Defendants for this fact does not mention Tony Johnson or Martha Stewart.

42.    It is **disputed** that in 2014, GPD Office Jeff Baxter discovered that the District Attorney's file from the murder investigation was destroyed due to flooding.

**Additional Material Facts:**

District Attorney Clark Everett testified in his deposition that the District Attorney's file on Sharpe was moved because of a hurricane *but was later found*. Pl. Appx. U, p. 88:5-14.

43.    It is disputed that Robert Cherry was Plaintiff's attorney at trial. Cherry Stokes was Plaintiff's trial attorney.

44.    It is **disputed** that Plaintiff's mother told Cherry Stokes that Charlene had provided information to the GPD implicating him in the murder. The deposition cited by Defendants for this assertion does not support this assertion.

45.    It is **disputed** that in May of 1994, the Pitt County District Attorney's Office obtained Charlene's medical records that indicated she had received mental health treatment and been committed at the Pitt County Hospital's adolescent psych unit in March of 1994.

**Additional Material Facts:**

The subpoena sent to Pitt County Memorial Hospital by the District Attorney only sought Charlene Johnson's medical records *between the dates of April 7, 1994, and May 17, 1994,* as reflected on the Subpoena (Pl. Resp. Appx. J, Dep. Ex. 76, p.

Sharpe 14163), and would not have produced medical records showing the extent and duration of Charlene's psychiatric treatment prior to that time. The District Attorney testified in his deposition that he was not aware that involuntary commitment papers were taken out on Charlene the night that Shrock took her to the hospital. Pl. Appx. U, p. 142:4-8. The District Attorney was also not aware that Charlene was admitted to the adolescent psychiatric ward for three weeks in February and March 1994 and then again in September 1994. *Id.*, p. 143:21-25 through 144:1-8. Therefore, any suggestion that the District Attorney was aware of Charlene's significant medical history and prolonged periods of treatment for mental and emotional illness is false.

46.    **Disputed**.

       **Additional Material Facts:**

       The medical records referred to would not have included any records from Charlene's three-week stay at PCMH adolescent psychiatric in February and March 1994 because the Subpoena issued by the District Attorney only sought documents from April 7, 1994, forward. See Plaintiff's response to paragraph 45, *supra.*

47.    It is admitted that Cherry Stokes stated in his deposition that he "remembered" Don Hicks, but that he had not "thought of him in years." Pl. Resp. Appx. H, Cherry Stokes Depo., p. 56:13-15.

48.    It is **disputed** that Greg Duke filed a Ritchie Motion "in response to" the disclosure.

       **Additional Material Facts:**

       When asked by counsel for Defendants whether Greg Duke "recognized the reference in those medical documents to . . . a psychiatric stay and filed the Richie

motion," District Attorney Everett stated, "*I don't know what caused him to file the motion.*" Pl. Appx. U, p. 43:14-22. Defendants did not obtain testimony from Greg Duke on this issue and have no evidence to support the assertion Mr. Duke filed the motion *in response to* the disclosure from the District Attorney's office.

49.    The trial court record of this case is in writing and speaks for itself. Plaintiff disputes any portion of Defendants' assertions of fact that are inconsistent with the trial record. It is **disputed** that these alleged facts are material to any claims against Defendants.

50.    It is admitted that Cherry Stokes filed a motion in the trial court in which he stated that he had retained an investigator named Johnny Rose who had made diligent efforts to locate Charlene Johnson prior to trial. It is **disputed** that these facts are material to any claims against Defendants.

51.    **Disputed**.

      **Additional Material Facts:**

      During her testimony during the 1997 MAR, Charlene disputed Everett's account that she had told him she was scared of being beaten up, saying instead that she was "scared to tell a lie." Pl. Appx. MM, p. 38:6-14.

52.    **Disputed.** See Plaintiff's response to paragraph 51, *supra*.

53.    Admitted.

54.    Admitted.

55.    It is admitted that Charlene testified that she was "cut up one night, and I had went to hospital [*sic*] . . . and the police brought me there and they started talking to me." Pl. Appx. KK, p. 46:22.  It is **disputed** that this is material to any claim against defendants.

22

56.     It is admitted that Charlene testified in the trial of Sharpe and that her testimony, which is in writing, speaks for itself. It is **disputed** that Defendants' characterization of Charlene's testimony is accurate, and it is further **disputed** that Charlene "stated that the Victim may have been turned when shot."

**Additional Material Facts:**

Defendants' statement of facts asserts that "Charlene maintained her entire five-hundred question testimony." [*sic*] While the precise meaning of this is not clear, to the extent it characterizes Charlene's testimony as consistent throughout, such a characterization is **disputed** by Plaintiff and by the transcript of Charlene's trial testimony. Charlene's testimony was rife with inconsistencies, equivocations, and outright guesses. *See* Pl. Appx. KK, p. 56:2-4 (Charlene testifying that the gun was held "probably like that," but that "I don't really know. I'm guessing right now"); p. 58:4 (testifying that Radcliffe "was probably standing right there"); p. 62:5-6 (testifying that Radcliffe's head was "like halfway in the passenger side, I guess"); p. 63:23-24 (testifying, when asked who got in the truck with Radcliffe, "I guess one of them"); p. 64:12-14 (when asked how Sharpe or Joyner got into the truck on top of Radcliffe, testifying, "They probably sat on him"); p. 72:7-10 (when asked if Sharpe and Joyner were running together, testifying, "one probably was running down the other street"), and other equivocations indicative of deception.

With respect to the relative positions of Sharpe and Radcliffe, Sharpe's counsel asked Charlene about this issue 12 times. In answer to the first ten questions on this issue, Charlene stated the men were "face to face" and confirmed that there was "no doubt in [her] mind." The eleventh time counsel for Sharpe asked the question,

Charlene stated, "I don't know if the white man turnt. I don't know if it was straight up or not." Then, in response to the follow-up question by Sharpe's counsel, "Your best recollection, you believe they were face to face?", Charlene responded, "Yes, I do." Pl. Appx. KK, pp. 56:18-25 through 57:1-16; p. 69:12-5; p. 73:5-21.

Beginning in September 1995 following the July 1995 trial of Sharpe, and continuing up to the present, Charlene Johnson has repeatedly maintained, and stated under oath in the form of affidavits, depositions, and in-court testimony, that the written statements signed by her were not true. See Plaintiff's response to paragraph 23, *supra.*

57.    It is admitted that Beatrice Stokes testified in the trial of Sharpe and that her testimony, which is reflected in a certified transcript, speaks for itself. It is **disputed** that Stokes testimony about witnessing the murder was true and accurate.

**Additional Material Facts:**

Melvin testified in her deposition that the alleged encounter between Best and Stokes in which Stokes got in Best's patrol car but refused to let him take notes *did not actually happen. Id.* at ¶ 132. Melvin also testified that Best brought in Beatrice Stokes as a witness because Melvin did not believe Charlene Johnson's account was true. Pl. Appx. W, p. 34:14-22; Vol II, p. 16:23-25 through p. 17:1-2.  Melvin, who was named as the lead detective, did not even meet Stokes until the day of trial. Pl. Appx. W, p. 16:1-4.

Furthermore, in a written statement witnessed by two members of the Greenville City Council, Stokes alleged that Best had told her what to say and paid her to say it.  Pl. Resp. Appx. C, Depo. Ex. 86, Sharpe 3747, 3749. Stokes's recantation was

given and signed in front of Defendant Melvin, as well as Pitt County Commissioners Rose Glover and Arielle Morris. Pl. Appx. W, p. 63:6–23; Pl. Appx. U, p. 274:19 through 275:1–5; Pl. Resp. Appx. C,  Depo. Ex. 86, Sharpe 3747, 3749. Finally, Melvin alleged that Best "paid, threatened, or otherwise pressured" two state's witnesses, including Charlene Johnson. Pl. Resp. Appx. K, Pitt DA Copies 2325. Accordingly, the subject matter of the testimony given by Beatrice Stokes is a matter of dispute.

58.    It is admitted that Melvin testified in the trial of Sharpe and that her testimony, which is reflected in a certified transcript, speaks for itself.

**Additional Material Facts:**

Melvin testified under oath in this case that "Dontae Sharpe did not sell drugs on the street," and that the area where Radcliffe was murdered "was not [Sharpe's] area. He wouldn't have been in that area." Pl. Appx. X, p. 58:10-13.

59.    Admitted.

60.    It is admitted that Sharpe called Ward and Hick as alibi witnesses at his trial. It is **disputed** that Defendants' characterization that this was "in contrast" to what Sharpe said to Melvin and Best during his interview is accurate.

61.    It is admitted that the jury convicted Sharpe. It is **disputed** that he was in fact guilty.

**Additional Material Facts:**

Sharpe's conviction was subsequently vacated after a multi-year investigation by the Duke Law School Wrongful Conviction Clinic that uncovered misconduct on the part of Shrock, Best, and Melvin. He subsequently received a Pardon of Innocence from Governor Roy Cooper. [D.E. 154-B.]

62.    Admitted.

63.    Admitted. It is **disputed** that this is material to any claim against Defendants.

64.    Admitted.

65.     It is admitted that when Charlene was asked by Melvin's counsel whether, when Charlene wrote "the statement," anybody else was in the room, Charlene stated, "There was nobody in the room with me."

> **Additional Material Facts:**
>
> During the same deposition, Charlene testified that Best kept standing there while she was writing and that, "coming back he told me stuff and I finished the rest of it." Best Appx. V, p. 90:11-14. Charlene further testified that Best "was standing out there and he would come and check on me and tell me things and I would write the rest of the stuff down." *Id.* at 94:11-20. She also testified that in the second half of her statement, she just wrote down what he told her. *Id*. at 40:18-24.

66.     It is admitted that Best asked Charlene to write down what she "knew" about the murder. It is **disputed** that what she *knew* about the murder almost two months later is material, as opposed to what she actually *witnessed* at the time of the murder.

> **Additional Material Facts:**
>
> Charlene Johnson testified at her deposition that the "first time she became aware of the murder" was *through the news*. Best Appx. V, p. 20:12 through 21:1.

67.    Admitted.

**Additional Material Facts:**

Charlene testified that after she wrote the first part of her statement, Best told her that "there wasn't enough, he said to write more." Best Appx. V, p. 39:14-24. She stated: "He was telling me things. What to write." *Id*. at 40:4-7.

68.    It is admitted that Best was aware of the importance of documenting anything relevant to an investigation, although the page and line citation provided by Defendants does not establish that fact.

**Additional Material Facts:**

Best did not document any of his interactions with the two alleged eyewitnesses, Charlene Johnson and Beatrice Stokes. PSF ¶¶ 125, 126; Pl. Appx. T, p. 127:4-21; p. 136:12-17.

69.    It is admitted that Best expected all relevant evidence to be memorialized in a report, although the page and line citation provided by Defendants does not establish that fact.

**Additional Material Facts:**

Best did not document any of his interactions with the two alleged eyewitnesses, Charlene Johnson and Beatrice Stokes. PSF ¶¶ 125, 126; Pl. Appx. T, p. 127:4-21; p. 136:12-17.

70.    Admitted. However, it is disputed that Best took notes in the Radcliffe homicide investigation. It is further disputed that Best wrote any reports in the Radcliffe homicide investigation. Pl. Appx. T, p. 118:13–25 (Best saying he had "no idea" why he didn't take notes about his conversation with Shrock regarding Charlene); p. 127:8–21 (Best saying he didn't write a report of a conversation Charlene because "[i]t wasn't up to me, it was Detective Melvin's case.").

71.    It is **disputed** that at the time of this investigation, the City had a written policy which it enforced. It is further disputed that the page and line citation provided by Defendant says that any policy was enforced.

> **Additional Material Facts:**
>
> Best testified in his deposition that there was "a book," but that he did not know what was in "the book"; he did not know who had "the book," but guessed that it was "with the supervisor"; that in fact he "never saw" the book; that he "didn't read the book"; and that he "never had a copy." Best Appx. GG, p. 104:9-25; 105:2-3 (never saw); 105:15-16 (didn't read); 106:3-5 (never had a copy). In the deposition of former GPD Chief Charles E. Hinman, Hinman testified that there was no policy or procedure manual when he came to the GPD in 1991. Pl. Resp. Appx. L, Hinman Depo., p. 21:20-23, and that prior to the enactment of a written policy on criminal investigations effective November 18, 1994, there was no other policy for criminal investigations. *Id.* at p. 30:13-25 through 31:1-4.

72.    It is **disputed** that Best testified that Shrock informed him that a female witness claimed that she had *witnessed* Dontae Sharpe kill the victim. Best testified that a woman had *told him she knew* who had killed the white man, and that it was Dontae Sharpe. Best Appx. GG, p. 118:8-9. *See also* Plaintiff's response to paragraph 66, *supra*. Furthermore, Defendants' characterization that Best testified Shrock said he had driven the woman to the hospital *because* she was acting strange is disputed. Best Appx. GG, p. 118:11-12.

> **Additional Material Facts:**
>
> Shrock has admitted—once in an interview with the GPD in 2014 conducted at the request of the District Attorney, and again to the Duke Law Wrongful Conviction

Clinic—that Charlene Johnson's purported statement implicating Sharpe in the Radcliffe murder *did not* occur the night Shrock allegedly took Charlene to the hospital on February 17, 1994. Plaintiff's Statement of Facts, ¶ 63, 64. Paragraph 72 simply repeats the false story Shrock testified to during Plaintiff's 1997 MAR hearing.

73.     It is admitted that Best *testified* that Charlene's mother had consented to Best and Melvin bringing Charlene to the GPD headquarters. It is **disputed** that this is true, or that it is material to any of the claims made by Plaintiff.

**Additional Material Facts:**

Best did not talk to Charlene's mother when he and Melvin went to her house on April 7, 1990, to bring her to GPD headquarters. Best Appx. GG, p.125:13-16.

74.     It is admitted that Best *testified* to this at his deposition. It is **disputed** that what Charlene Johnson allegedly told Best and Melvin was true and accurate. It is further **disputed** that Charlene "provided the correct location of the murder."

**Additional Material Facts:**

Beginning in September 1995, following the July 1995 trial of Sharpe, and continuing up to the present, Charlene Johnson has repeatedly maintained, and stated under oath in the form of affidavits, depositions, and in-court testimony, that the written statements signed by her were not true. See Plaintiff's response to paragraph 23, *supra.* With respect to the location of the murder, Charlene wrote in her statement that she was on 14th Street. Nowhere in her statement does she describe the location of the murder. Additionally, Charlene's written statement was given two months after the murder, during which time news of the murder had been

on television and newspapers. Charlene testified at her deposition that the "first time she became aware of the murder" was through the news. Best Appx. V, p. 20:12 through 21:1.

75.    It is admitted that Best *testified* to this at his deposition.  It is **disputed** that Best's testimony was true and accurate. During her deposition, Charlene Johnson testified that Best *told her what to write*. After she wrote the first part of her statement, Best told her that "there wasn't enough, he said to write more." Best Appx. V, p. 39:14-24. "He was telling me things. What to write." *Id*. at p. 40:4-7. "I just wrote down whatever was on that piece of paper." *Id*. at 40:18-24. "He was standing out there and he would come and check on me and tell me things and I would write the rest of the stuff down." *Id*. at p. 94:11-20.

76.    **Disputed.** Defendant does not cite to any specific page or line in support of this paragraph.

### Additional Material Facts:

During her deposition, Charlene Johnson testified that Defendant Best *told her what to write*. After she wrote the first part of her statement, Best told her that "there wasn't enough, he said to write more." Best Appx. V, p. 39:14-24. "He was telling me things. What to write." *Id*. at p. 40:4-7. "I just wrote down whatever was on that piece of paper." *Id*. at 40:18-24. "He was standing out there and he would come and check on me and tell me things and I would write the rest of the stuff down." *Id*. at p. 94:11-20.

77.    Defendant does not cite to any specific page or line in support of this alleged fact, and it is **disputed** that what Stokes allegedly told Best was true and accurate.

### Additional Material Facts:

Best wrote no notes or reports about the alleged interaction, PSF ¶¶ 125, 126, despite knowing that "all interviews" should go into a lead detective's report. *Id.* at ¶ 127. The District Attorney testified in his deposition that he was not aware of another case where Best had not written a report about a witness who he claimed was an eyewitness to a murder. *Id*. at ¶ 131. Melvin testified in her deposition that the alleged encounter between Best and Stokes in which Stokes got in Best's patrol car but refused to let him take notes *did not actually happen*. *Id*. at ¶ 132, and that Best brought in Beatrice Stokes as a witness because Melvin did not believe Charlene Johnson's account was true. Pl. Appx. W, p. 34:14-22; Vol II, p. 16:23-25 through p. 17:1-2.  Melvin, who was assigned to be the lead detective, did not even meet Stokes until the day of trial. Pl. Appx. W, p. 16:1-4.

Furthermore, in a sworn affidavit witnessed by two members of the Greenville City Council, Stokes alleged that Best had told her what to say and paid her to say it. Pl. Resp. Appx. C, Depo. Ex. 86, Sharpe 3747, 3749. Stokes's recantation was given and signed in front of Defendant Melvin, as well as Pitt County Commissioners Rose Glover and Arielle Morris. Pl. Appx. W, p. 63, lines 6–23; Pl. Appx. U, p. 274:19 through 275:1–5; Pl. Resp. Appx. C, Depo. Ex. 86, Sharpe 3747, 3749. Defendant Melvin has alleged that Best  "paid, threatened, or otherwise pressured" two state's witnesses, including Beatrice Stokes. Pitt DA Copies 2325.

78.   It is admitted that Melvin testified during her deposition that in 1994 Charlene Johnson was adamant that she saw Dontae Sharpe kill George Radcliffe. It is **disputed** that what Charlene was saying in 1994 was true and accurate.

**Additional Material Facts:**

Melvin testified that she did not believe at the time that Charlene's written statement was truthful. Pl. Appx. W, p. 34:14-17; Pl. Appx. X, p. 58:3-9 (admitting that the information provided by Charlene "wasn't adding up"). Melvin testified that in 1994 she was "trying to encourage Charlene to tell the truth and confirm that what she was saying wasn't true" because it that was "important to me." Best Appx. HH, p. 73:11 through 74:14.

79.      **Disputed**. The citation provided by Defendants (Best Appx. HH, p. 115:21-116:7) does not support this allegedly uncontested fact. Melvin testified that *Best and Charlene* "were always together in the room." Best Appx. HH, p. 115:21-24. It is also **disputed** that this is material to any of the claims made by Plaintiff.

80.      It is admitted that Melvin testified to this. It is **disputed** that this is material to any of the claims made by Plaintiff.

81.      **Disputed.** Defendants do not supply any specific page and line in Shrock's deposition in support of this assertion. Shrock testified at his deposition that he did not remember taking Charlene to the hospital. Best Appx. II, pp. 99:20-21; 132:10-11; 133:7-8.

82.      It is admitted that Shrock testified at the MAR hearing in 1997 that he verbally relayed to Best that Charlene had identified a man named "Dondy" or Dontae (but not Dontae Sharpe). It is **disputed** that this testimony was true.

**Additional Material Facts:**

Shrock subsequently admitted that his testimony at the 1997 MAR hearing was false.  PSF ¶¶ 63, 64; Pl. Appx. II, p. Sharpe 4684, ¶ 5.; Pl. Appx. NN, p. 2:79-85; p. 4:141-144 (see page number at top of page); p. 10:426-429 (see page number at top of page).

83.     Admitted.

84.     It is **disputed** that anything Shrock testified to at the 1997 MAR hearing was truthful.

      **Additional Material Facts:**

      Shrock subsequently admitted that his testimony at the 1997 MAR hearing was false.  PSF ¶¶ 63, 64; Pl. Appx. II, p. Sharpe 4684, ¶ 5.; Pl. Appx. NN, p. 2:79-85; p. 4:141-144 (see page number at top of page); p. 10:426-429 (see page number at top of page).

85.     It is **disputed** that anything Shrock testified to at the 1997 MAR hearing was truthful.

      **Additional Material Facts:**

      Shrock subsequently admitted that his testimony at the 1997 MAR hearing was false.  PSF ¶¶ 63, 64; Pl. Appx. II, p. Sharpe 4684, ¶ 5.; Pl. Appx. NN, p. 2:79-85; p. 4:141-144 (see page number at top of page); p. 10:426-429 (see page number at top of page).

86.     It is **disputed** that anything Shrock testified to at the 1997 MAR hearing was truthful.

      **Additional Material Facts:**

      Shrock subsequently admitted that his testimony at the 1997 MAR hearing was false.  PSF ¶¶ 63, 64; Pl. Appx. II, p. Sharpe 4684, ¶ 5.; Pl. Appx. NN, p. 2:79-85; p. 4:141-144 (see page number at top of page); p. 10:426-429 (see page number at top of page).

87.      It is **disputed** that anything Shrock testified to at the 1997 MAR hearing was truthful.

>   **Additional Material Facts:**
>
>   Shrock subsequently admitted that his testimony at the 1997 MAR hearing was false.  PSF ¶¶ 63, 64; Pl. Appx. II, p. Sharpe 4684, ¶ 5.; Pl. Appx. NN, p. 2:79-85; p. 4:141-144 (see page number at top of page); p. 10:426-429 (see page number at top of page).

88.      It is **disputed** that "Shrock did not speak to the District Attorney before the 1997 hearing." District Attorney Clark Everett testified as his deposition that it was his normal practice to meet with witnesses he intended to call to discuss their potential testimony. PSF ¶ 168; Pl. Appx. T, p. 237;4-16; Pl. Appx. U, p. 69:14–19; Pl. Appx. Y, p. 106:23-25.

89.      It is admitted that every person applying to be a police officer in North Carolina, including in Greenville, North Carolina, is required to take the Basic Law Enforcement Training (BLET) course before starting as a patrol officer. It is **disputed** that the BLET course addresses "all aspects of policing."

>   **Additional Material Facts**:
>
>   The BLET course is an entry level course *designed for patrol officers*. As Defendants' 30(b)(6) witness testified "BLET gives a fundamental understanding for most officers as to basic laws and procedures *that are regarded universal through wherever they become employed*." Pl. Resp. Appx. M, Bonner Depo., p. 72:2-4 (emphasis added). By its very title, Basic Law Enforcement Training does not address specialized topics applicable to detectives, such as the use of informants, the evaluation of witness statements, or the investigation of alibi

evidence, among other topics relevant to the investigation of the Radcliffe murder. *Id.* at 86:1-4.

90.    Admitted. It is **disputed** that this is a material fact regarding the claims in Plaintiff's complaint.

91.    Admitted. It is **disputed** that this is a material fact regarding the claims in Plaintiff's complaint.

92.    It is **disputed** that Melvin "attended a number of advanced investigation courses while employed by the GPD. Melvin testified that the only specialized course she took while employed at the GPD was rape investigation. "The rest of them were the basic certifications." Pl. Appx. X, p. 119:12-17.

>    **Additional Material Facts:**
>
>    As reflected in Melvin's final evaluation report before leaving the GPD in November 1994, Melvin "has never been afforded any formal training" in interviewing and interrogation," nor had Melvin had any "formal training related to homicide investigation." PSF ¶¶ 26, 27; Pl. Appx. CC, pp. 503, 507, 512, 519.

93.    It is admitted that Jon Blum's expert report stated that Melvin had attended these courses.

>    **Additional Material Facts:**
>
>    Between 1992 and 1995, Melvin's yearly evaluations recommended that she receive training in interviewing and interrogation, and/or other training in homicide investigations. Defendant Melvin did not receive this training prior to Charlene Johnson's April 7, 1994, statement. PSF ¶¶ 179-180; Pl. Appx. CC, pp. GPD 503, 507, 512, 519.

94.    Admitted. It is **disputed** that this is a material fact regarding the claims in Plaintiff's complaint.

95.    It is admitted that Jon Blum's expert report stated that Best had attended these courses.

>    **Additional Material Facts:**

>    Best received no training from the GPD regarding note taking. PSF ¶ 181; Pl. Appx. T, p. 47:1-3.

96.    It is admitted that Best completed training over his time employed by the GPD and received certificates for completing various training courses. However, Defendant's characterizations that the training was "extensive," that Best received "many" certificates, and that the training courses were "comprehensive," are opinions, not facts.

97.    Admitted.

>    **Additional Material Facts:**

>    Chief Hinman testified at his deposition that there was no policy on criminal investigations until November 1994, when the first *draft* of Chapter 42—Criminal Investigations—was approved by him to send to CALEA as part of the accreditation process. Pl. Resp. Appx. L, Hinman Depo., pp. 35:1 through 37:25.

98.    It is admitted that Jon Blum's expert report stated that the GPD earned CALEA accreditation in 1995, and that this was accomplished by less than 1% of law enforcement agencies in the US.  It is **disputed** that this is material to the claims in Plaintiff's complaint regarding GPD policies in effect *at the time of the Radcliffe investigation in 1994.*

>    **Additional Material Facts:**

Chief Hinman testified at his deposition that there was no policy on criminal investigations until November 1994, when the first *draft* of Chapter 42—Criminal Investigations—was approved by him to send to CALEA as part of the accreditation process. Pl. Resp. Appx. L, Hinman Depo., pp. 35:1 through 37:25.

99.      It is admitted that Hardy, Bass, and Forrest submitted affidavits making these statements. It is **disputed** that these statements are material to the claims in Plaintiff's complaint regarding GPD policies in effect *at the time of the Radcliffe investigation in 1994.*

**Additional Material Facts:**

Chief Hinman testified at his deposition that there was no policy on criminal investigations until November 1994, when the first *draft* of Chapter 42—Criminal Investigations—was approved by him to send to CALEA as part of the accreditation process. Pl. Resp. Appx. L, Hinman Depo., pp. 35:1 through 37:25.

100.   It is admitted that Hardy, Bass, and Forrest submitted affidavits making these statements. It is **disputed** that these statements are accurate.

**Additional Material Facts:**

These affidavits were drafted after the deposition of Sgt. William Bonner, the designated 30(b)(6) witness, to address Bonner's failure to identify any policies regarding Investigations, Impeachment Evidence, Exculpatory Evidence, Confidential Informants, Investigation Assignments, Investigation Supervision, Witness Interviews, or Investigator Training in existence before 1995.

Chief Hinman testified at his deposition that there was no policy on criminal investigations until November 1994, when the first *draft* of Chapter 42—Criminal

Investigations—was approved by him to send to CALEA as part of the accreditation process. Pl. Resp. Appx. L, Hinman Depo. pp. 35-37.

101.  Admitted. It is **disputed** that this is a material fact regarding the claims in Plaintiff's complaint concerning GPD policies *in effect in 1994*, before GPD was accredited by CALEA.

102.  Admitted. It is **disputed** that this is a material fact regarding the claims in Plaintiff's complaint concerning GPD policies *in effect in 1994*, before GPD was accredited by CALEA.

103.  Admitted. It is **disputed** that this is a material fact regarding the claims in Plaintiff's complaint concerning GPD policies *in effect in 1994*, before GPD was accredited by CALEA.

104.  It is admitted that Robert Pusins testified that *he* had not personally identified any other case in which the GPD failed to enact policies or procedures for training its officers. It is **disputed** that this established that there were no other such cases.

>**Additional Material Facts:**

Chief Hinman testified at his deposition that there was no policy on criminal investigations until November 1994, when the first *draft* of Chapter 42—Criminal Investigations—was approved by him to send to CALEA as part of the accreditation process. Pl. Resp. Appx. L, Himan Depo., pp. 35:1 through 37:25.

105.  Admitted.

106.  Admitted upon information and belief. It is a matter of dispute who directed that the physical evidence from the Sharpe case be destroyed. *See* Plaintiff's Omnibus Response to Defendants' Renewed Motions for Summary Judgment, pp. 16–23.

107.  Admitted.

108.  Disputed. On April 12, 2012, Best met with and was interviewed by Katie Claire Hoffman and Ellie Marranzini of the Wrongful Convictions Clinic at the federal courthouse in

Greenville, North Carolina, where Best worked as a security guard. *See* Pl. Fourth Appx. H, Aff. of James E. Coleman Jr.

Respectfully submitted this 11th day of December 2024.

<div align="right">

/s/ David S. Rudolf
David S. Rudolf, NCSB # 8587
Sonya Pfeiffer, NCSB # 37300
Phillip Lewis NCSB # 27944
Pfeiffer Rudolf
2137 South Boulevard, Suite 300
Charlotte, NC 28203
Telephone: (704) 333-9945
dsr@pr-lawfirm.com
spf@pr-lawfirm.com
pel@pr-lawfirm.com
ATTORNEYS FOR PLAINTIFF

</div>

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing using the CM/ECF system. Notice of filing will be sent to all parties by operation of the Court's electronic filing system.

This 11th day of December 2024.

/s/ David S. Rudolf
David S. Rudolf

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
### EASTERN DIVISION
### Civil No: 4:21-CV-00185-BO

MONTOYAE DONTAE SHARPE,

        Plaintiff,

    v.

DAVID RICKY BEST, JEFFREY D.
SHROCK, AND THE CITY OF
GREENVILLE, NORTH
CAROLINA,

        Defendants.

**PLAINTIFF'S FOURTH APPENDIX**

MONTOYAE DONTAE SHARPE,

        Plaintiff,

    v.

CAROLYN MELVIN,

        Defendant.

CIVIL NO:  4:22-CV-00088-BO-RJ
(Consolidated with 4:21-CV-00185-BO)

| Appendix # | Document |
|---|---|
| A | Press Advisory, 19 May 2000 [Sharpe 3721] |
| B | Fax from D. Reeves to C. Everett, 30 October 2000 [Pitt DA Copies 2352] |
| C | 2000 Interview Reports [Pitt DA Copies 824–832] |
| D | Transcript of Beatrice Stokes Interview by Sgt. John Nichols, 14 December 2000 [Pitt DA Copies 817–823] |
| E | CONFIDENTIAL 2001-00621 SBI File [Pitt DA Copies 2282–2290] |
| F | Fax from D. Reeves to C. Everett, 30 August 2002 [Pitt DA Copies 2291–2295] |
| G | Excerpt, Unfiled Motion for Disqualification of Assistant District Attorney [Pitt DA Copies 550–551] |
| H | Affidavit of James E. Coleman, Jr., 11 December 2024 |
| I | Clark Everett telephone records [Everett Prod 1, 3, 8–11] |
| J | Greenville Police—Property Report [Sharpe 4929–4932] |

1

Respectfully submitted this 11th day of December 2024.

/s/ David S. Rudolf
David S. Rudolf, NCSB # 8587
Sonya Pfeiffer, NCSB # 37300
Phillip Lewis NCSB # 27944
**PFEIFFER RUDOLF**
2137 South Boulevard, Suite 300
Charlotte, NC 28203
Telephone: (704) 333-9945
dsr@pr-lawfirm.com
spf@pr-lawfirm.com
pel@pr-lawfirm.com
*ATTORNEYS FOR PLAINTIFF*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I electronically filed the foregoing **PLAINTIFF'S FOURTH APPENDIX** using the CM/ECF system. Notice of filing will be sent to all parties by operation of the Court's electronic filing system.

This 11th day of December 2024.

<u>/s/ David S. Rudolf</u>
David S. Rudolf

3

IN THE UNITED STATES DISTRICT COURT
THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION
Lead Case No. 4:21-cv-185-BO
*Consolidated with 4:22-cv-88-BO*

|  |  |
|---|---|
| MONTOYAE DONTAE SHARPE,<br><br>                                    Plaintiff,<br><br>vs.<br><br>DAVID RICKY BEST, JEFFREY D. SHROCK, CAROLYN MELVIN, and the CITY OF GREENVILLE, NORTH CAROLINA,<br><br>                                    Defendants. | **DEFENDANT MELVIN'S REPLY BRIEF IN SUPPORT OF REVISED MOTION FOR SUMMARY JUDGMENT** |

Defendant Carolyn Melvin ("Melvin"), by and through her undersigned counsel, and pursuant to Local Civil Rule 7.1(g), submits the following Reply in support of her Revised Motion for Summary Judgment as to the Amended Complaint (D.E. 254).

## ARGUMENT

I.    **Plaintiff failed to move on Count IV (Malicious Prosecution under 42 U.S.C. § 1983) in his motions for summary judgment and is not entitled to summary judgment on this claim.**

Rule 56(a) of the Federal Rules of Civil Procedure provides: "[a] party may move for summary judgment, **identifying each claim or defense**—or the part of each claim or defense—on which summary judgment is sought." Fed. R. Civ. P. 56(a) (emphasis added).

In his Omnibus Response to Defendants' Renewed Motions for Summary Judgment, Plaintiff claims he is "entitled to summary judgment on his claim for malicious prosecution (Count IV)." (D.E. 277, at 9.) However, Plaintiff neither moved for summary judgment on this claim in his initial motion for summary judgment (D.E. 169; D.E. 53, Count IV, ¶¶ 199-210) nor

1

in his renewed motion for summary judgment (D.E. 244; D.E. 243, Count IV, ¶¶ 281-291).

Plaintiff, likewise, did not brief his malicious prosecution claim in his initial memorandum in

support of his motion for summary judgment (D.E. 178), and he incorporated his initial

memorandum by reference in support of his renewed motion. (D.E. 244, at 2.) Accordingly,

Plaintiff's motion for summary judgment on the malicious prosecution claim in his Omnibus

Response (D.E. 277) clearly violates Rule 56(a), which required Plaintiff to *identify in his

motions for summary judgment each claim* on which summary judgment is sought. Plaintiff did

not move for summary judgment on his malicious prosecution claim in either motion and has not

moved for leave to amend his renewed motion for summary judgment. Therefore, Plaintiff

cannot now move for the first time on said claim in his response in opposition to Melvin's

revised motion for summary judgment. *See, e.g.*, *Alvarez v. Getachew*, No. 1:17-CV-0141-PX,

2021 WL 1561517, at *2 (D. Md. Apr. 21, 2021) ("[C]ourts generally refuse to consider

arguments raised for the first time in a reply brief or memorandum."); *Thomas v. Trans Union,

LLC*, No. 4:22-CV-3669-SAL-TER, 2023 WL 9546647, at *1 (D.S.C. Dec. 1, 2023), *report and

recommendation adopted sub nom. Thomas v. Equifax Info. Servs., LLC*, No. 4:22-CV-3669-

SAL-TER, 2024 WL 449396 (D.S.C. Feb. 5, 2024) (denying the plaintiff's summary judgment

motion where he "failed to identify in his motion the specific claims or defenses for which he

seeks summary judgment"). Accordingly, this Court should decline to enter summary judgment

in Plaintiff's favor on the malicious prosecution claim.

## II.    Melvin is entitled to summary judgment on the § 1983 malicious prosecution claim (Count IV).

Plaintiff erroneously suggests that the Fourth Circuit applies a subjective test to

determine whether Melvin had probable cause for his arrest. (D.E. 277, at 9.) However, Fourth

Circuit precedent clearly provides to the contrary: "[p]robable cause is an objective standard of

2

probability that reasonable and prudent persons apply in everyday life, and determined by a "totality-of-the-circumstances" approach[.]" *Humbert v. Mayor & City Council of Baltimore City*, 866 F.3d 546, 555 (4th Cir. 2017), *as amended* (Aug. 22, 2017) (internal quotation marks and citations omitted). A court does " 'not examine the subjective beliefs of the arresting officers to determine whether they thought that the facts constituted probable cause.' " *Gilliam v. Sealey*, 932 F.3d 216, 234 (4th Cir. 2019) (quoting *Smith v. Munday*, 848 F.3d 248, 253 (4th Cir. 2017)). Stated differently, "whether a plaintiff's right to be free from arrest is clearly established turns not on 'whether there actually was probable cause . . . **but whether an objective law officer could reasonably have believed probable cause to exist**.' " *Thurston v. Frye*, 99 F.4th 665, 676 (4th Cir. 2024) (emphasis added) (quoting *Gomez v. Atkins*, 296 F.3d 253, 261–62 (4th Cir. 2002)).

Therefore, this Court should <u>not</u> consider the subjective beliefs of Melvin thirty years later[1] to determine whether she thought probable cause existed for Sharpe's arrest – especially in light of Melvin's resignation from the GPD on December 28, 1995 (D.E. 201-13) and her filing an unsuccessful lawsuit against the City of Greenville, the GPD, and Best, among others in May 1996[2]. Instead, this Court should consider whether an objective law enforcement officer "could reasonably have believed probable cause" existed for Sharpe's arrest. *Thurston*, 99 F.4th at 676; *see also Calliste v. City of Charlotte*, 695 F. Supp. 3d 708, 730 (W.D.N.C. 2023) ("Probable cause exists where a reasonable police officer would be led to arrest, imprison, or prosecute

---

[1] In his Omnibus Response, Plaintiff cites deposition testimony from Melvin on April 2 and April 4, 2024 – over 30 years after the February 11, 1994 homicide. Plaintiff does not cite any trial testimony from 1995 or other documents showing Melvin, in 1994 or 1995, thought she lacked probable cause for Sharpe's arrest. Moreover, the Court applies an objective, not a subjective, test to determine if probable cause existed.

[2] Melvin filed a lawsuit against the City of Greenville, Greenville Police Department, David Best, Cecil Hardy, Charles Hinman, Joseph Simonwich, and John Teel for violations of the Civil Rights Act and North Carolina Equal Employment Practices Act, and also asserted state law claims, in the Eastern District of North Carolina (4:96-cv-66-H). The Honorable United States District Judge Malcom J. Howard granted summary judgment in favor of all defendants on December 7, 1998. (Exhibit A.)

3

another by the facts and circumstances known to the officer at that time.") Here, an objective law enforcement officer, based on the totality of the circumstances, could reasonably have believed probable cause existed for Sharpe's arrest based on the following: (1) Charlene's handwritten statement implicating Sharpe in Radcliffe's homicide, (2) Charlene's handwritten statement providing the correct location of the murder and correctly identifying Sharpe as an active crack dealer in the crime scene vicinity where Radcliffe was purchasing drugs at the time of the homicide; and (3) Charlene's handwritten statement corroborating information previously provided by Martha Ann Stewart, Alonzo Vines, and Wilbur Mercer regarding the homicide and suspects. (D.E. 201-7; 203-1, at 8-14.)

Moreover, in contrast to the deposition testimony cited by Plaintiff about Melvin's "knowledge" at the time of the investigation in 1994 (D.E. 77, at 10), at Sharpe's criminal trial in 1995, Melvin testified on cross examination that she would investigate to ascertain if a person was guilty, and *only if* she found probable cause, would she indict said person:

> Q:    And if you received information from someone on the stand that would lead you to the commission of a crime, do you believe that you would arrest that person if they were guilty?
>
> A:    I would investigate it to ascertain if they were guilty.
>
> Q:    And if you found there to be probable cause you would indict that person, would you not?
>
> A:    Yes.

(D.E. 201-12, at 282:5 – 282:13.) Critically, a neutral and detached magistrate also determined probable cause existed for Sharpe's arrest (D.E. 203-2), which deserves deference by this Court, as Charlene did not recant to Tina Lyda, the paralegal of Sharpe's appellate attorney, until September 10, 1996 (D.E. 203-3) – well after Sharpe's trial in July 1995 (D.E. 201-12) and Melvin's resignation in December 1995. (D.E. 201-13). *See United States v. Orozco*, 41 F 4th

4

403, 407 (4th Cir. 2022) ("We afford initial probable cause determinations 'great deference'

when, as here, a 'neutral and detached magistrate' finds probable cause to support a warrant.")

(quoting *Illinois v. Gates*, 462 U.S. 213, 236 (1983)).

Accordingly, an objective law enforcement officer, based on information known to

Melvin in April 1994 when she arrested Sharpe, could reasonably have believed probable cause

to exist. Therefore, Melvin is entitled to summary judgment on the malicious prosecution claim.

### III.    Melvin is entitled to public official immunity on Plaintiff's state law claims against her.

Plaintiff contends that his "state-law claim for malicious prosecution does not sound in

negligence." (D.E. 277, at 12-13.) However, Plaintiff has not alleged a state law claim for

malicious prosecution against Melvin, only a malicious prosecution claim pursuant to § 1983.

(D.E. 243.) Instead, Plaintiff alleged the following state law tort claims against Melvin in his

Amended Complaint:

- Count XI: Wrongful Imprisonment and Civil Conspiracy

- Count XII: Gross and Reckless Negligence

(D.E. 243.)

Further, Plaintiff contends that "Melvin's use of false evidence to obtain a warrant for

Sharpe's arrest without probable cause may fairly be characterized as malicious, reckless[.]"

(D.E. 277, at 13.) However, Plaintiff has offered no evidence that Melvin <u>knew</u> Charlene's

written statement was false on April 7, 1994, when she typed the warrant for Plaintiff's arrest.

Plaintiff, in a footnote, states that Melvin's use of the "not buying it" language in her deposition

means "did not believe[.]" (D.E. 277, at 10, n. 3.) However, Melvin has not testified that she

thought Charlene's statement was false on April 7, 1994 when she obtained the warrant for

Sharpe's arrest. (D.E. 201-3.)  "Not buying it" and "did not believe" are two separate phrases

with two separate meanings. Moreover, Plaintiff's counsel could have asked Melvin to clarify what she meant by "not buying it" at her deposition, but failed to do so and cannot now, with authority, claim that Melvin meant she did not believe Charlene's statement on April 7, 1994, when she never explicitly testified to the same. (D.E. 201-3.) At her deposition in April 2024, Melvin unequivocally testified that the first time she learned that Charlene did not see Sharpe kill Radcliffe was when she "had left the PD [resigned from GPD effective December 28, 1995] and that's when Sarah said she recanted it. I never known anything different." (D.E. 201-3, Part II, 74:15 – 74:21.)  Hence, Melvin did not know on April 7, 1994, when she applied for Sharpe's arrest warrant, that Charlene's statement was false. In addition, Melvin testified in the case *sub judice* that Charlene <u>always</u> maintained that Sharpe was the shooter, and she did not have information of anything different in 1994 and 1995. (D.E. 201-3, Part II, 51:6 – 51:20).

Accordingly, there is no genuine issue of material fact as to whether Melvin acted maliciously or corruptly, as the evidence clearly shows that Melvin did not know Charlene's statement was false on April 7, 1994 when she obtained a warrant for Sharpe's arrest. Therefore, Melvin is entitled to public official immunity on Plaintiff's state law claims (Counts XI and XII).

<u>**CONCLUSION**</u>

For the foregoing reasons, and the reasons stated in Melvin's Memorandum of Law in Support of her Revised Motion for Summary Judgment (D.E. 256), Melvin respectfully requests the Court grant summary judgment in her favor on all claims.

Respectfully submitted this the 20th day of December, 2024.

6

**J.A. 2752**

**POYNER SPRUILL LLP**

By:   /s/ Sydney P. Davis
       J. Nicholas Ellis
       N.C. State Bar No. 13484
       jnellis@poynerspruill.com
       Sydney P. Davis
       N.C. State Bar No. 58038
       sdavis@poynerspruill.com
       P.O. Box 353
       Rocky Mount, NC  27802-0353
       Telephone: 252.972.7115

       *Attorneys for Defendant Carolyn Melvin*

7

## CERTIFICATE OF SERVICE

The undersigned hereby certifies, pursuant to Rule 5 of the Federal Rules of Civil Procedure, the foregoing was electronically filed with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following:

> David S. Rudolf
> Sonya Pfeiffer
> Phillip Lewis
> Rudolf Widenouse
> 225 East Worthington Avenue
> Charlotte, NC 28203
> *Attorneys for Plaintiff*
>
> Elizabeth A. Martineu
> Martineau King, PLLC
> P.O. Box 241268
> Charlotte, NC 28224
> *Attorneys for Defendants City of Greenville,*
> *Ricky Best, and Jeffrey Shrock*
>
> Peter Clements, Jr.
> Wilson Elser Moskowitz Edelman & Dicker, LLP
> 227 West Trade Street, 3$^{rd}$ Floor
> Charlotte, NC 28202
> *Attorneys for Defendants City of Greenville,*
> *Ricky Best, and Jeffrey Shrock*

This the 20th day of December, 2024.

> /s/ Sydney P. Davis
> Sydney P. Davis

8

J.A. 2754

**CERTIFICATE OF COMPLIANCE WITH WORD COUNT LIMIT**

The undersigned certifies the foregoing brief complies with Local Rule 7.2(f)(3). The brief contains 1,916 words, which includes the body of the brief, headings and footnotes. The caption, signature lines, certificate of service, and any cover page or index are not included in the above word count.

This the 20th day of December, 2024.

/s/ Sydney P. Davis
Sydney P. Davis

9

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION
Lead Case No. 4:21-CV-00185-BO**
*Consolidated with 4:22-CV-00088-BO*

| | |
|---|---|
| MONTOYAE DONTAE SHARPE,<br><br>                         Plaintiff,<br><br>vs.<br><br>DAVID RICKY BEST, JEFFREY D. SHROCK, CAROLYN MELVIN, and the CITY OF GREENVILLE, NORTH CAROLINA,<br><br>                         Defendants. | **DEFENDANT JEFFREY D. SHROCK'S REPLY TO PLAINTIFF'S RESPONSE TO SHROCK'S RENEWED MOTION FOR SUMMARY JUDGMENT** |

NOW COMES Defendant Jeffrey D. Shrock (herein after referred to as the "Shrock"), by and through his undersigned attorneys, and hereby replies to Plaintiff's Omnibus Response to Shrock's Renewed Motion for Summary Judgment ("Plaintiff's Response"). D.E. 277.

Plaintiff's Response [D.E. 277] integrates the arguments and assertions previously made in his response to Shrock's original Motion for Summary Judgment. D.E. 214. With leave of the Court [D.E. 242], Shrock incorporates by reference, and rests on the arguments made in, his previous Reply to Plaintiff's Response to Motion for Summary Judgment, [D.E. 214] and all related filings. D. E. 232.

## I.     SUMMARY OF THE NATURE OF THE CASE

Shrock respectfully incorporates by reference his summary of the nature of the case contained in his Memorandum in Support of Defendant Jeffrey D. Shrock's Motion for Summary Judgment, Section I. D.E. 262 as if stated verbatim herein.

## II.     FACTUAL BACKGROUND

Defendant Shrock incorporates his separate Statement of Undisputed Facts. D.E 261.

## III.     STANDARD OF LAW

Shrock incorporates his standard of law included in his Memorandum in Support of Defendant Jeffrey D. Shrock's Motion for Summary Judgment. D.E. 262 as if stated verbatim herein.

## IV.     ARGUMENT

Plaintiff's response fatally misunderstands the applicable standard regarding qualified immunity as it relies on a high level of generality instead of focusing on the particularized facts of this case. Further, Plaintiff's response again confuses the factual support and claims against the three officer defendants, Best, Melvin, and Shrock. The claims, defenses, and issues related to each officer in this case are distinct. Therefore, Shrock respectfully requests that the Court address the motions of each officer defendant separately.

### a. Defendant Shrock, in his individual capacity, is entitled to qualified immunity as to Plaintiff's Federal Claims against him.

Plaintiff's discussion of qualified immunity is fundamentally flawed and fatally defective as it relies on a high level of generality. Plaintiff's response alleges that Shrock is not entitled to qualified immunity on any of Plaintiff's claims because "no reasonable officer could claim they were not on notice that it is illegal to: (a) knowingly use false evidence to convict a person; (b) mislead a magistrate by omitting facts material to a probable cause determination; (c) fail to conduct a fair investigation for the purpose of concealing police misconduct; and (d) bury evidence that a fact finder needs to evaluate the credibility of a star witness." D.E. 277 p. 30. As explained below, reliance on such a general analysis is deficient.[1]

---

[1] Notably, Shrock is not even alleged to have provided misleading evidence to a magistrate or failed to conduct a fair investigation.

306119451v.1

Plaintiff's discussion of "clearly established law" is at odds with the legal standard because it does not focus on the particularized facts of this case.

As the United States Supreme Court unambiguously stated:

> Today, it is again necessary to reiterate the longstanding principle that "clearly established law" should not be defined "at a high level of generality." *Ashcroft v. al-Kidd*, 563 U.S. 731, 742, 131 S.Ct. 2074, 179 L.Ed.2d 1149 (2011). As this Court explained decades ago, the clearly established law must be "particularized" to the facts of the case. *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). Otherwise, "[p]laintiffs would be able to convert the rule of qualified immunity…into a rule of virtually unqualified immunity simply by alleging violation of extremely abstract rights." Id., at 639, 107 S.Ct. 3034.

*White v. Pauly*, 580 U.S. 73, 137 S.Ct. 548, 552 (2017).

Thus, the inquiry into whether the right was clearly established must "be undertaken in light of the specific context of the case" and "not as a broad general proposition…." *Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151, 2156 (2001). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier, supra*. If the right was not "clearly established" in the "specific context of the case," that is, if it was not "clear to a reasonable officer" that the conduct in which he allegedly engaged "was unlawful in the situation he confronted," then the law affords immunity from suit. *Saucier, supra*. In other words, officers are entitled to qualified immunity "if a reasonable officer possessing the same information could have believed that his conduct was lawful." *Slattery v. Rizzo*, 939 F.2d 213, 216 (4th Cir. 1991) (emphasis added).

In the instant case, when the doctrine of qualified immunity is analyzed correctly, it is clear that Shrock is entitled to qualified immunity. First, the facts establish that Shrock did not violate the Plaintiff's constitutional rights. However, even assuming arguendo that Plaintiff's rights may

3

have been violated, it was not clearly established at the time of Shrock's actions, that the specific actions taken by him violated the Constitution. Thus, under the circumstances, Shrock in his individual capacity is entitled to qualified immunity and therefore he is entitled to summary judgment.

Curiously, Plaintiff's Response fails to provide a particularized analysis of qualified immunity with respect to the distinct alleged actions of each officer defendant in this case. For example, on page 30 of Plaintiff's Response, he argues that defendants are not entitled to qualified immunity because "*Defendants* violated bedrock rules that define the American justice system," such as, "[misleading] a magistrate by omitting facts material to a probable cause determination," and "[failing] to conduct a fair investigation." (emphasis added). Logic dictates that if clearly established law must be particularized to the facts of a case, it must also be particularized between individual officer Defendants. For this reason alone, Plaintiff's discussion of qualified immunity is flawed.

In light of this, Defendant Shrock contends that he is entitled to qualified immunity based on the unique circumstances he faced and the specific actions he is alleged to have taken in this matter. Accordingly, Shrock respectfully requests that the Court separately address the qualified immunity of each officer defendant.

### b. Plaintiff ignores the testimony of the District Attorney Everett

Plaintiff's response argues that "District Attorney Everett testified under oath in his deposition that he was not aware of Charlene's psychiatric hospitalization." D.E. 277 p. 4. Plaintiff contends testimony of DA Everett claiming Charlene's hospitalization could *potentially* have been significant supports his claims. D.E. 245 ¶¶ 188, 189, 190.[2] However, Plaintiff ignores Shrock's

---

[2] Notably, the Plaintiff does not appear to address Shrock's argument that the relevant material—Charlene's transportation to the hospital and her involvement with drugs—was presented at his trial. D.E. 262 p. 10 ¶ 3.

argument, and the testimony of DA Everett, that he *possessed* the relevant information.

The District Attorney admitted the disputed information was contained in the disclosed medical records possessed by the District Attorney during his deposition.

> " Q. And then, going back to the Richie Motion quickly and the medical documents that – were turned over to Don Hicks, if, for some reason, Ricky Best, Shrock – Officer Shrock or anyone had information regarding Charlene Johnson's **medical history and psychiatric stay** and told you about it, that would've been information the DA's office already had prior to the 1995 trial, correct?"
>
> A.  We had the medical records.
>
> Q. And those medical records . . . referenced her psychiatric stay?
>
> A. Yes, sir."

*See* D.E. 261¶ 45 at Appx. BB, ("DA Everett Deposition") at 89:21-25-90:1-6."

Therefore, the pertinent question is not whether DA Everett currently recalls having the alleged information, but whether the District Attorney and Sharpe's personal attorney possessed, or had reasonable access to, that information prior to the trial. The testimony and evidence in this case unequivocally establish that DA Everett had the relevant information and disclosed it. As a result, Plaintiff's Brady claim fails and Shrock is entitled to summary judgment.

Defendant Shrock incorporates by reference all defenses and arguments presented in the motions for summary judgment, or related materials, of any other defendant in this action, to the extent they are equally applicable to Shrock.

## V.    <u>CONCLUSION</u>

For the reasons stated above, summary judgement is proper as to Defendant Jeffrey D. Shrock because (1) Shrock is entitled to qualified immunity for Plaintiff's § 1983 claims and (2)

there is no evidence any material exculpatory or impeachment evidence was suppressed and discovery has shown that Plaintiff Sharpe, his Counsel, and the District Attorney already possessed the allegedly exculpatory information. Therefore, all Plaintiff's claims against Shrock should be dismissed, and Defendant Shrock should be dismissed from this action.

Respectfully submitted, this the 23rd day of December 2024.

/s/ Peter Clements
Peter Clements N.C. State Bar No. 57853
Peter.clementsjr@wilsonelser.com
227 West Trade Street – Suite 300
Charlotte, NC 28202
Telephone: (401) 688-0306
*Attorney for Defendants:*
*Best, Shrock, and the City of Greenville*

6

306119451v.1

**J.A. 2761**

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a true and accurate copy of the foregoing was served this day on all counsel via CM/ECF.

This the 23$^{rd}$ day of December 2024.

<u>/s/ Peter Clements</u>
Peter Clements

306119451v.1

**J.A. 2762**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION
Lead Case No. 4:21-CV-00185-BO
*Consolidated with 4:22-CV-00088-BO*

|  |  |
|---|---|
| MONTOYAE DONTAE SHARPE,<br><br>                    Plaintiff,<br><br>vs.<br><br>DAVID RICKY BEST, JEFFREY D. SHROCK, CAROLYN MELVIN, and the CITY OF GREENVILLE, NORTH CAROLINA,<br><br>                    Defendants. | **DEFENDANT DAVID RICKY BEST'S REPLY TO PLAINTIFF'S OMNIBUS RESPONSE TO DEFENDANTS' RENEWED MOTIONS FOR SUMMARY JUDGMENT** |

NOW COMES Defendant David Ricky Best ("Best"), by and through his undersigned counsel, and in support of his Motion for Summary Judgment submits the following Reply to Plaintiff's Omnibus Response to Defendants' Renewed Motions for Summary Judgment ("Plaintiff's Response"). D.E. 277.

Plaintiff's Response integrates many arguments and assertions he made previously and, with leave of the Court [D.E. 242], Best incorporates by reference, and rests on the arguments made in, his previous Reply to Plaintiff's Response to Motion for Summary Judgment [D.E. 229] and all related filings. This Memorandum is intended to address only to those new arguments raised in Plaintiff [D.E. 277] and Bests rests on his reply [D.E. 229] the arguments raised Plaintiff's original response to Best's Motion for Summary Judgment. [D.E. 214].

## SUMMARY OF THE NATURE OF THE CASE

Best incorporates by reference the Summary of the Nature of the Case contained in his

Memorandum in Support of his Motion for Summary Judgment [D.E. 259] as if stated verbatim herein.

## FACTUAL BACKGROUND

Best incorporates his separate Statement of Undisputed Facts [D.E. 258] as if stated verbatim herein.

## ARGUMENT

Plaintiff's response misunderstands the applicable standard regarding qualified immunity as it relies on a high level of generality instead of focusing on the particularized facts of this case. Further, Plaintiff's response again confuses the factual support and claims against the three officer Defendants, Best, Melvin, and Shrock. The claims, defenses, and issues related to each officer in this case are distinct. Therefore, Best requests the Court address the motions of each officer Defendant separately.

**I.**    **There is no evidence Best knowingly/recklessly used false evidence to deny Plaintiff a fair criminal proceeding in violation of the Due Process Clause of the Fourteenth Amendment and the right of effective access to the courts in violation of the First Amendment (Counts I & VII).**

The first part of Charlene's statement to Best, the part that implicated Plaintiff in Radcliffe's murder, came from Charlene's own knowledge. Appx. QQ, "Deposition of Charlene Johnson" p. 40:1-17. Plaintiff claims the Court should disregard this admission because Melvin testified that she was present while Charlene wrote her statement [D.E. 215, Pl.'s Resp. Melvin Statement Material Facts, ¶ 20] and that she did not believe the statement to be true.

However, Plaintiff did not adduce any evidence that Best did not believe Charlene's statement to be true; instead, Plaintiff insists Best knew, or reasonably should have known, that Charlene's and Stokes' statements were false based on circumstantial evidence that could have potentially been used to impeach her statement. But Plaintiff ignores the corroborated details

contained in Charlene's statement which justified Best's belief Plaintiff murdered Radcliffe. For example, Charlene's statement provided the correct location of the murder and correctly identified Plaintiff as a crack dealer active in the area. Appx. O, pp. 1.  It also aligned with the prior information provided by witnesses Martha Stewart, Alonzo Vines, and Wilber Mercer. App. F, SHARPE 003686-003689; Appx. G, SHARPE 005028-005029; App. I, SHARPE 003690-003691. Plaintiff relies almost exclusively on evidence Defendant Melvin harbored subjective doubts regarding Charlene. However, Defendant Melvin's subjective beliefs, expressed decades after the incident, cannot be imputed to Best.

As Plaintiff has not adduced any evidence that Best knowingly/recklessly used false evidence that ultimately deprived Plaintiff of his constitutional rights in violation of the Due Process Clause of the Fourteenth Amendment and the right of effective access to the courts in violation of the First Amendment, Best is entitled to summary judgment on these claims.

II.     **There is no evidence Best concealed exculpatory and/or impeachment evidence thereby depriving Plaintiff of liberty and denial of fair criminal process in violation of the Due Process Clause of the Fourteenth Amendments (Counts VI)**

Best maintains he was never informed of Charlene's history of mental illness and had no reason to inquire into such matter. However, District Attorney Clark Everett ("DA Everett") testified that he already had the materials related to Charlene's hospitalization for mental illness because it was an issue in his prosecution of the women who assaulted Charlene after she identified Plaintiff as Radcliffe's murderer.  Appx. BB, "Everett Deposition" pp. 89:21-25-90:1-7.

" Q.    And then, going back to the Richie Motion quickly and the medical

documents that – were turned over to Don Hicks, if, for some reason, Ricky

Best, Shrock – Officer Shrock or anyone had information regarding

Charlene Johnson's medical history and psychiatric stay and told you about

it, that would've been information the DA's office already had prior to the

1995 trial, correct?"

A.     We had the medical records.

Q.     And those medical records . . . referenced her psychiatric stay?

A.     Yes, sir."

*See* D.E. 261¶ 45 at Appx. BB, ("DA Everett Deposition") at 89:21-25-90:1-6."

Those records indicate Charlene had been recently released from a "psych unit" prior to

Plaintiff's arrest. Appx. EE, p. 3. The pertinent question is not whether DA Everett currently recalls

having the alleged information, but whether DA Everett and Plaintiff's attorney possessed, or had

reasonable access to, that information prior to the trial, which they did.

Further, Best had no legal duty to continue investigating Charlene's credibility after the

neutral and detached magistrate found probable cause and issued a warrant for his arrest. It is well

established that "once probable cause to arrest is established, an officer is not required to continue

to investigate for exculpatory evidence before arresting such suspect." *United States v. Galloway*,

274 Fed. Appx. 241, 2008 WL 1751686 (4th Cir. 2008). "[A]n officer is not required to exhaust

every potentially exculpatory lead or resolve every doubt about a suspect's guilt before probable

cause is established." *Miller v. Prince George's County, Maryland*, 475 F.3d 621, 630 (4th Cir.

2007). This is because "the failure to pursue a potentially exculpatory lead is not sufficient to

negate probable cause." *Wadkins v. Arnold*, 214 F.3d 535, 541 (4th Cir. 2000).

In other words, law enforcement officers "have no constitutional duty to keep investigating

a crime once they have established probable cause." *Kompare v. Stein*, 801 F.2d 883, 890 (7th Cir.

1986). "Having uncovered sufficient evidence to establish probable cause, [the officers have] no

constitutional obligation to conduct any further investigation in the hopes of uncovering potentially

exculpatory evidence." *Simkunas v. Tardi*, 930 F.2d 1287, 1292 (7th Cir. 1991); *Schertz v. Waupaco County*, 875 F.2d 578, 583 (7th Cir. 1989). See also *McKinney v. Richland County Sheriff's Dept.*, 431 F.3d 415, 418-419 (4th Cir. 2005) (holding that the information known to the officer established probable cause, and that the existence of probable cause was not negated by the failure to conduct "a more thorough investigation" or the "failure to pursue exculpatory leads."). In fact, if an arrest is reasonable – i.e., supported by probable cause – the Fourth Amendment does not require any further investigation after the arrest in order "to render pretrial seizure reasonable." *Taylor v. Waters*, 81 F.3d 429, 436 (4th Cir. 1996). As Best clearly had probable cause to arrest Plaintiff based on Charlene's first corroborated statement, which was confirmed by a neutral and detached magistrate, he was not legally required to continue investigating subsequent exculpatory leads as alleged by Plaintiff. Therefore, Best is entitled to summary judgment on these claims.

### III. Plaintiff did not adduce any evidence that Best withheld exculpatory evidence, coerced witnesses, made false reports, destroyed physical exculpatory evidence, or made false representations about evidence in his possession in violation of the First and Fourteenth Amendments (Counts VIII & IX).

As Plaintiff did not make these allegations prior to filing his Amended Complaint on July 26, 2024, no discovery occurred in connection with these new allegations. As Plaintiff has no evidence to support these new allegations, he relies on ad hominem attacks and cherry-picked immaterial evidence to support his contention that Best "deliberately lie[s] and attempt[s] to mislead the Court in matters fundamental to the fair administration of justice for the purpose of hiding the truth and avoiding liability for his conduct." D.E. 277 p. 4. Plaintiff fails to adequately address Molly Muise's affidavit or the other evidence that directly refutes his baseless claims. Unsurprisingly, Plaintiff is unable to challenge the substance of the affidavits provided by Best and Molly Muise, as he entirely lacks the evidence to do so.[1]

---

[1] The Plaintiff's personal attacks on Best's credibility, based on minor inconsistencies in his deposition testimony

J.A. 2767

As Plaintiff has not adduced any evidence that Best withheld exculpatory evidence, coerced witnesses, made false reports, destroyed physical exculpatory evidence, or made false representations about evidence in his possession in violation of the First and Fourteenth Amendments, Best is entitled to summary judgment on these claims.

## IV. <u>Qualified Immunity shields Best from liability for any claims brought against him under the First, Fourth, or Fourteenth Amendment (Counts I, IV, V, VI & VII).</u>

Plaintiff's discussion of qualified immunity is fundamentally flawed and fatally defective as it relies in a high level of generality. Plaintiff's response alleges that Best is not entitled to qualified immunity on any of Plaintiff's claims because "no reasonable officer could claim they were not on notice that it is illegal to: (a) knowingly use false evidence to convict a person; (b) mislead a magistrate by omitting facts material to a probable cause determination; (c) fail to conduct a fair investigation for the purpose of concealing police misconduct; and (d) bury evidence that a fact finder needs to evaluate the credibility of a star witness." D.E. 277 p. 30. As Plaintiff cannot show that officers faced with the particularized circumstances of this case would know Best's actions were clearly unconstitutional, Best is entitled to qualified immunity, and Plaintiff's federal claims should be dismissed.

The United States Supreme Court unambiguously stated:

Today, it is again necessary to reiterate the longstanding principle that "clearly established law" should not be defined "at a high level of generality." *Ashcroft v. al-Kidd*, 563 U.S. 731, 742, 131 S.Ct. 2074, 179 L.Ed.2d 1149 (2011). As this Court explained decades ago, the clearly established law must be "particularized" to the

---

regarding a meeting with his attorney and Clark Everett, as well as his knowledge of Plaintiff's post-conviction efforts, are unfounded. Best had no knowledge of the details of Plaintiff's post-conviction efforts as alleged in the Amended Complaint. While Best had some knowledge of the law enforcement investigation into the actions of Melvin and other witnesses, this is entirely separate from the *Plaintiff's* post-conviction activities. Furthermore, Plaintiff has provided no evidence to suggest that Best was aware of Plaintiff's November 24, 2004, habeas petition, which is central to Plaintiff's claims. Best also objects to the improper use of materials previously undisclosed and allegedly obtained in coordination with Duke University. Fairness dictates that the Plaintiff should not be permitted to benefit from producing materials central to his claims after the close of discovery. Ultimately, the Plaintiff's attacks on Best's credibility are nothing more than a distraction designed to divert the Court's attention from the complete lack of evidence supporting the new claims in the Amended Complaint.

facts of the case. *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). Otherwise, "[p]laintiffs would be able to convert the rule of qualified immunity…into a rule of virtually unqualified immunity simply by alleging violation of extremely abstract rights." *Id.*, at 639, 107 S.Ct. 3034.

*White v. Pauly*, 580 U.S. 73, 137 S.Ct. 548, 552 (2017).

Thus, the inquiry into whether the right was clearly established must "be undertaken in light of the specific context of the case" and "not as a broad general proposition…." *Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151, 2156 (2001). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier, supra*. If the right was not "clearly established" in the "specific context of the case," that is, if it was not "clear to a reasonable officer" that the conduct in which he allegedly engaged "was unlawful in the situation he confronted," then the law affords immunity from suit. *Saucier, supra*. In other words, officers are entitled to qualified immunity "if a reasonable officer possessing the same information could have believed that his conduct was lawful." *Slattery v. Rizzo*, 939 F.2d 213, 216 (4th Cir. 1991) (emphasis added).

In the instant case, the facts establish that Best did not violate Plaintiff's constitutional rights. Even assuming, arguendo, that Plaintiff's rights were violated, it was not clearly established at the time of Best's actions that the specific actions Best took violated the Constitution. When the doctrine of qualified immunity is analyzed correctly, it is clear that Best, in his individual capacity, is entitled to qualified immunity and summary judgment on Plaintiff's claims.

Finally, Plaintiff's Response fails to provide a different analysis of qualified immunity with respect to the distinct alleged actions of each officer Defendant in this case. This omission is critical because, as discussed above, the determination of whether clearly established law applies must be specific to the facts of the case and the individual circumstances faced by each officer

Defendant. But Plaintiff's response fails to analyze qualified immunity as to each officer individually. For example, on page 30 of Plaintiff's Response, he argues that Defendants are not entitled to qualified immunity because "Defendants violated bedrock rules that define the American justice system," such as, "[misleading] a magistrate by omitting facts material to a probable cause determination," and "[failing] to conduct a fair investigation." It follows that if clearly established law must be particularized to the facts of a case, it must also be particularized to the actions of each individual officer Defendant. For this reason alone, Plaintiff's discussion of qualified immunity is flawed. Therefore, Best is entitled to qualified immunity and summary judgment should be granted.

## **<u>CONCLUSION</u>**

For the reasons stated above, Defendant David Ricky Best maintains that there are no genuine issues of material fact remaining on any of Plaintiff's claims, he is entitled to judgment as a matter of law, and all claims against him should be dismissed.

Respectfully submitted, this the 23rd day of December 2024.

/s/ Peter Clements
Peter Clements
N.C. State Bar No. 57853
Peter.clementsjr@wilsonelser.com
227 West Trade Street - Suite 300
Charlotte, NC 28202
Telephone: (401) 688-0306
***Attorneys for Defendants:***
***Shrock, Best, and the City of Greenville***

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies, pursuant to Rule 5 of the Federal Rules of Civil Procedure, the foregoing was electronically filed with the Clerk of Court using the CM/ECF system which will send notification of such filing to all counsel.

This the 23rd day of December 2024.

/s/ Peter Clements
Peter Clements

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION
CONSOLIDATED ACTION

MONTOYAE DONTAE SHARP,               )
                    Plaintiff,       )
                                     )
v.                                   )        No. 4:21-CV-185-BO
                                     )
DAVID RICKY BEST, *et al.*,          )
                    Defendants.      )

_____

MONTOYAE DONTAE SHARP,               )
                    Plaintiff,       )
                                     )
v.                                   )        No. 4:22-CV-88-BO
                                     )
CAROLYN MELVIN                       )
                    Defendant.       )

ORDER

This cause comes before the Court on multiple, cross-motions for summary judgment pursuant to Fed. R. Civ. P. 56. The appropriate responses and replies have been filed, or the time for doing so has expired. In this posture, the motions are ripe for disposition and, for the reasons that follow, the Court reserves a decision on qualified immunity and the matter will be set for trial.

BACKGROUND

*Procedural history*

Plaintiff, Sharpe, commenced this action on December 20, 2021, by filing a complaint alleging claims for constitutional violations under 42 U.S.C. § 1983, as well as state law and constitutional claims, arising from his wrongful conviction for the first-degree murder of George Radcliff. [DE 1]. The original complaint alleged claims against the City of Greenville, North Carolina and two members of the Greenville Police Department at the time of Radcliff's murder

J.A. 2772

and Sharp's conviction, David "Ricky" Best and Jeffrey Shrock. The City of Greenville moved for judgment on the pleadings in its favor on Sharpe's claim under *Monell v. New York City Department of Social Services*, 436 U.S. 658 (1978). After holding a hearing, the Court denied the City's motion without prejudice to re-raising the issue at the summary judgment stage. [DE 52].

On July 29, 2022, Sharpe filed a related case against Carolyn Melvin, another member of Greenville's police department at the time of Radcliff's murder and Sharpe's conviction, raising the same issues based upon the same set of circumstances and seeking the same relief. [DE 44]. The Court consolidated the two cases for purposes of discovery and motions practice. [DE 51]. Sharpe filed a consolidated complaint pursuant to the Court's order. [DE 53]. Following a lengthy period of discovery and shortly before the dispositive motions filing deadline, Sharpe moved to amend his consolidated complaint. Cross-motions for summary judgment were then filed. The Court held a hearing, after which it permitted Sharpe to file an amended consolidated complaint. [DE 242]. The parties then filed amended cross-motions for summary judgment in order to address the new claims raised in the amended consolidated complaint. [DE 244; DE 254; DE 257; DE 260; DE 263].

*Factual background*

Many of the salient, material facts underpinning the investigation, prosecution, and post-conviction proceedings involving Sharpe and the murder of George Radcliff are in dispute. The following facts appear to be undisputed, unless otherwise indicated. *See, e.g.,* [DE 245; DE 251; DE 253; DE 261; DE 264; DE 278]. George Radcliff was discovered shot to death inside his pickup truck at approximately 9:15 pm on Friday, February 11, 1994, near the intersection of West 6th and Sheppard Streets in Greenville, North Carolina. Greenville Police Department (Greenville PD) officers responded to the scene and took investigatory steps. Specifically, Officer Kevin Jones

2

**J.A. 2773**

spoke to witnesses Tony Johnson and Wilber Mercer (also known as Marciana) that night and officers conducted a sweep of the street in order to locate physical evidence. It is disputed whether Greenville PD officers spoke to Alonzo Vines, a claimed witness, the night of the murder.

An autopsy of Radcliff's body determined that a bullet entered Radcliff's upper left arm the travelled across his chest and lodged in his right arm. On February 14, 1994, defendant Carolyn Melvin, a Greenville PD detective, interviewed Wilber Mercer and Martha Stewart at the police station. Melvin's interview notes reflect that Mercer indicated that he was with Radcliff shortly before Radcliff's murder trying to help Radcliff find powder cocaine to purchase, though it was Mercer's intent to rip Radcliff off. Mercer indicated that he had left his jacket in Radcliff's truck, which was discovered there with blood on it after the shooting. The notes from Stewart's interview reflect that Stewart told Melvin that, while she was walking down the street, she saw two black males whistle at Radcliff's truck and then approach the truck; about a minute later, when Stewart was back inside her home, Stewart heard a gunshot.

On February 15, 1994, defendant Ricky Best, a Greenville PD detective, was assigned to the Radcliff investigation. It is disputed whether Melvin or Best acted as the lead or *de facto* lead investigator on the case and made decisions as to which witnesses to interview and which leads to follow. On February 15 and 16, 1994, Melvin requested Crime Stopper Coverage and interviewed Radcliff's wife, Tricia Radcliff. Defendant Jeffrey Shrock, a Greenville PD officer, contends that on or about February 17, 1994, he met Charlene Johnson near the scene of Radcliff's murder and that she later told Shrock that she had witnessed a man named Dontae shoot the victim. The circumstances surrounding Shrock's interactions with Johnson and her statements are hotly contested.

3

**J.A. 2774**

.

On April 7, 1994, almost two months after Radcliff's murder, Melvin and Best interviewed Johnson at the Greenville PD during which Johnson stated that she was in the area and had witnessed Radcliff's murder. Johnson was thirteen years old at the time of Radcliff's murder. Johnson wrote out a statement that day in which she implicated Sharpe and Mark Joyner in the murder, specifically stating that Sharpe was the shooter. Johnson's statement was presented to a magistrate that day and a warrant for Sharpe's arrest was issued. Sharpe's cousin, Mark Joyner, was also arrested in relation to Radcliff's murder. Joyner entered an Alford plea on January 10, 1996, after Sharpe had been convicted of first-degree murder.

Sharpe was questioned by Best and Melvin the night of his arrest. Sharpe indicated he had been with Karsen Robinson and his girlfriend Kizzie Paige on the night of Radcliff's murder and that he owned a .45 caliber gun which had been stolen; Radcliff was murdered with a .45 caliber gun. Sharpe denied any involvement in Radcliff's murder. Neither Melvin nor Best interviewed Sharpe's alibi witnesses.

On the night of Sharpe's arrest, Charlene Johnson was assaulted by five women, including Kizzie Paige. It is disputed whether after the assault Johnson maintained that her statement was true and whether the assault was motivated by Johnson having truthfully or falsely identified Sharpe. Johnson was taken to a safe house in Wilmington after the assault and was later given $500 through the Crime Stopper program. Sharpe was indicted for Radcliff's murder on April 18, 1994. Charlene Johnson submitted to a polygraph the following day, the results of which were inconclusive.

In May 1994, Beatrice Stokes allegedly approached Best and claimed to be an eyewitness to Sharpe's murder of Radcliff. Again, the facts and circumstances surrounding Stokes' statements are in dispute. Best did not write a report memorializing his interaction with Stokes.

.

Cherry Stokes was Sharpe's trial attorney. The trial took place in July 1995 in Pitt County Superior Court, with Judge Richard Parker presiding. Charlene Johnson testified at the trial and maintained that she had witnessed Sharpe and Mark Joyner murder Radcliff. Beatrice Stokes also testified. Stokes testified that she had seen Sharpe, Marciana, Lisa, Mark Joyner, and Candice or Candy, along with Radcliff, all standing near Radcliff's truck when Sharpe shot Radcliff. Melvin and Best also testified at the trial. The firearm used to kill Radcliff had not been recovered at the time of the trial. After the State rested, Sharpe's counsel moved to strike Charlene Johnson's testimony, which was denied. Sharpe called two witnesses, family members Patricia Ward and Patricia Hicks, as alibi witnesses. The jury returned a unanimous verdict of guilty on the charge of first-degree murder and Sharpe was sentenced to life imprisonment. Sharpe appealed. The Supreme Court affirmed his conviction and sentence. *State v. Sharpe*, 344 N.C. 190 (1996).

Not long after the trial, Charlene Johnson told Cherry Stokes's paralegal that she, Johnson, had not told the truth during the trial. Johnson stated that she had not been there when Radcliff was killed, that Best had given her and her family a lot of gifts, and that Beatrice Stokes also had not told the truth during the trial. Johnson later told Sharpe's appellate attorney's paralegal that everything she had said in the trial was a lie. On September 10, 1996, Johnson signed an affidavit recanting her trial testimony and affirming that she had not witnessed Radcliff's murder. *See* [DE 171-14].

After Johnson recanted her trial testimony, Sharpe filed a Motion for Appropriate Relief (MAR) in which he sought to vacate his conviction. An evidentiary hearing was held on December 11, 1997, and Best, Shrock, and Johnson testified at the hearing. Best and Shrock testified about their interactions with Johnson before and after she gave her statement which implicated Sharpe.

5

Based upon the evidence presented, the presiding judge was "reasonably well satisfied that Johnson testified truthfully at the trial of [Sharpe]." [DE 172-15 at 7].

Sharpe contends that, while she investigated Radcliff's murder, Melvin suffered from alcoholism, memory loss, and Grave's disease, none of which was disclosed to the district attorney or defense counsel. Melvin disputes that she had memory problems or that the Greenville PD was aware of her alcoholism. At the time she was investigating Radcliff's murder, Melvin believed Mercer, or Marciana, to be the prime suspect. After leaving the Greenville PD, Melvin became a private investigator and was hired by Sharpe's family. While investigating Sharpe's conviction, Beatrice Stokes provided Melvin, in the presence of two Greenville City Councilmembers, with a recantation of her trial testimony. *See* [DE 217-3]. Stokes indicated that she had not seen Sharpe shoot Radcliff, that Best had promised she would be paid for her trial testimony, and that Best had told her what other people had said about the case. Best has since stated that Melvin paid her or offered to pay her to recant her trial testimony.

Additional litigation challenging Sharpe's conviction followed the denial of his MAR in 1997, culminating with the vacatur of his conviction on August 22, 2019, in Pitt County Superior Court. On November 12, 2021, the Governor of North Carolina issued a full and unconditional pardon of innocence to Sharpe.

<u>DISCUSSION</u>

*Summary judgment standard*

A motion for summary judgment may not be granted unless there are no genuine issues of material fact for trial and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If that burden has been met,

6

the non-moving party must then come forward and establish the specific material facts in dispute to survive summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986). In determining whether a genuine issue of material fact exists for trial, a trial court views the evidence and the inferences in the light most favorable to the nonmoving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). However, "[t]he mere existence of a scintilla of evidence" in support of the nonmoving party's position is not sufficient to defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). "A dispute is genuine if a reasonable jury could return a verdict for the nonmoving party. A fact is material if it might affect the outcome of the suit under the governing law." *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (internal quotation marks and citations omitted). Speculative or conclusory allegations will not suffice. *Thompson v. Potomac Elec. Power Co.*, 312 F.3d 645, 649 (4th Cir. 2002).

When deciding cross-motions for summary judgment, a court considers each motion separately and resolves all factual disputes and competing inferences in the light most favorable to the opposing party. *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003). The court must ask "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251.

### *Section 1983 claims, qualified immunity*

The three individual defendants have raised the defense of qualified immunity as to the § 1983 claims against them in their individual capacities. Because qualified immunity provides immunity from suit, and therefore a trial, the Court considers this issue first. Qualified immunity shields government officials from liability for statutory or constitutional violations so long as they

can reasonably believe that their conduct does not violate clearly established law. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). A court employs a two-step procedure for determining whether qualified immunity applies that "asks first whether a constitutional violation occurred and second whether the right violated was clearly established." *Melgar v. Greene*, 593 F.3d 348, 353 (4th Cir. 2010). A clearly established right requires existing precedent which places "the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (noting that a case on point is not required). Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

Where qualified immunity has been raised, viewing the facts and drawing the reasonable inferences in the light most favorable to the plaintiff generally means adopting the plaintiff's version of the facts. *Scott*, 550 U.S. at 378; *Iko v. Shreve*, 535 F.3d 225, 230 (4th Cir. 2008); *see also Hensley on behalf of N. Carolina v. Price*, 876 F.3d 573, 579 (4th Cir. 2017) (court must "take the facts in the light most favorable to the plaintiffs to determine the applicable questions of law and ignore any contrary factual claims."). A court "do[es] not make credibility determinations in resolving the first prong of the [qualified immunity] analysis." *Wilson v. Prince George's Cty., Maryland*, 893 F.3d 213, 220 (4th Cir. 2018). The determination of whether a right is clearly established is a legal question always answerable at summary judgment, but where there are issues of fact with respect to the officer's conduct or its reasonableness, summary judgment is inappropriate. *Pritchett v. Alford*, 973 F.2d 307, 313 (4th Cir. 1992); *see also Willingham v. Crooke*, 412 F.3d 553, 559 (4th Cir. 2005) (internal quotation, alteration, and citation omitted) ("a genuine question of material fact regarding whether the conduct allegedly violative of the right actually occurred must be reserved for trial.").

First, the Court determines that the rights Sharpe alleges to have been violated were clearly established. Sharpe alleges that defendants Best and Melvin knowingly or recklessly used false evidence in obtaining his arrest and conviction (Counts I and II); that defendant Melvin failed to intervene, resulting in the denial of fair criminal proceedings (Count III); that Best and Melvin arrested Sharpe and instituted criminal charges without probable cause (Count IV); that Best and Melvin failed to investigate (Count V); that Best and Shrock concealed exculpatory and impeachment evidence (Count VI); that Best and Shrock knowingly and/or recklessly used false evidence in denying Sharpe due process and access to courts (Count VII); that Best deprived Sharpe of due process and access to the courts (Count VIII); and that Best in bad faith destroyed evidence (Count IX).

"Clearly established means that, at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful." *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018) (internal quotations and citation omitted); *see also Iko*, 535 F.3d at 238. In making this determination, a court must identify the specific rights the plaintiff alleges were violated at a high level of particularity. *Garrett v. Clarke*, 74 F.4th 579, 588 (4th Cir. 2023). However, a court considers both rights that have been specifically adjudicated as well as "those manifestly included within more general applications of the core constitutional principles invoked." *Booker v. S.C. Dep't of Corr.*, 855 F.3d 533, 538 (4th Cir. 2017) (quoting *Wall v. Wade*, 741 F.3d 492, 503 (4th Cir. 2014)). Additionally, the right need not be defined "in accordance with the very actions in question." *Tarashuk v. Givens*, 53 F.4th 154, 164 (4th Cir. 2022) (cleaned up, citation omitted).

The rights that Sharpe alleges to have been violated sound in core, constitutional principles. It was clearly established in 1994 that arresting a suspect without probable cause violated a clearly

established right. *See Gilliam v. Sealey*, 932 F.3d 216, 241 (4th Cir. 2019). A conviction based on the use of falsified evidence violates the Fourteenth Amendment, as does the government's failure to correct such false evidence when it appears. *United States v. Chavez*, 894 F.3d 593, 599 (4th Cir. 2018) (citing *Napue v. People of State of Ill.*, 360 U.S. 264, 269 (1959)). Moreover, the bad faith suppression of exculpatory evidence by police officers amounts to a due process violation, as does the failure to adequately investigate the crime, if that failure was done in bad faith in order to shield other wrongful acts. *Gilliam*, 932 F.3d at 241.

If Sharpe's version of the facts are taken as true, [DE 245], and if the Court ignores contrary factual claims, after Shrock informed Best about Charlene Johnson having information about Radcliff's murder, Best instructed Johnson about what to say in her written statement in which she admitted to witnessing Radcliff's murder by Sharpe. Best and Melvin then made no effort to corroborate Johnson's statement or confront her regarding the inconsistencies between her statement and the physical evidence, and Sharpe was arrested less than three hours after Johnson completed her statement. Melvin presented Johnson's statement to the magistrate even though she believed it to be false. Best and Melvin then failed to conduct any investigation into Johnson's psychiatric illness or her treatment and did not interview any of Sharpe's alibi witnesses, nor did Best disclose the number of payments and gifts that he gave to Johnson after she provided her statement, which included food and money to the extent that Johnson began referring to Best as "Daddy Ricky."

About a month later, Best told the district attorney that he had additional information about Radcliff's murder from Beatrice Stokes. Without memorializing his meeting in any notes, Best contends that he met with Stokes, and she told him that she, too, had witnessed Radcliff's murder. At the time, Best was a drug addict and was facing criminal charges, and Sharpe contends that

Best provided information about the murder to Stokes after Best offered to pay her for her testimony. None of this was revealed to the district attorney. During Sharpe's 1997 MAR hearing, Best did not reveal that he had coached Johnson in making her statement, or that her polygraph results were inconclusive, or that he had similarly coached Stokes.

Shrock became involved in the Radcliff murder investigation when he presented Johnson to Best as a witness. Shrock was familiar with Johnson, who was then thirteen years old, as he had transported Johnson to a psychiatric facility on February 17, 1994. Although Shrock later testified at Sharpe's 1997 MAR hearing that that same evening Johnson was released and he drove her home, and that she had told him then that she had witnessed Radcliff's murder, Johnson was in fact held for evaluation and treatment for three weeks. Shrock admitted in 2014 that his testimony on this point was false. Information about Johnson's commitment to a psychiatric facility was not provided to the district attorney.

Sharpe contends that, despite knowing about his efforts from 1997 forward to overturn his conviction, neither Best nor Shrock came forward to reveal any of the foregoing. Moreover, Sharpe contends that the evidence demonstrates that Best engaged in bad faith attempts to interfere with Sharpe's postconviction efforts, including the destruction of the physical evidence from the trial in 2004.

The Court determines that, based upon Sharpe's version of the facts, the constitutional rights he alleges were violated were clearly established. However, the evidentiary record on summary judgment precludes a finding at this stage on whether constitutional violations actually occurred. As noted above, material facts are hotly disputed in this case, beginning with whether the lead detective responsible for the case was Melvin or Best and whether Best coached Johnson into making her statement, which she later recanted. Stokes also recanted her trial testimony, when

11

**J.A. 2782**

Melvin was acting as a private investigator, but later withdrew that recantation. There is evidence which would suggest that it was Melvin who bribed Stokes into recanting, while other evidence suggests that Best convinced Stokes to withdraw her recantation. Best has filed an affidavit stating that he was unaware of any of Sharpe's post-conviction efforts between 1998 and 2012, and further that when approached in 2012 by the Duke Wrongful Conviction Clinic he declined to be interviewed. In response, Sharpe has proffered evidence that Best was involved in Sharpe's post-conviction proceedings and that he was, in fact, interviewed by the Duke Wrongful Conviction Clinic in 2012 at the United States Courthouse at Greenville.

A finder of fact is required to wade through the evidence in this case and determine what actually occurred. Only then will the Court be in a position to make a final decision on qualified immunity. In light of the foregoing, Sharpe's motion for summary judgment on Counts I, II, V, VI, and VII is denied. Defendants' motions for summary judgment as to the § 1983 claims are denied.

<p align="center"><u>Section 1983 claims,</u> Monell <i>liability</i></p>

Under *Monell*, a local government can be held liable under 42 U.S.C. § 1983 for its unconstitutional policies. 436 U.S. at 690-94. Municipal liability only results "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Id.* at 694. Municipal liability is not available under the theory of respondeat superior. *Milligan v. City of Newport News*, 743 F.2d 227, 229 (4th Cir. 1984).

> A policy or custom for which a municipality may be held liable can arise in four ways: (1) through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an omission, such as a failure to properly train officers, that 'manifest [s] deliberate indifference to the rights of citizens'; or (4) through a practice that

<p align="center">12</p>

is so persistent and widespread as to constitute a custom or usage with the force of law.

*Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003) (internal quotations omitted).

Sharpe contends that the City of Greenville is liable based upon its failure to train its police officers and failure to implement policies designed to prevent constitutional violations. "[T]he inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989). And, "[a] pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." *Connick v. Thompson*, 563 U.S. 51, 62 (2011). But in *Canton*, the Supreme Court "left open the possibility that, 'in a narrow range of circumstances,' a pattern of similar violations might not be necessary to show deliberate indifference." *Id.* at 63. In other words, "the so-called *Canton* exception," *Estate of Jones v. City of Martinsburg*, 961 F.3d 661, 672 (4th Cir. 2020), would apply where "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *City of Canton*, 489 at 390. Importantly, a finding that a particular officer was not satisfactorily trained or that he could have had more or better training is not sufficient to impose liability on the municipality. *Id.* at 390-91.

The City of Greenville has proffered evidence that in 1994 and after, the Greenville Police Department had written policies regarding investigations, exculpatory and impeachment evidence, the use of confidential informants, and witness interviews, which were based on the policies of larger North Carolina police departments. [DE 269-3] Hardy Aff. ¶ 4. The Greenville PD rewrote and updated its polices beginning in 1994 as a part of seeking accreditation from the Commission

on Accreditation for Law Enforcement Agencies (CALEA), but the policies which were in place prior to the accreditation process were substantially similar to those used to seek accreditation. *Id.* ¶ 5. While no copy of the Greenville PD's policy manual which was used in 1994 has been located, the City has nonetheless provided evidence that policies were in place and did exist during the investigation into the murder of George Radcliff. *See* [DE 269-3] Hardy Aff.; Bass Aff.; Forrest Aff.

Former Chief of Police Hinman, who served as Chief of the Greenville PD in 1994, has testified that, when he arrived at the department in 1991, he immediately began the process of seeking CALEA certification, but he did not recall what policies were in place when he arrived. [DE 217-12] Hinman Depo. at 21-22; 48. Hinman's affidavit does not create a genuine issue of material fact as to whether there were policies in place in 1994, however, as he has testified that he *does not recall* what policies were in place, while the affidavits proffered by the City demonstrate that policies were, in fact, in place.

Where a plaintiff seeks to hold a municipality liable based on a single incident theory, the existence of an applicable policy, which the plaintiff has not demonstrated was deficient except by relying on the single incident, defeats the plaintiff's *Monell* claim. *Estate of Jones*, 961 F.3d at 672. That Sharpe argues that the evidence shows that Best and Melvin were unaware of the Greenville PD's policies amounts essentially to an argument that a particular officer or officers needed more or better training. For example, Best testified that in 1994 there was a policy and procedures book that he believes was in the supervisor's office, though he did not recall ever reading what was in the book. [DE 201-5] Best Depo. at 104-105. But that is insufficient to impose liability on the City. "At its core, the strict *Monell* test asks for some level of notice." *Estate of Jones*, 961 F.3d at 672. That one or more of the City's officers failed to follow its policies during

a single incident "could not have put the City on earlier notice of the need to better train its officers . . .." *Id.*; *see also Semple v. City of Moundsville*, 195 F.3d 708, 713 (4th Cir. 1999).

In the operative complaint, Sharpe alleges that the constitutional violations which he contends occurred were a result of the "decades long failure of the Chiefs of the Greenville Police Department to adequately train and supervise patrol officers . . . and felony investigators . . .." [DE 243 at 69]. Importantly, however, Sharpe does not proceed under a pattern or practice theory of liability, but a single incident failure to train theory, which has never been found to apply by the Supreme Court or the Fourth Circuit. "Only where a failure to train reflects a 'deliberate' or 'conscious' choice by a municipality—a 'policy' as defined by [] prior cases—can a city be liable for such a failure under § 1983." *City of Canton*, 489 U.S. at 389. Sharpe has simply failed to create a genuine issue of material fact as to whether this is the appropriate case to send a *Canton* exception claim to the jury.

The City is therefore entitled to summary judgment in its favor on the *Monell* claim in Count X. Counts VIII and IX of the operative complaint are also alleged against the City. While the allegations are primarily against "defendants," generally, they concern Sharpe's claims that his due process and access to courts rights were violated following the denial of his 1997 MAR and that the City of Greenville and Best engaged in the bad-faith destruction of evidence in 2004. In his opposition to the motion for summary judgment, Sharpe contends that Counts VIII and IX are the "direct result of the claims detailed in Count X, *i.e.*, the City's failure to adopt necessary policies and properly train, supervise, and discipline its officers to avoid . . . constitutional violations . . .." [DE 277 at 24-25]. Because the Court has determined that the City is entitled to summary judgment on Count X, it determines that the City is further entitled to summary judgment on Counts VIII and IX.

*State law claims*

Sharpe alleges the following state common law claims against defendants: wrongful imprisonment and civil conspiracy against Melvin, Best, and Shrock in their individual capacities (Count XI); and gross and reckless negligence against Melvin and Best in their individual capacities and the City of Greenville (Count XII).

A civil conspiracy under North Carolina law requires a plaintiff to demonstrate "(1) an agreement between two or more individuals; (2) to do an unlawful act or to do an lawful act in an unlawful way; (3) resulting in injury to plaintiff inflicted by one or more of the conspirators; and (4) pursuant to a common scheme." *Privette v. Univ. of N. Carolina at Chapel Hill*, 96 N.C. App. 124, 139 (1989). Sharpe has failed to create a genuine issue of material fact as to whether Melvin, Shrock, and/or Best had an agreement to wrongfully imprison him. Defendants are entitled to summary judgment on Count XI.

Melvin and Best raise public officer immunity for Sharpe's gross and reckless negligence claim. Public officer immunity shields public officers from liability for individual capacity claims unless their actions are "corrupt, malicious or outside the scope of his official duties." *Estate of Burgess ex. rel. Burgess v. Hamrick*, 206 N.C. App. 268, 276 (2010). A malicious act is one which is done wantonly and contrary to the duty of the actor and which is intended to be injurious. *Wilcox v. City of Asheville*, 222 N.C. App. 285, 289 (2012). The intent to injure may be constructive and demonstrated by actions "so reckless or so manifestly indifferent to the consequences, where the safety of life or limb is involved, as to justify a finding of willfulness and wantonness equivalent in spirit to an actual intent." *Id.* (cleaned up, citation omitted). North Carolina "presumes 'that public officials will discharge their duties in good faith and exercise their powers in accord with

the spirit and purpose of the law.'" *Doe v. City of Charlotte*, 273 N.C. App. 10, 24 (2020) (citation omitted).

"Generally, where an officer defendant is entitled to qualified immunity for a Section 1983 claim, the officer is likewise entitled to public official immunity on derivative state law claims." *Caraway v. City of Pineville*, 639 F. Supp. 3d 560, 585 (W.D.N.C. 2022). Because the Court has denied qualified immunity at this stage on the § 1983 claims, it will also deny public officer immunity on Count XII as to Best and Melvin, leaving a final determination as to whether they are entitled to immunity for after a jury has determined the facts.

The City of Greenville has also raised an immunity defense to Count XII. The City of Greenville has purchased liability insurance, and thus has waived any governmental immunity as to Count XII to the extent of its liability insurance. *Meinck v. City of Gastonia*, 263 N.C. App. 414, 417 (2019). The City has failed, in its reply, to rebut Sharpe's argument that its purchase of insurance waives its immunity, nor has it argued that this action is excluded from coverage. *See* [DE 283]. The City has failed to carry its burden at the summary judgment stage on this claim, and its motion for summary judgment as to Count XII is denied.

*State Constitution claims*

Finally, Sharpe raises claims under North Carolina's Constitution in the alternative to the foregoing claims (Counts XIII – XIX). It is well established that a plaintiff may not maintain a claim under the North Carolina Constitution when adequate remedies at law exist. *Corum v. Univ. of N.C.,* 330 N.C. 761, 781-82 (1992). The "term adequate . . . is not used to mean potentially successful."                                                                                          t

17

**J.A. 2788**

*Craig ex rel. Craig v. New Hanover Bd. of Educ.*, 185 N.C. App. 651, 656 (2007), *rev'd on other grounds sub nom. Craig ex rel. Craig v. New Hanover Cnty. Bd. of Educ.*, 363 N.C. 334 (2009). Rather, it means "'available, existing, applicable remedy.'" *Id.* (citation omitted). Accordingly, claims under the North Carolina Constitution are limited to when a plaintiff has "no other remedy." *Corum*, 330 N.C. at 783.

As Sharpe has other remedies, his claims under the North Carolina Constitution are dismissed.

<u>CONCLUSION</u>

Accordingly, for the foregoing reasons, Melvin's motion for summary judgment as to plaintiff's amended complaint [DE 254] is GRANTED IN PART and DENIED IN PART; Best's motion for summary judgment as to plaintiff's amended complaint [DE 257] is GRANTED IN PART and DENIED IN PART; Shrock's motion for summary judgment as to plaintiff's amended complaint [DE 260] is GRANTED IN PART and DENIED IN PART; and the City of Greenville's motion for summary judgment as to plaintiff's amended complaint [DE 263] is GRANTED IN PART and DENIED IN PART. Summary judgment in favor of the City of Greenville is entered as to Counts VIII, IX, and X but denied as to Count XII. Summary judgment in favor of Melvin, Best, and Shrock is entered at to Count XI. Counts XIII – XIX of the amended complaint are DISMISSED.

The Court expressly reserves a ruling on qualified and public officer immunity as to Counts I – IX and XII. Once the jury determines the facts through the use of special interrogatories, the Court will make a final decision as to whether the individual defendants are entitled to qualified immunity on plaintiff's § 1983 claims and public officer immunity on plaintiff's remaining state

law claim. Plaintiff's motion for summary judgment on Counts I, II, V, VI, and VII [DE 244] is DENIED.

The motions for summary judgment regarding the first consolidated complaint, [DE 169; DE 179; DE 184; DE 189; DE 194] are DENIED AS MOOT. Melvin's motion to amend/correct appendix [DE 201] does not appear to contain any request for relief and is therefore DENIED. Plaintiff's motion to strike [DE 236] is DENIED AS MOOT.

The clerk is DIRECTED to refer this matter to United States Magistrate Judge Numbers for pretrial conference. A jury trial will commence during the Court's March 2025 term, with a specific date and time to be set by separate notice. The claims against Melvin will remain consolidated with the claims against Best, Shrock, and the City for purposes of the trial. A court-hosted settlement conference prior to trial shall be set upon request of any party.

SO ORDERED, this **10** day of February 2025.

TERRENCE W. BOYLE
UNITED STATES DISTRICT JUDGE

19

## IN THE UNITED STATES DISTRICT COURT
## THE EASTERN DISTRICT OF NORTH CAROLINA
### EASTERN DIVISION
### Lead Case No. 4:21-cv-185-BO
#### *Consolidated with 4:22-cv-88-BO*

MONTOYAE DONTAE SHARPE,

                    Plaintiff,

vs.

DAVID RICKY BEST, JEFFREY D.
SHROCK, CAROLYN MELVIN, and
the CITY OF GREENVILLE, NORTH
CAROLINA,

                    Defendants.

**CAROLYN MELVIN'S
NOTICE OF APPEAL**

NOW COMES Defendant Carolyn Melvin ("Melvin"), by and through her undersigned counsel, and hereby gives notice of appeal to the United States Court of Appeals for the Fourth Circuit regarding the United States District Court's February 11, 2025 Order [D.E. 287] denying in part Melvin's Motion for Summary Judgment. Melvin appeals the denial of her Motion for Summary Judgment as to qualified immunity and public official immunity on the following claims:

1. Count II (42 U.S.C. § 1983 – Knowing and/or Reckless Use of False Evidence)

2. Count III (42 U.S.C. § 1983 – Failure to Intervene)

3. Count IV (42 U.S.C. § 1983 – Malicious Prosecution and Seizure)

4. Count V (42 U.S.C. § 1983 – Failure to Investigate)

5. Count XII (Gross and Reckless Negligence)

J.A. 2791

Respectfully submitted this the 13th day of February, 2025.

POYNER SPRUILL LLP

By:   /s/J. Nicholas Ellis
      J. Nicholas Ellis
      N.C. State Bar No. 13484
      jnellis@poynerspruill.com
      Sydney P. Davis
      N.C. State Bar No. 58038
      sdavis@poynerspruill.com
      Michele L. Livingstone
      N.C. State Bar No. 55131
      mlivingstone@poynerspruill.com
      P.O. Box 353
      Rocky Mount, NC  27802-0353
      Telephone: 252.972.7115

      *Attorneys for Defendant Carolyn Melvin*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies, pursuant to Rule 5 of the Federal Rules of Civil Procedure, the foregoing was electronically filed with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following:

David S. Rudolf
Sonya Pfeiffer
Phillip Lewis
Rudolf Widenouse
225 East Worthington Avenue
Charlotte, NC 28203
*Attorneys for Plaintiff*

Elizabeth A. Martineu
Martineau King, PLLC
P.O. Box 241268
Charlotte, NC 28224
*Attorneys for Defendants City of Greenville,*
*Ricky Best, and Jeffrey Shrock*

Peter Clements, Jr.
Wilson Elser Moskowitz Edelman & Dicker, LLP
227 West Trade Street, 3rd Floor
Charlotte, NC 28202
*Attorneys for Defendants City of Greenville,*
*Ricky Best, and Jeffrey Shrock*

3

This the 13th day of February, 2025.

**POYNER SPRUILL LLP**

By: /s/J. Nicholas Ellis
J. Nicholas Ellis
N.C. State Bar No. 13484
jnellis@poynerspruill.com
Sydney P. Davis
N.C. State Bar No. 58038
sdavis@poynerspruill.com
Michele L. Livingstone
N.C. State Bar No. 55131
mlivingstone@poynerspurill.com
P.O. Box 353
Rocky Mount, NC  27802-0353
Telephone: 252.972.7115

*Attorneys for Defendant Carolyn Melvin*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
### EASTERN DIVISION
#### Lead Case No. 4:21-CV-00185-BO
##### *Consolidated with 4:22-CV-00088-BO*

MONTOYAE DONTAE SHARPE,

        Plaintiff,

vs.

DAVID RICKY BEST, JEFFREY D.
SHROCK, CAROLYN MELVIN, and
the CITY OF GREENVILLE, NORTH
CAROLINA,

        Defendants.

**NOTICE OF APPEAL OF DEFENDANTS
DAVD RICKY BEST AND JEFFREY D.
SHROCK**

  NOW COMES Defendants David Ricky Best and Jeffrey D. Shrock in the above

referenced case and hereby appeal to the United States Court of Appeals for the Fourth Circuit

from an Order dated February 10, 2025, and filed February 11, 2025, denying in part the motions

for summary judgment of David Ricky Best and Jeffrey D. Shrock. Specifically, Defendants Best

and Shrock appeal the Court's conclusions of law, which determined that the rights Plaintiff claims

they violated were clearly established. They also appeal the Court's denial of qualified immunity

and public official immunity. Defendants Best and Shrock have a right to immediate appeal based

on these conclusions of law and immunity. *See Atkinson v. Godfrey*, 100 F. 4th 498, 503 (4th Cir.

2024); *Griggs v. Provident Consumer Disc. Co.*, 459 U.S. 56, 58 (1982).


  Respectfully submitted, this the 13th day of February, 2025.



           /s/ Peter Clements
          Peter Clements

N.C. State Bar No. 57853
Peter.clementsjr@wilsonelser.com
227 West Trade Street # 300
Charlotte, NC 28217
Telephone: (401)688-0306
*Attorneys for Defendants Shrock,*
*Best, and the City of Greenville*

/s/Elizabeth A. Martineau
Elizabeth A. Martineau
(NC Bar No. 26394)
Martineau King PLLC
PO Box 241268
Charlotte, NC 28224
Telephone: (704)247-8524
Fax: (704) 247-8582
emartineau@martineauking.com

J.A. 2796

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies, pursuant to Rule 5 of the Federal Rules of Civil Procedure, the foregoing was electronically filed with the Clerk of Court using the CM/ECF system which will send notification of such filing to all counsel.

This the 13th day of February, 2025.

/s/ Peter Clements
Peter Clements

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION
CONSOLIDATED ACTION

MONTOYAE DONTAE SHARP, )
           Plaintiff, )
           )
v.                       )       No. 4:21-CV-185-BO[1]
           )
           )
DAVID RICKY BEST, *et al.*, )
           Defendants. )

MONTOYAE DONTAE SHARP, )
           Plaintiff, )
           )
v.                       )       No. 4:22-CV-88-BO
           )
CAROLYN MELVIN, )
           Defendant. )

ORDER

By order entered February 11, 2025, the Court granted in part and denied in part defendants' motions for summary judgment and denied plaintiff's motion for summary judgment. [DE 287]. The jury trial is currently set to commence during the Court's March 2025 term. On February 12, 2025, plaintiff filed a request for court-hosted settlement conference. [DE 289]. On February 13, 2025, defendants Carolyn Melvin, Ricky Best, and Jeffrey Shrock noticed interlocutory appeals of the Court's order on summary judgment. [DE 290; DE 291].

On February 14, 2025, defendants filed a corrected motion to continue the pretrial conference and trial, which plaintiff opposed. [DE 297; DE 298]. Defendants also requested that the Court schedule a court-hosted settlement conference after March 13, 2025. On February 18,

---

[1] No. 4:21-CV-185-BO remains the lead case in which all documents shall be filed, pending further order.

J.A. 2798

2025, plaintiff filed a motion to certify the interlocutory appeals as frivolous, which defendant Melvin has opposed. [DE 299; DE 306]. On February 27, 2025, defendants Best, Shrock, and the City of Greenville filed an emergency motion to stay this case pending resolution of the interlocutory appeal. [DE 307]. Plaintiff objects to the emergency motion. *Id*. A pretrial conference was held before Magistrate Judge Numbers on February 28, 2025. On March 5, 2025, plaintiff filed a motion for private mediated settlement conference. [DE 311].

<div align="center">DISCUSSION</div>

First, the motion to certify the interlocutory appeals as frivolous is denied. A frivolous appeal is one in which there is no basis in law or fact, *Nietzke v. Williams*, 490 U.S. 319, 325 (1989), or where it is "both meritless and substantively inappropriate." *Eckert Int'l, Inc. v. Gov't of Sovereign Democratic Republic of Fiji*, 834 F. Supp. 167, 174 (E.D. Va. 1993). That the Court has denied summary judgment on qualified immunity and public officer immunity based upon disputed facts does not render the interlocutory appeals frivolous. Indeed, whether and to what extent there is jurisdiction in the court of appeals to consider the denial of qualified immunity on interlocutory appeal requires the court of appeals to engage in "careful[] review" of the district court's order. *Howard v. Dowdy*, No. 20-2114, 2021 WL 1529288, at *1 (4th Cir. Jan. 27, 2021) (citing *Iko v. Shreve*, 535 F.3d 225, 234 (4th Cir. 2008)). Defendants' interlocutory appeal is not frivolous, and plaintiff's motion [DE 299] is denied.

Second, "the filing of a notice of appeal is an event of jurisdictional significance—it confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal." *Griggs v. Provident Consumer Disc. Co.*, 459 U.S. 56, 58 (1982). Although issues remain for adjudication in this case which are not the subject of the appeal, because the interlocutory appeal concerns qualified and public officer immunity, and the

<div align="center">2</div>

<div align="center">**J.A. 2799**</div>

assertion of immunity is not frivolous, a stay of the underlying proceedings in this Court is appropriate. *Apostol v. Gallion*, 870 F.2d 1335, 1338 (7th Cir. 1989); *see also Stewart v. Donges*, 915 F.2d 572, 576 (10th Cir. 1990). The emergency motion to stay [DE 307] is therefore GRANTED.

As this matter is now stayed, the motions to continue the pretrial conference and trial [DE 293; DE 294; DE 297] are denied as moot. The Court will not order private mediation during the pendency of the stay, and the motion for private mediated settlement conference [DE 311] is also denied as moot.

<div align="center">CONCLUSION</div>

Accordingly, for the foregoing reasons, the emergency motion to stay [DE 307] is GRANTED. This action is hereby STAYED pending resolution of the interlocutory appeal. The trial set for the March 2025 term is TERMINATED. The Clerk is DIRECTED to remove this case from the Court's active docket during the pendency of the appeal. The parties shall jointly notify this Court within ten (10) days of the filing of the Fourth Circuit's mandate of the posture of the case and the issues which remain for adjudication.

The motion to certify the interlocutory appeals as frivolous [DE 299] is DENIED. The motions to continue the pretrial conference and trial [DE 293; DE 294; DE 297] and for private mediated settlement conference [DE 311] are DENIED AS MOOT. In light of the stay, the Court will not schedule a court-hosted settlement conference. The parties remain free mediate without Court intervention.

SO ORDERED, this _____ day of March 2025.

_Terrence Boyle_
TERRENCE W. BOYLE
UNITED STATES DISTRICT JUDGE

<div align="center">3</div>

<div align="center">**J.A. 2800**</div>

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 14, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit by using the CM/ECF system.

I further certify that all participants are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ Peter Clements
Peter Clements